# Exhibit 3

# Redacted pursuant to
# Stipulated Protective Order [ECF 117]

**THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re University of Southern California Tuition and Fees COVID-19 Refund Litigation* | Case No. 2:20-cv-4066-DMG |
| | **Report of Hal J. Singer, Ph.D.** |
| | **December 9, 2022** |

# TABLE OF CONTENTS

INTRODUCTION AND ASSIGNMENT ............................................................................ 3

Summary of Conclusions ........................................................................................ 5

Qualifications ...................................................................................................... 9

I.     Choice-Based Conjoint Analysis Can Be Used to Demonstrate Economic Injury and Assess Aggregate Damages Using Data and Methods Common to the Class ............ 11

       A.     Choice-Based Conjoint Analysis Is a Standard Method Common to the Class ... 11

       B.     CBC Analysis Enjoys Widespread Acceptance in the Education Literature ........ 14

II.    My CBC Analysis Demonstrates Economic Injury to the Class ................................. 15

       A.     Design and Administration of CBC Survey ................................................. 16

       B.     Calculation of Net Reduction in Value ...................................................... 33

       C.     Fair Market Value, Common Impact, and Aggregate Damages Using Traditional CBC Framework ................................................................................ 39

III.   INCORPORATING MORE COMPLEX SUPPLY-SIDE CONSIDERATIONS ............................ 45

       A.     Evaluating Supply-Side Considerations in the Context of Higher Education ...... 46

       B.     Aggregate Damages Using Linear Demand Approximation ............................ 50

CONCLUSION ........................................................................................................ 53

Appendix 1 – Curriculum Vitae ............................................................................... 54

Appendix 2 – Materials Relied Upon ........................................................................ 66

Appendix 3 – Additional Tables and Figures ............................................................. 73

Appendix 4 – Undergraduate CBC Survey ................................................................. 77

Appendix 5 – Graduate CBC Survey ......................................................................... 85

CONFIDENTIAL

-3-

**INTRODUCTION AND ASSIGNMENT**

1.  Plaintiffs[1] in this case are undergraduate and graduate students who enrolled in in-person courses and programs at The University of Southern California ("USC" or "Defendant") for the Spring 2020 semester. Plaintiffs allege that approximately halfway through the Spring 2020 semester, USC transitioned all in-person classes to remote-only formats, ceased providing in-person instruction, and ceased providing access to its campus facilities and in-person resources.[2] Plaintiffs seek to represent a class of similarly situated students, all of whom attended USC's in-person programs and courses and had access to USC's campus facilities and resources for the first half of the Spring 2020 semester, and all of whom were denied those in-person classes and programs and access to campus ("Plaintiffs," the "Class," or "Class Members").[3]

2.  Plaintiffs allege that they and members of the proposed Class entered into a contract with USC that obligated USC to provide in-person instruction and campus access, after Plaintiffs and Class Members had been accepted to USC's in-person programs, enrolled in in-person courses at USC, and paid USC the tuition and fees USC demanded to receive in-person instruction and access to USC's campus resources and facilities.[4] Plaintiffs met their contractual obligations to USC by registering and paying for in-person courses.[5] Plaintiffs allege, however, that USC did not meet its contractual obligations to Plaintiffs and Class Members, thereby breaching the parties' contracts.[6] Plaintiffs further allege that they are entitled to restitution under a quasi-contract theory[7] and, moreover, that Defendant engaged in unfair business practices by retaining their full

---

  1. Injune David Choi, Christina Diaz, Chile Mark Aguiniga Gomez, J. Julia Greenberg, Justin Kerendian, and Latisha Watson.
  2. First Amended Consolidated Class Action Complaint ("*Complaint*") (ECF No. 126) ¶¶6-7.
  3. *Id.* ¶¶12-13, 90.
  4. *Id.* ¶¶100.
  5. *Id.* ¶56, 104.
  6. *Id.* ¶¶102-103.
  7. *Id.* ¶¶ 109-115.

tuition and fee payments despite not providing the instruction and benefits for which those payments were made.[8]

3.      The theory of harm in this matter, as alleged in the *Complaint*, is that Defendant failed to appropriately reimburse or otherwise compensate Class Members upon failing to deliver "their bargained- and paid-for instruction, opportunities, facilities, and services."[9] Plaintiffs' theory is that consumer injury (here, student injury) flows from the difference between what Plaintiffs paid in tuition and mandatory fees (based on USC's promise of in-person instruction and access to campus facilities and in-person amenities and services) and the value of what plaintiffs actually received.[10]

4.      I understand that USC charged the students in this Class both a tuition charge ("Tuition"), as well as various fee charges ("Fees").[11] I use the term "Tuition and Fees" when referring to these Class payments in aggregate.

5.      Counsel for Plaintiffs has asked me to assess whether economic injury and aggregate damages to Class Members flowing from USC's conduct challenged in the *Complaint* (the "Challenged Conduct") can be reliably determined using data and methods common to the Class.

---

8.   *Id.* ¶¶116-122.

9.   *Id.* ¶75.

10.  I understand that Plaintiffs may argue two separate theories for restitution, one under California's Unfair Competition Law and one based on quasi-contract theory. In either case, the same calculations in this report apply. *See In re Vioxx Class Cases,* 180 Cal. App. 4th 116, 131 (2009) ("The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution."); *see also Chowning v. Kohl's Department Stores, Inc.*, 735 Fed. Appx. 924, 925 (9th Cir. 2018) ("The proper calculation of restitution in this case is price paid versus value received. Under California law, where a plaintiff obtains value from the product, the proper measure of restitution is 'the difference between what the plaintiff paid and the value of what the plaintiff received.'" (citation omitted)); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (finding that plaintiff's proposed method for calculating restitution—which focused "on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase" absent defendant's misconduct, was appropriate).

11.  *Id.* ¶¶15, 18, 21, 24, 27, 30, 44, 90.

**SUMMARY OF CONCLUSIONS**

6.      There are two education "products" relevant to this case.[12] One product is a
university education provided through in-person classes and accompanied by access to a university
campus, where students participate in on-campus experiences and use physical campus facilities
and resources in person. For the remainder of the report, I term this bundle of in-person educational
experiences the "On-campus Experience." The other product is a university education provided
exclusively through online classes, videoconferencing, an online learning management system,
and is *not* accompanied by access to in-person campus events, resources, or the use of physical
campus facilities. I term this bundle of online educational experiences the "Online Experience."
The purpose of this report is to quantify the difference in fair market value between the product
that was sold to Class Members (i.e., the On-Campus Experience) and the product actually
received by Class Members (i.e., the Online Experience) following the involuntary "shift" from
the On-campus Experience to the Online Experience during the Spring 2020 semester at USC.

7.      I conclude that economic injury and aggregate damages to the Class can be
demonstrated under the theory of harm in this matter using Choice-Based Conjoint ("CBC")
analysis. In **Part I**, I show that CBC is a common statistical research tool that can be used to
objectively measure the fair market value of a service, i.e., the amount that a willing buyer and
willing seller would both accept. In this case, CBC analysis can model Plaintiff's theory of harm
using Class-wide data and methodologies. In **Part II**, I use a CBC analysis to objectively measure
the difference in fair market value between the On-Campus Experience and the Online Experience,
i.e., the difference between what Plaintiffs paid and the value of what Plaintiffs received. I
calculate that the Online Experience has a fair market value that is 30.4 and 24.1 percent *less* than

---

12.  Although education is arguably a service, the product/service distinction is not important in this matter. I will
use the term "product" to refer to what Class Members purchased with their Spring 2020 Tuition and Fees.

CONFIDENTIAL

the On-Campus Experience for undergraduates and graduate students, respectively. I then calculate aggregate damages to the Class based on Spring 2020 tuition and the proportion of the Spring 2020 semester that was affected by the switch to Online. Damages to the Class (the difference between what Class Members paid and the value of what they received) sum to $76.31 million, composed of $49.24 million in damages to undergraduate Class Members and $27.08 million in damages to graduate Class Members. Finally, in **Part III**, I discuss alternative "supply side" considerations, namely whether the fair market values I calculated based on student demand in Part II should be reduced by hypothetically allowing USC to reduce enrollment in a but-for world.

8.        CBC analyses allow researchers to empirically measure the difference in people's *valuation* of products with different features. (The term *valuation* is sometimes called "part worth," "utility", or "willingness to pay" in conjoint analysis.)[13] One powerful feature of CBC analysis is that it can value not only products, but also *individual product features* in isolation. That is, CBC can ascribe individual dollar valuations to product features that would normally not be priced in isolation. Because of this, CBC analysis is a standard economic approach that has been regularly employed to calculate damages to class members when class members purchase a product that has features that differ from those that were represented by a defendant to a purchaser at the point of

---

13.  *See, e.g.,* Greg Allenby et al., *Calculating Reasonable Royalty Damages Using Conjoint Analysis,* 45(2) AIPLA QUARTERLY JOURNAL 223-254, 241 (2017) [hereafter Allenby] ("[T]he damages expert can then perform a statistical analysis—referred to as conjoint analysis—in which he uses each respondent's choices to determine how much each level of each attribute contributes to the respondent's overall valuation of the product. This contribution is referred to as the 'part-worth' of the attribute level… It should be noted that part-worths are measured in utils; in economic parlance, the term util is a measure of utility or value."). *See also* Lisa Cameron, Michael Cragg, and Daniel McFadden, *The Role of Conjoint Surveys in Reasonable Royalty Cases*, LAW360, 2 (2013) [hereafter McFadden et al. (2013)] ("We can then use these data points about each respondent's choices in a statistical analysis to determine how much each level of each product attribute contributes to customers' overall valuation of the product. This contribution is referred to as the "part-worth" of the attribute level. In the patent infringement context, the part-worths are a key input in the determination of the reasonable royalty. They are typically used to isolate the consumer's willingness to pay (WTP) for the patented level of the attribute."). N. GREGORY MANKIW, PRINCIPLES OF MICROECONOMICS 134 (8th ed. 2018) [hereafter MANKIW] ("A buyer's maximum is called her willingness to pay, and it measures how much that buyer values the good.").

CONFIDENTIAL

purchase (*i.e.*, when a product has undisclosed attributes).[14] In this particular case, it can be used to measure the *difference* in students' valuation between the product as represented (the On-campus Experience) and the product actually received (the Online Experience). Importantly, by sampling from a population of students who *have already selected (or intend to select) an On-campus Experience in real life,* the CBC survey sample can be tailored to simulate the perspective of On-campus students at the time of enrollment for the Spring 2020 semester.

9.      I designed and employed a CBC survey that determined the difference in value (in unitless "utils") between an On-Campus Experience and an Online Experience at USC. I convert this value difference into a dollar percentage by calculating the discount from USC's base Tuition and Fees students would need to receive to be made whole following the shift to the Online Experience from the On-campus Experience (the "required discount"). The required discount can then be translated into the decline in fair market value following the shift. Class Member harm can then be measured using a standard "but-for world" damages model, which assesses the fair market value of what Class Members *would have* paid in Tuition and Fees in a "but-for" world where Class Members were *fully informed of the product* they were purchasing during the Spring 2020 enrollment period.[15] Using this model, I show that in the "but-for" world, all Class Members would have been charged lower Tuition and Fees, and thus are commonly impacted.

10.      I calculate aggregate damages to the Class (the difference between what Class Members paid and the value of what they received) under two methods. *First,* I calculate aggregate

14.  *See, e.g.*, *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018).

15.  Theon van Dijk and Frank Verboven, *Quantification of Damages*, 3 ISSUES IN COMPETITION LAW AND POLICY 2331-2348, 2332 ABA Section of Antitrust Law (2008) ("The concept underlying most economic damages assessments is that of the "but-for" world. [T]he but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

damages using the "traditional CBC framework," which assumes that supply of the product at

issue (enrollment spots at USC) would have remained the same in the but-for world. That is to say:

USC would *not* have reduced enrollment by *kicking out students or accepting fewer new students*

in its programs in the face of a lower valuation by students following a switch to an Online

Experience. In the context of this case, this assumption is reasonable. USC would not avoid

significant expenses by reducing enrollment. As USC's own witness testified, ████████████

████████,[16] meaning individual students at the margin do not impose a significant variable cost

to USC. Even if USC does incur a variable cost per student, and USC could have saved money in

the short term by reducing enrollment while its services were strictly online, USC is a non-profit

institution and its express educational mission does not permit it to engage in short-term profit-

maximization at the expense of its educational one. ████████████████████████

████████████████████████████████████████████████

████████.[17]

---

16. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████. *See also*
Stephen Hoenack et. al., *The Marginal Costs Of Instruction,* 24(4) RESEARCH IN HIGHER EDUCATION 335-417, 409-
410 (1986) ("This study has examined marginal instructional costs, particularly at the graduate level, in a large public
research university. […] An administration is also concerned with ensuring that the costs incurred outside departments
are covered, many of which are fixed over wide ranges of enrollments. These costs [] include libraries, maintenance
of plant and equipment, and administrative overhead[.] The administration thus finds itself funding fixed costs with
revenues that depend on enrollments. [..] [T]he expenses of maintaining core faculties [] do not vary much with
enrollments and the relatively "fixed" costs incurred outside departments.").
17. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

11.     *Second*, although I do not believe it to be necessary or appropriate here, I show how damages can be calculated when accommodating a supply response using a linear demand assumption. This model accounts for the prospect that USC might *reduce its supply of enrollment slots* in response to the decline fair market value. Under this assumption, USC would have reduced enrollment by *kicking out students or accepting fewer new students* following a switch to an Online Experience. Typically, the prospect of reducing supply to counteract lower prices is an economic consideration for private-sector firms selling products with a variable cost, which is not the case here. While I conservatively include this analysis for completeness (in the event USC claims and a factfinder believes that USC would reduce its enrollment in the but-for world), I do not believe it is the appropriate measure of damages in this matter because all available evidence—including USC's direct testimony—shows that the supply of enrollment slots for Spring 2020 would have remain fixed.

12.     I describe my methodologies, evidence, and analyses demonstrating each of my findings in detail below. All of the methodologies, evidence, and analyses I rely upon to reach each of my conclusions are common to the Class as a whole. The opinions in this report reflect my review of evidence, data, and other relevant materials reviewed or analyzed to date. These materials are listed in Appendix 2 to this report. I reserve the right to supplement or amend my opinions should new materials or information become available to me.

### QUALIFICATIONS

13.     I am a Managing Director at Econ One Research, Inc. ("Econ One"), an adjunct professor at the University of Utah College of Social & Behavioral Science where I teach antitrust economics to graduate economic students and serve as executive director of the Utah Project on

Antitrust and Consumer Protection.[18] My testifying experience has focused on antitrust and consumer protection matters, with a special emphasis in assessing common impact in class action litigation.

14.     I am an applied microeconomist with an emphasis on industrial organization and regulation. In an academic capacity, I have published several books and book chapters, spanning a range of industries and topics, and my articles have appeared in dozens of legal and economic journals. My competition-related articles have appeared in multiple American Bar Association (ABA) Antitrust Section journals, and I have been a panelist at several ABA Antitrust events. In a consulting capacity, I have been nominated for antitrust practitioner of the year among economists by the American Antitrust Institute (AAI) for my work in *Tennis Channel v. Comcast*, and AAI named me as co-Honoree in the same category in 2018 for my work in *In Re Lidoderm Antitrust Litigation*.

15.     I have testified as an economic expert in state and federal courts, as well as before regulatory agencies. I also have testified before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on the interplay between antitrust and sector-specific regulation. While I have served as expert for both plaintiffs seeking class certification and defendants opposing class certification, courts have relied on my work in certifying eight classes in antitrust matters,[19] and two classes in consumer

---

18. *See Utah Project on Antitrust and Consumer Protection,* THE UNIVERSITY OF UTAH, *available at* https://utahproject.utah.edu/.

19. *See Meijer, Inc. v. Abbott Laboratories,* No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (Granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.,* 262 F.R.D. 58 (D. Mass. 2008) (Granting Motion to Certify Class); *Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard,* No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) (Granting in Part Motion for Class Certification); *Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (Granting in Part Motion for Class Certification); *In re Delta/AirTran Baggage Fee Antitrust Litig.,* 317 F.R.D. 665 (N.D. Ga. 2016) (Granting Motion to Certify Class); *In re Lidoderm Antitrust Litig.,* No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (Granting Motions for Class Certifications and

protection matters.[20] In addition, with regard to consumer protection matters, I have specific experience and expertise using CBC to evaluate damages based on declines in consumer utility.

16.     My full curriculum vitae appears as Appendix 1 to this report and reflects a full list of the cases in which I have served as a testifying expert since 2014 and a list of publications I have authored in the last ten years.

17.     I have no financial stake in the outcome of this case. Econ One is being compensated for my work in this matter at my standard rate of $885 per hour whether Plaintiffs prevail or not.

## I.   CHOICE-BASED CONJOINT ANALYSIS CAN BE USED TO DEMONSTRATE ECONOMIC INJURY AND ASSESS AGGREGATE DAMAGES USING DATA AND METHODS COMMON TO THE CLASS

18.     In this section, I demonstrate that CBC analysis can be used to calculate economic injury and assess aggregate damages—that is, the excess of what Class Members paid USC over the value of what Class Members received—using data and methods common to all Class Members. The two CBC studies I conduct in this report to evaluate Plaintiffs' theory of harm are consistent with the methodologies described below.[21]

### A.     Choice-Based Conjoint Analysis Is a Standard Method Common to the Class

19.     CBC analyses are a subset of Discrete-Choice Experiments ("DCE"), which are controlled survey-based experiments that objectively measure preferences through a series of

---

Denying *Daubert* Motions); *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781 (announcing the court's intention to grant the Plaintiffs' Motion for Class Certification—as of the time of this report, the court has not issued the written opinion certifying the class in *Zuffa*); *Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal July 28, 2022) (order granting consumer plaintiffs' motion for class certification).

20.   *See In re MacBook Keyboard Litigation,* Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021) (Granting Motion to Certify Class); *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal. Jun. 28, 2022) (Granting Motion For Class Certification and Denying *Daubert* Motions).

21.   CBC analysis can also be used to evaluate other theories of harm that Plaintiffs may pursue at summary judgment and/or trial.

CONFIDENTIAL

"choice tasks".[22] Economists have used CBC analysis for decades to study and to empirically quantify consumer preferences. CBC analysis is grounded in economic modeling techniques pioneered by (among others) Nobel Prize-winning economist Daniel McFadden.[23] The economic modeling frameworks that provide the underpinning for CBC analysis have been widely used by economists to study markets for differentiated consumer products and services, in applications ranging from merger analysis to the competitive effects of introducing new products and services.[24]

20.     Conjoint analysis has been widely adopted by the private sector. As of the early 1980s, one study determined that there were hundreds of commercial applications of conjoint analysis each year.[25] A 2005 study of the conjoint analysis usage estimated that there are tens of thousands of such applications annually.[26] Applied conjoint analysis frequently focuses on products and services marketed to a wide variety of consumers.[27]

21.     CBC can be used to objectively quantify consumer "fair market valuations" of

---

22. A "choice task" asks respondent to select one of multiple alternative options. Typically, respondents choose between multiple products and a "no buy" option. *See, e.g.,* McFadden et al. (2013) at 2 ("Respondents to CBC surveys must typically perform between 12 and 20 "choice tasks," depending on the complexity of the product. In the cola example above, each choice task requires a respondent to choose his preferred alternative from among a "choice set" of four alternative product profiles. Each respondent choice provides a data point for the analysis. Hence, if 400 respondents take the survey and each respondent makes 20 choices, there will be 8,000 data points in the analysis.").

23. *See, e.g.,* Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) MARKETING SCIENCE 275-297 (1986); *see also* McFadden et al. (2013); Paul Green & V. Srinivasan *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice* 54 JOURNAL OF MARKETING 3-19 (1990).

24. *See, e.g.,* Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 RAND JOURNAL OF ECONOMICS (2000); *see also* Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan* 110 (4) JOURNAL OF POLITICAL ECONOMY (2002).

25. Green & Srinivasan, *supra,* at 3, citing Dick Wittnick & Phillippe Cattin, *Commercial Use of Conjoint Analysis: An Update* 53 JOURNAL OF MARKETING 91-96 (1989).

26. BRYAN K. ORME, GETTING STARTED WITH CONJOINT ANALYSIS: STRATEGIES FOR PRICING RESEARCH (2nd ed. Research Publishers 2005).

27. Green & Srinivasan, *supra,* at 3-4 ("Conjoint analysis continues to be popular….The large majority of conjoint studies pertain to consumer goods (59%) and industrial goods (18%)….New product/concept evaluation, repositioning, competitive analysis, pricing, and market segmentation are the principal types of applications."). *See also* VITHALA RAO APPLIED CONJOINT ANALYSIS, 133-136; 229-256. (Springer-Verlag 2014).

product features that are not priced separately.[28] CBC uses survey responses to quantify the

tradeoffs that consumers reveal they are willing to make when selecting among different products

comprised of different combinations of features.[29] The economic models underlying CBC analysis

express the "utility," or unitless value, that a consumer derives from a particular product in terms

of the salient features of that product. In other words, each product is expressed as a bundle of

features, and each feature contributes something to the overall "net utility" that the consumer

derives from the product. By selecting the most-preferred bundle of features among the choices

presented to them—that is, the product that maximizes each survey respondent's net utility—

respondents indirectly reveal the value they derive from individual features.[30] In this way, CBC

enables the researcher to elicit consumers' valuation of an individual dimension of a

multidimensional product. These unitless "util" valuations can then converted into dollar

valuations using a price attribute, and from a dollar valuation into fair market value.[31] I understand

that California courts have recognized conjoint survey analyses as a valid tool to determine cost-

---

28.  A "fair market value" is the value a consumer and a seller would assign a product provided they were both *fully informed* about its characteristics and were free from undue pressure. *See, e.g., Fair Market Value,* LII, CORNELL LAW SCHOOL (accessed Nov. 2022), *available at* https://www.law.cornell.edu/wex/fair_market_value, citing *United States v. Cartwright*, 411 U.S. 546 (May 7, 1973) ("[F]air market value (FMV) is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.").

29.  Conjoint studies sometimes attempt to create "incentive alignment" mechanisms for their respondents by (for example), offering the respondent a positive probability that every stated choice will result in an actual transaction. However, as Professor McFadden has noted, experimental evidence is that people have difficulty understanding, accepting, and acting on the incentives in these mechanisms. Thus, it can be quite difficult in practice to ensure incentive alignment in a CBC, or to determine in the absence of strong incentives whether subjects are responding truthfully. Fortunately, there is also considerable evidence that while it is important to get subjects to pay attention and answer carefully, they are mostly honest in their responses irrespective of the incentives offered or how well they are understood." *See* Moshe Ben-Akiva, Daniel McFadden & Kenneth Train, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis,* 10(1-2) FOUNDATIONS AND TRENDS IN ECONOMETRICS 1–144, 23-24 (2019).

30.  *See, e.g.,* Rao, *supra*, at 16-23.

31.  McFadden et al. (2013). at 2 ("Conceptually, we can illustrate how a respondent's choices can be used to determine WTP using the cola example. Suppose that all features other than price and type of sweetener are fixed, and we observe that the respondent: (1) chooses (patented) artificial sweetener when it costs 25 cents more than cane sugar and (2) chooses cane sugar when artificial sweetener costs 50 cents more. From these results, we can infer that the respondent's WTP for artificial sweetener lies between 50 cents and 25 cents.").

minus-value restitution in class action cases seeking class-wide restitution owed to injured class members.[32]

22.     CBC uses data and methods common to all class members, such as the students proposed as Class Members in this matter. The survey dataset that forms the basis for CBC analysis here is the same for all Class Members. The econometric techniques used to analyze the survey database here are likewise common to the proposed Class. Any data on supply-side factors here would likewise be common to all Class Members.

**B.     CBC Analysis Enjoys Widespread Acceptance in the Education Literature**

23.     Researchers regularly employ CBC analysis and broader DCE methodologies to investigate demand drivers for higher education specifically.[33] Below, I highlight two recent articles that informed the design, administration, and application of my CBC analysis described below: Duncan (2020)[34] and Manley *et al.* (2019).[35]

24.     Duncan (2020) examined the effects of various levels of course delivery and cost attributes on consumers' preferences. The author determined student preferences associated with the following attributes: course delivery, tuition and fees, and federal CARES scholarship support.

---

32.  *See, e.g.*, *Testone v. Barlean's Organic Oils, LLC*, No. 19-CV-169 JLS (BGS), 2021 WL 4438391, at *16-18 (S.D. Cal. Sept. 28, 2021) (granting class certification and approving plaintiffs' use of conjoint analyses to establish the restitutionary amount "necessary to compensate the purchaser for the difference between the product as labeled and the product as received" (internal citation omitted); *see also Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 566–67, 575-76 (N.D. Cal. 2020) (concluding that plaintiffs' conjoint study was "reliable and admissible for purposes of proving classwide damages"); *Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *11-12 (C.D. Cal. July 24, 2014) (proposed conjoint analysis was deemed an appropriate method for damage calculations).

33.  *See* Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19*, 35(3) JOURNAL OF HIGHER EDUCATION MANAGEMENT 35-43 (2020) [hereafter Duncan (2020).; Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) JOURNAL OF EDUCATION FINANCE 232-252 (2019) [hereafter Manley et al. (2019)]; John T. Mann and Shida R. Henneberry, *Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes*, AAEA ANNUAL MEETING (2012); Mikolaj Czajkowski, Tomasz Gajderowicz, Marek Giergiczny, Gabriela Grotkowska, and Urszula Sztandar-Sztanderska, *Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method*, 61 RESEARCH IN HIGHER EDUCATION 510-539 (2020).

34.  *See, e.g.*, Duncan (2020) at 35-43.

35.  *See* Manley et al. (2019) at 232-252.

CONFIDENTIAL

The study's results indicated that "course delivery is the most important criteria and face-to-face instruction is more important than CARES scholarship support and also as important as tuition and fees."[36]

25.     Manley *et al.* (2019) surveyed the preferences of currently enrolled students "in a regional university in the southeastern U.S." regarding their valuation of online classes.[37] Using DCE analysis, the authors found that students expressed a preference for "a traditional face-to-face class over an online class."[38]

26.     Both Duncan (2020) and Manley *et al* (2019) demonstrate that the results derived from a CBC or DCE survey can be applied to broader classes of individuals, as I will with the results of my own CBC methodology in this case.

27.     My CBC analysis and product attribution descriptions are consistent with the survey methodologies described in these studies. My CBC attributes *Class Modality* and *Price per Semester* (described in further detail below) are consistent with the inclusion of the course delivery attribute and the tuition and fees attribute in Duncan (2020). My description of the *Campus Facilities Access* attribute (described below) is likewise consistent with several factors included in Manley *et al.* (2019), including "Less Interaction with instructor" and "Interaction with students."[39] For the foregoing reasons, my methodology is firmly tethered to the academic literature investigating demand for higher education, especially in the context of online learning.

## II.  MY CBC ANALYSIS DEMONSTRATES ECONOMIC INJURY TO THE CLASS

28.     In this section, I describe the two CBC surveys I conducted to quantify the impact of the Challenged Conduct on undergraduates and graduate Class Members. These surveys both

---

36.  Duncan (2020) at 41.
37.  Manley et al. (2019) at 237.
38.  *Id.* at 242.
39.  *Id*. at 241.

CONFIDENTIAL

took place in October 2022. I first describe the design and administration of the CBC survey. I explain how I use the CBC surveys to calculate the difference in each *individual* survey respondent's valuation of an On-campus Experience compared to an Online Experience. I show then how the *individual* differences in valuations among respondents can be aggregated to calculate the *net* difference in value between the On-campus Experience and the Online Experience. I then explain why this net difference in value calculated from the CBC survey is a reliable estimate of Class Members' net reduction in value in the Spring 2020 semester when they received the Online Experience for approximately the half a semester instead of the expected full semester of the On-campus Experience. Finally, I demonstrate how this reduction in value can be translated into fair market value, which can be used to calculate both in the aggregate and on an individual basis, the difference between what Class Members paid and the value of what they actually received.

## A.    Design and Administration of CBC Survey

29.    My surveys contain three distinct modules: The "Screener" module; the "Attributes" module; and the "Conjoint" module. The Screener filters survey respondents to ensure they are in the relevant target population. The Attributes module describes to eligible respondents the product—a "Semester Package"—as well as all of the possible features that compose it. The Conjoint module presents eligible respondents with random combinations of the attributes and elicited several selections to develop each respondent's "utility model," or their individual valuation of the attributes. The Screener and the Attribute modules are reproduced in the Appendix. A sample of the Conjoint module (as each question set is randomly determined) is also included in Appendix.

30.    The first step of my CBC survey design was to define target populations from which to draw undergraduate and graduate representative samples. The Screener module in each survey

filtered out respondents who did not belong to the target population through a series of population-validation questions. Although the promised On-campus Experience and the delivered Online Experiences were the same for both groups, I decided to sample undergraduate and graduates separately because by definition the undergraduate and graduate population cannot overlap. Graduate students must have already completed an undergraduate education to even be eligible for admission. Furthermore, the testing and admission requirements for graduate students and undergraduate students are different (high school GPA and SAT or ACT vs. undergraduate GPA and GMAT/LSAT/MCAT).

31.     Within the undergraduate and graduate populations, the sample was designed to be limited to students who *had already selected (or intend to select) an On-campus Experience in real life.* This means that any respondents who have a revealed preference for an Online Experience from the outset are excluded from the sample. I did this to appropriately simulate the perspective of On-campus students at the beginning of enrollment in Spring 2020, since those students had already revealed that they preferred an On-campus Experience through their enrollment at USC's on-campus programs. In addition to filtering for respondents who have *already* enrolled in an On-campus Experience, I also allowed for respondents who say they *intend* to enroll in an On-campus Experience. This allows me to capture not only experienced students, but also those students who have no first-hand experience—similar to first year students in a program.

32.     For undergraduates in this matter, I targeted eligible individuals who could plausibly attend or have attended USC's in-person, on campus undergraduate program.[40]

---

[40]. I use data from USC's 2019-2020 submission to The Common Data Set (a collaboration data product in higher education supported by the College Board, Peterson's, and U.S. News & World Report, *see* https://commondataset.org/). *See* University of Southern California Common Data Set 2019-2020, *available at* https://oir.usc.edu/wp-content/uploads/2020/07/CDS_2019-2020_FINAL.pdf [hereafter CDS]. I select the 2019-2020 CDS data as it covers the semester (Spring 2020) at issue in this case.

Respondents for this survey were individuals who:

- Have not recently taken a survey regarding online education;

- Reside within the United States;

- Have taken within the past five years, or plan to take within the next two years, undergraduate, in-person, on-campus courses at a college or university;

- Are between the ages of 18 and 30;[41]

- Have an unweighted high school GPA and SAT or ACT score consistent with USC's undergraduate admission criteria.[42]

33.     For graduates in this matter, I targeted eligible individuals who could plausibly

attend or have attended one of USC's in-person, on campus graduate programs. Respondents for

this survey were individuals who:

- Have not recently taken a survey regarding online education;

- Reside within the United States;

- Enrolled within the past five years, or plan to enroll within the next two years, in an in-person, on-campus graduate program at a college or university;

- Are over the age of 18;

- Have an unweighted undergraduate GPA and standardized test scores on graduate admissions tests consistent with USC's graduate admissions criteria.[43]

---

41.  Qualtrics is unable to target respondents under 18 years of age. 97 percent of USC undergraduates are 25 or under. *See* CDS question F1. Five years after 25 equals 30. I therefore use an age range of 18 to 30.

42.  91 percent of all enrolled, degree-seeking, first-time, first-year (freshman) students had a 3.5 or higher high school GPA. CDS question C11. USC accepted students who submitted either the SAT or ACT. 95 percent of students who submitted SAT scores scored 1200 or higher. CDS question C9. USC accepted students who submitted either the SAT or ACT. 97 percent of students who submitted ACT scores scored 24 or higher. CDS question C9.

43.  No graduate program accepted an undergraduate GPA below 3.0. *See What GRE Scores Do You Need for USC?  GRE  Requirements*, PREPSCHOLAR  (accessed  Nov.  2022),  *available  at* https://www.prepscholar.com/gre/blog/usc-gre-scores/. Most graduate programs required either the GRE or GMAT. *FAQs,* OFFICE OF GRADUATE ADMISSION (accessed Nov. 2022), *available at* https://gradadm.usc.edu/faqs/general-faqs/applying-to-usc/#:~:text=While%20most%20USC%20graduate%20programs,ETS%20school%20code%20is%204852.  USC's current 25th percentile GMAT score is 690. *University of Southern California- Marshall School of Business*, PRINCETON  REVIEW  (accessed  Nov.  2022),  *available  at*  https://www.princetonreview.com/business/university-southern-california-marshall-school-business-1011159.  USC's current 25th percentile LSAT score is 163. I round down to 160 to avoid tipping off the survey respondent that 163 may be a breakpoint. *University of Southern California-  Law  School,*  PRINCETON  REVIEW  (accessed  Nov.  2022),  *available  at* https://www.princetonreview.com/law/university-southern-california-law-school-1035762. USC's 2022 average MCAT score was 517. *Average GPA and MCAT Score for Every Medical School (2022),* SHEMMASSIAN CONSULTING (accessed Nov. 2022), *available at* https://www.shemmassianconsulting.com/blog/average-gpa-and-mcat-score-for-every-medical-school. This corresponds to the 94th percentile. I allow students of the 90th percentile and above to enter,

Case 2:20-cv-04066-DMG-PVC   Document 136-4   Filed 03/01/23   Page 20 of 94   Page ID
#:3137
-19-

34.     I phrased these population filters in way to conceal the specific topic of the survey until a respondent qualified.

35.     Having qualified for the survey, respondents were moved to the Attributes Module, where I used language derived from USC's own marketing materials available to undergraduates and graduates in Spring 2020 to describe the university and the attributes the respondent would encounter in the survey. Respondents were first told that the topic of the survey was semester offerings at USC.[44] The language used to describe USC came directly from USC's "About USC" as written on the university website.[45] The survey then explained the CBC product is a "Semester Package." The "Semester Package" includes all of a student's classes for the semester, in addition to different options and prices. Respondents were asked to assume that they were taking courses related to their major (or in the case of graduate students, their program).[46] Respondents were told how the survey would proceed, including that the upcoming module would ask them to "select the semester offerings that you would actually select in real life," or to select the option to purchase none of the offerings.[47] Respondents were then taken through the attributes of the semester offerings available to them, beginning with the characteristics that, per USC's own marketing materials, USC offered its students during the Spring 2020 semester.

36.     Respondents were then introduced to the two key attributes that would appear in

---

which corresponds to a current score of 515. *Summary of MCAT Total and Section Scores,* (accessed Nov. 2022), *available at* https://students-residents.aamc.org/media/13381/download. No graduate program accepted a combined GRE score of less than 297. *See What GRE Scores Do You Need for USC? GRE Requirements*, PREPSCHOLAR (accessed Nov. 2022), *available at* https://www.prepscholar.com/gre/blog/usc-gre-scores/.

44.  Appendix 4, Q12. Appendix 5, Q15.

45.  Graduate specific language was taken from *Office of Graduate Admission,* UNIVERSITY OF SOUTHERN CALIFORNIA (accessed Nov. 2022), *available at* https://gradadm.usc.edu/our-programs/; *Academic Quality, Office of Graduate Admission,* UNIVERSITY OF SOUTHERN CALIFORNIA (accessed Nov. 2022), *available at* https://gradadm.usc.edu/explore/why-usc/academic-quality/.

46.  Appendix 4, Q13-Q15. Appendix 5, Q16 and Q17.

47.  Appendix 4, Q13. Appendix 5, Q16.

CONFIDENTIAL

the conjoint module: (1) Class Modality[48] and (2) Campus Facilities Access.[49] Class Modality and Campus Facilities Access are the two key attributes that, when combined, simulate either an On-campus Experience or an Online Experience in the conjoint. Recall that Plaintiffs allege that USC transitioned all in-person classes to remote-only formats and ceased providing access to its campus facilities, events, and in-person resources.[50] The Class Modality attribute captures the transition of in-person classes to remote-only formats, while the Campus Facilities Access captures the loss of access to USC's campus facilities, events, and in-person resources. Importantly, I make no quality claims regarding Class Modality—that is, I do not describe the "On-campus" modality as superior in any way to the "Online" modality. The survey made no description about the quality of either type of class and focused only on the objective modality of instruction and access to campus facilities criteria.

37.     Respondents were also introduced to two "decoy" attributes to divert attention from the key attributes of interest. The purpose of these decoy attributes is to avoid focusing the respondent's attention solely on the key attributes, which could lead some respondents to respond excessively to the net attractiveness of a particular feature.[51] Accordingly, I added two additional decoy attributes: (3) Tutoring Services,[52] and (4) Career Services and Events.[53] Because respondents are limited in their cognitive ability to choose among a large number of options, CBC researchers generally limit surveys to six or fewer attributes.[54] As shown in TABLE 1 and TABLE 2

---

48.  Appendix 4, Q16. Appendix 5, Q18.
49.  Appendix 4, Q17. Appendix 5, Q19.
50.  *Complaint* at ¶75.
51.  *See*, e.g., Gerald Häubl, Benedict Dellaert & Bas Donkers, *Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search*, 29(3) MKTG. SCI. 438-455, 439 (2010). ("[C]onsumers respond excessively to the attractiveness of the currently inspected product, at the expense of all others ("focalism")[.]").
52.  Appendix 4, Q18. Appendix 5, Q20.
53.  Appendix 4, Q19. Appendix 5, Q21.
54.  To avoid cognitive fatigue among respondents, conjoint researchers typically limit surveys to no more than six attributes, four to five products, and no more than 20 choice tasks. Even so, "other researchers argue that many

below, my surveys contain five attributes inclusive of the decoy attributes.

38.     Finally, respondents were introduced to the final attribute, (5) Semester Cost.[55] The Semester Cost attribute allows me to empirically assign a dollar value to each respondent's individual utilities (explained in the next section). Respondents were informed that this price included all relevant university fees but did not include room and board (which is not at issue in this case). Importantly, respondents were asked to assume that they had the same access to financial aid or scholarships they actually received in real life (or anticipated receiving in the case of a prospective student). This was done to ensure that respondents would view the Tuition and Fee as *charges* in the same way that students did in real life. In that way, a student would internally factor in any financial aid when making their choice.

39.     The full list of attributes presented to the undergraduate and graduate respondents is presented in TABLE 1 and TABLE 2. Aside from minor differences in attribute description, the only difference between the undergraduate and graduate attributes are different Semester Cost levels.

---

more attributes and products can be included, as long as the subjects understand how the attributes affect them[.]" *See* Moshe Ben-Akiva, Daniel McFadden, and Kenneth Train, FOUNDATIONS OF STATED PREFERENCE ELICITATION: CONSUMER BEHAVIOR AND CHOICE-BASED CONJOINT ANALYSIS 23-24 (Now Publishers 2019) [hereafter, McFadden et al. (2019)] at 21. *See also* McFadden et al. (2013) at 2.
   55.  Appendix 4, Q20. Appendix 5, Q22.

CONFIDENTIAL

TABLE 1: UNDERGRADUATE SURVEY CBC ATTRIBUTES

| Feature | Description | Levels |
|---|---|---|
| (1) Class Modality | If classes take place in classrooms on-campus or online via an internet-based learning platform. | On-campus |
| | | Online |
| (2) Campus Facilities Access | If students have access to USC's campus, campus facilities, and in-person events. | Access |
| | | No Access |
| (3) Tutoring Services | If students have access to tutoring through USC's Academic Support Network. | Available |
| | | Not Available |
| (4) Career Services and Events | If students have access to career services and events. | Available |
| | | Not Available |
| (5) Semester Cost (Price for a "Semester Package") | 150% of Base Price | $43,646 |
| | 125% of Base Price | $36,372 |
| | Base Price | $29,098 |
| | 75% of Base Price | $21,823 |
| | 50% of Base Price | $14,549 |

TABLE 2: GRADUATE SURVEY CBC ATTRIBUTES

| Feature | Description | Levels |
|---|---|---|
| (1) Class Modality | If classes take place in classrooms on-campus or online via an internet-based learning platform. | On-campus |
| | | Online |
| (2) Campus Facilities Access | If students have access to USC's campus, campus facilities, and in-person events. | Access |
| | | No Access |
| (3) Tutoring Services | If students have access to tutoring through USC's Academic Support Network. | Available |
| | | Not Available |
| (4) Career Services and Events | If students have access to career services and events. | Available |
| | | Not Available |
| (5) Semester Cost (Price for a "Semester Package") | 150% of Base Price | $48,864 |
| | 125% of Base Price | $40,720 |
| | Base Price | $32,576 |
| | 75% of Base Price | $24,432 |
| | 50% of Base Price | $16,288 |

40.     A brief note on technical terminology: In a CBC survey, a "feature" is a category, which is composed of "levels," or values, that each feature can take. For example, the feature Color may have three levels: Red, Blue, and Green. In a survey design context, the term "attribute" is used to refer to a feature and all of its levels, collectively.[56] In the Attributes Module, I described each attribute to the respondent, meaning that they were informed of a feature (such as Class Modality) as well as all potential levels (such as On-campus or Online) before beginning the Conjoint Module. This allowed respondents to understand the entire array of potential options in the survey. If a respondent did not assert that they understood the attributes described to them, they were disqualified from the survey. The various attributes are described in further detail below.

---

[56] In practice, the terms "feature" and "attribute" may be used synonymously with little loss of clarity. *Step 1: Defining Conjoint Features & Levels,* QUALTRICS (accessed Oct. 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/step-1-defining-conjoint-features-levels/.

CONFIDENTIAL

41.  *Class Modality*: Respondents were told that the semester offerings come in one of two class modalities: On-campus or Online. The Class Modality attribute was described to respondents as follows:

> You will be given the choice of two learning modalities for your classes for the next semester: **On-campus** or **Online**.
>
> **On-campus** classes will take place primarily in classrooms, laboratories, art and dance studios, and performing arts spaces on the 229-acre University Park campus in Los Angeles, CA. In an **On-campus** class, you will attend a live lecture and have the opportunity to meet with your professors and classmates in person.
>
> **Online** classes will be available via an internet-based learning platform and will consist of both asynchronous and synchronous components. For example, you will have access to pre-recorded lectures at any time and you will be required to participate in group discussions or other online activities at specified times over an online video conferencing tool. All communications with faculty, staff, and students would be done through email or video conferencing.

These descriptions were provided to best reflect the choice between the two distinct options that USC students were presented in the real world prior to the Spring 2020 semester. This language did not vary between the undergraduate and graduate surveys. The description of the On-campus learning modality is derived from USC's policy descriptions available to potential students prior to the Spring 2020 semester.[57] The description of the Online learning modality is based on USC's online learning definitions and descriptions, which had been in use since at least June 2015.[58]

---

57.  *About USC,* USC (accessed Nov. 28, 2022), *available at* https://admission.usc.edu/learn/about-usc/; *Campus Life,* USC (accessed Nov. 28, 2022), *available at* https://international.usc.edu/campus-life/; *Teaching at Dornsife, Calculating Contact Hours,* USC (accessed Nov. 28, 2022), *available at* https://dornsife.usc.edu/teaching-in-dornsife/calculating-contact-hours/ (describing "traditional in-person" contact hours).

58.  *See Teaching at Dornsife, Calculating Contact Hours,* USC (accessed Nov. 28, 2022), *available at* https://dornsife.usc.edu/teaching-in-dornsife/calculating-contact-hours/, ("Online Live/Synchronous Activities[:] Contact hours may be met through the use of Zoom or similar video-conferencing tools, which allow faculty to hold live synchronous class meetings and live office hours, as well as organize live discussion groups between students… Online Asynchronous Learning[:] In addition to online activities involving live/synchronous contact or interaction, there are asynchronous activities that can be considered functionally equivalent to contact hours… Required or scheduled communication with faculty [can be done] through email, a discussion forum, the course wall, Voice Thread or a video file."). Similar language can also be found at other colleges at USC, such as *Calculating Contact Hours in Online and Hybrid Classes,* USC ANNENBERG (accessed Nov. 28, 2022), *available at* https://annenberg.usc.edu/faculty-and-staff-resources/calculating-contact-hours-online-and-hybrid-classes; *See also About Us,* USC ONLINE (accessed Nov. 28, 2022), *available at* https://online.usc.edu/about-us/.

CONFIDENTIAL

Again, I made no quality claims regarding Class Modality.

42.    *Campus Facilities Access*: Respondents were told that the semester offerings come in one of two access options—Access or No Access:

> Your semester package may allow you access to **Campus Facilities.**
>
> If you select a semester package with access to **Campus Facilities**, for the next semester you will have full access to USC's state of the art campus facilities, including dining halls, galleries, libraries, athletics facilities, gyms, and more. You will have the opportunity to socialize in various campus buildings, quads, parks, and study areas, as well as the opportunity to be a part of various sports teams and clubs. In addition, you will have access to USC-sponsored events, such as football games, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events.
>
> If you select a semester package with without access to **Campus Facilities**, you will not have access to any of the campus facilities, groups, opportunities, or events described above. If you are taking **On-campus** classes, your access to USC's campus and facilities will be limited to the only the classrooms relevant to your classes

The description of Campus Access was derived from USC's marketing materials that described its campus to prospective students.[59] No Access was described as a negation of the Campus Access option.[60]

43.    *Price per Semester*: Respondents were told that the semester offerings will be priced inclusive of tuition and fees for the semester but would *not* include room and board. Undergraduate respondents were instructed to assume that the prices shown are for a typical semester; these prices were based on USC's 2019-2020 undergraduate On-Campus tuition and fee rates, which correspond with the Tuition and Fee prices USC charged in-person undergraduates

---

59.  *See, e.g., On Campus,* USC (accessed Nov. 28, 2022), *available at* https://visit.usc.edu/on-campus/; *USC Village,* USC (accessed Nov. 28, 2022), *available at* https://village.usc.edu/; *Campus Life,* USC (accessed Nov. 28, 2022), *available at* https://international.usc.edu/campus-life/.

60.  In the case where a Class Modality: On-campus option appear alongside a Campus Facilities Access: No Access option, I included the caveat that respondents would still have access to their On-campus classrooms, but not access to other campus facilities access.

for the Spring 2020 semester.[61] The base price for a semester is equal to $28,628 in tuition plus
$470 in fees, for a total of $29,098.[62] The range of prices shown will vary from 50 percent of base
($14,549) to 150 percent of base ($43,646), in steps of 25 percent, as shown in TABLE 3 below.

TABLE 3: PRICE PER SEMESTER FEATURE LEVELS, UNDERGRADUATE

| Discount/Premium | Price Shown |
| --- | --- |
| 150% | $43,646 |
| 125% | $36,372 |
| **Base Price** | **$29,098** |
| 75% | $21,823 |
| 50% | $14,549 |

Source: CDS 2019-2022

44.    The prices shown to graduate respondents were based on USC's 2019-2020 on-
campus Tuition and Fee rates for each graduate program, corresponding to prices USC charged in-
person graduates for the Spring 2020 semester. The base semester price shown in the conjoint was
the average of four USC graduate programs (general graduate, MBA, Law, and Medicine), whose
average tuition and fees were $29,095.[63] As in the undergraduate survey, the range of prices shown
varied from 50 percent of base ($16,288) to 150 percent of base ($48,864), in steps of 25 percent,
as shown in TABLE 4 below.

---

61.  CDS question G1, showing that undergraduate full-time tuition is $57,256 per year, with full-time mandatory
fees of $939 per year. *See also Tuition and Fees (Estimated), Fall 2019,* USC (accessed Nov. 28, 2022), *available at*
*https://catalogue.usc.edu/content.php?catoid=11&navoid=3681#tuition_(semester),_(estimated).*

62.  Equal to the sum of $57,256 and $939, divided by two. See my workpapers for details.

63.  Specifically, USC's MBA Tuition and Fees cost is $35,710/semester; law is $33,5961/semester; medicine is
$31,902/semester; general graduate programs are $29,098/semester. See workpapers for details. *See also Financial
Aid,* USC MARSHALL (Nov. 28, 2022), *available at*
*https://web.archive.org/web/20191108032249/https://www.marshall.usc.edu/programs/mba-programs/full-time-
mba/admissions/financial-aid; Cost of Attendance,* USC GOULD (accessed Nov. 28, 2022), *available at*
*https://web.archive.org/web/20191108035344/https://gould.usc.edu/academics/degrees/jd/financial-aid/cost/;*
*Investing in Graduate Education,* USC (accessed Nov. 28, 2022), *available at*
*https://web.archive.org/web/20191005054508/https://financialaid.usc.edu/graduates/keck/how-much-wil-my-
education-cost.html; Tuition and Fees (Estimated), Fall 2019,* USC (accessed Nov. 28, 2022), *available at*
*https://catalogue.usc.edu/content.php?catoid=11&navoid=3681#tuition_(semester),_(estimated).*

TABLE 4: PRICE PER SEMESTER FEATURE LEVELS, GRADUATE

| Discount/Premium | Price Shown |
|---|---|
| 150% | $48,864 |
| 125% | $40,720 |
| **Base Price** | **$32,576** |
| 75% | $24,432 |
| 50% | $16,288 |

Source: Average of individual graduate program
tuition and fees. See my workpapers for details.

45.     *Tutoring Services:* Respondents were told that the semester packages could include

access to Tutoring Services. The undergraduate version of this attribute was described as:

> Your semester package may include **Tutoring Services**.

> If you select a semester package with **Tutoring Services**, for the next semester
> you will have access to tutoring through USC's Academic Support Network (The
> Math Center, The Writing Center, The Language Center, American Language
> Institute, Kortschak Center for Learning and Creativity). In addition, you will
> have access to USC's Supplemental Instruction program, which targets
> traditionally difficult courses and provides regularly scheduled, peer-led study
> sessions.

> If you select a semester package without **Tutoring Services**, you will not have
> access to these services.

This language was derived from USC's Academic Support Network.[64] The graduate version

contained additional language relevant to graduate students from USC's Center for Excellence in

Teaching.[65]

46.     *Career Services:* Respondents were told that the semester packages could include

access to Career Services:

> Your semester package may include **Career Services.**

> If you select a semester package with **Career Services,** for the next semester you
> will have access to USC's many career development tools. This includes career

---

64. *Academic Resources,* USC (accessed Nov. 28, 2022), *available at* *https://undergrad.usc.edu/services/resources/.*
65. Appendix 5, Q20. *Vision and Mission,* USC (accessed Nov. 28, 2022), *available at* https://cet.usc.edu/about/vision-mission-and-strategy/.

advising for your major, helping you find internships/jobs, resume/cover letter
help, and more. You will also have access to networking opportunities through
professional associations, the exclusive alumni network, student organizations,
programs and scholarships, and events such as job fairs, networking events,
strategy workshops and mock interview sessions.

If you select a semester package without **Career Services,** you will not have
access to these services or events.

The language and services described above were derived from USC's Career Center.[66]

47.     The Conjoint module then asked respondents to select between semester packages

with randomized combinations of the levels available within each attribute. In this survey, I asked

each respondent to do this ten times.[67] For each choice task, a respondent was asked to select her

preferred alternative from among a "choice set" of alternative semester offerings, with each choice

defined by its attributes. In each choice set, the respondent was asked to select the semester offering

that she would purchase if those were the only options available. Each choice task presented the

respondent with three different semester offerings from which to choose. Importantly, in every

choice set, respondents were given the option not to purchase any of the three semester offerings.

Including such a "no buy" option allows a researcher to identify the willingness-to-pay of the

marginal consumer—that is, the price at which the marginal consumer is indifferent between

purchasing the semester offering and not purchasing it. In standard economic theory, the "marginal

consumer" is the last person willing to enter the market and consume the good at that price, so the

willingness-to-pay of the marginal consumer for a theoretical product represents the market price

for that product. In other words, the marginal consumer sits at the intersection of the supply and

demand curves.

---

66. *Career Center*, UNIVERSITY OF SOUTHERN CALIFORNIA (accessed Nov. 2022), *available at*
https://careers.usc.edu/.
67. CBC survey respondents generally perform at most 30 "choice tasks" within the Conjoint module. *See* Kirk
Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto, *The Number of Choice Tasks and Survey
Satisficing in Conjoint Experiments*, 26 POLITICAL ANALYSIS 112-119 (2018).

48.     I engaged Qualtrics to provide the sample respondents for the survey.[68] Qualtrics
is an industry standard survey platform that has been relied upon by over 16,000 brands and 75
percent of the Fortune 100.[69] Qualtrics is cited in various professional and academic publications.[70]
In addition to providing the platform to design the CBC survey, Qualtrics can be contracted to
source the a source a representative sample from a target population for survey.[71] I instructed
Qualtrics to provide an internet-based sample of U.S. residents over the age of 18 with the relevant
academic qualifications for USC undergraduate and graduate admissions, as described above. As
described, I sampled undergraduates and graduates independently, drawing a sample of at least
500 individuals for each of the graduate and undergraduate groups, which is typically considered
the standard survey sample size threshold for CBC.[72]

49.     To ensure response quality, before fielding the test to all 500 respondents in a
group, I performed "soft-launch" of the survey to a small group of respondents before collecting
the full sample. Doing so allowed me to evaluate the average time it took to complete the test, to
assess if respondents were confused by any of the question language, to identify errors in the
survey logic, and to identify if respondents were being disqualified from the survey at particular

---

68. The conjoint survey was administered by Qualtrics, which regularly conducts such surveys on behalf of
business schools and large corporations. *See Conjoint Analysis Software Tool*, QUALTRICS, *available at*
https://www.qualtrics.com/core-xm/conjoint-analysis/.

69. *The Operating System for XM trusted by over 16,000 brands and 75% of the Fortune 100*, Qualtrics, *available
at* https://www.qualtrics.com/customers/. *See, e.g.*, William G. Zikmund et al., BUSINESS RESEARCH METHODS (with
Qualtrics Printed Access Card) (Cengage Learning 9th ed. 2012).

70. *See, e.g.*, William G. Zikmund et al., BUSINESS RESEARCH METHODS (with Qualtrics Printed Access Card)
(Cengage Learning 9th ed. 2012).

71. *Online Sample*, QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/research-
services/online-sample/. Qualtrics works with partner panel companies to source eligible target population
respondents for these surveys. Qualtrics' sampling method and incentive structure for respondents can be reviewed at
*28 Questions to Help Buyers of Online Samples*, QUALTRICS (accessed Nov. 2022), *available at*
https://www.iup.edu/arl/files/qualtrics/esomar.pdf.

72. Qualtrics provides their own estimate of the number of respondents needed given the number of levels across
all features, the number of choice tasks, and a multiplier. Sawtooth software recommends a 500-user minimum. In
practice, the 500 responded threshold often far exceeds traditional minimum sample size calculations. *See Conjoint
Analysis White Paper*, QUALTRICS (accessed Oct. 2022), *available at* https://www.qualtrics.com/support/conjoint-
project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/#SurveyandSampleSize.

CONFIDENTIAL

validation questions. These "soft-launch" responses were included in the final sample. In addition,

as a part of its standard sample offering, Qualtrics removes low quality or fraudulent responses

from the survey.[73] These include, for example, responses from "bots," "speeders" who rushed

through the survey, or respondents who attempted to take the survey multiple times.[74]

50.      It bears noting that in any survey, some number of respondents may express

preferences counter to initial expectations. For example, there may be some subset of respondents

who express a preference for a higher price, all else equal. The academic literature explains that

some purportedly "irrational" responses are to be expected in real-world surveys. Economists

recognize that real-world survey participants sometimes provide responses that appear to deviate

from the textbook economic model of a rational consumer. Nobel Laureate Daniel McFadden and

his co-authors explain that "[c]onsumer choices from repeated menus in laboratory and market

experiments *often deviate* from strict neoclassical theory."[75] The presence of such responses is

hardly surprising, and does not invalidate my surveys, just as the residuals around a regression line

do not invalidate the underlying relationships among economic variables. The literature cautions

against disregarding seemingly irrational responses from CBC surveys or other Discrete Choice

Experiments ("DCEs") as potentially counterproductive.[76] Doing so "may result in the removal of

---

73. *Response Quality,* QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/support/survey-platform/survey-module/survey-checker/response-quality/.

74. As this process is automatically handled by Qualtrics' staff, Qualtrics did not record or report number of these low-quality responses to me. They are not included in the final survey sample.

75. McFadden et al. (2019) at 37. (emphasis added). *See also* McFadden et al. (2013) at 3 ("Irrational responses occur when a consumer makes a decision that violates one or more of economists' standard assumptions about consumer preferences. For example, a consumer makes an irrational choice if he prefers a good that costs more over the same good that costs less or if he chooses an inferior good over a superior good at the same price. Of course, irrational choices occur in other contexts, and they are a subject of study and debate among economists.").

76. Emily Lancsara and Jordan Louviere, *Deleting 'irrational' responses from discrete choice experiments: a case of investigating or imposing preferences?*, 15 HEALTH ECONOMICS 797–811, 797 (2006) [hereafter Lancsara and Louviere] ("This paper outlines a number of reasons why deleting responses from DCEs may be inappropriate after first reviewing the theory underpinning rationality, highlighting that the importance placed on rationality depends on the approach to consumer theory to which one ascribes. The aim of this paper is not to suggest that all preferences elicited via DCEs are rational. Instead, it is to suggest a number of reasons why it may not be the case that all

valid preferences; induce sample selection bias; and reduce the statistical efficiency and power of the estimated choice models"[77] For that reason, I do not exclude any of the respondents in my surveys for deviating from what we would *a priori* consider strictly rational response patterns.

50.     Summary statistics for both surveys are presented in Appendix 3. Broadly, the results of my surveys indicate that consumers are highly sensitive to the two key attributes, Class Modality and Campus Facilities Access. Respondents on average expressed a preference for an On-Campus Class Modality in both the undergraduate and graduate samples, and overwhelmingly valued having access to Campus Facilities.[78] These results are consistent with a net reduction in value switching from the On-campus Experience to the Online Experience.

51.     The results of the surveys indicate that the population of respondents exhibited utilities consistent with economic expectations. To illustrate, the chart below displays the average net utility with respect to percent discount for the populations of respondents in each survey. In each survey, the population of respondents strictly prefers lower prices to higher prices, as

---

preferences labelled as 'irrational' are indeed so. Hence, deleting responses may result in the removal of valid preferences; induce sample selection bias; and reduce the statistical efficiency and power of the estimated choice models."). *See also* Mandy Ryan, Verity Watson, and Vikki Entwistle, *Rationalising the 'Irrational': A Think Aloud Study of Discrete Choice Experiment Responses,* 18 HEALTH ECONOMICS 321–336 (2009) [hereafter Ryan et al.] ("Following an examination of adherence to the axioms of utility theory, the question is raised of what to do with respondents who fail such tests. Individuals may be dropped from further analysis, or analyse the response data with and without 'irrational' respondents. Lanscar and Louviere (2006) discuss a number of reasons why deleting 'irrational' responses is not appropriate, arguing that removal of such respondents may also result in removal of valid responses. McFadden (1999) stated that to define responses as truly 'irrational', additional information about respondents' perceptions and beliefs (that inform the decision process) as well as attitudes, motives, and preferences is required. When this additional information is considered, apparently 'irrational' responses may be shown to be rational.").

77.  Lancsara and Louviere at 797 ("Results of this nature that might be considered irrational are known to occur in the experimental setting. In many cases, they can reflect a specific behavioral response to the choice scenarios and may in fact be valid; thus, simply discarding them would be inappropriate. Indeed, the attribute non-attendance literature tells us that utility would be unaffected if respondents were simply ignoring certain attributes, so it is likely we are seeing some specific behavior here. Further, the notion of rational consumption in the case of risky health behaviors has been questioned."). *See also* John Buckell & Jody L. Sindelar, *The impact of flavors, health risks, secondhand smoke, and prices on young adults' cigarette and e-cigarette choices: a discrete choice experiment*, 114(8) ADDICTION 1427-35 (2019).

78.  65 percent of undergraduate and 60 percent of graduate respondents expressed a preference for the On-Campus Class Modality. These figures are 94 percent and 91 percent for Campus Facilities Access respectively.

CONFIDENTIAL

expected. Further, the relationship between discount and utility is approximately linear, lending support to my linear demand assumption described in Part III.B below.[79]



FIGURE 1: AVERAGE UTILITY BY DISCOUNT LEVEL

52.    Importantly, all of the results and subsequent calculations of the CBC survey are a reliable estimate of *Class Members' own preferences and valuations*. The CBC was designed to objectively measure the theory of harm in this case by simulating the tradeoffs between an Online Experience and an On-campus Experience for Spring 2020 students. Further, the sample selected for the CBC surveys is representative of the relevant USC undergraduate and graduate populations because only respondents who *actually purchased* an On-campus Experience in real life *and* fit

---

79.  This relationship is consistent with a linear demand curve. A demand curve is a function of both price and quantity; this result informs the price component.

USC's admission criteria were included in the representative sample for both surveys. Moreover, the large sample sizes of each survey ensure that the resulting utilities from the CBC are not driven by chance. The results and subsequent calculations flowing from the CBC survey are therefore a reliable estimate of Class Members' valuation at the time of enrollment for the Spring 2020 semester. [80]

## B.  Calculation of Net Reduction in Value

53.     In this section, I demonstrate how to calculate the net reduction in value switching from On-campus Experience to the Online Experience. I explain how the CBC surveys use "utility scores" to calculate the change in each *individual* survey respondent's valuation resulting from moving from an On-campus Experience to an Online Experience. I then show how the *individual* valuation of each of the respondents can be aggregated to calculate the *marketwide* reduction in value using standard methods. In the following section, I explain why this net reduction in value calculated from the CBC analysis is a reliable estimate of the reduction in fair market value.

54.     Once all responses from the CBC survey are recorded, Qualtrics uses standard statistical methods to calculate each *individual* respondent's "utility" for every level of every feature.[81] That is, based on their responses to the Conjoint module, the CBC analysis calculates how much each respondent values the different feature components, and expresses this value as a utility. Utilities on their own have no direct meaning—they are an index that of a consumer's preferences. Utilities can either be positive or negative. A negative utility is sometimes called a

---

80.  As instructed by Counsel, my CBC and analyses does not measure, discuss, nor assume any difference in the educational quality of the Online and On-campus Experiences.

81.  Qualtrics software uses standard Hierarchical Bayesian Methods to converge on the coefficients that represent the value of each attribute for each individual. Hierarchical Bayesian Methods represent the current standard in CBC analysis. *See Conjoint Analysis White Paper,* QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/.

"disutility."[82] The net utility of a product package is the sum of all of the individual utilities (and disutilities) of its components. When presented with multiple packages (including a "none of these options" package, which also has its own utility scores), the consumer selects the package with the highest net utility.

55.     Unitless utilities can be converted into dollars using the Semester Cost attribute.[83] I can determine the dollar value a respondent places on each utility by looking at the difference in dollars and the difference in utilities between different Semester Cost levels.[84] This allows me to calculate the change in a respondent's valuation *in dollar percentage terms* resulting from the shift from the On-campus Experience to the Online Experience at USC. As explained above, I model the On-campus Experience where *Class Modality* is set to "On-campus," and where *Campus Facilities Access* is set to "Access." I model the Online Experience where *Class Modality* is set to "Online," and where *Campus Facilities Access* is set to "No Access." My CBC analysis reveals that both undergraduate and graduate students are highly sensitive to shifting from an On-campus Experience to an Online Experience. These results are consistent with the literature cited above, which finds that students place more value on face-to-face interaction.[85] I demonstrate this calculation below.

56.     The CBC analysis provides me with each respondent's utility scores for every level

---

82. For example, if a survey respondent tended to avoid Semester Packages that contained an Online Class Modality (unless offset by a positive feature, such as a large discount or access to Tutoring Services), the software would calculate that this individual had a low or negative utility (a disutility) associated with Online classes.

83. Allenby at 242 n. 42 ("Consumer WTP for a particular attribute level is determined by dividing the part-worth of the attribute level (which is measured in utils) by the part-worth of price in order to obtain a part-worth expressed in dollar terms.").

84. McFadden et al. (2013) at 2 ("Conceptually, we can illustrate how a respondent's choices can be used to determine WTP using the cola example. Suppose that all features other than price and type of sweetener are fixed, and we observe that the respondent: (1) chooses (patented) artificial sweetener when it costs 25 cents more than cane sugar and (2) chooses cane sugar when artificial sweetener costs 50 cents more. From these results, we can infer that the respondent's WTP for artificial sweetener lies between 50 cents and 25 cents.").

85. Duncan (2020) at 41 ("[C]ourse delivery is the most important criteria and face-to-face instruction is more important than CARES scholarship support and also as important as tuition and fees."). Manley et al (2019) at 242 ("students expressed a preference for 'a traditional face-to-face class over an online class.'").

of a feature. Using this raw data from the CBC, I first calculate for each respondent their individual

net utility for the On-campus Experience (where *Class Modality* is "On-campus" and *Campus*

*Facilities Access* is "Access") and the Online Experience (where *Class Modality* is set to "Online"

and *Campus Facilities Access* is "No Access"). That is:

$$OnCampus\ Experience\ Net\ Utility = \left(Utility_{On-campus} + Utility_{Campus\ Access}\right)$$

$$Online\ Experience\ Net\ Utility = \left(Utility_{Online} + Utility_{No\ Campus\ Access}\right)$$

The net utility for the On-campus Experience is typically positive, and the net utility for the Online

Experience is typically negative.

57.     I then determine how respondents' net utilities are changed from the shift from an

On-campus Experience to an Online Experience. This "Online Shift Utility Change" is the

*difference* in net utility between the On-campus Experience Net Utility and the Online Experience

Net Utility. That is:

$$Online\ Shift\ Utility\ Change$$

$$= OnCampus\ Experience\ Net\ Utility - Online\ Experience\ Net\ Utility$$

I find, consistent with the prior academic research, that the Online Shift Utility Change is typically

negative, as respondents typically value the On-campus Experience at higher utility values than

they do the Online Experience. This means that respondents are made worse off by the switch from

an On-campus to Online Experience, all else held equal.

58.     The next step is to convert the utility value associated with the Online Shift Utility

Change into a dollar value. I can map utilities to dollars by calculating the "Price Change Utility,"

or the total utility associated with receiving a discount or premium off of the base Semester Cost.

The Price Change Utility is defined as the difference between (1) the utility that the respondent

derives from a semester offering when the Tuition and Fees are discounted or increased by a given

amount, $x$; and (2) the utility she derives from an otherwise identical offering at the base Tuition and Fees. That is:

$$Price\ Change\ Utility_x = Utility_{Price\ Change\ x} - Utility_{Base\ Price}$$

59.     With the Online Shift Utility Change and the Price Change Utility calculated for each respondent, I can then calculate each respondent's "required discount" (expressed in dollar percentage terms) to make them whole following the switch from the On-Campus Experience to the Online Experience. Put differently, this method calculates how much of a price discount in Tuition and Fees a respondent would need to be equally well off from the shift from the On-campus to an Online Experience at USC.

60.     Consider the following example: Assume a respondent $i$ with the following utility scores:

TABLE 5: EXAMPLE INDIVIDUAL UTILITY SCORES

| # | Feature | Levels | Individual i's Utility |
|---|---------|--------|------------------------|
| [1] | Class Modality | On-campus | 0.5 |
| [2] | | Online | -0.5 |
| [3] | Campus Facilities Access | Access | 0.75 |
| [4] | | No Access | -0.75 |
| [5] | Semester Cost | Base Price | 0 |
| [6] | | 75% of Base Price | 2 |
| [7] | | 50% of Base Price | 3.5 |

Given those values, I could calculate On-Campus Experience Net Utility at 1.25 (equal to 0.5 + .75) the Online Experience Net Utility at -1.25 (equal to -0.5 + -.75), and the Online Shift Utility Change at -2.5 (equal to -1.25 – 1.25), as demonstrated below:

TABLE 6: EXAMPLE NET UTILITY SCORE AND SHIFT UTILITY CHANGE CALCULATIONS

| # | Term | Calculation | Utility |
|---|------|-------------|---------|
| [8] | On-Campus Experience Net Utility | [1] + [3] | 1.25 |
| [9] | Online Experience Net Utility | [2] + [4] | -1.25 |
| [10] | Online Shift Utility Change | [9] - [8] | -2.5 |

CONFIDENTIAL

We now know that individual $i$ has a *negative* utility of -2.5 associated with the shift to the Online Experience. The next step is to compare this negative utility to the *positive* utilities associated with receiving a discount, and to find at what point individual $i$ is "made whole"— that is, where her overall utility is back to zero. In this example, a 25 percent discount (75% of Base Price) is not sufficient to compensate the respondent for the disutility she experiences (-2.5 + 2.0 = -0.5, which is < 0). However, a 50 percent discount (50% of Base Price) is more than sufficient to compensate the respondent for the disutility she experiences (-2.5 + 3.5 = 1.0 which is > 0). We can infer that this respondent would require a discount of between 25 percent and 50 percent to compensate her for the disutility resulting from the shift from the On-campus Experience to an Online Experience at USC.[86] A more precise discount can be calculated as the utility-weighted average of 25 percent and 50 percent, calculated using the linear relationship between the two discount levels:

$$y = mx + b$$

where $m$ is the slope and $b$ is the utility at the lower discount level. Here, $m = \frac{1.0-(-0.5)}{50\%-25\%}$ and $b = -0.5$. To find the distance from the lower discount level, $x$, at the point at which the respondent is indifferent, the relevant equation sets her utility $y = 0$, such that:

$$0 = \frac{1-(-0.5)}{50\%-25\%}x - 0.5$$

Solving algebraically for $x$ yields approximately 8.3 percent. Therefore, the required discount for this respondent to be made whole and *accept* the shift from On-campus to Online is 33.3 percent (= 25 percent + 8.3 percent).[87] In other words, this fictional respondent would require the Online

---

86.  McFadden et al. (2013) at 2, discussing that a valuation for an attribute can lie between two price points.

87.  My CBC methodology was designed conservatively to account for respondents who reported a positive utility for the Online Experience in 2022, even though some or all of those students would not have been likely to enroll in On-Campus programs with Campus Access (they would have chosen online classes). Even those students, to the extent they *did* enroll in an On-Campus program with Campus Access suffered harm because market prices are set at the margin. That is, the market price for a product is determined by the most price-sensitive customers on the product's

experience to be 33.3 percent cheaper than the base Tuition and Fees cost to be *indifferent* between an On-campus and the Online Experience.[88] The required discount is thus the change in value resulting from the shift. That is, if a respondent values an On-campus Experience at $100 and an Online Experience at $66.67, the respondent would require a $33.33 discount to be made equally well off if they purchased an On-campus Experience and were then switched to an Online Experience.

61.     Having calculated every respondent's *individual* required discount to be made whole, the final step is to aggregate the *net* required discount and change in valuation for all respondents in the survey. I do this by averaging the required discount across all respondents.[89]

62.     I perform these calculations on the Undergraduate and Graduate surveys. The results show that the average required discount is 30.4 percent for undergraduate respondents and 24.1 percent for graduate respondents. TABLE 7 shows the results of these calculations.

---

demand curve. As long as aggregate demand for USC's educational services decreased when USC switched to the Online Experience, every consumer (even those that individually valued the Online Experience) would have been charged lower Tuition and Fees in the but-for world.

88.  Dr. McFadden explains that by including a "no buy" options (as I did in this survey), the valuation (or WTP) calculation can directly inform the valuation premium (here, a price discount) for specific product features. McFadden et. al. (2013) at 4 ("Defendants have argued that WTP results emerging from the conjoint analysis do not directly address the value of the patents in question. However, it is important to note that different research questions require different information about WTP. [...] f the researcher wants to assess the price premium associated with the infringing feature, then he will need to develop a conjoint survey that assesses the WTP of the marginal consumer — i.e., the consumer who is indifferent between buying and not buying the infringing product. It is the WTP of the marginal consumer that is equivalent to the price premium associated with the infringing level of the attribute; this marginal consumer can be identified by offering respondents a "no buy" option.").

89.  *See* McFadden et. al. (2013) at 4 ("[I]f the researcher seeks qualitative information about how much consumers value the fringing level(s) of the attribute at issue, he can develop a conjoint survey that provides that average or median consumer WTP"). *See also* Allenby at 442. ("Plaintiffs' experts then estimated damages through a calculation that essentially multiplied average consumer WTP"). I cap respondents at the lowest (50 percent of base price) and highest (150 percent of base price) discounts/premiums in the event that they either could not have been made whole with the discount range presented or would have paid greater premiums than reflected in the survey options. These are respondents who have an extreme aversion to the Online Experience, or who indicated they would tolerate a more than 150 percent price increase for the Online Experience.

TABLE 7: CBC RESULTS: REQUIRED DISCOUNT TO MAKE RESPONDENTS WHOLE
SHIFTING FROM THE ON-CAMPUS EXPERIENCE TO THE ONLINE EXPERIENCE

|  | Undergraduates | Graduates |
|---|---|---|
| **Required Discount** (Shift from On-campus/Access to Online/No Access) | 30.4% | 24.1% |

## C. Fair Market Value, Common Impact, and Aggregate Damages Using Traditional CBC Framework

63.     In this section, I demonstrate how the required discount calculated from the CBC—the dollar value of the net reduction in value following the switch—translates into an estimate of the change in fair market value of the Tuition and Fees USC charged Class Members. I then demonstrate that this change in fair market value leads to common impact to the entire Class using a standard "but-for world" damages model. This model assesses what Class Members *would have* paid in Tuition and Fees in a "but-for" world where Class Members were fully informed of the mid-semester switch from an On-campus Experience to an Online Experience.[90] I then calculate aggregate damages to the Class.

64.     Above, I demonstrated how the net reduction in utility associated with the switch from the On-campus Experience to the Online Experience could be translated into a required discount measured in percentage terms. The final step is to calculate how this required discount translates into a reduction in the fair market value of the Tuition and Fees USC charged to each Class Member.

65.     The required discount, calculated from the net change in utility, is simply a quantification of the downward shift in the demand curve for USC's educational product following

---

90. Theon van Dijk and Frank Verboven, *Quantification of Damages*, 3 ISSUES IN COMPETITION LAW AND POLICY 2331-2348, 2332 ABA Section of Antitrust Law (2008) ("The concept underlying most economic damages assessments is that of the "but-for" world. [T]he but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

the shift from On-campus to Online. This represents what USC's demand curve *would* have been

during the enrollment of Spring 2020 in a "but-for" world where students knew, *a priori,* that they

would be purchasing an Online Experience instead of an On-campus Experience.[91] The vertical

distance of the shift is exactly equal to the required discount—30.4 percent for undergraduates and

24.1 percent for graduates—as shown in FIGURE 2 below.

FIGURE 2: ILLUSTRATION OF A DOWNWARD DEMAND SHIFT



66.     Fair market value, or the market price *assuming* all participants have complete

information, occurs at the intersection of the demand curve and the supply curve.[92] The traditional

CBC approach is to assume that the supply curve is fixed (vertical) as shown in FIGURE 3 below.[93]

---

91.  Note this illustration shows the results of a *full* semester Online. I adjust by the *partial* semester that was actually Online in my calculation of damages.

92.  *See, e.g.,* MANKIW at 66 ("[S]upply and demand determine prices in a market economy[.]").

93.  I explain why a fixed supply curve is an appropriate assumption in Part III, and how the fair market value and calculations of damages change if the supply curve is not fixed.

CONFIDENTIAL

FIGURE 3: ILLUSTRATION OF MARKET PRICE GIVEN DOWNWARD DEMAND SHIFT AND FIXED
SUPPLY



Thus, under the traditional CBC approach where the supply curve is fixed, *the shift in the market price, or the change in fair market value, is exactly equal to the required discount.* Moreover, this *reduction in fair market value affects all students by the same percentage,* because USC does not price discriminate and all students within a program are charged the same Tuition and Fees. That is, in the Spring 2020 semester, all students (even the ones who may individually prefer an Online Experience) paid a price represented by the "Market Price, Original Demand" point shown above. However, had all students known at the point of purchase that they would receive the Online Experience instead, the prevailing market price would have been "Market Price, Shifted Demand." Aggregate damages are thus borne by *all* students in the market, regardless of their own individual tolerance for any given price level, because they paid more than the market would have dictated had the market been fully informed.

CONFIDENTIAL

67.     Aggregate damages are calculated using the decline in value between an On-campus Experience and an Online Experience for the affected period across all Class Members. In this analysis, the decline in value experienced by Class Members is equal to the *net* Tuition and Fees price reduction because the supply curve is fixed. Because I calculated the required discount in percentage terms, the percentage reduction in value can be applied regardless of whether the student received financial aid.[94] I base damages on *net* Tuition and Fees (*gross* Tuition and Fees minus the financial aid USC granted to students) because *net* Tuition and Fees USC received from Class Members represents the actual cash transferred from Class Members to USC for the Spring 2020 semester. Any financial aid received by Class Members (including full-ride students) is not included in my analysis of Class Member damages.

68.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████[95]

Whether or not *gross* Tuition and Fees charges are subsidized by any third party is not relevant to this matter. Those subsidies, to the extent they exist, would also exist in the *but-for* world where Class Members knew, *a priori,* that they would be purchasing an Online Experience instead of an On-campus Experience. The existence of subsidies has no effect on students diminution of value, or on the loss of fair market value experienced by Class Members.

69.     I estimate USC's net Tuition and Fees paid by Class Members in Spring 2020

---

94. This is, in part, why I asked responded to consider their answers to the survey in light of the real world scholarships or financial aid they received or anticipated receiving. The tuition and damages calculations in this report are all net of financial aid. Similarly, to the extent USC claims that its Tuition and Fees are in any way subsidized, my use of a percentage reduction in the fair market value means that the post-subsidy price can be adjusted by the same amount.
95. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████

CONFIDENTIAL

Semester in TABLE 8 below using USC's 2020 fiscal year Financial Report.[96] USC's Tuition and

Fees *net* of USC's financial aid or discounts to students was $1.62 billion for the full fiscal year

2020. This figure includes revenue from both On-campus and Online programs, as well as Tuition

and Fees for Fall 2019 and Summer 2020. To estimate only the Tuition and Fees paid by Class

Members (who attended On-campus programs) in Spring 2020, I subtract estimated Tuition and

Fees associated with Fall 2019, Summer 2020, and all Online programs.[97] I estimate Spring 2020

Tuition and Fees for undergraduate Class Members at $346.62 million and graduate Class

Members at $240.17 million—totaling approximately 36 percent of the full FY 2020 Tuition and

Fees.[98] The details of these calculations are available in Appendix 3.

TABLE 8: ESTIMATED SPRING 2020 NET TUITION AND FEES ($MILLIONS)

| Est. Spring 2020 On-Campus Tuition and Fees | Net |
|---|---|
| Undergraduate | **$346.62** |
| Graduate | **$240.17** |

Source: USC FY 2020 Financial Report. Appendix 3.

70.     Aggregate damages to the Class is the product of: (1) net Class Member

expenditures on Tuition and Fees for On-campus learning with Campus Access in the Spring 2020

semester at USC (estimated above); (2) the proportion of the semester during which students

received only Online learning with No Campus Access; and (3) the reduction in Tuition and Fees

required to make students whole, implied by the disutility calculations described above. While I

---

96. *See Financial Report 2020,* UNIVERSITY OF SOUTHERN CALIFORNIA *(accessed Dec. 2022), available at* https://customsitesmedia.usc.edu/wp-content/uploads/sites/25/2021/04/15205453/2020-Annual-Financial-Report.pdf.

97. I assume that of the full FY 2020 Net Tuition and Fees, 45 percent are attributable to Fall 2019, 45 percent to Spring 2020, and 10 percent to Summer 2020. I then decomposed the Spring 2020 Tuition and Fees into Undergraduate and Graduate figures based on the university's reported student full-time-equivalent headcount (https://nces.ed.gov/ipeds/datacenter/facsimileView.aspx?unitid=123961&goToReportId=6&surveyNumber=14&year=2020). Finally, I deduct these figures by the reported percentages of students who took Online Classes only, treating hybrid students as 50 percent On-campus, 50 percent Online. *See* Appendix 3 and my workpapers for details.

98. Should UNC provide precise figures for Class Members payments for Spring 2020, damages can be re-estimated by placing this figure in column [1] of Tables 9 and 10 and following the equations in the first row. Damages to individual Class Members can also be calculated in this way.

establish damages in the aggregate herein, using this same formula on any individual Class
Member would calculate that individual's damages as well. I show this calculation for
undergraduate Class Members in the aggregate in TABLE 9 below. Damages for undergraduate
Class Members are approximately $49.24 million.

TABLE 9: AGGREGATE DAMAGES - UNDERGRADUATE CLASS MEMBERS ($MILLIONS)

| [1] | [2] | [3] = [1] * [2] | [4] | [5] = [3] * [4] |
|---|---|---|---|---|
| Spring 2020 Semester, Tuition and Fees | Portion of Spring 2020 Semester Subject to Online, No Campus Facility Access | Tuition and Fees Subject to Online, No Campus Facility Access | Required Discount | Damages |
| $346.62 | 46.79% | $162 | 30.36% | $49.24 |

I repeat this calculation for graduate Class Members in TABLE 10 below. Damages for graduate
Class Members are $27.08 million.

TABLE 10: AGGREGATE DAMAGES – GRADUATE CLASS MEMBERS ($MILLIONS)

| [1] | [2] | [3] = [1] * [2] | [4] | [5] = [3] * (1 - [4]) |
|---|---|---|---|---|
| Spring 2020 Semester, Tuition and Fees | Portion of Spring 2020 Semester Subject to Online, No Campus Facility Access | Tuition and Fees Subject to Online, No Campus Facility Access | Required Discount | Damages |
| $240.17 | 46.79% | $112.37 | 24.09% | $27.08 |

71.    Thus, total damages for the Class sum to approximately $76.31 million ($49.24
million + $27.08 million). This calculation of aggregate damages is entirely classwide, in the sense
that it does not turn on any individualized inputs. Calculating damages attributable to any
individual Class Member is as simple as inputting such individual's net Tuition and Fees payments
into column 1 and following this same formula.

74.    Importantly, these damage calculations are based on market prices in the but-for
world. Market prices are set by *aggregate* supply and demand. The survey results show that the
vast majority of students prefer the On-Campus Experience. As shown in Appendix 3, 82 percent

of the 525 undergraduate survey respondents expressed a net preference for the On-campus

Experience (all else held equal), while 18 percent expressed a preference for the Online

Experience. These results were similar for graduate students[99] and are consistent with the academic

literature.[100] From the standpoint of calculating damages, however, *everyone* was harmed in the

*same way and to the same extent* because *aggregate* demand for the Online Experience is lower

than *aggregate* demand for the On-campus Experience. Given the aggregate numbers, the but-for

market price for *all* students would have been lower. Students who may have individually preferred

the Online Experience did not escape injury because they still paid more than what the market

price would have been in the but for world.

### III. INCORPORATING MORE COMPLEX SUPPLY-SIDE CONSIDERATIONS

72.      The traditional CBC method described above, without further analysis, is an

approach that has been widely accepted as appropriate to calculate damages in several types of

litigation matters where customers receive products or services that differ from what they had been

promised and expected to receive in exchange for the price they paid.[101] And it warrants repeating

that this traditional approach does not "ignore" the supply side;[102] rather, it assumes that the supply

curve for enrollment slots would have remained constant (vertical) had USC anticipated the decline

in Class Members' Tuition and Fees valuation associated with the shift from the On-campus

---

99.  Approximately 79 percent of the 696 graduate survey respondents expressed a preference for the On-campus Experience, while 21 percent expressed a preference for the Online Experience.

100.  *See, e.g.,* Duncan (2020) at 35, implying that approximately 25 percent of students prefer an On-campus Experience. ("For example, Top Hat's (2020) survey of college students in mid-April of 2020 finds that 78 percent of students do not find online classes engaging and 75 percent miss face-to-face interaction with professors and other students.").

101.  *See, e.g.*, *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018).

102.  The supply side of the market is implicitly incorporated through the attributes and pricing levels shown to respondents, which are based upon actual market prices. Actual market prices reflect the behavior of rivals to USC and the competitive landscape within which USC's pricing models were developed.

CONFIDENTIAL

Experience to the Online Experience. USC did in fact supply a set quantity for enrollment, which
Class Members actually purchased. Thus, as a matter of historical fact, the supply was fixed, Class
Members were harmed on each unit of that constant supply, and the relevant question is by how
much Class Members were harmed for those specific purchases. The traditional CBC approach is
therefore consistent with a consumer-driven theory of harm.

73.     Further, the traditional CBC approach is consistent with my understanding of
Plaintiffs' claims. Because Plaintiffs allege that that USC promised to provide the in-person on-
campus educational offering to *all* USC students enrolled in the Spring 2020 semester for the in-
person education option, USC cannot rewind the clock and attempt to renegotiate that promise  in
a but-for world with only a *smaller subset* of Plaintiffs after realizing the lower net Tuition and
Fee price it would need to offer to make them purchase its Online Experience voluntarily. Put
differently, because the number of Class Members is fixed by USC's promises, it is consistent with
the theory of harm to hold the quantity of enrollment slots fixed in this analysis.

## A.     Evaluating Supply-Side Considerations in the Context of Higher Education

74.     Nevertheless, for completeness, in this section I contemplate the possibility of an
additional supply-side analysis. As a matter of theory, such analyses are relevant in understanding
the behavior of the traditional short-term profit-maximizing firm; that is, a firm with some level
of pricing power that could reduce its supply in the short run in response to a decline in demand.
Theoretically, reducing supply in response to lower prices might be rational for a short-term profit
maximizing firm because reducing supply would help such a firm to avoid incurring variable costs
associated with producing its product. A reduction in supply might also affect the market and exert
upward pressure on prices. Such theoretical principles are unlikely to apply fully in the context of
not-for-profit higher education for three reasons: (1) not-for-profit colleges and universities
maximize "profits" differently than typical for-profit private sector firms; (2) ████████████

CONFIDENTIAL

████████████████████████████████████████████████████████████████

████████████████████████████████ [103]; (3) supply decisions were made and implemented on a broader basis than the single semester under consideration in this matter. Below, I discuss each of these in detail.

75.     Economic literature analyzing enrollment and pricing optimization strategies for institutes of higher education acknowledges that a non-profit college or university faces a different maximization problem than a traditional profit-maximizing firm. Specifically, not-for-profit colleges and universities must incorporate additional factors, including, for example, considerations for a strong athletics program, diversity initiatives, and future earning potential of admittees. In other words, enrollment and pricing decisions are made for reasons other than profit.

76.     Moreover, the academic literature on higher education acknowledges that "universities do not typically cover all their costs through tuition and other fees, and *it is difficult to state what universities are maximizing* or even who is doing the maximizing."[104] The reasoning behind this ambiguity is related to the long-term incentives borne by institutions of higher education. The marginal net revenue generated by an individual student during his or her enrollment is not necessarily the expected total revenue generated by that student; colleges and universities also factor in considerations of, for example, future donative contributions based on the earning potential of each admitted student and his or her experience at the college or university.[105] By extension, universities face incentives to maximize not only their per-semester

---

103.   ████████████████████████████████████████████████████████████

104.   Michael Rothschild and Lawrence J. White, *The Analytics of the Pricing of Higher Education and Other Services in Which the Customers Are Inputs,* 103:3 JOURNAL OF POLITICAL ECONOMY 583-586, 583 (1995) (emphasis added).

105.   Glenn A. Bryan and Thomas W. Whipple, *Tuition Elasticity of the Demand for Higher Education among Current Students,* 66(5) JOURNAL OF HIGHER EDUCATION 560-574, 569 (1995) ("However, the output of the [optimization] model is only one factor in the tuition decision process. Net earnings maximization may not be the major objective of the institution, as nonprofit goals may have higher priority.").

revenues, but also to "maximize 'prestige' by maximizing alumnus success in the long run"[106] In other words, "[i]f the institution maximizes the human capital acquired by each student enrolled in the short run, then enrolling the highest quality student body consistent with the institution's quality reputation and its financial resources can maximize alumni success. Hence, in the short run the institution maximizes the *quality* of each class enrolled."[107]

77.     Given this incentive structure, colleges and universities do not consider short-term profit-maximization the same way that other economic actors do. In fact, if the goal is to maximize long-term revenues, then the optimal enrollment strategy is to set tuition levels to maximize the number of prestige-enhancing students enrolled, subject to capacity constraints, without losing prestige by admitting underqualified students.[108]

78.     This incentive structure—maximizing enrollment while respecting capacity constraints—also follows from the cost structure associated with institutes of higher education. Broadly, economists recognize three distinct cost types faced by all firms, including college and universities. These three cost types are fixed costs, variable costs, and quasi-fixed or stepwise costs. Fixed costs are independent of enrollment and include, for example, maintaining a building, making payments on debt, etc. Variable costs are an increasing function of enrollment and include, for example, software licenses and supplies for food services provided to students. Quasi-fixed or stepwise costs are costs that are fixed for certain enrollment levels and increase in a stepwise manner as enrollment levels reach certain thresholds, for example, an additional instructor must be hired for every 100 additional students enrolled. According to the economic literature on higher

---

106.   Donald I. Bosshardt, Larry Lichtenstein, and Mark P. Zaporowsky, *A Model Of College Tuition Maximization*, 2(1) CONTEMPORARY ISSUES IN EDUCATION RESEARCH 53-70, 54 (2009)[hereafter Bosshardt et al (2009)].
107.   Robert E. Martin, *Tuition Discounting Without Tears*, 23(2) ECONOMICS OF EDUCATION REVIEW 177-189 (2004).
108.   Bosshardt *et al* (2009) at 59.

CONFIDENTIAL

education pricing, "colleges are more likely to vary their net tuition price in order to attain a
relatively *fixed* target enrollment… enrollment targets are likely to be set based on a college's
residential hall capacity, instructional staff size, or available classroom and lab facilities."[109] That
is, enrollment decisions are made with respect to targeting a specific capacity, rather than targeting
a specific tuition level.

79.     Finally, enrollment decisions are made on a long-term basis in at least two
dimensions. ███████████████████████████████████████████████████████
█████████████████.[110] *Second*, to a lesser extent, hiring decisions—both instructional and in
an academic support capacity—were made on at least an academic year basis, with the possible
exception of part-time lecturers.

80.     Taken together, these three factors—(1) universities face incentive structures not
necessarily compatible with traditional short-term profit maximization; (2) fixed costs are
relatively higher than variable costs in the context of higher education and therefore universities
are incentivized to enroll at their capacity constraint; and, (3) enrollment decisions are rarely
limited to a single-semester outlook—imply that supply in the Spring 2020 semester at USC in
terms of enrollment slots was likely fixed. This is corroborated by USC's testimony that USC
███████████████████████████████████████████████████".[111] Therefore,
it is my economic opinion that the relevant supply under consideration is the fixed supply actually
offered to students during that time frame.

---

109.   Ann M. Gansemer-Topf, Peter F. Orazem, and Darin R. Wohlgemuth, *Do Liberal Arts Colleges Maximize Profits?*, 88(1) SOUTHERN ECONOMIC JOURNAL 274-294 (emphasis added).
110.   ██████████████████████████.
111.   ████████████████████████████████████████████

## B.    Aggregate Damages Using Linear Demand Approximation

81.    Despite economic reasoning in support of fixed supply, as described in detail above, as an alternative, an additional supply-side analysis that I will describe in this section allows for the possibility that USC could have reduced supply in the but-for world Tuition and Fees were lower—where Class Members were fully informed of the switch to an Online Experience and thus required a discount on Tuition and Fees. This analysis allows USC to respond to Class Members' lower demand for the education product by reducing the number of enrollment slots available to students. Such a reduction might have allowed USC to incur lower costs in the but-for world where Tuition and Fees were lower, by reducing the total variable costs attributable to students.[112] Again, as a practical economic matter, this is unlikely; it would not be in USC's long-term economic interests to remove students generally, and it would certainly not in in USC's long-term interests to remove students between the Fall 2019 and the Spring 2020 semester as a cost saving measure. Nevertheless, should a factfinder determine it is important to evaluate the impact that a supply reduction would have, this additional supply-side modeling can be added on to the CBC framework developed above.

82.    Elementary economic models show how a decrease in demand in a competitive market leads to a decrease in price, via a movement along the market supply curve.[113] As explained below, standard economics also shows that firms respond to a decrease in demand by lowering their prices. Because the supply-side analysis depends on USC's own-price elasticity of demand, which depends on outside options for buyers, it takes into account the behavior of rival

---

112.    Supply-side analysis holds costs fixed between the but-for and actual worlds. Such costs generally would have been similar whether or not USC had reduced supply.

113.    *See, e.g.*, MANKIW at 80("How an Increase [or Decrease] in Demand Affects the Equilibrium[:] An event that raises [lowers] quantity demanded at any given price shifts the demand curve to the right [left]. The equilibrium price and the equilibrium quantity both rise [fall].").

CONFIDENTIAL

suppliers.[114]

83.     To maximize profits, firms increase the price of their output until the markup of price over marginal cost is equal to the inverse of the own-price elasticity, a tenet of pricing theory sometimes referred to as the Lerner Index.[115] A profit-maximizing firm with pricing power chooses the price of its output—and thus the amount of output to supply—using this inverse elasticity rule, which can be written:

$$\frac{P - C}{P} = \frac{1}{E_D}$$

where $P$ is the price, $C$ is the marginal cost, and $E_D$ is the own-price elasticity of demand, defined as the percentage decrease in quantity demanded generated by a one percent increase in price. When $E_D$ is low, demand is said to be inelastic. The more inelastic is demand, the greater will be the markup of price over cost because consumer demand is less affected by price. As explained below, the inverse-elasticity formula allows one to calculate how a profit-maximizing firm with pricing power would adjust its prices in response to a decrease in demand.

84.     I can use the output of the CBC analysis described in Part II above, combined with the Lerner Index, to calculate the decrease in USC's profit-maximizing price resulting from the shift from the in-person, on-campus USC experience to online, remote-only. Economists commonly employ linear approximations to the demand curve.[116] As demonstrated below, this

---

114.   *See* William Landes & Richard Posner, *Market Power in Antitrust Cases,* 94 HARVARD LAW REVIEW 937, 944-945 (1981) (showing mathematically that a firm's own-price elasticity of demand is a function of the supply elasticity of competing firms).

115.   *Id.*

116.   *See, e.g.,* Jerry Hausman, Serge Moresi & Mark Rainey, *Unilateral Effects of Mergers With General Linear Demand*, 111(2) ECONOMICS LETTERS 119–21, 119 (2011) ("We derive the formula for the unilateral price effects of mergers of two products with linear demand in the general asymmetric situation. The formula uses the same information required to calculate upward pricing pressure in the 2010 Horizontal Merger Guidelines."); Betul Lus & Ana Muriel, *Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models*, 18(1) PRODUCTION AND OPERATIONS MANAGEMENT 95-113, 95 (2009)("We consider two substitutable products and compare two alternative measures of product substitutability for linear demand functions

approach takes USC's price-cost margins into account, without requiring any data on USC's costs. Moreover, it applies to any downward-sloping linear demand curve, regardless of its slope or intercept. Accordingly, I begin with a linear approximation to the demand curve for USC semester offerings. A linear demand curve is written:

$$Q = \alpha - \beta P$$

where $\alpha$ is the intercept of the demand curve, $\beta$ is the slope of the demand curve, $Q$ is the quantity demanded, and $P$ is price.

85.     Recall from Part II above that the survey will yield the required decline in price to compensate consumers for the shift from the in-person USC experience to online. To sell the same quantity it did in the actual world, USC would have to provide this full shift downward in Tuition and Fees.

86.     Faced with this decline in demand, USC's profit-maximizing response in this scenario (again, assuming *arguendo*, contrary to its mission, that USC was singularly focused on maximizing profit in the short term, which as described above is not an appropriate assumption) would be to adjust its price downward, *and* to reduce its supply. After accounting for these supply-side factors, the calculated decline in market price as USC shifted from On Campus programs with Campus Access to Remote programs with No Campus Access would be *one half* the prior amount. This is not a coincidence—it can be shown mathematically that this is a general property of linear demand curves: When the demand curve is linear, the decrease in the profit-maximizing price resulting from a downward vertical shift in the demand curve is equal to one-half of the distance

---

that are commonly used in the literature."); Jerry Hausman, *Sources of Bias and Solutions to Bias in the Consumer Price Index*, 17(1) JOURNAL OF ECONOMIC PERSPECTIVES 23-44 (2003) [hereafter, Hausman (2003)] (using a linear approximation to the demand curve to calculate consumer surplus). More generally, linear approximations are standard in economics. *See, e.g.,* ROBERT S. PINDYCK & DANIEL L. RUBINFELD, ECONOMETRIC MODELS & ECONOMIC FORECASTS 233 (McGraw-Hill, Inc. 3rd ed., 1991) [hereafter, Pindyk & Rubinfeld] ("[A]ny nonlinear function can be expressed as a [linear] Taylor series expansion."). *See also id.* at 510-11.

of the vertical shift. This result holds for any linear demand curve, regardless of its slope or intercept.[117] Thus, pursuant to this alternative method—that I include conservatively even though the method incorrectly assumes colleges and universities approach pricing in a manner similar to sellers in other industries—my calculation of aggregate damages results in aggregate damages of half the amounts found where supply is held constant.

CONCLUSION

87.    For the foregoing reasons, I conclude that economic injury and aggregate damages can be reliably demonstrated using methods and data common the Class under either of the theories for restitution brought by Plaintiffs.

*       *       *

Hal J. Singer, Ph.D.:

Executed on December 9, 2022

---

117.    Note that for a linear demand curve, $P = \alpha/\beta - Q/\beta$. If the intercept of the demand curve, $\alpha$, shifts downward to $\alpha'$, then the downward vertical shift is $\Delta P = [\alpha/\beta - Q/\beta] - [\alpha'/\beta - Q/\beta] = [\alpha - \alpha']/\beta$. The profit-maximizing price for a firm facing a linear demand curve is $PMAX = 0.5[\alpha/\beta + C]$. Therefore, the decrease in the firm's profit-maximizing price resulting from a downward shift in demand is $\Delta PMAX = 0.5[\alpha/\beta + C] - 0.5[\alpha'/\beta + C] = 0.5[\alpha - \alpha']/\beta = 0.5\Delta P$. *See also* Jerry Hausman & Gregory Leonard, *Efficiencies from the Consumer Viewpoint* 7 GEORGE MASON LAW REVIEW 707 (1999) (solving for the pass-through rate when a monopolist faces a linear demand curve).

CONFIDENTIAL

## APPENDIX 1 – CURRICULUM VITAE

**Hal J. Singer**

Econ One Research
Suite 510 805 15th St., N.W.
Washington, D.C. 20005
Phone: 202.312.3065
hsinger@econone.com

**Education**

Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics

B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Positions**

ECON ONE, Washington, D.C.: Managing Director 2018-present.

UNIVERSITY OF UTAH, Salt Lake City, UT: Adjunct Professor August 2022 - present.

**Employment History**

GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018, 2019, 2020, 2021, 2022

ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-2018.

NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.

EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.

CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.

LECG, INC., Washington, D.C.: Senior Economist, 1998-1999.

U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-1998.

CONFIDENTIAL

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT,
Baltimore: Teaching Assistant, 1996-1998.

**Honors**

Honoree, Outstanding Antitrust Litigation Achievement in Economics, American
Antitrust Institute, *In re Lidoderm Antitrust Litigation,* Oct. 9, 2018.

Finalist, Outstanding Antitrust Litigation Achievement in Economics, American
Antitrust Institute, *Tennis Channel v. Comcast*, Dec. 4, 2013.

**Authored Books and Book Chapters**

*Do Municipal Broadband Networks Stimulate or Crowd Out Private Investment?
An Empirical Analysis of Employment Effects*, in THE IMPACT OF THE
INTERNET ON JOBS (Lorenzo Pupillo, ed. Palgrave 2017).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR
TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored
with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in
THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE
REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia
University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in
LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed.,
John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-
Mexico Arbitration on Telecommunications Services*, co- authored with J.
Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip
Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE
INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden
and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should
We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING:
THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf
Dewenter eds., Elsevier Press 2005).

CONFIDENTIAL

## Journal Articles

*The Abuse of Offsets as Procompetitive Justifications: Restoring the Proper Role of Efficiencies After Ohio v. American Express and NCAA v. Alston*, GEORGIA STATE LAW REVIEW (2022), co-authored with Ted Tatos.

*Antitrust Anachronism: The Interracial Wealth Transfer in Collegiate Athletics Under the Consumer Welfare Standard,* ANTITRUST BULLETIN (2021), co-authored with Ted Tatos.

*Competing Approaches to Antitrust: An Application in the Payment Card Industry,* 27(3) GEORGE MASON LAW REVIEW (2020), co-authored with Kevin Caves.

*Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2020), co-authored with Ted Tatos.

*Antitrust Out of Focus: The FTC's Myopic Pursuit of 1-800 Contacts' Trademark Settlements,* ANTITRUST SOURCE (2019), co-authored with Geoff Manne and Josh Wright.

*Countervailing Coordination Rights in the News Sector Are Good for the Public (A Response to Professor Yun),* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2019), co-authored with Sanjukta Paul.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard,* 26 GEORGE MASON LAW REVIEW (2019), co-authored with Kevin Caves.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?,* ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2015), co-authored with Kevin Caves.

CONFIDENTIAL

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

CONFIDENTIAL

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON
TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored
with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59
FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored
with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL
Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301
(2006).

*Uberregulation without Economics: The World Trade Organization's Decision in
the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL
COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory
Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's
"Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored
with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4
TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with
Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL
OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W.
Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF
INSURANCE REGULATION 63 (2003), co- authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF
NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY,
PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A.
Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet
Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-
authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop
Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002),
co-authored with J. Gregory Sidak.

CONFIDENTIAL

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL
ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner
Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-
authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*,
91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND
PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory
Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to
Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON
REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory
Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*,
18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50
HASTINGS LAW REVIEW 1639 (2000), co- authored with J. Gregory Sidak
and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND
FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

**Expert Testimony Since 2012**

Federal Trade Commission v. Meta Platforms Inc., et al, Case No. 5:22-cv-04325-
EJD (N.D. Cal.)

In Re: Broiler Chicken Growing Antitrust Litigation (No. II), Case No. 6:20-MD-
02977-RJS-CMR (E.D. Ok).

Fusion Elite All Stars et al v. Varsity Brands, LLC et al, Case No. 2:20-CV-03390
(SHL-tmp) (W.D. Tenn.)

In Re: Pork Antitrust Litigation, Case No. 0:18-cv-01776 (JRT-HB) (D. Minn.)

(Im)Balance of Power: How Market Concentration Affects Worker Compensation
and Consumer Prices (U.S. House  Committee on Economic Disparity and
Fairness in Growth)

In re Google Play Consumer Antitrust Litigation, Case No. 3:20-cv-05761-JD

(N.D. Cal)

Reviving Competition, Part 1: Proposals to Address Gatekeeper Power and Lower Barriers to Entry Online (U.S. House of Representatives Subcommittee on Antitrust)

Breaking the News – Journalism, Competition, and the Effects of Market Power on a Free Press (U.S. Senate Subcommittee on Competition Policy)

In Re: London Silver Fixing, Ltd. Antitrust Litigation, Case No. 1:14-md-02573-VEC (S.D. N.Y.)

In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, Case No. 19-md-02913-WHO (N.D. Ca.)

Paul Weidman et. al v. Ford Motor Company, Case No. 18-cv-12719 (E.D. Mich.)

Leinani Deslandes et al v. McDonald's USA, LLC, Case No. 17-cv-04857 (N.D. IL)

In Re: Macbook Keyboard Litigation, Case No.: 5:18-cv-02813-EJD (N.D. Ca.)

Estate of Beverly Berland v. Lavastone Capital LLC, Case No. 1:18-cv-02002-CFC (D. Del.)

Donald Conrad et al. v. Jimmy John's Franchise LLC, et al., No. 3:18-cv-00133-NJR (S.D. Ill.)

Zydus Pharmaceuticals Inc. and Cadila Healthcare Limited v. Takeda Pharmaceutical Company Limited et al., No. 18-01994 (FLW)(TJB) (D. N.J.)

In Re GSE Bonds Antitrust Litigation, No. 1:19-cv-01704-JSR (S.D. N.Y.)

beIN Sports, LLC v. Comcast Cable Communications, LLC, File No. CSR-8972-P (FCC)

Chelsea Jensen, et al. v. Samsung Electronics et al., Court File No. T-809-18 (Federal Court in Canada)

Estate of Phyllis Malkin v. Wells Fargo Bank, N.A., No. 17-cv-23136 (S.D. Fl.)

In Re Capacitors Antitrust Litigation, Master File No. 3:14-cv-03264-JD (N.D. Ca.)

In re Foreign Exchange Benchmark Rates Antitrust Litigation, Case No. 1:13-cv-

07789-LGS (S.D. N.Y.)

Massachusetts Technology Park Corporation v. Axia Netmedia Corporation, KCST USA, Inc., No. 01-17-0004-3049 (American Arbitration Association)

Cung Le et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, Case No.: 2:15-cv-01045-RFB-(PAL) (D. Nev.)

The Ohio State University v. New Par D/B/A Verizon Wireless, Case No. 2:15-cv-2866 (S.D. Oh.)

Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds Company, Case No. 17-cv-318 (W.D. Wis.)

Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al. Case No. 14CECG03039 MBS (Cal. Fresno)

In re Lidoderm Antitrust Litigation, MDL Dkt. No. 14-md-02521-WHO (N.D. Cal.)

Maxon Hyundai Mazda et al. v. Carfax Inc., Case No. CV 2680 (AJN) (RLE) (S.D. N.Y.)

Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice, et al., Case No. 2014-cv-254012 (Ga. Super.)

In re MyFord Touch Consumer Litigation, Case No. 13-cv-3072-EMC (N.D. Cal.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association, Case No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association and Larry Bryan, Case No. 14-CIV-62610-BLOOM/VALLE (S.D. Fla.)

In the Matter of Flat Wireless, LLC, for and on behalf of its Operating Subsidiaries, v. Cellco Partnership d/b/a Verizon Wireless, and its Operating Subsidiaries, File No. EB-15-MD-005 (Federal Communications Commission)

Omni Healthcare et al. v. Health First Inc. et al, Case No. 6:13-CV-01509-RBD-DAB (M.D. Fla.)

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.)

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-0001-6315 (Am. Arbitration Ass'n)

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.)

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board)

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission)

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Cal.)

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fla.)

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Cal.)

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission)

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission)

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation)

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association)

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. N.Y.)

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada)

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fla.)

CONFIDENTIAL

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce)

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.)

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.)

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fla.)

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee)

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.)

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission)

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc., Case No. 2:06-cv-02768-MSG (E.D. Pa.)

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.)

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

CONFIDENTIAL

Telecommunications Policy

CONFIDENTIAL

APPENDIX 2 – MATERIALS RELIED UPON

**Depositions**
Deposition of Gregory Condell (Oct. 28, 2022)

**Legal Documents**

*Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 566–67, 575-76 (N.D. Cal. 2020)

*Chowning v. Kohl's Department Stores, Inc.*, 735 Fed. Appx. 924, 925 (9th Cir. 2018)

*Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018)

*Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal July 28, 2022)

*Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *11-12 (C.D. Cal. July 24, 2014)

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018)

*In re Delta/AirTran Baggage Fee Antitrust Litig.,* 317 F.R.D. 665 (N.D. Ga. 2016)

*In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal. Jun. 28, 2022)

*In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)

*In re MacBook Keyboard Litigation,* Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021)

*In re Vioxx Class Cases,* 180 Cal. App. 4th 116, 131 (2009)

*Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009)

*Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008)

*Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012)

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008)

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015)

*Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008)

*Testone v. Barlean's Organic Oils, LLC*, No. 19-CV-169 JLS (BGS), 2021 WL 4438391 *, at *16-18 (S.D. Cal. Sept. 28, 2021)*

*United States v. Cartwright*, 411 U.S. 546 (May 7, 1973)

**Literature**

Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan* 110 (4) Journal of Political Economy (2002)

Ann M. Gansemer-Topf, Peter F. Orazem, and Darin R. Wohlgemuth, *Do Liberal Arts Colleges Maximize Profits?,* 88(1) SOUTHERN ECONOMIC JOURNAL

Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 Rand Journal of Economics (2000)

Betul Lus & Ana Muriel, *Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models,* 18(1) PRODUCTION AND OPERATIONS MANAGEMENT (2009)

Bryan K. Orme, *Getting Started with Conjoint Analysis: Strategies for Pricing Research* (2nd ed. Research Publishers 2005)

Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) Marketing science (1986)

Dick Wittnick & Phillippe Cattin, *Commercial Use of Conjoint Analysis: An Update* 53 Journal of Marketing (1989)

Donald I. Bosshardt, Larry Lichtenstein, and Mark P. Zaporowsky, *A Model Of College Tuition Maximization,* 2(1) CONTEMPORARY ISSUES IN EDUCATION RESEARCH (2009)

Emily Lancsara and Jordan Louviere, *Deleting 'irrational' responses from discrete choice experiments: a case of investigating or imposing preferences?,* 15 HEALTH ECONOMICS (2006)

Gerald Häubl, Benedict Dellaert & Bas Donkers, *Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search,* 29(3) MKTG. SCI. (2010)

CONFIDENTIAL

Glenn A. Bryan and Thomas W. Whipple, *Tuition Elasticity of the Demand for Higher Education among Current Students,* 66(5) JOURNAL OF HIGHER EDUCATION (1995)

Greg Allenby et al., *Calculating Reasonable Royalty Damages Using Conjoint Analysis,* 45(2) AIPLA Quarterly Journal (2017)

Jerry Hausman & Gregory Leonard, *Efficiencies from the Consumer Viewpoint* 7 GEORGE MASON LAW REVIEW 707 (1999)

Jerry Hausman, Serge Moresi & Mark Rainey, *Unilateral Effects of Mergers With General Linear Demand,* 111(2) ECONOMICS LETTERS (2011)

Jerry Hausman, *Sources of Bias and Solutions to Bias in the Consumer Price Index,* 17(1) JOURNAL OF ECONOMIC PERSPECTIVES 23-44 (2003)

John Buckell & Jody L. Sindelar, *The impact of flavors, health risks, secondhand smoke, and prices on young adults' cigarette and e-cigarette choices: a discrete choice experiment,* 114(8) ADDICTION (2019)

John T. Mann and Shida R. Henneberry, *Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes*, AAEA Annual Meeting (2012)

Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) Journal of Education Finance (2019)

Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19,* 35(3) Journal of Higher Education Management (2020)

Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto, *The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments,* 26 POLITICAL ANALYSIS (2018)

Lisa Cameron, Michael Cragg, and Daniel McFadden, *The Role of Conjoint Surveys in Reasonable Royalty Cases*, Law360, 2 (2013)

Mandy Ryan, Verity Watson, and Vikki Entwistle, *Rationalising the 'Irrational': A Think Aloud Study of Discrete Choice Experiment Responses,* 18 HEALTH ECONOMICS (2009)

Michael Rothschild and Lawrence J. White, *The Analytics of the Pricing of Higher Education and Other Services in Which the Customers Are Inputs,* 103:3 JOURNAL OF POLITICAL ECONOMY (1995)

Mikolaj Czajkowski, Tomasz Gajderowicz, Marek Giergiczny, Gabriela Grotkowska, and Urszula Sztandar-Sztanderska, *Choosing the Future: Economic Preferences for Higher*

CONFIDENTIAL

*Education Using Discrete Choice Experiment Method*, 61 Research in Higher Education (2020)

Moshe Ben-Akiva, Daniel McFadden & Kenneth Train, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis,* 10(1-2) Foundations and Trends in Econometrics (2019)

N. Gregory Mankiw, Principles of Microeconomics (8th ed. 2018)

Paul Green & V. Srinivasan *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice* 54 Journal of Marketing (1990)

Robert E. Martin, *Tuition Discounting Without Tears,* 23(2) ECONOMICS OF EDUCATION REVIEW (2004)

ROBERT S. PINDYCK & DANIEL L. RUBINFELD, *ECONOMETRIC MODELS & ECONOMIC FORECASTS* (McGraw-Hill, Inc. 3rd ed., 1991)

Stephen Hoenack et. al., *The Marginal Costs Of Instruction,* 24(4) Research in Higher Education (1986)

Theon van Dijk and Frank Verboven, *Quantification of Damages,* 3 ISSUES IN COMPETITION LAW AND POLICY ABA Section of Antitrust Law (2008)

Vithala Rao, *Applied Conjoint Analysis,* (Springer-Verlag 2014)

William G. Zikmund et al., *BUSINESS RESEARCH METHODS* (with Qualtrics Printed Access Card) (Cengage Learning 9th ed. 2012)

William Landes & Richard Posner, *Market Power in Antitrust Cases,* 94 HARVARD LAW REVIEW (1981)

**Publicly Available**

*28 Questions to Help Buyers of Online Samples,* QUALTRICS (accessed Nov. 2022), *available at* https://www.iup.edu/arl/files/qualtrics/esomar.pdf

*About Us,* USC Online (accessed Nov. 28, 2022), *available at https://online.usc.edu/about-us/*

*About USC,* USC (accessed Nov. 28, 2022), *available at* https://admission.usc.edu/learn/about-usc/

*Academic Quality, Office of Graduate Admission,* UNIVERSITY OF SOUTHERN CALIFORNIA (accessed Nov. 2022), *available at* https://gradadm.usc.edu/explore/why-usc/academic-quality/.

CONFIDENTIAL

*Academic Resources,* USC (accessed Nov. 28, 2022), *available at*
https://undergrad.usc.edu/services/resources/

*Average GPA and MCAT Score for Every Medical School (2022),* Shemmassian Consulting
(accessed Nov. 2022), *available at at https://www.shemmassianconsulting.com/blog/average-
gpa-and-mcat-score-for-every-medical-school*

*Calculating Contact Hours in Online and Hybrid Classes,* USC Annenberg (accessed Nov. 28,
2022), *available at https://annenberg.usc.edu/faculty-and-staff-resources/calculating-contact-
hours-online-and-hybrid-classes*

*Campus Life,* USC (accessed Nov. 28, 2022), *available at*
https://international.usc.edu/campus-life/

*Career Center,* UNIVERSITY OF SOUTHERN CALIFORNIA (accessed Nov. 2022),
*available at* https://careers.usc.edu/

*Common Data Set Initiative*, Common Dataset(accessed Dec. 2022), *available at*
https://commondataset.org/

*Conjoint Analysis Software Tool,* QUALTRICS, *available at* https://www.qualtrics.com/core-
xm/conjoint-analysis/

*Conjoint Analysis White Paper,* QUALTRICS (accessed Nov. 2022), *available at*
https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-
choice-based/conjoint-analysis-white-paper/

*Conjoint Analysis White Paper,* QUALTRICS (accessed Oct. 2022), *available at*
https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-
choice-based/conjoint-analysis-white-paper/#SurveyandSampleSize

*Cost of Attendance,* USC GOULD (accessed Nov. 28, 2022), *available at*
https://web.archive.org/web/20191108035344/https://gould.usc.edu/academics/degrees/jd/fina
ncial-aid/cost/

*Fair Market Value,* LII, Cornell Law School (accessed Nov. 2022), *available at
https://www.law.cornell.edu/wex/fair_market_value*

*FAQs,* Office of Graduate Admission (accessed Nov. 2022), *available at
https://gradadm.usc.edu/faqs/general-faqs/applying-to-
usc/#:~:text=While%20most%20USC%20graduate%20programs,ETS%20school%20code%2
0is%204852*

CONFIDENTIAL

*Financial Aid,* USC MARSHALL (Nov. 28, 2022), *available at* https://web.archive.org/web/20191108032249/https://www.marshall.usc.edu/programs/mba-programs/full-time-mba/admissions/financial-aid

*Financial Report 2020,* UNIVERSITY OF SOUTHERN CALIFORNIA (accessed Dec. 2022), *available at* https://customsitesmedia.usc.edu/wp-content/uploads/sites/25/2021/04/15205453/2020-Annual-Financial-Report.pdf

*Investing in Graduate Education,* USC (accessed Nov. 28, 2022), *available at* https://web.archive.org/web/20191005054508/https://financialaid.usc.edu/graduates/keck/how-much-wil-my-education-cost.html

Office of Graduate Admission, UNIVERSITY OF SOUTHERN CALIFORNIA (accessed Nov. 2022), available at https://gradadm.usc.edu/our-programs/

*On Campus,* USC (accessed Nov. 28, 2022), *available at* https://visit.usc.edu/on-campus/

*Online Sample,* QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/research-services/online-sample/

*Response Quality,* QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/support/survey-platform/survey-module/survey-checker/response-quality/

*Step 1: Defining Conjoint Features & Levels,* QUALTRICS (accessed Oct. 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/step-1-defining-conjoint-features-levels/

*Summary of MCAT Total and Section Scores,* (accessed Nov. 2022), *available at https://students-residents.aamc.org/media/13381/download*

*Teaching at Dornsife, Calculating Contact Hours,* USC (accessed Nov. 28, 2022), *available at https://dornsife.usc.edu/teaching-in-dornsife/calculating-contact-hours/*

*Tuition and Fees (Estimated), Fall 2019,* USC (accessed Nov. 28, 2022), *available at* https://catalogue.usc.edu/content.php?catoid=11&navoid=3681#tuition_(semester),_(estimate d)

*University of Southern California Common Data Set 2019-2020, available at* https://oir.usc.edu/wp-content/uploads/2020/07/CDS_2019-2020_FINAL.pdf

*University of Southern California- Law School,* Princeton Review (accessed Nov. 2022), *available at https://www.princetonreview.com/law/university-southern-california-law-school-1035762*

CONFIDENTIAL

*University of Southern California- Marshall School of Business*, Princeton Review (accessed Nov. 2022), *available at https://www.princetonreview.com/business/university-southern-california-marshall-school-business-1011159*

*USC Village,* USC (accessed Nov. 28, 2022), *available at* https://village.usc.edu/

*Utah Project on Antitrust and Consumer Protection,* The University of Utah*, available at* https://utahproject.utah.edu/

*Vision and Mission,* USC (accessed Nov. 28, 2022), *available at* https://cet.usc.edu/about/vision-mission-and-strategy/

*What GRE Scores Do You Need for USC? GRE Requirements*, PrepScholar (accessed Nov. 2022), *available at https://www.prepscholar.com/gre/blog/usc-gre-scores/*

**Trial Materials**
 First Amended Consolidated Class Action Complaint (ECF No. 126)

CONFIDENTIAL

-73-

## APPENDIX 3 – ADDITIONAL TABLES AND FIGURES

### TABLE 11: SUMMARY SURVEY RESULTS

|  | Undergraduates | | Graduates | |
|---|---|---|---|---|
|  | Count | Percent | Count | Percent |
| Survey Respondents | 525 | 100% | 696 | 100% |
| Modality: On-Campus Preference | 341 | 65% | 419 | 60% |
| Facilities: Access Preference | 491 | 94% | 635 | 91% |
| *Net On-Campus & Access Preference* | 430 | 82% | 552 | 79% |
| Career Service Preference | 476 | 91% | 629 | 90% |
| Tutor Services Preference | 497 | 95% | 594 | 85% |

|  | Count | Percent | Count | Percent |
|---|---|---|---|---|
| Max Discount Required | 328 | 62% | 447 | 64% |
| Min Discount Required | 43 | 8% | 110 | 16% |

### TABLE 12: ESTIMATED SPRING 2020 TUITION AND FEE CALCULATIONS ($MILLIONS)

|  | FY 2020 Net Tuition and Fees | Value |
|---|---|---|
| [1] | Undergraduate + Graduate | $1,620.7 |
|  | **Spring 2020 Tuition and Fee Split** | **Value** |
| [2] | Undergraduate + Graduate | 45% |
|  | **Est. Spring 2020 Tuition and Fees** | **Value** |
| [3] = [1] * [2] | Undergraduate + Graduate | $729.3 |
|  | **FY 2020 Student FTE** | **Value** |
| [4] | Undergraduate | 21,992 |
| [5] | Graduate | 21,505 |
| [6] = [4] + [5] | Undergraduate + Graduate | 43,497 |
|  | **Est. Spring 2020 Tuition and Fees** | **Value** |
| [7] = [3] * ([4]/[6]) | Undergraduate | $368.75 |
| [8] = [3] * ([5]/[6]) | Graduate | $360.58 |
|  | **Percentage of Students On Campus** | **Value** |
| [9] | Undergraduate | 94.0% |
| [10] | Graduate | 66.6% |
|  | **Est. Spring 2020 On Campus Tuition and Fees** | **Value** |
| [11] = [7] * [9] | Undergraduate | $346.62 |
| [12] = [8] * [10] | Graduate | $240.17 |

CONFIDENTIAL

TABLE 13: SURVEY DEMOGRAPHICS - GPA

| GPA | Undergraduate | Graduate |
|---|---|---|
| 3.00 - 3.24 | n/a | 8.5% |
| 3.25 - 3.49 | n/a | 13.4% |
| 3.50 - 3.74 | 37.3% | 36.1% |
| 3.75 - 4.00 | 62.7% | 42.1% |

Note: Undergraduate N = 525, Graduate N = 696

TABLE 14: SURVEY DEMOGRAPHICS – AGE

| Age | Undergraduate | Graduate |
|---|---|---|
| Median | 25 | 25 |
| Average | 24.6 | 24.8 |
| Max | 30 | 40 |
| Min | 18 | 18 |

Note: Undergraduate N = 525, Graduate N = 696

TABLE 15: SURVEY DEMOGRAPHICS – GENDER

| Gender | Undergraduate | Graduate |
|---|---|---|
| Male | 23.6% | 41.8% |
| Female | 73.1% | 56.9% |
| Non-binary / third gender | 3.2% | 0.6% |
| Prefer not to say | 0.0% | 0.4% |
| Prefer to self-describe | 0.0% | 0.3% |

Note: Undergraduate N = 525, Graduate N = 696

TABLE 16: SURVEY DEMOGRAPHICS – RACE

| Race | Undergraduate | Graduate |
|---|---|---|
| White | 71.6% | 55.3% |
| Black or African American | 13.9% | 26.0% |
| American Indian or Alaska Native | 2.2% | 2.3% |
| Asian | 7.8% | 8.4% |
| Native Hawaiian or Pacific Islander | 1.1% | 1.2% |
| Other | 3.4% | 6.8% |

Note: Undergraduate N = 525, Graduate N = 696

TABLE 17: SURVEY DEMOGRAPHICS – ETHNICITY

| Ethnicity | Undergraduate | Graduate |
|---|---|---|
| Hispanic | 15.8% | 23.6% |
| Non-Hispanic | 84.2% | 76.4% |

Note: Undergraduate N = 525, Graduate N = 696

CONFIDENTIAL

TABLE 18: SURVEY DEMOGRAPHICS – GRADUATE DEGREE PROGRAM

| Graduate Degree Program | Graduate | Graduate |
|---|---|---|
| Master of Business Administration (MBA) | 30.3% | 211 |
| Other Graduate Degree (MS, MA, PhD, any other "Master") | 34.2% | 238 |
| Medical Degree (MSN, DNP, or RN) | 14.2% | 99 |
| Law Degree (JD, LLM, or SJD) | 11.1% | 77 |
| Medical Degree (MD or DO) | 10.2% | 71 |

Note: Undergraduate N = 525, Graduate N = 696

CONFIDENTIAL

TABLE 19: SURVEY DEMOGRAPHICS – STATE OF RESIDENCE

| State | Undergraduates | Percent | | State | Graduates | Percent |
|---|---|---|---|---|---|---|
| California | 60 | 11.4% | | California | 85 | 12.2% |
| Texas | 41 | 7.8% | | New York | 71 | 10.2% |
| New York | 40 | 7.6% | | Texas | 58 | 8.3% |
| Florida | 36 | 6.9% | | Florida | 57 | 8.2% |
| Georgia | 25 | 4.8% | | Georgia | 34 | 4.9% |
| Illinois | 21 | 4.0% | | Illinois | 31 | 4.5% |
| Pennsylvania | 21 | 4.0% | | Virginia | 25 | 3.6% |
| Ohio | 20 | 3.8% | | Ohio | 24 | 3.4% |
| Michigan | 17 | 3.2% | | Pennsylvania | 23 | 3.3% |
| New Jersey | 17 | 3.2% | | New Jersey | 23 | 3.3% |
| North Carolina | 16 | 3.0% | | Michigan | 20 | 2.9% |
| Arizona | 14 | 2.7% | | North Carolina | 20 | 2.9% |
| Massachusetts | 12 | 2.3% | | Alabama | 15 | 2.2% |
| Virginia | 12 | 2.3% | | Arizona | 14 | 2.0% |
| Indiana | 12 | 2.3% | | Washington | 13 | 1.9% |
| Utah | 12 | 2.3% | | Louisiana | 13 | 1.9% |
| Washington | 11 | 2.1% | | South Carolina | 13 | 1.9% |
| Maryland | 11 | 2.1% | | Colorado | 12 | 1.7% |
| South Carolina | 11 | 2.1% | | Tennessee | 11 | 1.6% |
| Alabama | 9 | 1.7% | | Connecticut | 11 | 1.6% |
| Oklahoma | 9 | 1.7% | | Massachusetts | 10 | 1.4% |
| Tennessee | 8 | 1.5% | | Maryland | 9 | 1.3% |
| Louisiana | 8 | 1.5% | | Iowa | 8 | 1.1% |
| Missouri | 7 | 1.3% | | Wisconsin | 8 | 1.1% |
| Connecticut | 7 | 1.3% | | Kentucky | 8 | 1.1% |
| Colorado | 6 | 1.1% | | Delaware | 7 | 1.0% |
| Arkansas | 6 | 1.1% | | Utah | 7 | 1.0% |
| Wisconsin | 5 | 1.0% | | Nevada | 7 | 1.0% |
| Kansas | 4 | 0.8% | | Minnesota | 6 | 0.9% |
| Delaware | 4 | 0.8% | | Kansas | 6 | 0.9% |
| | | | | District of Columbia | 6 | 0.9% |
| Minnesota | 4 | 0.8% | | Arkansas | 5 | 0.7% |
| Iowa | 4 | 0.8% | | Missouri | 5 | 0.7% |
| Kentucky | 4 | 0.8% | | Oklahoma | 4 | 0.6% |
| West Virginia | 3 | 0.6% | | Indiana | 4 | 0.6% |
| Idaho | 3 | 0.6% | | Rhode Island | 4 | 0.6% |
| Mississippi | 3 | 0.6% | | Oregon | 4 | 0.6% |
| Nebraska | 3 | 0.6% | | Mississippi | 3 | 0.4% |
| Nevada | 2 | 0.4% | | Montana | 2 | 0.3% |
| New Mexico | 2 | 0.4% | | Nebraska | 2 | 0.3% |
| Montana | 2 | 0.4% | | Idaho | 2 | 0.3% |
| Maine | 2 | 0.4% | | Vermont | 2 | 0.3% |
| North Dakota | 2 | 0.4% | | West Virginia | 1 | 0.1% |
| Wyoming | 2 | 0.4% | | | | |
| District of Columbia | 2 | 0.4% | | New Hampshire | 1 | 0.1% |
| Hawaii | 2 | 0.4% | | Hawaii | 1 | 0.1% |
| Alaska | 1 | 0.2% | | New Mexico | 1 | 0.1% |
| South Dakota | 1 | 0.2% | | **TOTAL** | **696** | **100%** |
| Oregon | 1 | 0.2% | | | | |
| **TOTAL** | **525** | **100%** | | | | |

**APPENDIX 4 – UNDERGRADUATE CBC SURVEY**

Q1 Have you taken any surveys in the last 30 days on these topics? (Select all that apply.)

☐ Clothing

☐ Advertisements on TV

☐ Video Games

☐ Online Education

☐ Cosmetics

☐ Other Category

☐ I have not taken any surveys

Q2 In which state do you currently reside?

▼ Alabama (1) ... I do not reside in the United States (53)

Q3 Have you taken any **undergraduate** courses **on a college campus** within the past five years OR do you plan to take any **undergraduate** courses **on a college campus** within the next two years?

○ Yes, I have taken or plan to take undergraduate courses on a college campus

○ No, I have NOT taken nor plan to take undergraduate courses on a college campus

Q4 What is your age?

_____

Q5 How do you describe yourself?

○ Male

○ Female

○ Non-binary / third gender

○ Prefer to self-describe    _____

○ Prefer not to say

CONFIDENTIAL

Q6 Please choose one or more races that you consider yourself to be:

☐     White

☐     Black or African American

☐     American Indian or Alaska Native

☐     Asian

☐     Native Hawaiian or Pacific Islander

☐     Other _____

Q7 Are you of Hispanic or Latino origin?

○ Yes

○ No

Q8 To the best of your recollection, what is your current unweighted **high school GPA** or what was your **unweighted high school GPA** upon graduation?

○ 0.00 - 0.99

○ 1.00 - 2.99

○ 3.00 - 3.24

○ 3.25 - 3.49

○ 3.50 - 3.74

○ 3.75 - 4.00

○ None of the above

CONFIDENTIAL

Q9 To the best of your recollection, what was your composite score (400-1600) on the **SAT standardized test**?

○ 400 - 599

○ 600 - 999

○ 1000 - 1199

○ 1200 - 1399

○ 1400 - 1499

○ 1500 - 1600

○ I did not take the SAT standardized test

Q10 To the best of your recollection, what was your composite score (1-36) on the ACT standardized test?

○ 1 - 20

○ 21 - 23

○ 24 - 28

○ 29 - 33

○ 33 - 36

○ I did not take the ACT standardized test

Q11 You have been selected to participate in our survey about course offerings at the **University of Southern California (USC)**.

To participate in this survey, you must agree to answer the questions by yourself and without asking for help from anyone else. Answer the questions with your honest answers and opinions.  We ask that you complete the survey in one sitting and without stopping in the middle.

Do you agree to these instructions?

○ Yes, I agree

○ No, I don't agree

Q12 *More about USC:*
The **University of Southern California (USC)** is one of the world's leading private research universities. An anchor institution in Los Angeles, a global center for arts, technology and

international business, USC's diverse curricular offerings provide extensive opportunities for interdisciplinary study and collaboration with leading researchers in highly advanced learning environments.

In its comprehensive 2022 ranking, The Wall Street Journal and Times Higher Education ranked USC 19th among more than 1,000 public and private universities. Among all California institutions — public and private — only USC, Caltech and Stanford University ranked within the top 20.

This year, USC received more than 71,000 applicants for its fall freshman class, with an acceptance rate of 12.5 percent. The number of students who are the first in their families to attend USC has been growing steadily for five years — 23 percent of the incoming class are first-generation college students, and 32 percent of the Class of 2025 are students of color. With one of the most abundant financial aid pools in the country, USC provides more than $640 million in scholarships and aid.

Located in the heart of Los Angeles, USC's University Park campus is part of the city's Downtown Arts and Education Corridor and is home to the USC Dana and David Dornsife College of Letters, Arts and Sciences and many professional schools.

○ I understand

○ I DO NOT understand

Q13 For the remainder of this survey, please assume you are considering **enrolling at USC for an upcoming undergraduate semester.**

You will be shown a set of three **semester "packages,"** which, in addition to your classes for the semester, will come with different options and prices. After carefully considering the options available to you, **please select the semester package that you would actually purchase in real life.** If you would not select any of the packages shown to you, please select the fourth option ("I would not select any of the semester packages shown here").

The survey will ask you to make this decision ten times.

○ I understand

○ I DO NOT understand

Q14 First, please indicate your actual undergraduate major, or your intended major if you plan to take undergraduate courses.

_____

CONFIDENTIAL

Q15 Each **semester package** you will pick from will come with a combination of options which will affect your university experience for the semester. These options will be explained in a moment. Please assume that in this semester you are taking courses related to your major or general education requirements.

○ I understand

○ I DO NOT understand

Q16 You will be given the choice of two learning modalities for your classes for the next semester: **On-campus** or **Online**.

**On-campus** classes will take place primarily in classrooms, laboratories, art and dance studios, and performing arts spaces on the 229-acre University Park campus in Los Angeles, CA. In an **On-campus** class, you will attend a live lecture and have the opportunity to meet with your professors and classmates in person.

**Online** classes will be available via an internet-based learning platform and will consist of both asynchronous and synchronous components. For example, you will have access to pre-recorded lectures at any time and you will be required to participate in group discussions or other online activities at specified times over an online video conferencing tool. All communications with faculty, staff, and students would be done through email or video conferencing.

○ I understand

○ I DO NOT understand

Q17 Your semester package may allow you access to **Campus Facilities.**

If you select a semester package with access to **Campus Facilities**, for the next semester you will have full access to USC's state of the art campus facilities, including dining halls, galleries, libraries, athletics facilities, gyms, and more. You will have the opportunity to socialize in various campus buildings, quads, parks, and study areas, as well as the opportunity to be a part of various sports teams and clubs. In addition, you will have access to USC-sponsored events, such as football games, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events.

If you select a semester package with without access to **Campus Facilities**, you will not have access to any of the campus facilities, groups, opportunities, or events described above. If you

are taking **On-campus** classes, your access to USC's campus and facilities will be limited to the only the classrooms relevant to your classes

○ I understand

○ I DO NOT understand

Q18 Your semester package may include **Tutoring Services**.

If you select a semester package with **Tutoring Services**, for the next semester you will have access to tutoring through USC's Academic Support Network (The Math Center, The Writing Center, The Language Center, American Language Institute, Kortschak Center for Learning and Creativity). In addition, you will have access to USC's Supplemental Instruction program, which targets traditionally difficult courses and provides regularly scheduled, peer-led study sessions.

If you select a semester package without **Tutoring Services**, you will not have access to these services.

○ I understand

○ I DO NOT understand

Q19 Your semester package may include **Career Services.**

If you select a semester package with **Career Services,** for the next semester you will have access to USC's many career development tools. This includes career advising for your major, helping you find internships/jobs, resume/cover letter help, and more. You will also have access to networking opportunities through professional associations, the exclusive alumni network, student organizations, programs and scholarships, and events such as job fairs, networking events, strategy workshops and mock interview sessions.

If you select a semester package without **Career Services,** you will not have access to these services or events.

○ I understand

○ I DO NOT understand

Q20 Finally, each **semester package** comes with a price. This is the price for all options of the **semester package** as well as all classes for the semester**.** (To graduate, you must complete eight semesters in total.)

Note that this price includes all other university fees but does **not** include room and board.

CONFIDENTIAL

If you received (or anticipate receiving) financial aid or scholarships for your undergraduate education, please assume that it is available to you when making your selection.

○ I understand

○ I DO NOT understand

Conjoint Module (Illustrative Examples):
(1/10) Choose your preferred option below:

|  | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | Online | On-campus | On-campus | |
| Campus Facilities Access | No Access | No Access | Access | I would not select any of the semester offerings shown here |
| Tutoring Services | Available | Available | Not Available | |
| Career Services and Events | Available | Not Available | Available | |
| Semester Cost | $29098.00 | $14549.00 | $36372.00 | |
| | ○ | ○ | ○ | ○ |

(2/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | Online | On-campus | Online | |
| Campus Facilities Access | No Access | Access | Access | I would not select any of the semester offerings shown here |
| Tutoring Services | Available | Available | Not Available | |
| Career Services and Events | Available | Available | Not Available | |
| Semester Cost | $36372.00 | $14549.00 | $14549.00 | |
| | ○ | ○ | ○ | ○ |

(3/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | Online | On-campus | On-campus | |
| Campus Facilities Access | Access | No Access | Access | I would not select any of the semester offerings shown here |
| Tutoring Services | Available | Not Available | Available | |
| Career Services and Events | Available | Available | Available | |
| Semester Cost | $43646.00 | $29098.00 | $29098.00 | |
| | ○ | ○ | ○ | ○ |

CONFIDENTIAL

### APPENDIX 5 – GRADUATE CBC SURVEY

Q1
Have you taken any surveys in the last 30 days on these topics? (Select all that apply.)

☐     Clothing

☐     Advertisements on TV

☐     Video Games

☐     Online Education

☐     Cosmetics

☐     Other Category

☐     I have not taken any surveys

Q2 In which state do you currently reside?

▼ Alabama (1) ... I do not reside in the United States (53)

Q3
Have you enrolled in any **graduate level** programs that took place **on a college or university campus** within the past five years OR do you plan to enroll in any **graduate level** programs that will take place **on a college or university campus** within the next two years?

○ Yes, I have or plan to enroll in a graduate program on a college campus

○ No, I have NOT nor plan to enroll in a graduate program on a college campus

Q4 What is your age?

_____

CONFIDENTIAL

Q5 How do you describe yourself?

    ○ Male

    ○ Female

    ○ Non-binary / third gender

    ○ Prefer to self-describe  _____

    ○ Prefer not to say

Q6 Please choose one or more races that you consider yourself to be:

    ☐    White

    ☐    Black or African American

    ☐    American Indian or Alaska Native

    ☐    Asian

    ☐    Native Hawaiian or Pacific Islander

    ☐    Other  _____

Q7 Are you of Hispanic or Latino origin?

○ Yes

○ No

Q8 To the best of your recollection, what is your current unweighted **undergraduate GPA or** what was your **unweighted undergraduate  GPA** upon graduation?

○ 0.00 - 0.99

○ 1.00 - 2.99

○ 3.00 - 3.24

○ 3.25 - 3.49

○ 3.50 - 3.74

○ 3.75 - 4.00

○ None of the above

Q9 Please indicate the type of graduate degree program you enrolled in or plan to enroll in.

○ Master of Business Administration (MBA)

○ Law Degree (JD, LLM, or SJD)

○ Medical Degree (MD or DO)

○ Medical Degree (MSN, DNP, or RN)

○ Other Graduate Degree (MS, MA, PhD, any other "Master")

○ None of the above

Q10 To the best of your recollection, what was your total score (200–800) on the **GMAT**?

○ 200 - 599

○ 600 - 649

CONFIDENTIAL

○ 650 - 689

○ 690 - 749

○ 750 - 779

○ 780 - 800

○ I did not take the GMAT

Q11 To the best of your recollection, what was your score (120–180) on the LSAT?

○ 120 - 149

○ 150 - 159

○ 160 - 169

○ 170 - 174

○ 175 - 180

○ I did not take the LSAT

Q12 To the best of your recollection, what was your composite score (472–528) on the MCAT exam?

○ 472 - 499

○ 500 - 514

○ 515 - 519

○ 520 - 528

○ I did not take the MCAT exam

Q13 To the best of your recollection, what was your **combined** verbal reasoning score (130–170) and quantative reasoning score (130–170) on the GRE standardized test?

○ 260 - 279

○ 280 - 299

○ 300 - 319

○ 320 - 340

○ I did not take the GRE standardized test

Q14
You have been selected to participate in our survey about course offerings at the **University of Southern California (USC)**.

To participate in this survey, you must agree to answer the questions by yourself and without asking for help from anyone else. Answer the questions with your honest answers and opinions.  We ask that you complete the survey in one sitting and without stopping in the middle.

Do you agree to these instructions?

○ Yes, I agree

○ No, I don't agree

Q15

*More about USC:*
The **University of Southern California (USC)** is one of the world's leading private research universities. An anchor institution in Los Angeles, a global center for arts, technology and international business, USC's diverse curricular offerings provide extensive opportunities for collaboration with leading researchers in highly advanced learning environments.

 Graduate and professional studies at the University of Southern California prepare students for leadership positions in research, education and professional practice. Students can choose from a wide array of master's, PhD, dual-degree and graduate certificate programs in our distinguished liberal arts college or 20 professional schools.

USC has established itself as one of the top private research universities in the United States. USC's prestigious post-baccalaureate programs foster intellectual discovery and professional growth, and continue to graduate world leaders across all professions and fields of study. USC's interdisciplinary approach encourages our students to synthesize knowledge across fields of study to gain new insights and surpass boundaries, thus preparing them for leadership positions in research, education and professional practice. In its comprehensive 2022 ranking, US News and World Report ranked USC 25th out of 443 national universities.

 Located in the heart of Los Angeles, USC's University Park campus is part of the city's

Downtown Arts and Education Corridor and is home to the USC Dana and David Dornsife
College of Letters, Arts and Sciences and many professional schools.

○ I understand

○ I DO NOT understand

Q16
For the remainder of this survey, please assume you are considering **enrolling at USC for an
upcoming graduate semester.**

You will be shown a set of three **semester "packages,"** which, in addition to your classes for the
semester, will come with different options and prices. After carefully considering the options
available to you, **please select the semester package that you would actually purchase in real
life.** If you would not select any of the packages shown to you, please select the fourth option ("I
would not select any of the semester packages shown here").

The survey will ask you to make this decision ten times.

○ I understand

○ I DO NOT understand

Q17 Each **semester package** you will pick from will come with a combination of options which
will affect your university experience for the semester. These options will be explained in a
moment. Please assume that in this semester you are taking courses related to your degree or
general education requirements.

○ I understand

○ I DO NOT understand

Q18 You will be given the choice of two learning modalities for your classes for the next
semester: **On-campus** or **Online**.

**On-campus** classes will take place primarily in classrooms, laboratories, art and dance studios,
and performing arts spaces on the 229-acre University Park campus in Los Angeles, CA. In an
**On-campus** class, you will attend a live lecture and have the opportunity to meet with your
professors and classmates in person.

**Online** classes will be available via an internet-based learning platform and will consist of both
asynchronous and synchronous components. For example, you will have access to pre-recorded
lectures at any time and you will be required to participate in group discussions or other online

activities at specified times over an online video conferencing tool. All communications with faculty, staff, and students would be done through email or video conferencing.

○ I understand

○ I DO NOT understand

Q19 Your semester package may allow you access to **Campus Facilities.**

If you select a semester package with access to **Campus Facilities**, for the next semester you will have full access to USC's state of the art campus facilities, including dining halls, galleries, libraries, athletics facilities, gyms, and more. You will have the opportunity to socialize in various campus buildings, quads, parks, and study areas, as well as the opportunity to be a part of various sports teams and clubs. In addition, you will have access to USC-sponsored events, such as football games, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events.

If you select a semester package with without access to **Campus Facilities**, you will not have access to any of the campus facilities, groups, opportunities, or events described above. If you are taking **On-campus** classes, your access to USC's campus and facilities will be limited to the only the classrooms relevant to your classes

○ I understand

○ I DO NOT understand

Q20 Your semester package may include **Tutoring Services**.

If you select a semester package with **Tutoring Services**, for the next semester you will have access to program specific tutoring services through USC's Academic Support Network. In addition, if your program requires teaching or assistantships, you will have access to USC's Center for Excellence in Teaching which will offer you training opportunities that are customized to your discipline's unique teaching needs.

If you select a semester package without **Tutoring Services**, you will not have access to these services.

○ I understand

○ I DO NOT understand

Q21 Your semester package may include **Career Services.**

If you select a semester package with **Career Services,** for the next semester you will have access to USC's many career development tools. This includes career advising for your degree,

CONFIDENTIAL

helping you find internships/jobs, resume/cover letter help, and more. You will also have access to networking opportunities through professional associations, the exclusive alumni network, student organizations, programs and scholarships, and events such as job fairs, networking events, strategy workshops and mock interview sessions.

If you select a semester package without **Career Services,** you will not have access to these services or events.

○ I understand

○ I DO NOT understand

Q22 Finally, each **semester package** comes with a price. This is the price for all options of the **semester package** as well as all classes for the semester**.**

Note that this price includes all other university fees but does **not** include room and board.

If you received (or anticipate receiving) financial aid or scholarships for your education, please assume that it is available to you when making your selection.

○ I understand

○ I DO NOT understand

(1/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | On-campus | Online | Online | |
| Campus Facilities Access | No Access | No Access | Access | I would not select any of the semester offerings shown here |
| Tutoring Services | Available | Not Available | Not Available | |
| Career Services and Events | Available | Available | Available | |
| Semester Cost | $24432.00 | $32576.00 | $32576.00 | |
| | ○ | ○ | ○ | ○ |

CONFIDENTIAL

(2/10) Choose your preferred option below:

|  | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | On-campus | On-campus | On-campus | I would not select any of the semester offerings shown here |
| Campus Facilities Access | Access | Access | No Access | |
| Tutoring Services | Available | Not Available | Not Available | |
| Career Services and Events | Available | Available | Not Available | |
| Semester Cost | $24432.00 | $40720.00 | $48864.00 | |
|  | ○ | ○ | ○ | ○ |

(3/10) Choose your preferred option below:

|  | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | On-campus | On-campus | Online | I would not select any of the semester offerings shown here |
| Campus Facilities Access | Access | No Access | No Access | |
| Tutoring Services | Not Available | Available | Available | |
| Career Services and Events | Not Available | Available | Available | |
| Semester Cost | $24432.00 | $48864.00 | $16288.00 | |
|  | ○ | ○ | ○ | ○ |

CONFIDENTIAL