1    Steve W. Berman (*pro hac vice*)
     *steve@hbsslaw.com*
2    HAGENS BERMAN SOBOL SHAPIRO LLP
     1301 Second Avenue, Suite 2000
3    Seattle, WA 98101
     T: (206) 623-7292
4    F: (206) 623-0594

5    Christopher R. Pitoun (SBN 290235)
     *christopherp@hbsslaw.com*
6    HAGENS BERMAN SOBOL SHAPIRO LLP
     301 North Lake Avenue, Suite 203
7    Pasadena, CA 91101
     T: (213) 330-7150
8    F: (213) 330-7152

9    [Additional Counsel listed on signature page]

10   *Interim Co-Lead Class Counsel and*
     *Attorneys for Plaintiff J. Julia Greenberg*
11

12               **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                     **WESTERN DIVISION**

15   *In re University of Southern California*      No. 2:20-cv-04066-DMG-PVC
     *Tuition and Fees COVID-19 Refund*
16   *Litigation*                                   **MEMORANDUM OF POINTS
                                                     AND AUTHORITIES IN SUPPORT
17                                                   OF PLAINTIFFS' MOTION FOR
                                                     CLASS CERTIFICATION**
18
                                                     Date:        May 19, 2023
19                                                   Time:        9:30 a.m.
                                                     Courtroom:   8C
20
                                                     Action filed:   May 7, 2020
21                                                   Consolidated:   July 17, 2020
                                                     Trial Date:     January 9, 2024
22                                                   Time:           8:30 a.m.
                                                     Courtroom:      8C
23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

II.  FACTUAL BACKGROUND ......................................................... 3

    A.  Common evidence shows a bargain for in-person education at USC. .... 4

    B.  USC's breach of the parties' bargain for in-person education and experiences is subject to common proof. .................................... 9

    C.  Classwide damages or entitlement to restitution can also be shown by a common method tied to Plaintiffs' legal theories. ........................ 12

III.  LEGAL STANDARD ................................................................ 13

    A.  Numerosity is readily met here. ............................................. 13

    B.  Commonality is met: many common questions of law and fact exist. .. 13

    C.  Plaintiffs' claims are typical of Class members' claims. .................. 14

    D.  Plaintiffs and their counsel are adequate representatives. ................. 15

IV.  PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(B)(3) ........ 16

    A.  Common issues predominate. ................................................ 16

        1.  Common questions predominate in the contract claim. ............. 17

        2.  Common questions predominate in the quasi-contract claim for restitution. ................................................................ 19

        3.  Common questions predominate in the UCL claim. ................. 20

        4.  Damages are capable of classwide measurement. .................... 20

        5.  Predominating common questions of law and fact are not limited to Plaintiffs' Case-in-Chief. ........................................... 22

    B.  A class action is superior to multiple individual actions. ................. 23

V.  CONCLUSION ..................................................................... 24

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alexander v. Fla. Intern. Univ. Bd. of Trs*,
   2021 WL 9038526 (Fla. Cir. Ct. Dec. 30, 2021).....................................3

*Alonzo v. Maximus, Inc.*,
   275 F.R.D. 513 (C.D. Cal. 2011)..............................................................23

*Amchem Prods. V. Windsor*,
   521 U.S. 591 (1997) ...........................................................................14, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ...........................................................................13, 17

*Arredondo v. Univ. of La Verne*,
   2022 WL 3222376 (C.D. Cal. Aug. 2, 2022) ............................................6

*Arredondo v. Univ. of La. Verne*,
   341 F.R.D. 47 (C.D. Cal. 2022)......................................................*passim*

*In re Arris Cable Modem Consumer Litig.*,
   327 F.R.D. 334 (N.D. Cal. 2018) ............................................................22

*Bally v. State Farm Life Ins. Co.*,
   335 F.R.D. 288 (N.D. Cal. 2020) ............................................................19

*Booth v. Molloy Coll.*,
   2022 N.Y. Misc. LEXIS 9176 (N.Y. Sup. Ct. Dec. 13, 2022)...................3

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ...........................................................................22, 23

*In re Conseco Life Ins. Litig.*,
   920 F. Supp. 2d 1050 (N.D. Cal. 2013)...................................................19

*Cross v. Univ. of Toledo*,
   2021 WL 1822676 (Ohio Ct. Cl. Apr. 26, 2021) ....................................14

*Diaz v. Univ. of S. Cal*,
   2020 WL 5044419 (C.D. Cal. July 17, 2020) (Gee, J.)...........................16

*Eddlemon v. Bradley Univ.*,
  2022 WL 3227865 (C.D. Ill. July 22, 2022) ................................................. 3, 14

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir.) ........................................................................ 15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................ 17

*Ewert v. eBay*,
  2010 WL 4269259 (N.D. Cal. Oct. 25, 2010) ........................................... 19

*Gunderson v. Alta Devices, Inc.*,
  2021 WL 1998608 (N.D. Cal. May 19, 2021) .......................................... 23

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................................. 22

*Hamilton v. TBC Corp.*,
  328 F.R.D. 359 (C.D. Cal.) (Gee, J.) ..................................................... 2, 22

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................................. 14

*Hardwick v. Hoovestol, Inc.*,
  2022 WL 4596592 (C.D. Cal. Sept. 12, 2022) (Gee, J.) ...........................*passim*

*In re Heritage Bond Litig.*,
  2004 WL 1638201 (C.D. Cal. July 12, 2004) .......................................... 15

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2007) ............................................................. 21

*Keegan v. American Honda Motor Co., Inc.*,
  284 F.R.D. 504 (C.D. Cal. 2012) .......................................................... 16

*Little v. Grand Canyon Univ.*,
  2022 WL 266726 (D. Ariz. Jan. 28, 2022) ............................................. 3, 14

*Overgaard v. Johnson*,
  68 Cal. App. 3d 821 (1977) ................................................................. 21

*Simpson v. Fireman's Fund Ins. Co.*,
  231 F.R.D. 391 (N.D. Cal. 2005) ......................................................... 14, 15

-iii-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Staubus v. Regents of Univ. of Minn.*,
   2022 Minn. Dist. LEXIS 7247 (Minn. Dist. Ct. Nov. 9, 2022) ............................ 3

*In re Univ. of S. Calif. Tuition & Fees Covid-19 Refund Litig.*,
   2021 WL 3560783 (C.D. Cal. Aug. 6, 2021) (Gee, J.) ...................... 5, 17, 18, 20

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................... 13, 14

*Zinser v. Accufix Res. Inst., Inc.*,
   253 F.3d 1180 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001) ........ 13, 23

## OTHER AUTHORITIES

California's Unfair Competition Law ................................................................. 2, 17

Federal Rule of Civil Procedure 23 ............................................................ 2, 13, 19

Federal Rule of Civil Procedure 23(a) ................................................................. 13

Federal Rule of Civil Procedure 23(a)(2) ............................................................ 13

Federal Rule of Civil Procedure 23(a)(3) ............................................................ 14

Federal Rule of Civil Procedure 23(a)(4) ....................................................... 15, 16

Federal Rule of Civil Procedure 23(b) ................................................................. 13

Federal Rule of Civil Procedure 23(b)(3) ........................................ 1, 16, 17, 22, 23

Federal Rule of Civil Procedure 23(g) ................................................................. 16

Federal Rule of Civil Procedure 30(b)(6) ....................................................... 7, 8, 11

Restatement (Second) of Contracts § 211(2) (2018) ............................................ 18

Restatement (Second) of Contracts § 347 (2018) ................................................ 21

1

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

2

Plaintiffs' motion for class certification under Federal Rule of Civil Procedure

3

23(b)(3) should be granted. After Defendants The University of Southern California and

4

The Board of Trustees of The University of Southern California (collectively "USC")

5

collected tens of thousands of dollars in tuition and fees for the Spring 2020 semester

6

from each of the Plaintiffs (and other students enrolled at USC that semester), USC did

7

not deliver the promised in-person/on-campus education to any of them after mid-March

8

2020, when USC shuttered its campus, moved all classes to remote platforms, and

9

barred all students from accessing USC's physical facilities. Despite this, USC retained

10

Class members' full tuition and the fees for which they now seek a partial refund.

11

Worse yet, even as USC was doing so, its personnel privately acknowledged that

12

the online education product USC was delivering was far different and less valuable

13

than what it had promised to all Class members. When students turned *en masse* to

14

complain and seek refunds for not receiving the on-campus in-person education for

15

which they had prepaid tens of thousands of dollars, USC outwardly denied any

16

obligation or willingness to do so. But internal emails, for example, within USC's Office

17

of the Provost show that USC knew it had grossly failed to perform. An April 29, 2020

18

email from Michael Price, USC's then-Manager of Academic Initiatives at the Office

19

of the Provost to Beth Schuster, USC's Chief of Staff at the Office of the Provost,

20

privately admitted that:

21

22

> [T]he biggest problem is that ***it's hard to dispute the assertion that the online experience pales in comparison to the on-campus experience***. The draft responses basically ignore those claims.[1]

23

24

And months later, when the impact of the lack of any in-person/on-campus

25

instruction could no longer be ignored, USC's own professors took the unprecedented

26

27

28

---

[1] Ex. 1 at USC000077614 (Highly Confidential) (emphasis added). All "Ex." references are to Exhibits attached to the contemporaneously filed with the Declaration of Daniel J. Kurowski ("Kurowski Decl.").

step of publicly airing this reality in the press. USC's Associate Professor of Teaching, John R. Murray, turned to the Los Angeles Times to pen a June 3, 2020 Op-Ed piece in which he lamented that, "Nearly all in-person USC classes will also be online. ***But remote learning doesn't cut it***."[2]

Because students did not receive the in-person/on-campus education during the Spring 2020 semester for which they paid and that USC promised to deliver, Plaintiffs now move to certify a Class defined as: "**All students who paid or were obligated to pay tuition, fees, or other costs to The University of Southern California for the Spring 2020 academic term**." The definition is subject to the exclusions set forth in Plaintiffs' Motion and Notice of Motion.

Plaintiffs support their Motion by the accompanying report of their expert economist, Dr. Hal J. Singer of Econ One Research.[3] Dr. Singer designed and implemented a choice-based-conjoint survey and analysis from which he showed classwide damages or restitutionary entitlement totaling $76.31 million.[4] His conjoint methodology is precisely the type of reasoned damages analysis this Court has recognized as an accepted and reliable means of showing classwide damages.[5]

Class certification is appropriate because Plaintiffs' claims for breach of an implied-in-fact contract (Count I), restitution based on quasi-contract (Count II), and violations of California's Unfair Competition Law (Count III) are subject to common predominating proof and meet all requirements of Rule 23. Unsurprisingly, therefore, Judge Scarsi of this Court recently granted class certification to another university

---

[2] Ex. 2 (emphasis added).

[3] *See* Ex. 3 Report of Hal J. Singer, Ph.D. dated Dec. 9, 2022 ("Singer Rpt.").

[4] *Id.* at ¶¶ 70–71.

[5] *See Hamilton v. TBC Corp.*, 328 F.R.D. 359, 373–74 (C.D. Cal.) (Gee, J.) (in claims for, *inter alia*, unjust enrichment, upholding class plaintiffs' expert economist's damages report over *Daubert* challenge because "'choice-based conjoint analysis' is often used in market research and has been used by other courts in the past.").

COVID-19 refund-related breach of contract and restitution complaint.[6] Numerous courts across the country have done the same.[7] This Court should follow suit.

For all these reasons, as detailed below, Plaintiffs' Motion should be granted.

## II.  FACTUAL BACKGROUND

USC is a private higher education institution offering in-person educational classes on its Los Angeles, California campus since its founding in 1880.[8] It enrolled about 48,500 undergraduate and graduate students for the 2019–2020 academic year.[9] USC required all undergraduate students to go to in-person classes; it offered no online undergraduate programs. Although USC offered some fully online graduate programs during the Spring 2020 semester, none of the members of the proposed Class chose that option.[10]

For the Spring 2020 term, USC charged all full-time students the same tuition amount of $28,628. Students enrolled less than full-time were charged the same per unit tuition charge.[11] USC also imposed uniform, mandatory fees, including a Student Health Service Fee ($366) and a Student Programming Fee ($64 and $43 for undergraduate and

---

[6] *See Arredondo v. Univ. of La. Verne*, 341 F.R.D. 47 (C.D. Cal. 2022).

[7] *See, e.g., Eddlemon v. Bradley Univ.*, 2022 WL 3227865 (C.D. Ill. July 22, 2022); *Alexander v. Fla. Intern. Univ. Bd. of Trs.*, 2021 WL 9038526 (Fla. Cir. Ct. Dec. 30, 2021); *Booth v. Molloy Coll.*, 2022 N.Y. Misc. LEXIS 9176 (N.Y. Sup. Ct. Dec. 13, 2022); *Little v. Grand Canyon Univ.*, 2022 WL 266726 (D. Ariz. Jan. 28, 2022); *Staubus v. Regents of Univ. of Minn.*, 2022 Minn. Dist. LEXIS 7247 (Minn. Dist. Ct. Nov. 9, 2022).

[8] *See* Answer to First. Am. Consol. Class Action. Compl. ("Answer") ¶ 33 [ECF 128].

[9] *Id.* ¶ 5.

[10] *Id.* Before the Spring 2020 semester, USC treated online and in-person classes and programs as distinct. It reported to the U.S. Department of Education that as of October 15, 2019 it had 19,268 undergraduate students and 20,407 graduate students who were "*Not enrolled* **in any distance education courses**" with 6,651 students reported as "**Enrolled** *exclusively* **in distance education courses**." Ex. 4 (emphases in original). The few graduate programs that it offered online were geared for individuals who were working in addition to taking classes. *See* Ex. 5 at USC0000027216 ("USC offers several options for students who are unable to commit to full-time, on campus graduate programs . . . **ONLINE PROGRAMS** . . . Graduate students who choose to pursue our online degree programs will enjoy the convenience and flexibility of such an option.").

[11] First Am. Consol. Class Action. Compl. ("FAC") ¶ 43 [ECF 126]; Answer ¶ 43.

graduate students, respectively).[12] During the Spring 2020 term, many USC students paid other fees, like Laboratory Fees ($5–$500).[13]

## A.    Common evidence shows a bargain for in-person education at USC.

Through its official form publications and standard course registration process, USC promised students enrolled in in-person programs for the Spring 2020 Semester that in exchange for their tuition and fee payments, USC would provide them in-person classes and access to USC's campus and facilities. USC's Student Handbook, Course Catalog, official brochures, and websites—all form communications that USC published in uniform manner with no negotiation or input from individual students— promised students that USC would provide them in-person classes and access to USC's campus and facilities.

Throughout the USC Student Handbook ("Handbook"), a standard form publication provided by USC to all students, USC repeatedly indicated that students enrolled at USC would have access to campus facilities and more. For example, USC represented to students that "[t]he university has ***the responsibility to provide students the use of campus facilities***."[14] The Handbook also indicated that USC was responsible for providing Plaintiffs and Class members with opportunities to interact with faculty outside of the classroom.[15] It specified students' right to participate in student organizations, which may "[r]eserve campus facilities for events, programs and meetings."[16] The Handbook also explained that use of USC "computers and computing facilities is central to the learning experience at USC."[17]

---

[12] FAC ¶ 43; Answer ¶ 43.

[13] FAC ¶ 43; Answer ¶ 43.

[14] Ex. 6 at USC0000001364 (emphasis added); FAC ¶ 52; Answer ¶ 52.

[15] FAC ¶ 53 (citation omitted).

[16] FAC ¶ 54 (citation omitted).

[17] FAC ¶ 52 (citation omitted); Answer ¶ 52.

-4-

Like the Handbook, the 2019–20 USC Catalogue ("Catalogue"), another USC form publication drafted solely by USC and disseminated to all its students, specified that USC would provide Plaintiffs and the Class with access to in-person/on-campus courses.[18] The Catalogue, containing a single, interactive USC Schedule of Classes was provided to Plaintiffs and all proposed Class members before enrollment and from it they selected their Spring 2020 Semester in-person classes.[19] The Schedule of Classes contains a "Building Directory" that lists over 300 campus buildings that USC represented would be available to USC students during the Spring 2020 Semester.[20] It also contained the "Classes Offered" for the semester. Each entry in the "Classes Offered" section of the Schedule listed the type of class (*e.g.*, lecture or lab), its planned meeting time, date, instructor, and the specific in-person physical location of each of the in-person classes for which Plaintiffs and proposed Class members enrolled.[21] Students registered and paid for their Spring 2020 Semester in-person classes after reviewing the options in the Catalogue's Schedule of Classes.

For example, the Catalogue's "Schedule of Classes" for the Spring 2020 term showed lectures by USC Viterbi School of Engineering Professor Jesse Yen, an "ultrasonic imaging expert" to be held at Ronald Tutor Hall ("RTH") and hands-on laboratory instruction at the Denney Research Center ("DRB").[22] The Catalogue also identified course locations to specific buildings and room numbers within the buildings, allowing students to click on a link to bring up a campus map to show students the

---

[18] FAC ¶ 55 (citation omitted).

[19] *See generally*, Ex. 7 at Stott Dep. Ex. 10 (available at https://web-app.usc.edu/ws/soc _archive/soc/term-20201/building-directory/index) (last visited Feb. 28, 2023).

[20] *Id.*

[21] *Id.* Such facts distinguish Spring 2020's facts from subsequent semesters. *In re Univ. of S. Calif. Tuition & Fees Covid-19 Refund Litig.*, 2021 WL 3560783, at *6 (C.D. Cal. Aug. 6, 2021) ("Defendants correctly note, however, that the 2020–2021 Catalog specifically states that all classes will be held online.").

[22] FAC ¶ 55 (citation omitted).

building's location on-campus.[23] Thousands of similar types of hands-on classes with specific campus locations are listed in the Catalogue.[24]

Enrollment at USC's in-person educational programs also entitled students to a broad spectrum of on-campus activities, including over 1,000 student organizations, fraternities and sororities, marching band, recreational sports, and NCAA Division 1 athletics.[25] On its website, USC promoted itself to students as a "dynamic community" in which students would "[e]njoy access to facilities and technologies that rival those of professional settings," including 23 libraries, and an 8:1 student to faculty ratio.[26] It assured students they could "participate in more than 1,000 student organizations responsible for campus programs such as concerts, lectures, and leadership programs to develop valuable skills and build community on campus."[27]

In other widely distributed promotional materials, USC included images of its campus and students enjoying campus amenities.[28] As Andrew Stott, USC's Vice Provost for Academic Programs, admitted at his deposition, the "campus certainly features in the promotional materials" sent to prospective students.[29] In them, USC described the rich in-person campus experiences that would be available to USC in-

---

[23] Ex. 8 at Stott Tr. 158:15–159:20. *See also id.* at 392:17–393:2 ("Q: Okay. There's nothing in the catalog that talks about specifically the university switching an in-person class to an online class; correct? [Objection omitted.] THE WITNESS: There – there's nothing specific about that.").

[24] *See Arredondo v. Univ. of La Verne,* 2022 WL 3222376, at *5 (C.D. Cal. Aug. 2, 2022) ("Because Defendant listed physical locations of classes during the registration and payment process, Plaintiff and class members also reasonably understood that they would be receiving access to the Main Campus if they paid Main Campus tuition and fees.").

[25] FAC ¶ 58.

[26] Ex. 9 at USC000133031; FAC ¶ 47 (citation omitted); Answer ¶ 47.

[27] FAC ¶ 47 (citation omitted); Answer ¶ 47.

[28] Ex. 8 at Stott Tr. 29:18–25 ("numerous images that I can verify are . . . USC's campus."; *id.* at 30:12–15 "That is the Doheny Memorial Library."; *id.* at 30:16–19 "That's Tommy Trojan – the statue of the Tommy Trojan in the center of campus." "That's the Bovard Auditorium on campus.").

[29] *Id.* at Stott Tr. 34:8–15.

person students. USC represented to prospective students that they would "immediately [be a] part of a close-knit community with other students, and have a number of resources at your disposal" and would "[f]orm connections with students in your residential college and feel more connected to the entire campus community."[30] USC's Rule 30(b)(6) witnesstestified he was unaware of any USC publication that indicated in-person classes, on-campus experiences and sporting events would be provided online instead of in-person.[31]

USC's websites also promoted the hands-on, immersive instruction and world-class facilities available only through on-campus enrollment. For example, USC's Roski School of Art and Design promoted its facilities as follows:

> The hub of USC Roski School of Art and Design resides on the main USC campus in two buildings, Watt and Harris Halls, that are dedicated to art and design. Within these buildings, Roski students have access to the Galen Ceramics Studio; three design studios, including the Galen 3D print lab; two large drawing & painting studios; a printmaking lab; as well as the Handtmann Photography Lab and the Galen Intermedia Lab. The large Sculpture Studio, with both indoor and outdoor spaces, includes a shared woodshop. At the center of it all is the Helen Lindhurst Fine Arts Gallery—open to the public Monday through Friday—where undergraduate students can apply annually to present exhibitions of their artwork.[32]

So too, the Spring 2020 Course Catalog featured pictures of students filming their student projects "on location at Universal Studios" and described the USC School of Cinematic Arts as "one of the nation's preeminent centers for the creation, study, research and development of film, television and interactive media" offering students "nearly 200,000 square feet of facilities" and "production facilities that rival industry counterparts" and access to "USC's Trojan Vision television station."[33]

---

[30] *See, e.g.*, Ex. 10 at USC000028260; *see also* FAC ¶ 57 (citation omitted); Answer ¶ 57.

[31] Ex. 8 at Stott Tr. 35:7–18.

[32] FAC ¶ 48 (citation omitted); Answer ¶ 48.

[33] Ex. 11 at USC000113723.

-7-

The Iovine and Young Academy for the Arts, Technology, and the Business of Innovation's USC webpage touted that students will participate in "[l]ectures, presentations, discussions, tutorials and trips throughout the year" and partake in "hands-on learning for skills and tools, workshops to critique and develop student projects and discussions to encourage critical thought and ideas."[34] To those in the Full-Time MBA Program, USC promised classes would be "taught in state-of-the-art case rooms featuring network access for every student" and access to USC's "Experiential learning Center" which offered students "opportunities for experimentation, video practice, simulation exercises and group preparation."[35] By contrast, USC's "Online MBA Program" was for "students who are currently employed and wish to remain within the labor force while earning a degree."[36]

In its form admissions communications, USC noted that students' undergraduate experience would occur in Los Angeles: "Beyond the tall trees of our beautiful campus is downtown Los Angeles, the heart of the vibrant city you will call home for your undergraduate career."[37] USC advised prospective students that "a campus visit" to USC was one of the "best ways to find out why USC should be among your top college choices."[38] And USC's Rule 30(b)(6) witness admitted that prior to Spring 2020, USC routinely hosted in-person campus tours for prospective students to persuade them to enroll at USC.[39]

---

[34] FAC ¶ 49 (citation omitted); Answer ¶ 49.

[35] Ex. 12 at USC000118132.

[36] Ex. 13 at USC000118152.

[37] *See, e.g.,* Ex. 14 at PL-GREENBERG 000001 (Greenberg); Ex. 15 at USC000125296 (Kerendian); Ex. 16 at USC000129722 (Gomez); Ex. 17 at USC000130086 (Diaz).

[38] Ex. 10 at USC000028267.

[39] Ex. 8 at Stott Tr. 71:12–16.

-8-

**B.     USC's breach of the parties' bargain for in-person education and experiences is subject to common proof.**

That USC did not deliver the in-person/on-campus education it promised is also subject to common (and largely undisputed) evidence. USC admitted that in response to the pandemic, it switched *every single one* of its promised in-person classes from in-person to an online modality.[40]

USC's Spring 2020 semester began on January 13, 2020.[41] Although USC classes were scheduled to take place in-person through May 2020, USC moved all classes to a remote setting and discontinued in-person instruction to all student Class members from mid-March 2020 through the end of the Spring 2020 semester.[42] USC students in the proposed Class were barred from campus and campus facilities between mid-March 2020 through the end of the Spring semester.

While the parties may dispute whether they bargained for in-person education and experiences (Plaintiffs' position) or simply for credits and progress toward a degree (USC's position), itself an issue capable of classwide resolution regardless of the answer, there is no dispute that USC stopped providing in-person education and experiences on March 10, 2020.[43] On March 6, 2020, USC conducted a three-day test of the University's technical capabilities from March 11–13, 2020.[44] On March 10, 2020, USC announced it would continue remote classes after the March 14–21, 2020 Spring Recess, for the week of March 22–29, 2020.[45] On March 11, 2020, USC extended the period of remote instruction from March 30, 2020 until April 14, 2020, telling students leaving campus for Spring Recess they may not return until at least April 13,

---

[40] Ex. 8 at Stott Tr. 110:4–5 ("Every single one.").

[41] Ex. 18 at USC000128974.

[42] Ex. 19 at USC000127140–41; Ex. 20 at USC000001572; Ex. 21 at USC000001573; Ex. 22 at USC000127092.

[43] Answer ¶¶ 61–63.

[44] *Id*. ¶ 61.

[45] *Id*. ¶ 62.

2020.[46] And by March 15, 2020, USC "**made the decision . . . to finish the academic semester online or remotely**."[47] As a result, "athletic programs, facilities, libraries, laboratories, workshops, professional research, gyms, pools, dining halls, on-campus employment became inaccessible to . . . all USC students . . . ."[48]

The impact of USC's breach also is subject to common proof. USC's own internal emails show its personnel privately acknowledged that the remote off-campus offering substituted by USC was far different and less valuable than the education for which students bargained. As USC's Michael Price (USC's Manager of Academic Initiatives) confided in an email to Beth Shuster (Chief of Staff for USC's Office of the Provost) on April 29, 2020:

> For your consideration. This includes the President's sentiments. The biggest problem is that *it's hard to dispute the assertion that the online experience pales in comparison to the on-campus experience*. These draft responses basically ignore those claims—not sure if there's a better way to address those writers' concerns.[49]

Other examples abound. *See, e.g.*, Ex. 24 at USC000032175 (March 12 email Andrew Guzman (USC Law Dean): "I share your view that it is not how we would teach if we were unconstrained."); Ex. 25 at USC000032653 (March 13, 2020 email from professor: "Doing online USC classes because of COVID-19 might be 'convenient' BUT NEVER a replacement for REAL CORPOREAL presence in tactile form and space. Student work progress will not be comparable.") (alterations in original); Ex. 26 at USC000130629 (March 21, 2020 Email from Dean Robert Cuietta to Students, Faculty, and Staff of USC Kaufman: "We know nothing can compare to in-person instruction."); Ex. 27 at USC000036072 ("There really isn't a good substitute for in-person classes . . . . But I get that we are all trying to put a positive spin on the situation. We have to smile

---

[46] *Id.* ¶ 63.

[47] Ex. 23 at USC000129823 (emphasis in original).

[48] Ex. 8 at Stott Tr. 283:8–17.

[49] Ex. 1 at USC000077614 (Highly Confidential) (emphasis added).

because otherwise we'll cry, right?").

Students felt the same way. There were both online petitions and individual and group pleas for tuition refunds because students were not receiving the in-person instruction and campus access for which they had paid tens of thousands of dollars.[50] As USC's Rule 30(b)(6) witness admitted "the number of people who signed the petition [requesting a partial refund] was in the thousands, but I cannot give you an exact number."[51]

Despite its knowledge that online experiences differed from the on-campus experience it provided until March 10, 2020, USC steadfastly maintains that no money should be due to students. USC's Board of Trustees and USC's senior leadership, the dean's counsel, the provost cabinet, the president, and the senior leadership team provided input leading to USC's uniform decision not to issue any tuition refunds to any student.[52] Privately, USC's leadership acknowledged it had to concoct a narrative of why the University would not refund back any tuition payment. Provost Zukoski confided that: "That we might entertain the argument to return part of the tuition is a bit scary…My sense is that we better start to develop the narrative on why tuition is not going to be discounted. This will be dicey. But we will be better off if we have the arguments at the tip of our tongues."[53]

The net result is that to date USC, one of the wealthiest universities with an endowment in the Spring 2020 of about $5.7 billion and, having collected $1.62 billion in net tuition and fee revenues in 2019–20, made no tuition adjustment for the Spring

---

[50] Ex. 8 at Stott Tr.. 117:4–15  ("I am aware of various petitions to the university. . . I'm aware of a change.org petition that had several thousand signatures. I believe. And. . . . there were numerous e-mails sent to the president's and provost office and dean's offices making various requests for partial or full refunds.").

[51] *Id.* at Stott Tr. 55:6–11.

[52] *Id.* at Stott Tr. 180:23–183:3.

[53] Ex. 28 at USC000033111 (Highly Confidential).

2020 semester in which it provided no campus access or in-person instruction.[54] While students suffered the financial harm of prepaying tuition for services and access they did not receive, USC saw its net assets ***rise by over $1.88 billion*** from FY2020 to FY2021, increasing to over $11.317 billion.[55]

**C.    Classwide damages or entitlement to restitution can also be shown by a common method tied to Plaintiffs' legal theories.**

Classwide damages or entitlement to restitution can be calculated using a method common to the Class, as shown by the expert report of Dr. Hal J. Singer.[56] Conducting a Choice-Based Conjoint ("CBC") survey and analysis, a common statistical research tool used to objectively measure the value consumers place on various attributes of an offered product or service, Dr. Singer measured the difference in value between USC's on-campus and online experiences. After having done so, Dr. Singer concluded that economic injury and aggregate damages or restitution due to the Class can be shown under Plaintiffs' theory of harm in this matter using CBC analysis.[57] Calculating "aggregate damages to the Class based on Spring 2020 tuition and the proportion of the Spring 2020 semester that was affected by the switch to Online, Dr. Singer opines that damages to the Class (the difference between what Class Members paid and the value of what they received) total $76.31 million, composed of $49.24 million in damages to undergraduate Class members and $27.08 million in damages to graduate Class members."[58]

---

[54] Answer ¶ 41; Ex. 29 at USC000017117.

[55] Ex. 29 at USC000017116.

[56] *See generally* Ex. 3 (Singer Rpt.).

[57] *Id.* ¶¶ 6–7.

[58] *Id.* ¶ 7.

### III.      LEGAL STANDARD

To certify a class, Rule 23(a) and at least one subsection of Rule 23(b) must be met.[59] "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule."[60] "[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'"[61] But, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."[62] "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[63]

**A.      Numerosity is readily met here.**

"A putative class may be certified only if it 'is so numerous that joinder of all members is impracticable.'"[64] That is met here given that the Class consists of over 40,000 Spring 2020 USC students.

**B.      Commonality is met: many common questions of law and fact exist.**

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class."[65] "[T]he putative class members' claims must depend upon a common contention that is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[66] Courts construe this requirement

---

[59] *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001).

[60] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

[61] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–466 (2013) (quoting *Dukes*, 564 U.S. at 351).

[62] *Id.* at 466.

[63] *Id*.

[64] *Hardwick v. Hoovestol, Inc.*, 2022 WL 4596592, at *4 (C.D. Cal. Sept. 12, 2022) (Gee, J.) (quoting Fed. R. Civ. P. 23(a)(1)).

[65] Fed. R. Civ. P. 23(a)(2).

[66] *Hardwick*, 2022 WL 4596592, at *6.

permissively.[67] Notably, "[e]ven a single [common] question will do."[68] And where questions common to Class members present significant issues that can be resolved in a single adjudication "there is clear justification for handling the dispute on a representative rather than on an individual basis."[69] Plaintiffs meet this low bar. Common issues here include: (1) whether USC and Class members had a contract that obligated USC to provide in-person instruction and access to campus facilities and in-person resources; (2) whether USC breached the contract; (3) whether USC's refusal to refund prorated tuition for the lack of in-person classes and services is "unfair" under the UCL; and (4) the fact and measure of damages. Many courts have found commonality in similar cases.[70] This Court should too.

## C.    Plaintiffs' claims are typical of Class members' claims.

Rule 23(a)(3) requires showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[71] "The purpose of this requirement is to assure that the interest of the named representative aligns with the interests of the class."[72] "Typicality is a permissive standard and requires only that the representative's claims are reasonably co-extensive with those of absent Class members; they need not be substantially identical."[73] "In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff."[74] Typicality does not require that "all class members

---

[67] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

[68] *Dukes*, 564 U.S. at 359.

[69] *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997).

[70] *See. e.g.. Arredondo*, 341 F.R.D. at 51: *Little*. 2022 WL 266726. at *5: *Eddlemon*. 2022 WL 3227865, at *4; *Cross v. Univ. of Toledo*, 2021 WL 1822676, at *5 (Ohio Ct. Cl. Apr. 26, 2021).

[71] Fed. R. Civ. P. 23(a)(3).

[72] *Hardwick*, 2022 WL 4596592, at *5 (citation and quotation omitted).

[73] *Id.* (citation and quotation omitted).

[74] *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) (quotation omitted).

suffer the same injury as the named class representative."[75] Thus, typicality "is not demanding."[76]

Plaintiffs' claims are typical of the claims of the absent Class members they seek to represent. Like all Class members, Plaintiffs suffered the "same or similar injury" asserting claims for USC's breach of the parties' agreement to provide in-person instruction and experiences arising out of USC's transformation from an on-ground school to an online school in March 2020. Like all Class members, Plaintiffs enrolled in on-campus programs and Plaintiffs suffered the same injuries—the inability to go to in-person classes, use on-campus services for which they paid, and USC's ongoing refusal to prorate tuition and fees. All were uniformly affected by USC's University-wide decisions and policies to refuse to provide prorated tuition and fees for Spring 2020. Plaintiffs satisfy typicality.

**D.     Plaintiffs and their counsel are adequate representatives.**

Plaintiffs satisfy Rule 23(a)(4)'s "adequacy" test. "The Rule 23(a)(4) adequacy determination turns on the answers to two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[77] Plaintiffs are adequate Class Representatives. "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees."[78] No such antagonism or conflict of interest exists here between Plaintiffs and the absent Class members. Each Plaintiff shares the same interest with absent Class members of proving that (1) USC breached a contract for in-person educational experiences, (2) USC unjustly enriched itself at students' expense by refusing to issue any refunds for the

---

[75] *Id.*

[76] *In re Heritage Bond Litig.*, 2004 WL 1638201, at *4 (C.D. Cal. July 12, 2004).

[77] *Hardwick*, 2022 WL 4596592, at *6.

[78] *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir.).

Spring 2020 semester tuition and fees, and/or (3) that USC's refusal to refund prorated tuition for the lack of in-person classes and services is "unfair" under the UCL. Plaintiffs therefore have the same core interest as that of other Class members.

Plaintiffs' involvement further confirms their adequacy.[79] Here, each Plaintiff sat for depositions and were extensively questioned by USC's counsel; produced documents in response to USC's document requests; answered USC's interrogatory requests; and conferred with counsel to review and approve filings.[80]

Plaintiffs' counsel also are adequate Class Counsel. This Court already found as much when it appointed the three Interim Co-Lead Firms for this litigation.[81] Since then, Interim Co-Lead Counsel have zealously litigated this case, invested thousands of dollars in retaining and deposing experts, spent many hours moving the case forward through discovery and motion practice, and remain qualified to serve.[82] Given that, the Court should now also appoint these same Interim Co-Lead Counsel as Class Counsel under Rules 23(a)(4) and 23(g).

## IV.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(B)(3)

### A.    Common issues predominate.

For Rule 23(b)(3), Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[83] Predominance is met here where Plaintiffs invoke the

---

[79] *See Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504, 526 (C.D. Cal. 2012) (adequacy met where "class representatives have been engaged participants in this litigation, submitting declarations in support of plaintiffs' motions and making themselves available for deposition testimony.").

[80] *See generally* Kurowski Decl. ¶¶ 28–32.

[81] *See Diaz v. Univ. of S. Cal.*, 2020 WL 5044419, at *5 (C.D. Cal. July 17, 2020) (Gee, J.) ("the tripartite co-interim class counsel structure initially proposed by Watson's and Greenberg's attorneys to Diaz's counsel permits the attorneys who are best situated to represent the class to continue to do so.").

[82] *See* Kurowski Decl. ¶¶ 13–27; Drake Decl. ¶¶ 24–31; Katriel Decl. ¶¶ 12–27.

[83] Fed. R. Civ. P. 23(b)(3).

-16-

same California laws—contract, quasi-contract, and Unfair Competition Law—and rely on the same evidence to prosecute each claim.

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[84] "This requires careful scrutiny of whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."[85] "If one or more of the central issues in the action are common to the class and can be said to predominate," as here, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."[86] Predominance focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[87] "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying causes of action."[88] At class certification, Plaintiffs need not prove that they will prevail on these issues, just that they can offer evidence common to the Class.[89]

### 1. Common questions predominate in the contract claim.

First, common issues predominate in Plaintiffs' contract claim as they will use common evidence and legal theories to prove each element. "It is well-established that the basic legal relationship between a student and a university is contractual in nature."[90] At trial, Plaintiffs must ultimately prove "(1) the contract, (2) plaintiff's performance or

---

[84] *Hardwick*, 2022 WL 4596592, at *7 (citation and quotation omitted).

[85] *Id*. (citations and quotation omitted).

[86] *Id*. (citations and quotation omitted).

[87] *Amchem*, 521 U.S. at 623.

[88] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

[89] *Amgen*, 568 U.S. at 459.

[90] *In re USC*, 2021 WL 3560783, at *4 (citation omitted).

excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."[91] Here, common evidence exists that will let a jury conclude the existence of a bargain for in-person instruction and experiences at USC.[92]

That finding is underscored by the fact that Plaintiffs' evidence of USC's promise of in-person/on-campus education utilizes the uniform content of USC's standard form publications like the USC Handbook, Catalogue, and USC's website disclosures. None of these USC publications were subject to individual bargaining, input, or negotiation by any particular student Class member. Resort to such standard forms to prove the meaning of the alleged contractual promise, therefore, highlights the predominant nature of the common question across the Class because California law adopts Section 211(2) of the Restatement (Second) of Contracts. That Section, entitled "Standardized Agreements," provides that: "Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing."[93]

California courts repeatedly resort to Section 211(2) to find that claims for breach of a contractual promise found in form publications should be given classwide treatment, even if an ambiguity exists that requires resorting to extrinsic evidence and that could be interpreted differently by different recipients.

However, as Plaintiffs point out, when there is a standardized agreement like the form contract at issue in this case, the agreement "is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing."[94] "[C]ourts in construing and applying a standardized contract seek to effectuate *the reasonable expectations of the average member of the public who accepts it. The result may be to give the advantage*

---

[91] *Id.*

[92] *See supra* Section II.A.

[93] Restatement (Second) of Contracts § 211(2) (2018) (emphasis added).

[94] Restatement (Second) of Contracts § 211(2) (2018).

*of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute*."[95] "Accordingly, in construing the form contract between eBay and class members, *the court need not delve into the actual knowledge of individual class members. The court therefore concludes that plaintiffs' breach of contract claim does not raise individual issues likely to be the object of most of the court's and the parties' efforts*."[96]

Plaintiffs will also use common evidence to support that they (and the Class) performed their material obligations under the contract. They similarly use common evidence that USC breached the contract, invoking USC's own communications and conduct which does not vary from Class member to Class member.[97] And they will show the damages resulting from USC's breach.[98] These issues are central to resolving the contract claim and will all be proven using common evidence.

### 2.   Common questions predominate in the quasi-contract claim for restitution.

Plaintiffs will use common evidence to prove that it is unjust for USC to keep tuition and fees paid for on-campus classes, facilities, and services when USC did not provide those experiences and services. "Quasi-contract claims require the plaintiff to show (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense."[99] Here too, Plaintiffs will use common evidence to present the

---

[95] *Id.* at Comment e.

[96] *Ewert v. eBay*, 2010 WL 4269259, at *7 (N.D. Cal. Oct. 25, 2010) (emphasis added); *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 302 (N.D. Cal. 2020) (same); *In re Conseco Life Ins. Litig.*, 920 F. Supp. 2d 1050, 1065 (N.D. Cal. 2013), order vacated on other grounds pursuant to settlement, *In re Conseco Life Ins. Litig.*, 920 F. Supp. 2d 1050, 1056 (N.D. Cal. Jan. 29, 2013) (Contracts are "drafted as such precisely in order to avoid the problem Conseco now invites—that thousands of policyholders have thousands of different understandings of a standard form. Allowing Conseco's assertion that its agents had multiple and inconsistent understandings of a *standard form*, to defeat class certification here would up-end Rule 23's commonality requirement.") (emphasis in original).

[97] *See supra* Section II.B.

[98] *See generally* Ex. 3 (Singer Rpt.).

[99] *In re USC*, 2021 WL 3560783, at *8 (quotation and citation omitted).

circumstances which show that USC received a benefit (the Class members' tuition and fee payments) and that it would be unjust for USC to keep that benefit.

### 3. Common questions predominate in the UCL claim.

Plaintiffs also show predominance for their UCL "unfair business practice" claim through the of use common evidence and legal theories. "The UCL prohibits 'unfair competition,' which is defined as 'any unlawful, unfair, or fraudulent business act or practice.'"[100] An "unfair" business practice under the UCL "is one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[101] Plaintiffs rely on classwide "facts showing that the consumer injury is substantial, not outweighed by any countervailing consumer benefits, and could not have been reasonably avoided."[102] Like with their quasi-contract claim, Plaintiffs use common evidence supporting their claim that USC's refusal to refund prorated tuition for the lack of in-person classes and services is "unfair" under the UCL.[103] This question is central to resolving the UCL claim.

### 4. Damages are capable of classwide measurement.

"As part of predominance, 'plaintiffs must show that damages are capable of measurement on a classwide basis,' though damages calculation issues cannot alone defeat class certification."[104] "Damages are capable of measurement on a classwide basis when the damages calculation is attributable to a plaintiff's theory of harm."[105] "At this stage, Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability."[106] Plaintiffs "need not

---

[100] *Id.* at *9 (quoting Cal. Bus. & Prof. Code § 17200).

[101] *Id.* at *10 (quotation omitted).

[102] *Id.* (citation omitted).

[103] *Id.*

[104] *Arredondo*. 341 F.R.D. at 53 (quoting *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2007)).

[105] *Id.* (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013)).

[106] *Just Film*, 847 F.3d at 1121.

show that each members' damages from that conduct are identical."[107] Plaintiffs carry these requirements having presented an articulable theory of damages capable of classwide resolution.[108] As detailed in the Singer Report, economic and aggregate damages to the Class flowing from USC's challenged conduct can be reliably determined using data and methods common to the Class.[109]

Here, that common and predominating showing naturally follows because the Restatement (Second) of Contracts, which California courts follow, provides the standard for contract damages. Section 347 of that Restatement provides the following standard for measuring breach of contract damages:

> Subject to the limitations stated in §§ 350–53, "the injured party has a right to damages based on his expectation interest as measured by **(a) the loss in the value *to him* of the other party's performance caused by its failure or deficiency,** plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."[110]

This difference in value to the Plaintiffs' Class between the on-campus/in-person education and campus access they paid for and online off-campus offering they received from USC during the Spring 2020 semester is precisely what Dr. Singer has calculated classwide by resort to his conjoint survey and analysis.[111] That conjoint methodology is one that this and other California courts have found not only to be reliable, but also one that satisfies Rule 23(b)(3)'s predominance requirement.[112]

---

[107] *Id.* at 1120.

[108] *Arredondo*, 341 F.R.D. at 53.

[109] *See generally* Ex. 3 (Singer Rpt.).

[110] Restatement (Second) of Contracts. § 347 (emphasis added): *Overgaard v. Johnson*, 68 Cal. App. 3d 821, 823 (1977) ("'Benefit of the bargain' is the **difference between the actual value of what plaintiff has received and that which he expected to receive**.") (emphasis added).

[111] *See* Ex. 3 at Singer Rpt. ¶ 7.

[112] *See, e.g., Hamilton,* 328 F.R.D. at 373–74 (Gee. J.) (certifying unjust enrichment claim after upholding class plaintiffs' expert economist's damages report "'choice-based conjoint analysis'" is often used in market research and has been used by other courts in the past."): *Hadley v. Kellogg Sales Co.,* 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018) (conjoint survey met predominance: "conjoint analysis is widely-accepted as a reliable economic tool for isolating price premia."); *In re Arris Cable Modem*

Moreover, measuring classwide damages or restitution entitlement by accounting for the difference in value between what Class members bargained for and what they actually received also tracks Plaintiffs' theory of harm within the meaning of *Comcast*.[113] The Complaint alleges that Plaintiffs' harm stemmed from "being deprived of the education, experience, and services that they were promised and reasonably expected to obtain, and for which they have paid."[114] Dr. Singer's CBC analysis calculates the damages caused by this deprivation by measuring the reduction in value received by Class members relative to what USC had promised to them.

### 5. Predominating common questions of law and fact are not limited to Plaintiffs' Case-in-Chief.

The predominance of common questions of law and fact are not limited to the elements of Plaintiffs' claims, as such common questions also predominate over USC's affirmative defenses. The majority of USC's affirmative defenses center on the application of various state and local orders, the application of which will not vary from Class member to Class member.[115] Similarly, USC offers a purported reservation of rights argument in its fifth affirmative defense, which tries to invoke uniform language to avoid its promised bargain.[116] And though USC identifies no applicable force majeure clause, USC offers such a defense based on a factor not unique to any student: the pandemic.[117] While affirmative defenses do not operate to prevent a finding of predominance, class certification is further supported by such common defenses here.[118]

---

*Consumer Litig.*, 327 F.R.D. 334, 373 (N.D. Cal. 2018) ("[T]he Court finds that conjoint analysis is a generally reliable, well recognized method for estimating how consumers value different attributes of a product.").

[113] *See generally Comcast Corp.*, 569 U.S. at 27.

[114] FAC ¶ 106.

[115] *See, e.g.*, Answer at Defenses 2, 3, 6, 7, 8, 9, 10, 13, 14, 16.

[116] *Id.* at Defense 5.

[117] *Id.* at Defense 15.

[118] *See Gunderson v. Alta Devices, Inc.*, 2021 WL 1998608, at *5 (N.D. Cal. May 19, 2021) (certifying class where defendant offered affirmative defenses "which are not specific to the putative representative Plaintiffs."); *Hardwick*, 2022 WL 4596592, at *7 (class certification may be proper "even though other important matters will have to be

-22-

**B.    A class action is superior to multiple individual actions.**

Certifying the proposed Class of injured students is superior to the alternative of individual actions. The factors the Court considers in determining superiority of the class action device are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."[119] Each factor favors a finding of superiority here.

First, the students who make up the proposed Class have no interest in controlling the prosecution or defense of separate actions. "[C]lass members would likely have little interest in prosecuting separate actions because each putative class member's claims are probably insufficient to justify litigation's high risks and costs."[120] Courts generally find superiority met where, as here, "litigation costs would likely dwarf potential recovery if each class member litigated individually."[121]

Second, while multiple cases were filed against USC, all such cases have been consolidated before this Court.[122] As a result, "there appears to be no other pending litigation brought on behalf of [USC] students seeking recovery for damages stemming from the alleged breach of contract at issue here."[123]

---

tried separately, such as . . . some affirmative defenses peculiar to some individual class members") (citation and quotation omitted).

[119] Fed. R. Civ. P. 23(b)(3); *see Zinser*, 253 F.3d at 1190.

[120] *Arredondo*, 341 F.R.D. at 53.

[121] *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 527 (C.D. Cal. 2011), a reality here where the expert witness costs alone involved tens of thousands of dollars of investment that would dwarf an individual student's attainable recovery. *See* Ex. 3 at Singer Rpt. ¶ 17 (expert's hourly rate).

[122] *See generally* ECF 54, 58.

[123] *Arredondo*, 341 F.R.D. at 54.

-23-

Third, it remains desirable to concentrate the litigation of the claims in this forum. USC is located in this forum and "concentrating the litigation in this Court would eliminate the risk of inconsistent adjudication and promote the fair and efficient use of the judicial system."[124]

Finally, there are no likely difficulties in managing this class action, in which all of its claims are governed and brought under a single state's (California) laws and where USC's uniform conduct of converting all on-ground students into remote students forms the centerpiece of the litigation.

## V.   CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted and Plaintiffs' and Interim Co-Lead Counsel should be appointed Class Representatives and Class Counsel, respectively. Plaintiffs further request that the Court grant them all such other relief the Court deems necessary and appropriate.

---

[124] *Id.* at 54.

Dated: March 21, 2023                    Respectfully submitted,

                                         */s/ Daniel J. Kurowski*
                                         **HAGENS BERMAN SOBOL
                                         SHAPIRO LLP**
                                         Daniel J. Kurowski (*pro hac vice*)
                                         Whitney K. Siehl (*pro hac vice*)
                                         455 N. Cityfront Plaza Drive, Suite 2410
                                         Chicago, IL 60611
                                         Tel: (708) 628-4949
                                         Email: dank@hbsslaw.com
                                         Email: whitneys@hbsslaw.com

                                         Steve W. Berman (*pro hac vice*)
                                         1301 Second Avenue, Suite 2000
                                         Seattle, WA 98101
                                         Tel: (206) 623-7292
                                         Email: steve@hbsslaw.com

                                         Christopher R. Pitoun (SBN 290235)
                                         301 North Lake Avenue, Suite 203
                                         Pasadena, CA 91101
                                         Tel: (213) 330-7150
                                         Fax: (213) 330-7152
                                         Email: christopherp@hbsslaw.com

                                         **BERGER MONTAGUE PC**
                                         Ellen T. Noteware (*pro hac vice*)
                                         1818 Market Street, Suite 3600
                                         Philadelphia, PA 19103
                                         Tel: (215) 875-3000
                                         Email: enoteware@bm.net

                                         E. Michelle Drake (*pro hac vice*)
                                         Ariana Kiener (*pro hac vice*)
                                         43 SE Main Street, Suite 505
                                         Minneapolis, MN 55414
                                         Tel: (215) 875-3000S
                                         Email: emdrake@bm.net
                                         Email: akiener@bm.net

-25-

1

2      **THE KATRIEL LAW FIRM, P.C.**
       Roy A. Katriel, Esq. (SBN 265463)
3      2262 Carmel Valley Road, Suite 201
       Del Mar, CA 92014
4      Tel: (619) 363-3333
5      Email: rak@katriellaw.com

6      *Interim Co-Lead Counsel for Plaintiffs*

7
                       -and-
8

9      **THE KALFAYAN LAW FIRM, APC**
       Ralph B. Kalfayan (SBN 133464)
10     Veneeta Jaswal (SBN 320108)
       2262 Carmel Valley Road, Suite 200
11     Del Mar, CA 92014
12     Tel: (619) 232-0331
       Email: ralph@rbk-law.com
13     Email: veneeta@rbk-law.com
14

15     **LYNCH CARPENTER LLP**
       (Eddie) Jae K. Kim (SBN 236805)
16     117 East Colorado Blvd., Suite 600
       Pasadena, CA 91105
17     Tel: (619) 762-1910
18     Email: ekim@lcllp.com

19
       Gary F. Lynch (*pro hac vice*)
20     Edward W. Ciolko (*pro hac vice*)
21     1133 Penn Avenue, 5th Floor
       Pittsburgh, PA 15222
22     Tel: (412) 322-9243
23     Email: gynch@lcllp.com
       Email: eciolko@lcllp.com
24

25     **LAW OFFICES OF JENNIFER DUFFY**
26     Jennifer Duffy
       28649 S. Western Avenue, Suite 6571
27     Los Angeles, CA 90734
28     Tel: (310) 714-9779
                       -26-

Email: jennifer@usclassactions.com

**PARRIS LAW FIRM**
R. Rex Parris (SBN 96567)
Alexander R. Wheeler (SBN 239541)
Kitty K. Szeto (SBN 258136)
John M. Bickford (SBN 280929)
Ryan A. Crist (SBN 316653)
43364 10th Street West
Lancaster, CA 93534
Tel: (661) 949-2595
Email: rrparris@parrislawyers.com
Email: kszeto@parrislawyers.com
Email: awheeler@parrislawyers.com
Email: jbickford@parrislawyers.com
Email: rcrist@parrislawyers.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on March 21, 2023, a true and correct copy of the foregoing was filed electronically via CM/ECF, with notice delivered to all counsel of record.

*/s/ Daniel J. Kurowski*
Daniel J. Kurowski

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this memorandum of points and authorities complies with the 25-page count limit set by the Court's Initial Standing Order entered in this case. *See* ECF 8.

*/s/ Daniel J. Kurowski*
Daniel J. Kurowski

MEMO IN SUPPORT OF CLASS CERT. MOTION                    Case No. 2:20-cv-04066-DMG-PVC