Roy A. Katriel (SBN 265453)
**THE KATRIEL LAW FIRM, P.C.**
2262 Carmel Valley Rd., Suite 201
Del Mar, CA 92014
Telephone: (619) 363-3333
Facsimile: (866) 832-5852
e-mail: rak@katriellaw.com

[additional counsel on signature page]

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re University of Southern California Tuition and Fees COVID-19 Refund Litigation* | Case No. 2:20-CV-4066-DMG <br><br> **UNSEALED PER ECF NO. 173** <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF RONALD T. WILCOX, PH.D.** <br><br> **Date: May 19, 2023** <br> **Time: 9:30 a.m.** <br> **Place: Courtroom 8C** <br> **Judge: Dolly M. Gee** <br><br> **Action filed: May 7, 2020** <br> **Consolidated: July 17, 2020** <br> **Trial Date: January 9, 2024** |

# **TABLE OF CONTENTS**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT……….……….1

II.    WILCOX UNDERTOOK NO WORK TO TEST THE
VALIDITY OF HIS CRITICISMS, SO HIS REBUTTAL
REPORT CANNOT "HELP    THE TRIER OF FACT"
AS REQUIRED BY FED. R. EVID. 702…………………………………..3

    A.    Plaintiffs' Expert, Dr. Hal J. Singer, Reliably Calculated
Classwide Damages After Conducting Well-Accepted
Choice-Based-Conjoint Surveys And Analysis……………...……3

    B.    USC Proffered The Wilcox "Rebuttal" Report Without
Any Survey, Conjoint Study, Or Assessment Of
Damages (Or Lack Of Damages)…………………………………..4

    C.    Wilcox Admitted That His Purported Criticisms May
Not Adversely Impact Dr. Singer's Classwide Damages
But He May Only Speculate Because He Did No Work
Of His Own……………………………………………………10

        1.    Wilcox Does Not Know How Or Whether His
Criticism Of Dr. Singer's Survey Prompt Wording
Would Affect Dr. Singer's Results…………………………...10

        2.    Wilcox Concedes His Criticism Of Dr. Singer's
Enrollment Language Is Not One As To Which
He Has Any Opinion……………………………………12

        3.    Other Wilcox Criticisms Are Foreclosed By
California Law……………………………………..………15

III.    USC AND WILCOX'S "REBUTTAL" RELY ON THE WRONG
LEGAL STANDARD FOR RECOVERABLE DAMAGES OR
RESTITUTION, THEREBY RENDERING WILCOX'S ENTIRE
OPINION INADMISSIBLE…………………………………………16

    A.    Wilcox Entire Expert Opinion Is Premised On The
Assumption That USC's Pricing And Selling Choices
For Online Education In A But-For World Govern
Plaintiffs' Recovery……………………………………..…..16

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

B.    Wilcox's Assumption Directly Contradicts California Law….....…..19

1.    Under California Law, Breach of Contract Damages Are Governed By The Loss In Value To The Plaintiffs Due To USC's Failure To Perform………..19

2.    Where Impossibility Prevents Full Performance, California Law Provides For Recovery For The Breach In The Form Of Restitution Whose Measure Also Is Determined By The Loss Of Value To The Plaintiffs……………………………………………23

CONCLUSION……………………………………………………25

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Combe Inc. v. Dr. August Wolf GMBH & Co. KG Arzneimittel*,
382 F. Supp.3d 429 (E.D. Va. 2019)……………………………………………8

*Cytosport, Inc. v. Vital Pharmaceuticals, Inc.*,
617 F.Supp.2d 1051 (E.D. Cal. 2009)…………………………………………9

*Daubert v. Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993)……………………………………………………………9

*Dunne, Jr. v. Resource Converting, LLC*,
2022 WL 2132449 (E.D. Mo. Jun. 14, 2022)…………………………………9

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
87 F. Supp.3d 928 (N.D. Cal. 2015)…………………………………………...9

*Koninklijke Philips Electronics N.V. v. Hunt Control Sys., Inc.*,
2017 WL 3719468 (D.N.J. Aug. 29, 2017)…………………………………...7

*Kurtz v. Kimberly-Clark Corp.*,
321 F.R.D. 482 (E.D.N.Y. 2017)……………………………………………..4

*Lanard Toys Ltd. v. Anker Play Prods., LLC*,
2020 WL 6873647 (C.D. Cal. Nov. 12, 2020)………………………………23

*Marsu, B.V. v. Walt Disney Co.*,
185 F.3d 932 (9th Cir. 1999)…………………………………………………15

*Miller v. Fuhu Inc.*,
2015 WL 7776794 (C.D. Cal. Dec. 1, 2015)…………………………………4

*Odyssey Wireless, Inc. v. Apple Inc.*,
2016 WL 7644790 (S.D. Cal. Sept. 14, 2016)…………………………..……4

*Olin Corp. v. Lamorak Ins. Co.*,
2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018)…………………..……..23

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

*Overgaard v. Johnson*,
68 Cal. App.3d 821 (1977)……………………………………………………..20

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015)………………………………………………15,  16

*Saavedra v. Eli Lilly & Co.*,
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)……………………………………..3

*The Teaching Company Limited Partnership v. Unapix Entertainment, Inc.*,
87 F. Supp.2d 567 (E.D. Va. 2000)………………………………………….…..8

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*,
2006 WL 62846 (W.D. Mich. Jan. 10, 2006)…………………………………….7

*Williams v. Apple Inc.*,
338 FRD 629 (N.D. Cal. 2021)…………………………….…………….22-23

*Wreal LLC v. Amazon.com, Inc.*,
2015 WL 12550932 (S.D. Fla. Feb. 3, 2015),
*aff'd* 840 F.3d 1244 (11th Cir. 2016)……………………………...……….7-8


**Statutes, Rules and Secondary Sources:**

Cal. Civ. Code, § 1511……………………………………………………..24

Cal. Civ. Code, § 1514……………………………………………………..24

Fed. R. Evid. 702………………………………………………………..2

Restatement (Second) of Contracts, § 347…………………………….……..20, 21

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF RONALD T. WILCOX, PH.D.</u>

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiffs' motion to strike the report and testimony of Defendants' proffered rebuttal expert, Ronald T. Wilcox, Ph.D., should be granted for several independent reasons.

*First*, as a matter of law, Wilcox's expert report and testimony cannot meet the "helpfulness" threshold requirement for expert opinion testimony under Federal Rule of Evidence 702. This is so because Wilcox merely lobs subjective criticisms of the choice-based-conjoint survey and damages analysis presented by Plaintiffs' expert economist, Dr. Hal J. Singer, but Wilcox did no survey or analysis of his own to test whether the purported criticisms he identified make any difference to the results Dr. Singer calculated.

With no survey or calculations of his own, Wilcox cannot and does not opine whether his critique would cause the damages Dr. Singer calculated to be lower, higher, or unchanged.  Because a jury would be left to speculate what impact, if any, adopting Wilcox's opinions would have on the damages calculated by Plaintiffs' expert economist, Wilcox's mere critiques are not helpful to the trier of fact and must be stricken.  Federal courts in California and across the country have so held, and this Court should follow suit.

*Second*, even if one could overlook the utter lack of helpfulness lent by Wilcox's report, his testimony should be stricken for another equally fatal reason. Wilcox's entire report relies on an incorrect legal standard of recoverable damages or restitution available to students who allege USC failed to perform its promise to offer in-person, on campus education.  Ignoring the governing standard set forth in the Restatement (Second) of Contracts and California Civil Code Section 1514,

1

Wilcox mistakenly believed that the measure of recovery requires consideration of USC's hypothetical pricing for online, off-campus education in a but-for world and the competitive landscape for college offerings (so-called "supply side" factors). California law, however, holds the opposite.  Faced with USC's inability to perform during the COVID-19 pandemic, students are entitled to a prorated refund of the fees and tuition they prepaid to USC based on *their* valuation of the services they did not receive.  Wilcox's reliance on an incorrect legal standard renders his entire opinion testimony *per se* inadmissible.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Because Wilcox's report and opinion testimony is neither helpful to a fact-finder (leaving it to speculate) nor is based on reliable principles (he relies on the wrong legal standard), they flunk Rule 702's admissibility requirements and must be stricken.

For these reasons, as detailed below, Plaintiffs' motion should be granted.

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

## II.  **WILCOX UNDERTOOK NO WORK TO TEST THE VALIDITY OF HIS CRITICISMS, SO HIS REBUTTAL REPORT CANNOT "HELP THE TRIER OF FACT" AS REQUIRED BY FED. R. EVID. 702.**

### A.  **Plaintiffs' Expert, Dr. Hal J. Singer, Reliably Calculated Classwide Damages After Conducting Well-Accepted Choice-Based-Conjoint Surveys And Analysis.**

On December 9, 2023, Plaintiffs served on Defendants the Expert Report of Hal J. Singer, Ph.D.  *See* Dkt. No. 145 (under seal)[1]. Dr. Singer's expert report detailed his use of two Choice-Based-Conjoint ("CBC") studies to ascertain whether classwide damages could be calculated in this case and, if so, to quantify them.  *See generally* Singer Rpt. [Dkt. No. 145], at ¶ 7.   As Dr. Singer explained, "I demonstrate that CBC analysis can be used to calculate economic injury and assess aggregate damages—that is, the excess of what Class Members paid USC over the value of what Class Members received—using data and methods common to all Class Members." *Id.*, at ¶ 18.   To do so, Dr. Singer drafted, tested, administered, and analyzed the results of a set of choice-based-conjoint surveys. *See id.*, at ¶¶ 29-52. "Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes—often called the market's willingness to pay." *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, *4 (C.D. Cal. Dec. 18, 2014).

Dr. Singer's CBC surveys and analysis revealed classwide damages directly attributable to USC's conduct forming part of the Class Action Complaint totaled approximately $76.31 million, comprised of $49.24 million in damages sustained by undergraduate putative class members and $27.08 sustained by the graduate student members of the putative class.  *See id.*, at ¶ 71, and at Tables 9 and 10.  As

---

[1] Dr. Singer's opening expert report was filed as Exhibit 3 to the Declaration of Daniel J. Kurowski In Support Of Plaintiffs' Motion For Class Certification.  The full version of the report was filed partially under seal as Docket No. 145.

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

Dr. Singer attested, "[c]onjoint analysis has been widely adopted by the private sector." *Id.*, at ¶ 20. So too, federal courts across California and nationwide have expressed that, "numerous courts . . . have accepted" conjoint analyses "as reliable methodologies for calculating price premiums on a classwide basis in consumer class actions." *Miller v. Fuhu Inc.*, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015); *see also Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2016) ("Further, a conjoint analysis is a generally accepted method for valuing the individual characteristics of a product."); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017) (stating that conjoint analyses "have previously been approved in consumer class actions as reliable methodologies available for calculating the price premium attributable to a product characteristic").

### B. USC Proffered The Wilcox "Rebuttal" Report Without Any Survey, Conjoint Study, Or Assessment Of Damages (Or Lack Of Damages).

In apparent response and rebuttal to Dr. Singer's CBC studies and the damages derived therefrom, USC served the expert rebuttal report of Ronald T. Wilcox, Ph.D. on January 18, 2023. *See* Dkt. No. 156-9 (under seal)[2]. Unlike Dr. Singer's undertaking, Wilcox provided no survey, no conjoint work, nor any numerical calculation. Instead, Wilcox's entire report is directed to lobbing his perceived criticisms of Dr. Singer's CBC survey.

Unlike Dr. Singer, Wilcox administered no survey. He therefore has no basis on which to opine whether any of his perceived criticisms of the CBC work Dr. Singer did would alter the results Dr. Singer obtained and, if so, in which

---

[2] Dr. Wilcox's rebuttal report was filed as Exhibit 16 to the Declaration of Leo P. Norton In Support Of Defendants' Opposition To Plaintiffs' Motion For Class Certification. The full version of that report was filed partially under seal as Docket No. 156-9.

4

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

direction or to what extent.  A jury hearing and accepting Wilcox's testimony would therefore be left to speculate whether his criticisms mean that the $76.31 million in classwide damages Dr. Singer reported should be adjusted downward, upwards (and by how much), or not at all.  Wilcox offers nothing to prevent the fact-finder from guessing.

Wilcox's failure to conduct his own survey—his failure to do anything to directly show the validity or reliability of his purported critiques of Dr. Singer's work—is especially glaring here.  At deposition, Wilcox admitted that in other cases in which he had been proffered as a rebuttal expert, he *had* conducted his own rebuttal conjoint survey, but he did not do so in this case:

> Q    Okay.  But it's your testimony today that if we went through the list here of cases in which you've testified since 2019, that we would actually find cases in which you've administered your own conjoint survey?
>
> A    It would be clear, these were *rebuttal* conjoint surveys.  But, yes, I did conduct -- *I would have conducted a conjoint survey*.  That is my testimony.
>
> Q    Okay.  Did you conduct a rebuttal conjoint survey as you've used the term in this case?
>
> A    No.
>
> . . . .
>
> Q    Did you conduct any survey here, whether conjoint or otherwise?
>
> A    I did not conduct a survey in this case.

Ex. 1 to Katriel Decl. [Wilcox Dep. Tr.], at 17:1-19 (emphasis added).

The natural result of that omission was also laid bare during Wilcox's deposition.  Because he had not administered his own survey to test what import, if any, his criticisms of Dr. Singer's work would have on Dr. Singer's damages

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

result, Wilcox could not provide *any* opinion on damages or how his critiques would affect the ultimate damages figure Dr. Singer reported:

> Q    And I take it, sir, from your prior testimony today that as part of undertaking that assignment, you did not conduct your own survey to -- you did not conduct your own survey; correct?
>
> A    I did not conduct a survey in this case.
>
> Q    And I take it, based on that, that it would be fair to say that whatever criticisms you levied in your report as to Dr. Singer's work here, you did not come up with a different number than the numbers that he put forth as his results.   Would that be fair?
>
> A    I did not put forward an affirmative damages estimate.
>
> Q    Well, you did not put forth an affirmative damages estimate, but you also didn't put forth a rebuttal damages estimate; correct?
>
> THE WITNESS:  I did not put forth a damages estimate.

*Id.*, at 41:2-15 (objection omitted).

Wilcox's inability to provide any insight into how his criticisms of Dr. Singer's work would affect the damages Dr. Singer calculated became especially pronounced because Wilcox conceded that he could not rule out that an individual or a *group of students* (*i.e.,* a class of students) sustained financial harm because of the conduct the operative Class Action Complaint alleges USC engaged in.   Yet, being unable to rule out that such damages were sustained by the student putative class members, Wilcox failed to carry out any survey or other testing to determine whether his criticisms of Dr. Singer's work would have any impact on the classwide damages Dr. Singer calculated following his conjoint survey and analysis:

> Q    But I also understand from your responses to a few questions ago that you've also allowed for the possibility that groups of students were harmed, suffered financial economic harm if the conduct alleged in the operative complaint is proven to be true; correct?

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

THE WITNESS:  *I cannot preclude the  possibility* that some student or *some group of  students might have suffered some sort of harm*.

*Id.*, at 42:15-25 (emphasis added, objection omitted).

Wilcox's opinion testimony does not meet the threshold "helpfulness" requirement of Federal Rule of Evidence 702.  And, USC cannot avoid that result merely by labeling Wilcox a "rebuttal" expert.  Rule 702's requirements apply equally to rebuttal and affirmative experts.  Courts nationwide have found unhelpful rebuttal survey experts who, like Wilcox, did not conduct their own survey to test the impact of their criticisms of the opposing expert's survey work:

> Additionally, Dr. Rappaport did not conduct a survey of his own to show that the other surveys were inaccurate. Dr. Rappaport's criticism of the reports would have been aided, perhaps significantly, by a demonstration that Dr. Rappaport's suggested methodology would have given different results on the issue of likelihood of reverse confusion.  In sum, Dr. Rappaport's critique of Philips's expert surveys was not persuasive.

*Koninklijke Philips Electronics N.V. v. Hunt Control Sys., Inc.*, 2017 WL 3719468, at *32 (D.N.J. Aug. 29, 2017) (internal citation omitted).

Courts adopt this reasoning to "rebuttal" experts to the same extent as to affirmative experts:

> [T]he absence of competing survey evidence from [*the rebuttal expert*] showing divergent survey results significantly undermines the efficacy of plaintiffs' arguments that defendants' evidence is so unreliable that it must be excluded. In other words, plaintiffs' criticisms of the methodology used by the defense experts would have been substantially aided by proof that the 'correct' methodology would have led to a different result.

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.,* 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006) (emphasis added); *see also Wreal LLC v. Amazon.com, Inc.*, 2015 WL 12550932, at *16 (S.D. Fla. Feb. 3, 2015), *aff'd*, 840 F.3d 1244 (11th

Cir. 2016) ("[C]ourts do and should ignore or give little weight to survey criticisms absent a showing that using the approach the critiquing expert believes to be correct would lead to a different result.") (emphasis added).

More recently, yet another federal court also used the same reasoning to find unhelpful another expert's mere criticisms of the opposing expert survey:

> Furthermore, because defendant did not conduct its own survey using a different control, there is no empirical basis on which to conclude whether or to what degree a different control would have captured a materially higher level of survey noise.

*Combe Inc. v. Dr. August Wolf GMBH & Co. KG Arzneimittel*, 382 F. Supp.3d 429, 464-65 (E.D. Va. 2019).

Time and again, courts have failed to credit mere expert criticism of the opposing party's expert survey evidence where the criticism was unaccompanied by testing to show it would affect the survey results being criticized. So where, as here, one party's expert reports on the results of his survey and the opposing party's rebuttal witnesses merely lob purported criticisms without advancing a rival survey analysis, courts have discarded the import of such "expert" criticisms:

> Although Defendant presented an expert to challenge Dr. Jacoby's results, Mr. Ossip acknowledged that the best way to determine whether the alleged design flaws he identified had any effect on the outcome would be to conduct an alternate survey. However, Unapix did not present any alternative survey.

*The Teaching Company Limited Partnership v. Unapix Entertainment, Inc.*, 87 F. Supp.2d 567, 584-85 (E.D. Va. 2000).

So too, a California federal district court found it particularly important that, as here, a defendant's expert's criticism of the plaintiff's expert's survey was unaccompanied by any survey performed by the criticizing expert:

> Notably, while defendant submits a declaration by an expert who criticizes plaintiff's survey, defendant did not conduct its own survey, despite adequate time to do so. At oral argument, remarkably,

> defendant's counsel admitted that he and his client made a conscious choice to not perform a competing survey as *they* believed the motion was baseless and a survey was thus, unnecessary.

*Cytosport, Inc. v. Vital Pharmaceuticals, Inc.*, 617 F.Supp.2d 1051, 1075, n.10 (E.D. Cal. 2009) (italics in original).

These authorities stand for the unsurprising proposition that expert opinion testimony that merely criticizes, with no affirmative showing by the rebuttal expert's own work to document the impact of the critiques, is unhelpful and leaves the fact-finder to impermissibly speculate. A federal trial court explained as much:

> As to *Pratt's criticism* that Dr. Sokhansanj failed to account for the increased drying rate that would occur if the samples were mechanically agitated, the criticism is unsupported and *unhelpful to a jury because Pratt has never done any testing* to show that agitation of MSW would increase the drying rate, he has not reviewed any studies that show that, nor has he conducted any experiments on MSW to show that would be the case.

*Dunne, Jr. v. Resource Converting, LLC*, 2022 WL 2132449, at *17 (E.D. Mo. Jun. 14, 2022) (emphasis added).

In *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993), the United States Supreme Court tasked federal district judges to act as "gatekeepers" before admitting expert opinion testimony. Interpreting Federal Rule of Evidence 702, the Supreme Court held that such testimony should not be admitted where, as here, it is not "helpful" to the trier of fact. *Id.*, at 579. Expert opinion that invites a jury to speculate about the ultimate result is unhelpful and inadmissible under the Rule. *See Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp.3d 928, 947 (N.D. Cal. 2015) (finding proposed expert testimony unhelpful and inadmissible insofar as it would be "inviting the jury to speculate"). Because Wilcox's "rebuttal" does just that, it should be stricken.

**C.    Wilcox Admitted That His Purported Criticisms May Not Adversely Impact Dr. Singer's Classwide Damages But He May Only Speculate Because He Did No Work Of His Own.**

That Wilcox's failure to conduct any survey of his own would lead a fact-finder to speculate about the impact, if any, of his criticisms of Dr. Singer's calculated damages is not a hypothetical legal argument.  When confronted at deposition with purported criticisms Wilcox raised in his report, he repeatedly could not tell whether they would have a greater or lesser impact on harm done to the students than that captured in Dr. Singer's conjoint survey results.

**1.    Wilcox Does Not Know How Or Whether His Criticism Of Dr. Singer's Survey Prompt Wording Would Affect Dr. Singer's Results.**

Take, for example, Wilcox's criticism that Dr. Singer presented a survey scenario in which students either had remote education or in-person education by USC for the Spring 2020 semester.  (Dr. Singer then prorated the damages revealed by the survey to account for the actual portion of the Spring 2020 semester in which USC went entirely online).  Wilcox's report attacked this language as leading to an overstatement of damages because it did not recite that the Spring 2020 term included both modalities, as it began in-person before USC shut down in March 2020.  *See* Wilcox Rpt., at ¶¶ 85-87.   According to Wilcox's report:

> The reason Dr. Singer's survey design and pro-rated calculation are problematic is that they do not properly account for how and why students may prefer one modality of instruction over the other. In particular, the fact that the first half of Spring 2020 was available in person meant that students would have had a chance to make in-person connections with course instructors, fellow classmates, and broader faculty and staff. The beginning of the semester is also a period during which project teams and study groups form, and during which students may explore various courses before finalizing their curriculum. Putative class members had access to these activities in person in the first half of the semester, and the value derived from these activities

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

would potentially last the entirety of the semester, not just for the duration of in-person instruction.

*Id.*, at ¶ 87; *see id.*, at ¶ 26 (Dr. Singer's wording "fails to take into account that many of the benefits from in-person attendance in the first half of the semester").

Initially at deposition, Wilcox hewed to this attack on how Dr. Singer's survey prompt would overstate damages:

> Q    Okay. So is your criticism as stated in Paragraph 26 of your report that Dr. Singer's conjoint survey results would have a tendency to overstate the impact of the shift to online off-campus education because the prompt did not inform the survey-takers that the first half of the semester would be taken in person?
>
> A    Among other things, yes.

Ex. 1 to Katriel Decl. [Wilcox Dep. Tr.], at 86:5-12.

But because Wilcox did not conduct his own survey to test the impact of the language used by Dr. Singer that Wilcox found objectionable, Wilcox conceded that describing the semester in the manner Wilcox advocated could have a *greater adverse impact* on students than the manner Dr. Singer had presented it. That is, Wilcox admitted that having the Spring 2020 semester begin in-person and suddenly switch without warning to a fully online remote modality could prove more disruptive to students who had gone into the semester expecting in-person instruction. By contrast, had students been told from the start that the entire Spring 2020 semester would be offered remotely online (as Dr. Singer's survey prompt presented it), they could have experienced less disruption as they would have been given this clear expectation before enrolling:

> Q    Could you envision a situation, sir, though, where students would find it *more troubling to learn that they would start a semester in person and then, without warning or time for transition, they would immediately be switched to a fully online kicked-off-campus scenario*?
>
> BY MR. KATRIEL:

---

11

Q    That would be *more troubling* to a certain group of students *than doing it either entirely online or entirely in person for the entire semester*?

THE WITNESS:  *I can't preclude any kind of preferences among any student or groups of students.*  I will simply say that in my experience as a person who has also done online education and does it every year at the Darden School, that once you have met students in person, their interactions online are much more robust.  And so, in my experience, online learning is more valuable once students have had face-to-face interaction, *but I cannot preclude the fact that perhaps some student feels differently about that.*

*Id.*, at 86:13-87:12 (emphasis added, objections omitted).

So, while Wilcox's expert report's criticisms of Dr. Singer's survey prompt language made it seem like the critiqued language inevitably would overstate damages, at deposition Wilcox revealed that he could not discern whether *his* proposed language would actually be the one to overstate damages by being perceived as more detrimental and disruptive to groups of students.  His testimony simply leaves the fact-finder to speculate because Wilcox conducted no survey questioning of his own to ascertain whether his proposed phraseology would have any bearing on Dr. Singer's survey results.  That bare testimony, with no analysis, cannot possibly "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

### 2.    Wilcox Concedes His Criticism Of Dr. Singer's Enrollment Language Is Not One As To Which He Has Any Opinion.

Other examples abound.  For example, Wilcox's report criticizes Dr. Singer's conjoint survey phrasing because Wilcox contends the description does not clarify whether survey participants are to assume they are enrolled at USC for a degree program or merely there as visiting students for a single semester.  *See* Wilcox Rpt., at ¶ 81.  Again, with no survey of his own to assess the validity or effect of that

critique, Wilcox posits that Dr. Singer's wording overstates damages because survey respondents who assumed they would merely visit at USC for a semester would have placed a greater value on being in in-person on-campus classes than already enrolled USC degree-seeking students:

> The incentives of a non-USC student to come to southern California and spend a semester at USC in-person or attend USC classes remotely are different from the incentives of a previously enrolled or recently admitted USC student to continue with the remote modality of education, which is the pertinent question in this matter. The scenario of a student coming to USC for a single semester is similar to a student going for an international semester abroad. Besides the education itself, such a student would also be expected to highly value direct interactions with other students and faculty as well as cultural and extra-curricular activities on the USC campus. For such a student, the WTP [willingness-to-pay] for an in-person education would likely be higher than the WTP for a remote program. In contrast, the difference in WTP for remote education and in-person education would not be as high for an already-enrolled USC student who has had a chance to engage with fellow students and faculty and to partake in various extra-curricular activities in the past, or for an incoming USC admit who would get a chance to participate in such activities in the subsequent semesters when the campus opens again.

Wilcox Rpt., at ¶ 82.

At deposition, however, Wilcox again was forced to concede that his supposition about which way his criticism would cut (if at all) was unfounded. This was so partly because, for example, Wilcox's criticism failed to consider that a number of existing or incoming USC degree-seeking students were transfer students who, by definition, had elected to leave their prior college specifically to complete their studies at USC, thereby likely having as great or greater willingness-to-pay precisely for the USC campus experience than visiting students:

> Q    How about students who are degree-seeking students at USC in the spring 2020 semester, if they became that because they transferred from another institution precisely because they wanted the USC

13

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

experience to complete their degree there, is that factored into your understanding at all as to the different price sensitivities that you called the different groups of students?

THE WITNESS:  *I haven't fully considered the transfer students or what the implications of transfer students are.*

BY MR. KATRIEL:

Q    Well, so, therefore, I take it, you have no opinion as to whether the price sensitivity of students who transferred to USC for that spring 2020 semester would be a greater sensitivity than students who were merely visiting USC for that semester; right?  You just don't have an opinion on that?

THE WITNESS:  *I have no opinion about the price sensitivity of transfer students.*

BY MR. KATRIEL:

Q    And you understand that students who had transferred into USC for the spring 2020 semester from another university institution would be encompassed within the class definition as well; right?

THE WITNESS:  *I've previously stated that I don't remember the exact definition of the class.*

Wilcox Dep. Tr., at 79:14-80:23 (emphasis added, objections omitted); *see also id.*, at 80:25-81:7 (agreeing with the proposition that "USC also takes in any number of students each semester from junior colleges").

The salient point is that Wilcox's deposition testimony now reveals how unhelpful his expert report criticisms, devoid of any testing survey of his own, really are.  His report attacked the wording of Dr. Singer's survey description but did nothing to test with an alternate survey of his own whether his proposed wording would have any impact—much less the impact he claims Dr. Singer's language had—on Dr. Singer's survey and damages results. All Wilcox offers are his

14

disagreements with the survey language Dr. Singer employed, but a jury receiving that opinion evidence would be unable to tell what difference would result if Wilcox's disagreements were accepted. Wilcox himself was forced to vacillate at deposition because he had "no opinion" on how his criticism would affect USC transfer students who undeniably form part of the putative class. If Wilcox can form "no opinion" on how the criticism he identifies in his report affects the ultimate damages results, how can a jury possibly be expected to do so from receiving Wilcox's report and testimony?

USC introduced Wilcox's "rebuttal" opinion testimony to argue that, given Wilcox's criticisms of Dr. Singer's CBC studies, Dr. Singer's damages computation should be inadmissible. But that rebuttal opinion proves especially problematic in the context of a damages calculation because "California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (quoting *Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932, 938–39 (9th Cir. 1999)). "[T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Marsu*, 185 F.3d at 939. His testimony, which does not even opine whether Dr. Singer's damages figures are overstated, is especially unhelpful in the face of this liberal standard for proof of damages. It should be stricken.

### 3. Other Wilcox Criticisms Are Foreclosed By California Law.

The all-too facile nature of Wilcox's rebuttal report is evident. Some of his purported criticisms of Dr. Singer's conjoint survey run directly against prohibitions of California law. Key among these is Wilcox's contention that in his conjoint surveys, Dr. Singer "fails to provide critical information to respondents about

benefits from remote education related to protection from exposure to COVID-19 and prevention of the spread of the disease in Spring 2020." Wilcox Rpt., at ¶ 73. His argument is that Dr. Singer's damages model fails to account for the benefits students received in reducing their exposure to COVID-19 after USC went entirely online during the Spring 2020 semester.   But California law holds the precise opposite: "[t]he calculation [of damages or restitution] need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase." *Pulaski & Middleman*, 802 F.3d at 989.   Reduced exposure to COVID was something unknown either to USC or the students when students paid for their Spring 2020 semester that began in January 2020.   Contrary to Wilcox's assertion, that USC's breach may have provided this "benefit" after the semester began and USC failed to deliver in-person instruction is not to be factored into the damages assessment because, as Pulaski held, the pertinent valuation is the valuation placed by the students at the time of their enrollment before the commencement of the Spring 2020 semester.   To the extent Wilcox's criticisms would have Dr. Singer act contrary to California law, they cannot be credited and should be stricken.

## III.   USC AND WILCOX'S "REBUTTAL" RELY ON THE WRONG LEGAL STANDARD FOR RECOVERABLE DAMAGES OR RESTITUTION, THEREBY RENDERING WILCOX'S ENTIRE OPINION INADMISSIBLE.

### A.   Wilcox Entire Expert Opinion Is Premised On The Assumption That USC's Pricing And Selling Choices For Online Education In A But-For World Govern Plaintiffs' Recovery.

Wilcox's rebuttal suffers the additional basic flaw that he assumed an entirely incorrect legal standard for the measure of recoverable damages or restitution in a breach of contract or quasi-contract case.   He erroneously assumed that relief in such cases requires calculation not only of the value that USC students would place on the in-person on-campus education they did not receive—their willingness-to-

pay [WTP] for the alternative online off-campus product they received relative to the in-person promised education—but also would require analysis of USC's choice and willingness to sell and price any online off-campus educational offering in a hypothetical damages but-for world. These so-called "supply-side factors," or what USC has described as the "willingness to sell" or WTS, underpin the entirety of Wilcox's rebuttal.

In his report, Wilcox summarizes his operating assumption:

> Dr. Singer's methodology simply assumes that any change in students' WTP would directly result in a change in USC's asking price. This is simply not the case for exclusive higher education institutions, such as USC, who set their asking prices significantly below the market clearing price. As such, any decline in WTP would not necessarily bring the WTP of a USC student to below USC's asking price such that he or she would no longer want to attend USC. Further, USC's low acceptance rate suggests that it should be able to replace any student not willing to attend USC with other qualified candidates that were not previously accepted. As a result, there is no reason to believe that USC would be forced to reduce its prices to achieve its enrollment numbers.

Wilcox Rpt., at ¶ 20.

Wilcox devoted an entire section of his report to opine that he believed calculation of USC's pricing decision in a but-for world was a necessary step that Dr. Singer's conjoint analysis could not capture because it only measured students' willingness to pay for online education without regard to USC's willingness to sell or price that product. Section III.C of Wilcox's report is therefore entitled:

> Dr. Singer Ignores How Prices Are Set by Exclusive Not-For-Profit Schools Such as USC and Incorrectly Assumes That a Lower Willingness-To-Pay for a USC Education Would Necessarily Translate to a Reduced 'Market Price'

Wilcox Rpt., at p. 29, § III.C.

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

Within that section, Wilcox elaborates at length how his rebuttal of Dr. Singer's work is grounded on Dr. Singer's failure to assess USC's willingness to sell and pricing decisions for an alternative online education product and, instead, measured only the student demand and willingness to pay for such a product.  For example, Wilcox recites that:

> Dr. Singer's estimate of the decline in the so-called 'market price' or 'fair market value' is fundamentally flawed because he fails to appropriately account for how tuition and fees are set in the market for education. Dr. Singer's analysis assumes that tuition and fees in higher education are set by the intersection of supply and demand, and as a result, that a decline in the WTP for its educational services would require USC to lower its tuition and fees. These assumptions are incorrect because they ignore how exclusive non-profit research universities like USC set tuition and make enrollment decisions, including how USC actually set tuition for the academic year 2019 to 2020, which includes Spring 2020.

Wilcox Rpt, at ¶ 65..

Wilcox doubled-down on this basis for his rebuttal report, explaining that:

> In other words, USC sets its price much lower than the price it could have set if it wanted to clear the market, i.e., if it wanted to match the demand for its product to its enrollment quota. What this means is that a typical USC student pays a lower price than their WTP. As a result, even if a typical student's WTP for a USC education were to decrease, for example as a result of educational services transitioning to a remote modality as Dr. Singer asserts, their WTP could still exceed the actual price USC charged. *USC would have no need to lower its asking price to entice that student to continue to attend USC. . . . USC could have simply replaced any newly admitted students unwilling to attend USC with other students willing to attend USC at current tuition prices from the pool of qualified candidates not previously accepted*.

*Id.*, at ¶ 67 (emphasis added).

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

At deposition, Wilcox again expounded on this theme and explained why a conjoint analysis was a methodology incapable of assessing classwide damages because it captured only purchasers' willingness-to-pay (*i.e.,* their demand levels) without considering sellers' willingness-to-sell (*i.e.,* to supply).    So, despite repeated acceptance by courts nationwide of conjoint analysis as a reliable means of calculating classwide damages, Wilcox took the view that conjoint was an unacceptable methodology for doing so:

> Q    Well, have you ever come across a conjoint survey analysis that you felt properly captured class-wide damages in any case in which you've been  involved or have reviewed as part of your career?
>
> THE WITNESS: *In the conjoint analyses that I've seen in the context of litigation, no  individual has ever done any supply side analysis whatsoever; and absent a supply side analysis, it is impossible for conjoint analysis to determine  what are generally referred to as price premium damages*.

Ex. 1 to Katriel Decl. [Wilcox Dep. Tr.], at 25:7-19 (emphasis added).

### B.    Wilcox's Assumption Directly Contradicts California Law.

#### 1.    Under California Law, Breach of Contract Damages Are Governed By The Loss In Value To The Plaintiffs Due To USC's Failure To Perform.

Wilcox is wrong.   He and USC contend that recovery in Plaintiffs' contract and quasi-contract claims is not governed merely by the diminished value to the students of receiving online off-campus USC education instead of the in-person on-campus product USC promised but also hinges on USC's decision on how it would offer or price the alternative off-campus online product in a hypothetical but-for damages world.   He, therefore, assails Dr. Singer's resort to a CBC model as capturing only value to the students or their willingness-to-pay.

Whatever merit an assessment of supply and pricing may have in false advertising, CLRA, or mislabeling cases, breach of contract actions pose a different

19

scenario.  There, the Restatement (Second) of Contracts, which California law adopts, clarifies that breach of contract damages are measured solely by the difference in value to the non-breaching party of what it was promised and what it received.  Section 347 of the Restatement (Second) of Contracts makes this abundantly clear:

> Subject to the limitations stated in §§ 350- 53, the injured party has a right to damages *based on his expectation interest* as measured by
>
> (a) the **loss in the value to him** of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform.

Restatement (Second) Contracts, § 347 (emphasis added); *see Overgaard v. Johnson*, 68 Cal. App.3d 821, 823 (1977) ("'Benefit of the bargain' is the difference between ***the actual value of what plaintiff has received and that which he expected to receive***.") (emphasis added).

The reason contract damages are measured by the difference in value to the non-breaching party, without regard to the breaching party's decision to price or supply the product is straightforward.  In a breach of contract or quasi-contract case, damages are only considered once it already has been shown that: the defendant made an enforceable promise to deliver a certain product to the plaintiff in the agreed-upon quantities and at the agreed-upon price; the defendant failed to fully perform that promise; and, as a result, the plaintiff is entitled to obtain recovery to protect the benefit of his bargain.

As a matter of law, the contract or quasi-contract shown to have been breached already fixed the supply and prices at which the defendant had a legal obligation to provide the product to the plaintiff.  Once having been found in breach,

that non-performing defendant does not get to go back and attempt to renegotiate the binding promise he has been shown to have breached by attempting to posit a new price, quantity, or term. Those terms are already set in place by the contractual or quasi-contractual promise that necessarily must be shown to have existed before the question of damages or restitution is reached. Given this, the defendant's hypothetical pricing or selling decisions of the non-conforming product are irrelevant; the only damages or restitution yardstick is the loss in value *to the non-breaching plaintiff* between what he was promised and he received. *See* Restatement (Second Contracts) § 347(a) ("the injured party has a right to damages *based on his expectation interest* as measured by (a) the **loss in the value to him** of the other party's performance caused by its failure or deficiency).

The measure of damages or restitution in a breach of contract or quasi-contract is *not* the difference in price for which the breaching defendant would elect to sell the non-conforming product. It is, instead, the amount needed to be refunded to the non-breaching plaintiff to make him whole by securing for him the benefit of his bargain after the defendant's breach resulted in the delivery of a less valuable bargain than had been agreed to by the parties. Willingness to pay for the missing attribute relative to the attribute delivered is the measure, and that is precisely what a conjoint analysis reliably captures.

This is precisely what Dr. Singer's expert report explained but what Wilcox's rebuttal ignores:

> Further, the traditional CBC approach is consistent with my understanding of Plaintiffs' claims. Because Plaintiffs allege that that USC promised to provide the in-person on-campus educational offering to *all* USC students enrolled in the Spring 2020 semester for the in-person education option, USC cannot rewind the clock and attempt to renegotiate that promise in a but-for world with only a *smaller* subset of Plaintiffs after realizing the lower net Tuition and Fee price it would need to offer to make them purchase its Online

> Experience voluntarily. Put differently, because the number of Class Members is fixed by USC's promises, it is consistent with the theory of harm to hold the quantity of enrollment slots fixed in this analysis.

Singer Expert Report, at ¶ 73 (italics in original).

In one of her last class certification opinions before being elevated from the district court for the Northern District of California to the Ninth Circuit, Judge Lucy H. Koh reached the same conclusion in another breach of contract class action and explained why the same position Wilcox and USC advance now is wrong and contrary to California law:

> Apple next argues that 'Swain's conjoint survey improperly excludes supply-side considerations.' Specifically, Apple asserts Swain only accounted for 'the value iCloud users supposedly place on their data being stored only using Apple's servers' and not Apple's willingness to *supply* in-house iCloud storage. In Apple's view, Plaintiffs should have calculated 'market price in the *but-for world—i.e.*, the price of [iCloud] without the disputed language.'
>
> The Court disagrees with Apple on two grounds. The first Is conceptual. **To measure contract damages, Plaintiffs need not hypothesize Apple's willingness to supply iCloud in a 'but-for world' where the iCloud Agreement lacks the disputed language.** Indeed, it is unclear how Plaintiffs would model Apple's theoretical supply of a hypothetical product. *See* Swain Dep. At 150:4–151:1 (discussing the difficulty of determining "what Apple thinks it might have done or imagines that it might do"). Rather, where 'defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between [1] the value that the performance would have had if there had been no breach and [2] the value of such performance as was actually rendered. **In principle, this requires a determination of the values of those performances to the injured party himself and *not* their values to some hypothetical reasonable person or *on some market*.'** Restatement (Second) of Contracts § 347 (emphasis added); *see also Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1709 (1996) (citing Restatement § 347's definition of contract damages).

*Williams v. Apple Inc.*, 338 FRD 629, 654-55 (N.D. Cal. 2021) (italics in original, boldface added).

Because Wilcox's entire rebuttal opinion relies on the wrong legal standard, it is *per se* unhelpful, unreliable, and inadmissible. *See Lanard Toys Ltd. v. Anker Play Prods., LLC*, 2020 WL 6873647, at *6 (C.D. Cal. Nov. 12, 2020) ("Expert testimony also should be excluded when it applies the wrong legal standard.") (quoting *Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018)). Wilcox's testimony and report should be stricken.

### 2.    Where Impossibility Prevents Full Performance, California Law Provides For Recovery For The Breach In The Form Of Restitution Whose Measure Also Is Determined By The Loss Of Value To The Plaintiffs.

Perhaps mindful of its doomed position, USC filed a last-minute motion for partial judgment on the pleadings as to Plaintiffs' claim for breach of an implied-in-fact contract. *See* Dkt. No. 152. USC argues that impossibility of its performance is undisputed due to the COVID-19 shutdown ordinances that prevented it from offering in-person on-campus instruction. *See* Dkt. No. 152-1, at 6:10-7:2. Hence, USC now argues that Plaintiffs only have a remaining count for quasi-contract whose recovery is limited to restitution and the measure of that restitution requires an assessment of USC's willingness-to-sell and the students' willingness-to-pay. *Id.*, at 7:9-17.

But USC, like Wilcox, is wrong. California's Civil Code codifies what result ensues in a breach of contract action once impossibility is shown. Contrary to USC's assumption, the Civil Code holds that proving impossibility of performance does *not* dispose of a breach of contract action. Instead, it acts to discharge the defendant's obligation to continue performing but entitles the plaintiff to a prorated refund or restitution. And that measure of restitution is codified to be governed by

the difference in value between what the plaintiff placed on receiving full performance versus the performance he received.  This is the precise result Dr. Singer's CBC methodology calculated.

That is first spelled out in California Civil Code Section 1511, entitled "Causes excusing performance." It provides that:

> The want of performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:
>
> . . .
>
> 2. When it is prevented or delayed by an irresistible, superhuman cause, or by the act of public enemies of this state or of the United States, unless the parties have expressly agreed to the contrary;

Cal. Civil Code, § 1511(2).

Three sections later, the Code explains the effect on recovery once impossibility is shown.  But neither USC's motion for judgment on the pleadings nor Wilcox even cite this section.  California Civil Code Section 1514, entitled "Performance prevented by cause excusing performance" provides that:

> If performance of an obligation is prevented by any cause excusing performance, other than the act of the creditor, the debtor is entitled to *a ratable proportion* of the consideration to which he would have been entitled upon full performance, *according to the benefit which the* <u>*creditor receives*</u> *from the actual performance*.

Cal. Civ. Code, §1514 (emphasis added).

Here, USC, as the party owing performance of the contract, is the "debtor" within the meaning of the statute and the students owed performance are the "creditors."  Section 1514 now clarifies that if, due to some excusing cause, USC could not provide the contracted-for promise of in-person, on campus-education but only offered some part of it, USC could retain only "a ratable proposition of the consideration which [USC] would have been entitled upon full performance." *Id.*

24
PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

The consideration USC would have been entitled to in exchange for full performance was the full tuition and fees it charged the student class members which they paid before the start of the Spring 2020 semester. Because USC did not fully perform due to the COVID-19 pandemic shutdown, however, Section 1514 provides that USC is only entitled to keep a "ratable  proportion" of those tuition and fees paid for by the students for the in-person on-campus Spring 2020 semester.

Critically, Section 1514 dictates that the measure of that prorated proportion is governed *not* by what USC would have charged in some hypothetical market but, instead, is governed solely "according to the benefit which the creditor [*i.e.,* the students] receive[] from the actual performance." *Id*. The measure of the refund is therefore governed by the value (i.e., benefit) placed on the service by the creditor (student). This is what Dr. Singer's CBC studies capture, and Wilcox's criticisms that Dr. Singer instead had to consider USC's supply side market pricing is directly at odds with California's Civil Code.

Whether considered from the perspective of breach of contract expectation damages (governed by Restatement (Second) § 347) or from the perspective of restitutionary damages following proof of impossibility of performance (governed by California Civil Code §1514), Wilcox's entire expert opinion testimony assumes the wrong legal standard. USC's last-minute resort to  restitution arguments does not safeguard Wilcox's fatally flawed reliance on an incorrect measure of recovery. His report and testimony therefore must be stricken.

## **CONCLUSION**

For all the foregoing reasons Plaintiffs' motion to strike the expert report and testimony of Ronald T. Wilcox should be granted.

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

Dated:  April 21, 2023

Respectfully submitted,

**THE KATRIEL LAW FIRM, P.C.**

*/s/Roy A. Katriel*
Roy A. Katriel, Esq. (SBN 265463)
**THE KATRIEL LAW FIRM, P.C.**
2262 Carmel Valley Road, Suite 201
Del Mar, CA  92014
Tel: (619) 363-3333
Email: rak@katriellaw.com

**BERGER MONTAGUE PC**
Glen L. Abramson
Ellen T. Noteware
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: gabramson@bm.net
Email: enoteware@bm.net

**BERGER MONTAGUE PC**
E. Michelle Drake
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel: (215) 875-3000
Email: emdrake@bm.net

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Christopher R. Pitoun (SBN 290235)
christopherp@hbsslaw.com
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Tel: (213) 330-7150
Fax: (213) 330-7152

26

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
(*Pro Hac Vice* forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Email: steve@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Daniel J. Kurowski (*Pro Hac Vice*)
Whitney K. Siehl (*Pro Hac Vice*)
whitneys@hbsslaw.com
455 N. Cityfront Plaza Drive,
Suite 2410
Chicago, IL 60611
Tel: (708) 628-4949
Email: dank@hbsslaw.com
Email: whitneys@hbsslaw.com

*Interim Co-Lead Counsel for Plaintiffs*

-and-

**THE KALFAYAN LAW FIRM, APC**
Ralph B. Kalfayan (SBN 133464)
2262 Carmel Valley Road, Suite 200
Del Mar, CA 92014
Tel: (619) 232-0331
Email: ralph@rbk-law.com

**CARLSON LYNCH LLP**
(Eddie) Jae K. Kim (236805)
117 East Colorado Blvd., Suite 600
Pasadena, CA 91105
Tel: (619) 762-1910
Email: ekim@carlsonlynch.com

**CARLSON LYNCH LLP**

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY

Gary F. Lynch
(*Pro Hac Vice* forthcoming)
Edward W. Ciolko
(*Pro Hac Vice* forthcoming)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
Email: gynch@carlsonlynch.com
Email: eciolko@carlsonlynch.com

**LAW OFFICES OF JENNIFER DUFFY**
Jennifer Duffy
28649 S. Western Avenue, Suite 6571
Los Angeles, CA  90734
Tel: (310) 714-9779
Email: jennifer@usclassactions.com

**PARRIS LAW FIRM**
R. Rex Parris (SBN 96567)
Alexander R. Wheeler (SBN 239541)
Kitty K. Szeto (SBN 258136)
John M. Bickford (SBN 280929)
Ryan A. Crist (SBN 316653)
43364 10th Street West
Lancaster, CA 93534
Tel: (661) 949-2595
Email: rrparris@parrislawyers.com
kszeto@parrislawyers.com
awheeler@parrislawyers.com
jbickford@parrislawyers.com
rcrist@parrislawyers.com

*Attorneys for Plaintiffs and
the Proposed Class*

PLAINTIFFS' MEM. ISO MOTION TO STRIKE WILCOX'S REPORT AND TESTIMONY