# **<u>Exhibit 1</u>**



**19TH JUDICIAL DISTRICT COURT**
**PARISH OF EAST BATON ROUGE**
**STATE OF LOUISIANA**
**300 NORTH BLVD**
**BATON ROUGE, LA 70801**

**19TH DAY OF MAY, 2023**

TO:   **JEFF OSTROW**
      **1 WEST LAS OLAS BLVD**
      **FORT LAUDERDALE, FL 33301**

MICHAEL MIAZZA, ET AL VS BOARD OF SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE

**CASE NUMBER:** C-696918

**JUDGE:** HON DONALD R. JOHNSON

**DIVISION:** 24

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE

AFOREMENTIONED CASE: ENCLOSED YOU WILL FIND A COPY OF A JUDGMNT
SIGNED ON MAY 12, 2023 BY JUDE DONALD JOHNSON.

*Jani Janean*

DEPUTY CLERK FOR DOUG WELBORN

NOTIFIED:

ANDREW A LEMMON
 ANDREW BLANCHFIELD
 ANNA C. HAAC
 CHELSEA A PAYNE
 CHRISTOPHER K. JONES
 ERIC M. POULIN
 HASSAN A. ZAVAREEI
 JEFF OSTROW
 JEFFREY K, BROWN
 JOHN P MURRILL
 MELISSA S. WEINER
 MINDY DOLGOFF
 NEIL SWARTZBERG
 RICHARD C DALTON
 ROY T. WILLEY

EAST BATON ROUGE PARISH
Filed May 12, 2023 1:17 PM
Deputy Clerk of Court
C-696918
24

## NINETEENTH JUDICIAL DISTRICT COURT

### STATE OF LOUISIANA

### PARISH OF EAST BATON ROUGE

| | |
|---|---|
| MICHAEL MIAZZA | DOCKET NO. C-696,918 |
| VERSUS | DIVISION C |
| BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE | |

### *CONSOLIDATED WITH*

| | |
|---|---|
| TAYLOR GUNTER | DOCKET NO. C-698,930 |
| VERSUS | SECTION 24 |
| LOUISIANA STATE UNIVERSITY SYSTEM, and other affiliated entities and individuals MARY L. WERNER, ROBERT S. DAMPF, JAMES M. WILLIAMS, RONALD R. ANDERSON, LEE MALLETT, RICHARD E ZUSCHLAG, JACK A BLOSSMAN, REMY VOISIN STARNS, JIMMIE M WOODS, GLENN ARMENTOR, VALENCIA S JONES, B. WAYNE BROWN, PATRICK C. MORROW, RAYMOND R. MORRIS and COLLIS B. TEMPLE | |

### JUDGEMENT

Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College's ("LSU") Motion for Summary Judgment came for hearing in open court on March 16, 2023. Present in court were:

Anna Haac, Andrew Lemmon and Schuyler Standley on behalf of Taylor Gunter, individually and on behalf of the proposed class; and

Christopher Jones and Andrew Blanchfield on behalf of Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU").

Having carefully considered Defendant LSU's Motion for Summary Judgment, Plaintiff Taylor Gunter's Opposition thereto, and Defendant's Reply, all supporting evidence, and the applicable law:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED ORDERED that Defendant

LSU's Motion for Summary Judgment is GRANTED with respect to Plaintiff Gunter's claims for

punitive damages, and DENIED on all other grounds. Plaintiff's punitive damages claims against

LSU are dismissed with prejudice.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Motion for Class

Certification filed by Plaintiff, Taylor Gunter, is GRANTED and certifies a class of the following

pursuant to Article 591(A) and (B):

All students who, as of March 13, 2020, were enrolled at Louisiana State University's main
campus in Baton Rouge who paid Tuition and/or Fees for the Spring 2020 semester, or on whose
behalf such payment was made.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this court appoints

Plaintiff Gunter as Class Representative, and appoints her counsel as Class Counsel, with Tycko

& Zavareei LLP and Leeds Brown Law, P.C. appointed as Co-Lead Class Counsel, an Executive

Committee appointed that is comprised of Lynch Carpenter, LLP, The Sultzer Law Group, P.C.,

Pearson Warshaw, LLP, Kopelowitz Ostrow P.A., and Anastopoulo Law Firm, LLC, and Andrew

Lemmon of the Lemmon Law Firm appointed as Liaison Counsel.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that both parties are to meet

and confer and submit a proposed publication order and notice to advise all Class Members of this

action and their rights within 30 days or after any appeals are resolved.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Court adopts the

attached proposed Written Reasons for Judgment as its reason for judgment herein.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Judgment be

designated as a Final Judgment under La.C.C.P. article 1915, as there is no just reason for delay.

Baton Rouge, Louisiana, this /2 day of May 2023.

JUDGE, 19th JUDICIAL DISTRICT COURT

I HEREBY CERTIFY THAT ON THIS DAY A COPY OF
THE WRITTEN REASONS FOR JUDGMENT /
JUDGMENT / ORDER / COMMISSIONER'S
RECOMMENDATION WAS MAILED BY ME WITH
SUFFICIENT POSTAGE AFFIXED.
SEE ATTACHED LETTER FOR LIST OF RECIPIENTS.

DONE AND MAILED ON  May 22, 2023

DEPUTY CLERK OF COURT

**Please Send and Serve All Counsel of Record**

Andrew Lemmon
Andrew@lemmonlawfirm.com
P.O. Box 904
Hahnville, LA 70057

Roy T. Willey, IV (admitted pro hac vice)
roy@akimlawfirm.com
Eric M. Poulin (admitted pro hac vice)
eric@akimlawfirm.com
32 Anne Street
Charleston, SC 29403

Melissa S. Weiner (pro hac vice
forthcoming)
mweiner@pswlaw.com
800 LaSalle Ave., Ste. 2150
Minneapolis, MN 55402

Jeff Ostrow (pro hac vice forthcoming)
ostrow@kolawyers.com
Jonathan M. Streisfeld (pro hac vice
forthcoming)
streisfeld@kolawyers.com
1 West Las Olas Blvd., Ste. 500
Fort Lauderdale, FL 33301

Hassan Z. Zavareei (admitted pro hac vice)
hzavareei@tzlegal.com
Anna Haac (admitted pro hac vice)
ahaac@tzlegal.com
182 L Street NW, Ste. 1000
Washington, DC 20036

Richard C. Dalton
rick@rickdaltonlaw.com
Richard C. Dalton, LLC
P.O. Box 358
Carencro, LA 70520

Jason P. Sultzer (pro hac vice forthcoming)
sultzerj@thesultzerlawgroup.com
Jeremy Francis (pro hac vice forthcoming)
jfrancis@thesultzerlawgroup.com
85 Civic Center Plaza, Ste. 104
Poughkeepsie, NY 12601

Jeffrey K. Brown (pro hac vice forthcoming)
jbrown@leedsbrownlaw.com
Michael A. Tompkins (pro hac vice
forthcoming)
mtompkins@leedsbrownlaw.com
Brett R. Cohen (pro hac vice forthcoming)
bcohen@leedsbrownlaw.com
One Old Country Road, Ste. 347
Carle Place, NY 11514

Andrew Blanchfield, T.A. (#16812)
Email: ablanchfield@keoghcox.com
Christopher K. Jones (#28101)
Email: cjones@keoghcox.com

Chelsea A. Payne (#35952)
Email: cpayne@keoghcox.com
701 Main Street (70802)
Post Office Box 1151
Baton Rouge, Louisiana 70821
Telephone: (225) 383-3796
Facsimile: (225) 343-9612

EAST BATON ROUGE PARISH
Filed May 12, 2023 1:17 PM
Deputy Clerk of Court

C-696918
24

# NINETEENTH JUDICIAL DISTRICT COURT

## STATE OF LOUISIANA

### PARISH OF EAST BATON ROUGE

| | |
|---|---|
| MICHAEL MIAZZA | DOCKET NO. C-696,918 |
| VERSUS | DIVISION C |
| BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE | |

### CONSOLIDATED WITH

| | |
|---|---|
| TAYLOR GUNTER | DOCKET NO. C-698,930 |
| VERSUS | SECTION 24 |
| LOUISIANA STATE UNIVERSITY SYSTEM, and other affiliated entities and individuals MARY L. WERNER, ROBERT S. DAMPF, JAMES M. WILLIAMS, RONALD R. ANDERSON, LEE MALLETT, RICHARD E ZUSCHLAG, JACK A BLOSSMAN, REMY VOISIN STARNS, JIMMIE M WOODS, GLENN ARMENTOR, VALENCIA S JONES, B. WAYNE BROWN, PATRICK C. MORROW, RAYMOND R. MORRIS and COLLIS B. TEMPLE | |

## WRITTEN REASONS

The Court enters the following findings of fact, conclusions of law, and Order GRANTING

IN PART and DENYING IN PART Defendant Louisiana State University's ("LSU")'s Motion

for Summary Judgment. LSU's motion is GRANTED regarding punitive damages.[1] For all other

claims, its motion is DENIED.

**Motion for Summary Judgment**

### I. JURISDICTION AND VENUE

1.     This Court has personal jurisdiction over moving Defendant Board of Supervisors

of Louisiana State University and Agricultural and Mechanical College ("Defendant" or "LSU")

pursuant to La. Rev. Stat. § 13:5106.

---

[1] Plaintiff Gunter conceded that punitive damages are not available for her claims. Pl. Mem. at 6, n.3.

2.      Venue is proper in this Court pursuant to La. Rev. Stat. § 13:5104 because moving

Defendant operates its academic institutions in this Parish.

## II. FINDINGS OF FACT

3.      Defendant LSU offers both in-person, on-campus academic programs, as well as

fully-online distance-learning programs,[2] such as "LSU Online".[3]

4.      Plaintiff Gunter has presented testimony that during her application, admission,

enrollment, registration, and payment process with LSU as a student, she understood and expected

that LSU was going to provide students like herself with access to campus, in-person classes,

access to campus facilities, access to labs, access to in-person technologies, and other in-person,

on-campus educational services if she paid the tuition and fees associated with the Main Campus.[4]

5.      For purposes of this motion, it is undisputed that LSU's Spring 2020 semester

began on January 13, 2020,[5] that LSU provided in-person classes from January 13, 2020, until

March 15, 2020, and that LSU then switched to online classes after March 16, 2020, with online

classes continuing through the end of the semester on May 9, 2020.[6]

6.      LSU did not issue any refunds of tuition or mandatory fees for the Spring 2020

semester after the shutdown but offered a 15% reduction in tuition and fees for its Summer 2020,

Spring Intercession 2020, and Summer Intercession 2020 semester, which were also online.[7]

7.      The parties do not dispute that Plaintiff Gunter enrolled in five classes as an

undergraduate student at LSU for the Spring 2020 semester, totaling 15.0 credit hours, with

Plaintiff Gunter presenting record evidence showing these courses were scheduled to be in-person

and on-campus at the start of the Spring 2020 semester.[8]

8.      Record evidence shows that on December 20, 2019, LSU posted tuition and fee

charges for the Spring 2020 semester to Plaintiff Gunter's account, amounting to $4,002.55 in

tuition and $1,977.45 in fees,[9] for a combined total of $5,980.[10]

---

[2] Pl. Ex. G, 1442 Dep. (D. Torres) 476–478.
[3] *Id.* at 478:2–23.
[4] Pl. Ex. B, Gunter Decl. at ¶ 4, 6, 17, 20.
[5] Def. Ex. 10, Academic Calendar 2019-2020.
[6] Def. Ex. 6, Elahe Russel Decl. ¶ 8.
[7] *See* Pl. Ex. C, Thomas Galligan Dep. 212:3-20.
[8] *See* Pl. Ex. B, Gunter Decl. at ¶ 23; Dep. of Taylor Gunter, Def. Ex. 3, 20:9–18; Def. Ex. 5-A.
[9] Although Defendant proffers that Plaintiff Gunter paid "$1,950.45" in fees, the record evidence shows that LSU
omits two fees charged to Plaintiff Gunter's account on January 15, 2020, such that the fees and thus the total combined
tuition and fees that Plaintiff Gunter actually paid based on the record evidence was $27 higher than represented in
LSU's briefing. *See* Def. Ex. 6-A, LSU TIS Customer Account Analysis Report ("Account Report"), at Bates No.
022731, lines 1787–1788.
[10] *See* Def. Ex. 6-A, Account Report, at Bates No. 022732, lines 1722–89.

9.   Plaintiff Gunter made arrangements to pay for her cost of attendance at LSU by taking out $6,184 in federal student loans and obtaining federal and state financial aid.[11]

10.   Although LSU's Motion claims that Plaintiff Gunter received more in financial aid than she was required to pay for the Spring 2020 semester, LSU does not take into account that Plaintiff Gunter's total cost of attendance for the Spring 2020 semester was significantly greater than the combined cost of tuition and fees alone, as she also had to pay for food and housing, transportation, and other miscellaneous educational expenses.[12]

11.   LSU's record evidence shows that Plaintiff Gunter paid for her tuition and the majority of her fees by taking out over $6,184 in student loans.[13] Plaintiff Gunter has also presented evidence that the rest of her student loans and the majority of her financial aid was used to cover the rest of their statutorily permitted uses, such as transportation, housing, and meals.[14]

12.   LSU points to six categories of funds that it claims "offset" Plaintiff Gunter's tuition and fee damages.[15] Although LSU states that Plaintiff Gunter received a total of "$5,486" in awards,[16] LSU proffered no undisputed evidence or other authority regarding the context, background, purpose, or source of any of these funds, nor that the use of such monies was limited to the payment of the $5,980 in tuition and fees that she was charged for the Spring 2020 semester.

13.   It is undisputed that these funds include four types of financial aid for her Spring 2020 semester: a federal Pell Grant ($3,097.00), a Louisiana Go Grant ($750.00), an Academic Excellence Fee exemption ($125.00), and a Student Excellence Fee exemption ($514.00). LSU also identifies two COVID-19 hardship-related grants, one federal aid disbursement under the CARES Act, which LSU denominates the "Student Relief Fund" ($1,000) and one award from the College of Art & Design ($1,000).[17]

14.   For the majority of these categories of funds, the record evidence and statutory guidance shows that the funds could be used toward Plaintiff Gunter's total cost of attendance, or

---

[11] *Id.* at Bates No. 022731, lines 1777–78; Pl. Ex. B, Gunter Decl. at ¶ 15.

[12] Def. Ex. 3, Gunter Dep. 58:7–15.
[13] Def. Ex. 6-A, Account Report, at Bates No. 022731, lines 1777–78; Declaration of Taylor Gunter, Ex. B at ¶ 15–16.
[14] *See* Def. Ex. 3, Gunter Dep. 58:7–15.
[15] Def. Mem. at 3.
[16] In its brief and all supporting sworn declarations, LSU identifies Plaintiff Gunter's financial aid and other awards for the Spring 2020 semester as $5,486, but the six funding sources LSU identifies actually total $6,486.20. However, there is record evidence showing that the College of Art & Design award, in the amount of $1,000, was paid after the completion of the Spring 2020 semester and was applied to Plaintiff Gunter's Summer 2020 tuition—a semester which was also remote—not the Spring 2020 tuition or fees for which Plaintiff Gunter seeks damages. *See* Def. Ex. 6-A, Account Report at Bates No. 022729, line 1953. There is thus a dispute of fact as to whether this "award" is attributable to the Spring 2020 semester that cannot be resolved in Defendant's favor on summary judgment.
[17] Def. Ex. 7, Decl. of Amy Matrix, ¶ 21.

any education-related expense, and that they were not specifically tied to tuition and fees paid to LSU. This is consistent with LSU's corporate representative's testimony that when a student receives financial aid at LSU and the student's account has no balance, the financial aid remits directly back to the student.[18]

15.     In terms of financial aid that Plaintiff Gunter received at the start of the Spring 2020 semester, Defendant points to her Pell Grant, LA Go Grant, and two fee Exemptions, all of which were provided before LSU transitioned to remote-only in the wake of COVID-19, and thus, for a purpose other than to compensate Plaintiff Gunter for injuries suffered from such transition.

16.     With respect to the Exemptions, LSU cites record evidence that the Academic Excellence Fee Exemption ($125) and the Student Excellence Fee Exemption ($514.20) were credited to Plaintiff Gunter's account in December 2019.[19] In its Motion, LSU did not point to any other evidence regarding the purpose or limitations on the Exemptions Plaintiff Gunter received that has been placed in the record. On the other hand, at argument, Plaintiff pointed to evidence that the fee exemptions can be funded by a variety of sources, including non-LSU sources.[20]

17.     According to Plaintiff Gunter's Account Report, on January 3, 2020, Plaintiff Gunter's Direct Subsidized Loan ($2,721.00) and a Direct Unsubsidized Loan ($3,463.00) were disbursed to her student account, and applied to her tuition and fee balance for the Spring 2020 semester, leaving her with a credit of $870.20.[21] That same day, Plaintiff Gunter's Pell Grant disbursed, increasing her account credit to $3,967.20.[22] This amount was remitted to her personal bank account on January 4, 2020, for use on other expenses relating to the Spring 2020 semester, including for rent, food, and transportation. This evidence supports Plaintiffs' contention that these funds were not required to be applied principally and exclusively to Ms. Gunter's tuition and fees paid to LSU. This is consistent with the nature of Pell Grants, which are federally funded student financial aid that is disbursed by an educational institution and is not limited to paying just for tuition and fees.[23]

18.     According to Plaintiff Gunter's Account Report, on February 12, 2020, Plaintiff Gunter received a Louisiana Go Grant ("LA Go Grant") of $750.[24] With respect to the LA Go

---

[18] Pl. Ex. H, 1442 Dep. (E. Russell), 240:7–242:10; *see also* Def. Ex. 3, Gunter Dep. at 58:7–15 (testifying that she had to pay "to live," including paying for rent, food, and transportation.).
[19] *See* Def. Ex. 6-A, Account Report, at Bates 022731, lines 1763–64; Def. Ex. 3, Gunter Dep. 34:11–24, 35:6–11.
[20] Def. Ex. 7, Matrix Decl. at ¶ 8.
[21] *See* Def. Ex. 6-A, Account Report, at Bates 022731, lines 1777–78.
[22] *See id.* at Bates 022731, lines 1779.
[23] *See* 20 U.S.C. § 1070a(b)(1) (citing 20 U.S.C § 1087ll for "cost of attendance" definition).
[24] *See* Def. Ex. 6-A, Account Report, at Bates No. 022732, line 1791.

Grant ($750.00), LSU likewise only provides record evidence that Plaintiff Gunter received that amount towards her overall cost of attendance.[25] This grant is a Louisiana state-funded analogue to Pell Grants that is available to Louisiana residents who "can demonstrate financial need," and like the Pell Grant, there is evidence showing that it can be applied to any education-related expense, not just tuition and fees.[26] Indeed, according to Plaintiff Gunter's Account Report, LSU applied the LA Go Grant to the remaining balance on Plaintiff Gunter's account and remitted to her the remainder of $643 for use on other expenses relating to the Spring 2020 semester, including for rent, food, and transportation.[27]

19.    Other than the LA Go Grant being used to pay for two fees and parking, Plaintiff Gunter's tuition and the rest of her fees was paid using her student loans.[28] Thus, according to Plaintiff Gunter's Account Report, the LA Go Grant and the Exemptions were the only "awards" that were actually used to pay for her Spring 2020 semester fees or tuition as she paid for her tuition and the rest of her fees with student loans.[29]

20.    Plaintiff Gunter presents credible testimony that from the start of the Spring 2020 semester until the onset of COVID-19, she received the type of in-person, on-campus educational experience that she expected to receive when she applied to LSU's Baton Rouge campus and registered to attend the Spring 2020 semester.[30]

21.    Plaintiff Gunter further alleges and presents record evidence that she overpaid for the latter half of the Spring 2020 semester due to LSU closing its campus, halting all in-person classes, and transitioning Plaintiff Gunter to an online-only remote learning environment for the remainder of the semester in response to the COVID-19 pandemic. Plaintiff Gunter's support for her claims includes her own testimony that she did not receive the educational services that she paid for, as well as with an expert report calculating her damages, based on LSU records, at between $437 - $933 based on two different potential damages methodologies.[31]

22.    LSU has testified via deposition and interrogatory responses that it did not issue any refunds of Plaintiff Gunter's tuition and fees for the Spring 2020 semester related to the

---

[25] Def. Ex. 3, Gunter Dep. 41:10–19.
[26] See 28 La. Admin. Code Pt IV, § 1201(B).
[27] Def. Ex. 6-A, Account Report, at Bates No. 022732, lines 1791–96; Def. Ex. 3, Gunter Dep. 58:7–15.
[28] Def. Ex. 6-A, Account Report, Bates No. 022731, lines 1777–78; Pl. Ex. B, Gunter Decl. at ¶ 15.
[29] See id. at Bates No. 022731, lines 1763–64, 1777–78.
[30] See Def. Ex. 3, Gunter Dep. 20:14–18.
[31] See, e.g., Pl. Ex. H, 1442 Dep. (E. Russell), 164:10–165:14, 167:11–23 (confirming that most of the in-person or on-campus services that were provided prior to COVID-19 were not provided after the widespread outbreak of COVID-19, with classes transitioning to "100 percent online"); Pl. Ex. I, 1442 Dep. (J. Droddy), 449:3–11; Pl. Ex. G, 1442 Dep. (D. Torres) 518:18–522:2.

COVID-19 shutdown. [32] Plaintiff Gunter has confirmed that she has not received any refunds from LSU.[33]

23.     In terms of the funds that Plaintiff Gunter received following the onset of COVID-19, Plaintiff Gunter received two COVID-19 hardship-related awards, one CARES Act "award" and one award from the College of Art & Design: LSU has not demonstrated that either were limited to Spring 2020 tuition and fees or that they were funded by LSU. Rather, there is evidence that they were funded by non-LSU sources.

24.     Specifically, according to Plaintiff Gunter's Account Report, on April 9, 2020, Plaintiff Gunter received a disbursement ($1,000, which LSU denominates "the Student Relief Fund") that was deposited into her bank account.[34] This award consisted of CARES Act funding from the federal government that LSU was required to disburse these funds directly to Plaintiff Gunter and not apply them to her account balance.[35] These funds were not used to pay for or refund tuition and fees for the Spring 2020 semester.[36] And the CARES Act makes clear that such relief monies could be used for costs other than tuition and fees, "such as food, housing, course materials, technology, health care, and child care."[37]

25.     On May 27, 2020, Plaintiff Gunter received a matching $1,000 award from the College of Art & Design's General Scholarship Fund to supplement her CARES Act award. The email that Plaintiff Gunter received confirming this award (and which LSU offers in support of summary judgment) had no information about the award acting as a refund for tuition or fees or stating the purpose of the award other than expressing the hope that it "will help you during these extraordinary times."[38] Further, the email was sent from the LSU Foundation, not LSU itself, and stated that the award was from LSU donors, not LSU.[39] Finally, according to Plaintiff Gunter's Account Report, LSU applied this award to her account balance reflecting tuition charged for Summer 2020, not Spring 2020 (a semester which was also remote).[40] Accordingly, there exists a

---

[32] Pl. Ex. H, 1442 Dep. (E. Russell) 170:13–18; Ex. I, 1442 Dep. (J. Droddy) 449:12-23; Pl. Ex. D, Def. Ans. To Pls. Interrogatories, (1442 Dep. Ex. 10) (Response to Interrog. No. 7).
[33] Pl. Ex. A, Decl. of Hal Singer, at 3; Pl. Ex. B, Gunter Decl. at ¶ 22.
[34] See Def. Ex. 6-A, Account Report at Bates No, 022732, lines 797–1800.
[35] Pl. Ex. H, 1442 Dep. (E. Russell) 225:19–22.
[36] Def. Ex. 6-A at Bates No. 022732, lines 797–1800; Def. Ex. 8.
[37] CARES Act, PL 116-136, 134 Stat 281, § 18004(c) (March 27, 2020); see also 1442 Dep. (E. Russell) 225:19–22 ("The first pot of student emergency funds required that we passed it on to the student without applying it to any outstanding balance they may have").
[38] Def. Ex. 9.
[39] See id.
[40] Def. Ex. 6-A, Account Report, at Bates No. 022732, line 1983; see also Def. Ex. 9.

dispute of fact as to whether the award is relevant to the Spring 2020 semester, with evidence

showing these funds were not restricted to Spring 2020 tuition and fees, as LSU claims.

## CONCLUSIONS OF LAW

26.     Summary judgment is appropriate only when, "[a]fter an opportunity for adequate

discovery, . . . the motion, memorandum, and supporting documents show that there is no genuine

issue as to material facts and that the mover is entitled to judgment as a matter of law." La. Code

Civ. Proc. Art. 966(A)(3).

27.     A genuine issue arises "if reasonable persons could disagree." *Woods v. Winn-Dixie*

*Stores, Inc.*, 2022-0191 (La. App. 1 Cir. 9/16/22). And a genuine issue is "material" when "its

existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory

of recovery." *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So. 2d 730,

751. "Simply put, a 'material' fact is one that would matter on the trial on the merits." *Id.*

28.     The movant, here LSU, bears the burden of proof on summary judgment and must

"show an absence of factual support for one or more elements essential to plaintiffs' claim." *Hester*

*v. Walker*, 2020-01278 (La. 5/13/21), 320 So. 3d 362, 366. Any doubts, moreover, should be

resolved in the non-moving party's favor. *Hines v. Garrett*, 2004-0806 (La. 6/25/04), 876 So. 2d

764, 765.

29.     Ms. Gunter presents a live controversy and has shown injury and damages.

30.     Here, Ms. Gunter alleges and has presented evidence that she paid more in tuition

and fees than the market value of what she received. Overpayment is a classic form of injury, and

the amount of such overpayment constitutes damages that regularly serve as the basis for breach

of contract and conversion claims. *See, e.g., Young Conservatives of Texas Found. v. Univ. of N.*

*Texas*, 597 F. Supp. 3d 1062, 1074 (E.D. Tex. 2022) (overpayment of tuition is an injury); *In re*

*Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018) (recognizing "injury in the form of lost

money fairly traceable to an allegedly unlawful supra-competitive price"); *Maya v. Centex Corp.*,

658 F.3d 1060, 1069 (9th Cir. 2011) (overpayment is a cognizable injury); *Mims v. Stewart Title*

*Guar. Co.*, 590 F.3d 298, 302 (5th Cir. 2009) (same); *see also De Lambre v. Williams*, 36 La. Ann.

330, 330 (1884) (a suit for recovery of damages for overpayment of contracted amount); *Perez v.*

*Bruister*, 823 F.3d 250, 266 (5th Cir. 2016) (measuring damages by the amount the plaintiffs

overpaid).

31.     LSU does not claim that it provided Ms. Gunter a free ride. Defs. Statement of Undisputed Facts, ¶¶ 10–11. To the contrary, there is no question that Ms. Gunter did, in fact, pay for the Spring 2020 semester.[41] Plaintiff's injury is thus cognizable.

32.     Further, Plaintiff has provided expert testimony from Dr. Singer, a published economist and professor, detailing a variety of methodologies that can measure the price differential between the in-person educational experience at LSU that Ms. Gunter testified she expected and received for the first half of the Spring 2020 semester and an online-only remote educational program that Ms. Gunter received for the second half of the Spring 2020 semester. Specifically, Dr. Singer has calculated Ms. Gunter's damages at between $437 and $933 for the Spring 2020 semester using two potential benchmark methodologies: (i) a 15% discount that LSU itself applied to the Summer 2020 semester, which was also online and remote as a result of COVID-19, and (ii) a direct price comparison between what LSU's traditional campus-based students pay versus what LSU's online distance learning ("ODL") students pay.[42]

33.     Plaintiff has thus provided ample evidence of both injury and damages. Similar motions have been denied in analogous cases, including in *Luquetta v. Regents of the Univ. of California*, No. A128882, 2012 WL 1499040, at *16 (Cal. Ct. App. Apr. 30, 2012), and *Omori v. Brandeis Univ.*, No. 20-cv-11021, 2022 WL 10511039, at *6 (D. Mass. Oct. 18, 2022) (finding that damages may be calculated through comparing a university's online programs with its in-person programs).[43] Here, the facts are nearly identical to these cases, and the Court likewise denies LSU's arguments.

34.     Nor has LSU met its burden of showing that the financial aid Ms. Gunter received should reduce or offset her damages. Rather, LSU's offset and double recovery arguments show a fundamental misunderstanding of how financial aid works, misstates the facts, and misapplies the law.

---

[41] *See* Def. Ex. 6-A, Account Statement, at Bates 022731; Def. Ex. 3, Gunter Dep. 25:21–22.
[42] *See generally* Pl. Ex. A-1.
[43] *See also Jones v. Administrators of Tulane Educ. Fund*, 51 F.4th 101, 115–16 (5th Cir. 2022) (assessing motion to dismiss; "Tulane allegedly packaged online tuition as a product separate and distinct from in-person tuition and offered online programs at a significantly cheaper cost than in-person programs. We can reasonably infer that 'the higher tuition ... [is] based, at least in part, on access to in-person instruction and on-campus facilities and resources.'); *Allen v. Jacksonville Univ.*, No. 3:21-CV-178-MMH-LLL, 2022 WL 17668615, at *10 (M.D. Fla. Dec. 14, 2022) (assessing motion to dismiss; "Factual development could reveal that Allen's damages depend solely upon a quantitative calculation—for example, a cost comparison between the in-person degree program at JU and an online degree program at a comparable university.").

**A.    For purposes of this Motion, Defendant has waived the defense of offset.**

35.    As an initial matter, LSU's argument that the amount Ms. Gunter received in

financial aid "directly offset the amount she is claiming" (Mot. at 1), is an affirmative defense that

must be plead in the Answer. *Hooper v. Louisiana Pigment Co., LP*, 2019-816 (La. App. 3 Cir.

5/13/20), 298 So. 3d 810, 831 ("Offset has been recognized as an affirmative defense which must

be specifically pled in the defendant's answer."). LSU has not plead this affirmative defense. *See*

*generally*, Def. Ans., Ex. E. "The failure to set forth affirmative defenses waives those defenses

and bars the introduction of evidence offered in connection with an affirmative defense." *Amedee*

*v. Aimbridge Hosp. LLC*, 2021-01906 (La. 10/21/22), 351 So. 3d 321, 333.

36.    At summary judgment, it is the moving party's burden (and thus LSU's) to show

that no genuine issue of material fact exists regarding its affirmative defenses. *State, Div. of*

*Admin., Off. of Risk Mgmt. v. Chennel Lite Clark*, 2008-0823 (La. App. 1 Cir. 12/23/08) ("A party

pleading an affirmative defense has the burden of proving it by a preponderance of the evidence.").

37.    At argument, LSU argued its contentions regarding double recovery and mootness

stood separately from any offset defense. Given that LSU's argument is that Plaintiff Gunter's

receipt of financial aid and grants should be weighed against the amount of damages that she

claims, the Court fails to see how this argument is anything but an offset defense. Indeed, LSU has

moved to amend its answer to include the defense of offset. *See* Def. Mot. Amend. Compl. For the

purposes of this motion, however, amendment is untimely. LSU's failure to raise offset is enough

for this Court to deny their motion for summary judgment at the outset.

**B.    Offset is not supported by undisputed evidence.**

38.    LSU has also cited no undisputed evidence to show that any of Plaintiff Gunter's

financial aid or awards should be applied to reduce or offset her damages in whole or part. Rather,

LSU's argument fails to consider the fact that financial aid goes to pay the entire cost of a student's

education, not just tuition and fees.

39.    According to Plaintiff Gunter, she does not seek a second payment to cover her

tuition and fees. If a jury were to determine that LSU's in-person tuition or fees should have been

discounted for the latter-half of the Spring 2020 semester, that discount would have resulted in an

overpayment to LSU, and a refund of that overpayment should have flowed directly to Plaintiff

Gunter to cover other cost of attendance expenses for the Spring 2020 semester.

40.     Although LSU claims that Plaintiff Gunter's financial aid and grants went to
"reduce her tuition and fees" (Mot. at 4), the statutes applicable to Pell Grants and LA Go Grants
make it clear that they apply to the cost of attendance as a whole, not simply to tuition and fees.
*See* 20 U.S.C. § 1070a(b)(1) (Pell Grants); 28 La. Admin. Code Pt IV, § 1201(B) (LA Go Grant).

41.     Other cases have rejected the same arguments LSU makes here. In *Luquetta*, 2012
WL 1499040, at *16, the court determined that "[t]he flaw in the University's position is that it
fails to take into account the entire cost of attending a professional degree program. Fees may not
be viewed in isolation but instead must be seen as one component of the cost of attending a . . .
professional degree program[.]" *Id.* Likewise, a Louisiana court refused to offset damages because
of the plaintiff's receipt of a Pell Grant, explaining "a Pell grant is an award to the student, not to
the institution." *Till v. Delta Sch. of Com., Inc.*, 487 So. 2d 180, 183 (La. Ct. App. 1986).

42.     Plaintiff also presents evidence that LSU was not permitted to apply Ms. Gunter's
CARES Act payment to her account balance; rather it had to be disbursed directly to Ms. Gunter,
who was permitted by statute to use the funds on any "eligible expenses under a student's cost of
attendance, such as food, housing, course materials, technology, health care, and child care."
CARES Act, PL 116-136, 134 Stat 281, § 18004(c) (March 27, 2020).[44]

43.     With respect to Ms. Gunter's matching College of Arts & Design Award[45] and the
fee Exemptions, based on the limited evidence that Defendant has provided, Ms. Gunter was also
not restricted to applying them to just tuition and fees.

44.     There is thus both legal and evidentiary support that the bulk of funds LSU seeks
to use as offsets were not restricted to payment of tuition or fees. This is consistent with the holding
of *Till*, 487 So. 2d at 183, as well as evidence of how LSU operated in practice based on Ms.
Gunter's own experience.

45.     For example, according to Ms. Gunter's Account Report, the LA Go Grant and the
Exemptions were the only grants or awards that were even used to pay for her Spring 2020
semester fees—she paid for her tuition and the rest of her fees with student loans.[46] LSU was not

---

[44] *See also* Pl. Ex. H, 1442 Dep. (E. Russell) 225:19–22 ("The first pot of student emergency funds required that we
passed it on to the student without applying it to any outstanding balance they may have").
[45] Because the College of Art & Design Award was placed into her account after the Spring 2020 semester concluded
and was applied towards her Summer 2020 tuition, there is no basis to conclude that this has any relevance to the
damages she seeks in this case for the Spring 2020 semester.

[46] *See* Def. Ex. 6-A, Account Report at Bates No. 022732, lines 1777–78.

permitted to apply Ms. Gunter's CARES Act payment to her account balance, so it disbursed directly to her, as did the entirety of her Pell Grant.[47]

46.     Although it is possible that the Academic Excellence Fee and Student Excellence Fee Exemptions would have reduced solely the fees charged to Ms. Gunter, Defendant has failed to cite undisputed evidence of the purpose or uses of these Exemptions. Without any such evidence, this Court cannot surmise in Defendant's favor that these fees should act as an offset. And even so, a partial discount on these fees would not mean that Ms. Gunter was not damaged or otherwise give rise to mootness or double recovery issues.

**C.     Double recovery is not supported by the law or evidence.**

47.     The prohibition on double recovery is triggered where "[a] wrongdoer [would] be required to pay twice for the same elements of damages." *Albert v. Farm Bureau Ins. Co.*, 2005-2496 (La. 10/17/06), 940 So. 2d 620, 622 (emphasis added). Courts remedy double recovery by providing a "credit or set-off" for "those items . . . that are the same under both obligations." *Gagnard v. Baldridge*, 612 So. 2d 732, 736 (La. 1993) (implementing offsets for medical expenses and benefits where company was liable under both tort damages and worker's compensation); *Pelle v. Munos*, 2019-0549 (La. App. 1 Cir. 2/19/20), 296 So. 3d 14, 20 (determining that recovery of property damages from two different insurance policies for the same accident constitutes double recovery). In other words, the doctrine of double recovery only applies when there are multiple post-injury recoveries that fully compensate for the same element of damages.

48.     Here, however, Plaintiff has presented testimony from LSU's own witnesses—including LSU's Corporate Representative and LSU's Interim President—who repeatedly testified[48] that Spring 2020 students like Ms. Gunter received no refunds or compensation for being deprived of the in-person, on-campus education and services that they and she pre-paid for but did not receive.[49] This is confirmed in LSU's interrogatory responses as well.[50]

---

[47] *Id.* at Bates No. 022732, lines 1779-87, 1797-1800.
[48] *See* Pl. Ex. H, 1442 Dep. (E. Russell) 170:13-15. ("Q: So LSU didn't offer any refunds on fees or tuition for the spring 2020 semester, correct? A: That's correct"); Pl. Ex. C, Galligan Dep. 51:21-52:1 ("We made the decision that we would not refund tuition[,] fees and . . . certain other fees.").
[49] By contrast, students who were forced to move out of on-campus housing did receive *partial* refunds of their Spring 2020 housing pre-payments, but LSU still imposed a 75% penalty on these students, meaning they only received a refund of approximately 25%, whereas Plaintiff alleges that they should have received approximately 50% to correspond to the 50% of the Spring 2020 semester during which they were denied housing. Class Certification Reply at 18. Plaintiff would thus not be seeking a *full* pro-rata refund on behalf of these students, which would amount to a double recovery, but she is seeking the remaining 25% that she alleges they are due.

[50] Pl. Ex. D, Def. Ans. to Pls. Interrogatories, (1442 Dep. Ex. 10) at 7-8 (listing no refunds for tuition or mandatory fees by the main LSU campus for the Spring 2020 semester).

49.     LSU's claim that Ms. Gunter has been compensated for her injury—much less "double" compensated—is thus contradicted by the evidence in this case, rendering summary judgment inappropriate.

50.     LSU cites only to Ms. Gunter's deposition in support of its double recovery argument. But any fair reading of Ms. Gunter's testimony, especially in view of other evidence such as Plaintiff Gunter's Account Report, shows that the characterization of Ms. Gunter's statements as "admissions" to using "award" monies to "reduce[] her tuition and fees" does not constitute an admission that she was compensated for her injury. Rather, Ms. Gunter's deposition testimony could be understood as going only to her understanding of whether her financial aid or other awards increased or reduced her account balance,[51] as shown on her Account Report.[52]

51.     Furthermore, Ms. Gunter repeatedly made clear that she had not been compensated for LSU's breach.[53]

52.     The only "awards" that Ms. Gunter received following the onset of COVID-19 are (1) a CARES Act award, and (2) the matching College of Art & Design award.

53.     But Plaintiff points to evidence that the College of Art & Design award was applied towards Ms. Gunter's Summer 2020 tuition.[54] This Court thus cannot conclude as a matter of law that it served as compensation for Spring 2020 injuries.

54.     Similarly, there is no basis to conclude that the CARES Act award served as compensation for tuition or fee overpayments given that LSU was not allowed to apply these funds to tuition or fee balances, as discussed above.

55.     Nor can this Court conclude that Ms. Gunter's testimony—again, Defendant's only evidence—constitutes an admission otherwise. For example, when asked whether her CARES Act award (i.e., Student Relief Fund Award) "appli[ed] to reduce the amount of tuition and fees that [she] had to pay for the spring of 2020 semester," Ms. Gunter responded "I am not sure. That is what is looks like."[55] Unsatisfied with this response, counsel for Defendants asked if she "agree[d]

---

[51] *See* Def. Ex. 3, Gunter Dep. 34:11–24 (Academic Excellence Fee); 35:6–18 (Student Excellence Fee); 38:19–39:7 (Pell Grant).

[52] The Account Report introduced at Ms. Gunter's deposition is not the one that Ms. Gunter saw on a day-to-day basis. *See* Def. Ex. 3, Gunter Dep. 30:2–10 (explaining to Ms. Gunter that the Account Report "is just another format" of her account summary that she produced in discovery). So, it further follows that Ms. Gunter's understanding of the Account Report was reliant on counsel for Defendant's unsubstantiated and ambiguous descriptions, followed by appropriate objections, of what each column in the Account Report stood for, including the meaning of a positive or negative change to the balance of her account.

[53] *See* Def. Ex. 3, Gunter Dep. 25:15–19; 59:2–3; *accord.* Pl. Ex. B, Gunter Decl. at ¶ 22 ("I have not received a refund of any tuition or fees from LSU for the Spring 2020 semester.").

[54] *See* Def. Ex. 6-A, Account Report at Bates No. 022729, line 1953.

[55] Def. Ex. 3, Gunter Dep. 43:2–7.

with [them] that th[e] thousand-dollar credit reduces the balance to actually a credit balance on

[her] account as reflected in this account summary," to which Ms. Gunter responded

affirmatively.[56] Only then did defense counsel ask, "And so, because of that, I just wanted to

confirm that that means that it reduced the amount of tuition and fees for the spring of 2020 that

you had to pay."[57] Arguably, Ms. Gunter's answering "Correct" only corresponded to defense

counsel's explanation of the Account Report, not her subjective knowledge.[58]

56.     In addition to the above, the collateral source rule also provides an exception to

double recovery that bars LSU from using the CARES Act payment, matching College of Art &

Design award, or any other funding from an independent source to reduce its damages liability.

Under this rule, "any payments received by the plaintiff from an independent source are not

deducted from the award the injured party would otherwise receive from the wrongdoer." *Hoffman*

*v. 21st Century N. Am. Ins. Co.*, 2014-2279 (La. 10/2/15), 209 So. 3d 702, 704. Accordingly, "[t]he

wrongdoer cannot reap the benefit of a contract for which the wrongdoer paid no compensation."

*Bozeman v. State*, 2003-1016 (La. 7/2/04), 879 So. 2d 692, 704 (quoting *Acuar v. Letourneau*, 260

Va. 180, 531 S.E.2d 316, 322–323 (2000)).

57.     Here, Plaintiff has raised a question of fact as to whether the collateral source rule

would serve as a bar to LSU's double recovery argument, and LSU has failed to cite undisputed

evidence that the financial aid it seeks to use to reduce its damages liability was paid by LSU.

Based on that alone, summary judgment must be denied. Moreover, there is evidence that the

financial aid and awards Ms. Gunter received that LSU seeks to use as offsets were paid by

independent non-LSU sources, including the federal and state governments and LSU donors.[59]

58.     In addition, Plaintiff argues that each of these awards was gratuitous and are

unrelated to compensating Ms. Gunter for her damages. *See Johnson v. Baker*, 11 Kan. App. 2d

274, 278, 719 P.2d 752, 756 (1986) ("The majority rule is that gratuitous payments received by

injured parties cannot be used to mitigate damages."); *accord Spizer v. Dixie Brewing Co.*, 210

So. 2d 528, 533 (La. Ct. App. 1968) (gratuitous medical services could be recovered under

collateral source rule).

---

[56] *Id.* 43:12–17.
[57] *Id.* 43:19–22.
[58] *Id.* 43:24.
[59] As discussed herein, the Pell Grant and CARES Act payment were both from the federal government. The LA Go Grant is a state government grant. The funds for the College of Art & Design award were paid by LSU donors. Although LSU offers no evidence on the funding source of the Exemptions, these can be funded by multiple sources. *See* Ex. H, 1442 Dep. (E. Russell) 254:18–21; Def. Ex. 7 at ¶ 8 ("In addition to University funded exemptions, students can receive exemptions from sponsors, meaning a person or entity will pay for all or part of a student's tuition.").

59.     Finally, Louisiana courts have considered whether the purported compensation would otherwise go to different uses if it was not used to compensate a plaintiff for their injury. *See, e.g., Dunlap v. Armendariz*, 265 So. 2d 352, 354 (La. Ct. App. 1972) (dismissing defendant's argument that wages were already compensated through the use of annual and sick leave, because use of this leave for disability precluded Plaintiff from using it in other circumstances). And as discussed above, Ms. Gunter has presented evidence that every dollar she paid using any of these grants in tuition and fees was a dollar that she could not spend on her other education-related expenses.

60.     Accordingly, as Ms. Gunter has presented evidence that she received these benefits from independent sources and requiring her to use these funds to pay for Spring 2020 tuition and fees would reduce her patrimony, these funds are protected by the collateral source rule. *See Johnson*, 719 P.2d at 752 (applying the collateral source rule to reverse mitigation of tuition reimbursement damages by subtracting financial aid and scholarships).

61.     To the extent Defendant argues that its affirmative defense of offset for double recovery moots Plaintiff Gunter's case, its arguments are flawed for all the reasons discussed above. An issue is moot when a judgment or decree on that issue has been "deprived of practical significance" or "made abstract or purely academic." *In re E.W.*, 2009-1589 (La. App. 1 Cir. 5/7/10), 38 So. 3d 1033, 1037 (providing examples of mooted cases as where "(1) there has been a change in the law, (2) the defendant paid the monies owed, (3) the wrongful behavior has passed and is not likely to recur, or (4) a party has died."). As a dispute remains regarding Defendant's liability for breach of contract, including the calculation of damages, a justiciable controversy remains in this case.

**D.     Attorneys' Fees Are Available**

62.     LSU's request that this Court find that attorneys' fees are unavailable to Plaintiff Gunter is incorrect. Plaintiff requests attorneys' fees pursuant to La. Code Civ. Proc. Ann. art. 595, which are available as the Court certified this action as a class action. As the Fifth Circuit has explained, Article 595(A) authorizes courts to "'allow' attorney's fees to class representatives from funds or other sources of recovery made available to the class—whether by judgment, settlement, or otherwise—so long as such favorable result is the product of the class litigation." *Grant v. Chevron Phillips Chem. Co.*, 309 F.3d 864, 874 (5th Cir. 2002). To extent class certification is granted, attorneys' fees may be recovered.

**Class Certification**

## FINDINGS OF FACT

Plaintiff Gunter and all proposed class members were enrolled as students at LSU's Baton

Rouge campus during the Spring 2020 semester.

These student Class Members, which LSU refers to as "traditional" students, are identified

via a spreadsheet produced by LSU in discovery, along with the specific amounts they paid for

tuition and certain fees and the number of hours of "brick and mortar" classes they were enrolled

in.[60]

Throughout LSU's documents and testimony, LSU refers to its "traditional" campus-based

students as "on-campus," "on-premises," or "face-to-face" students.[61]

LSU separately offers and packages online programs.[62]

LSU's corporate representative testified to the fact that the market for online classes is a

"totally different market" from its traditional campus-based market and that the educational

services that students expect when they apply and sign up to come to a traditional LSU campus-

based program involving a rich array of on-campus activities, services, and amenities.[63]

LSU's corporate representative further testified that the "traditional" student who applies

to LSU's campus-based program is "looking to further their education and have the resident

campus experience," meaning they expect more than academic programs, but also "Greek life; the

dormitories that we have on campus . . . what the amenities that those residence halls have; the

sports programs. . . intramural teams that might compete with other campuses . . . the LSU band,"

and that it is "a different group of individuals that are looking for that residential experience."[64]

Classes offered through LSU's traditional campus-based degree programs are identified in

LSU's course catalogue during the registration process as in-person (such as with a building name

and room number), with a small percentage of classes identified as being offered in an online

---

[60] *See* Pl. Ex. I [Dep. 1442 Ex. 4]. This spreadsheet, at 350 pages, contains charges and payment data for LSU Baton Rouge students, separated by "Traditional" students and "LSU Online" students. It includes information on 20,000+ anonymized students enrolled in LSU Baton Rouge's traditional campus-based degree program (with additional columns showing, for example, course fees, scholarships, exemptions, or other funding provided).

[61] *See* Pl. Ex. I [Dep. 1442 Ex. 4] (differentiating between "Traditional" and "LSU Online" students); Pl. Ex. F, 1442 Dep. (Jain) at 48:14-17, 48:22-49:10; Pl. Ex. H, (C. Benton) at 150:13-22; Pl. Ex. D, (T. Smith) 337:10-21; Pl. Ex. G, (K. Mumphrey) at 360:10-14.

[62] *Compare* Pl. Ex. MM, *with* Pl. Ex. NN; *see also* Pl. Ex. H, 1442 Dep. (C. Benton) at 146:21-147:14; Pl. Ex. G, 1442 Dep. (K. Mumphrey) at 359:24-360:7.

[63] Pl. Ex. E, 1442 Dep. (D. Torres) at 474:14-16; 540:24-541:6.

[64] *Id.* at 476:13-478:1.

format to LSU's traditional campus-based students.[65]

When students register for classes through the myLSU web portal, students know whether they will be taking a class in-person and on campus, including in which campus building and room, or, in very few instances, online.[66]

Following registration, students are then presented with an invoice, referred to by LSU as a "Fee Bill," which lists the tuition for the courses selected, as well as specifically identified Mandatory Fees a student is required to pay in exchange for the instruction, services, and amenities promised by LSU, all of which are uniform amounts based on the credit hours selected.[67]

The myLSU web portal is a common platform that all LSU students use to register for classes and to pay their Fee Bill, among other things.[68]

Only after completing registration for their classes and then being charged tuition and fees by LSU via a Fee Bill were students able to attend their classes, including at the beginning of the Spring 2020 semester, during which classes were provided in-person and in accordance with the students' initial course schedules; with attendant access to all the on-campus services and amenities for which they were charged.[69]

After having attended in-person classes and having had access to all the on-campus opportunities and benefits at the outset of the Spring 2020 semester, LSU students learned in mid-March 2020 that LSU's campuses were closing, and LSU's classes would move online due to COVID-19.[70] Campus "went on lockdown the day after Spring Break . . . until the end of the [Spring 2020] semester."[71]

Following LSU's shutdown after the outbreak of COVID-19, students no longer had access to LSU's main campus, including in-person classes or the on-campus facilities and services that had

---

[65] *Id.* at 482:12-483:13 (testifying that "a very small percentage" of classes were offered through LSU's traditional campus-based programs); *see, e.g.,* Pl. Ex. M (1442 Dep. Ex. 3) (course schedule for Spring 2020 Italian offerings, showing classes that will be in-person, for example "ROOM 0241 BUILDING LOCKETT," versus those that will be online, as indicated with "100% WEB BASED"); Pl. Ex. PP, (showing all course offerings under Spring 2020 drop-down, with rooms and buildings identified); Pl. Ex. H, 1442 Dep. (C. Benton, University Registrar) at 114:8–20.

[66] Pl. Ex. H, 1442 Dep. (C. Benton) at 114:15-20, 119:12-20, 121:9-14; see also Pl. Ex. N (1442 Dep. Ex. 7) (instructional manual outlining how to add classes to a schedule).

[67] *See* Pl. Ex. DD, (LSU Tuition and Required Fee Schedule for Spring 2020); Pl. Ex. EE, (breaking down Student Dedicated Fees for Spring 2020); Pl. Ex. O (1442 Dep. Ex. 13) (instructional manual outlining the payment process a student must follow, with snapshots of exemplar Fee Bills); Pl. Ex. P, 1442 Dep. (E. Russell) at 228:18-232:5, 233:18-22, 236:2-237:22.

[68] Pl. Ex. F, 1442 Dep. (Jain) at 32:19-33:4; Pl. Ex. H, 1442 Dep. (C. Benton) at 97:2-24.

[69] Pl. Ex. H, 1442 Dep. (C. Benton, University Registrar) at 121:15-18.

[70] *See* Pl. Ex. Q; Pl. Ex. Y; *see also* Pl. Ex. P, 1442 Dep. (E. Russell) at 167:17-23.

[71] Pl. Ex. E, 1442 Dep. (D. Torres) at 518:18-522:2.

been open and offered to them for the first part of the Spring 2020 semester.[72]

Afterwards, LSU adopted a policy that it would not offer pro-rata refunds of tuition, Mandatory Fees, or parking fees for the remaining portion of the Spring 2020 semester.[73]

However, for later online semesters, including Spring Intercession 2020, Summer 2020, and Summer Intercession 2020, LSU used COVID-19 relief funds from the federal government to offer across-the-board discounts.[74]

LSU's COVID-19 housing refund policy imposed a 75% penalty on students who moved out of their on-campus housing at LSU's direction pursuant to a form housing contract that all LSU students signed.[75]

Plaintiff provides the Report of Hal J. Singer, Ph.D. to support that damages can be calculated using a common methodology.[76] Mr. Singer discusses three methods for calculating damages that can be applied uniformly across the proposed Class: (1) the tuition and fees charged to LSU's online distance learning students can be used to calculate the market price that LSU should have charged for its post-COVID 19 online instruction during the latter half of Spring 2020; (2) a 15% discount that LSU actually applied across-the-board for the Spring Intercession 2020, Summer 2020, and Summer Intercession 2020 could likewise be applied to Spring 2020 tuition and Mandatory Fee payments; (3) a Choice-Based Conjoint analysis could be conducted to "estimate student disutility (the downward shift in the demand curve) assuming students had known, at the time of Spring 2020 semester registration and enrollment for classes, that partway through the semester classes would shift from in-person to online and that campus would close." *Id.* at § II.

## CONCLUSIONS OF LAW

Based on the following points of law, the Court concludes that the certified Class defined above meets the requirements for class certification under Article 591 (A) and (B).

Further, the parties should meet and confer and submit a proposed publication order and

---

[72] *See, e.g.,* Pl. Ex. P, 1442 Dep. (E. Russell) at 164:10-165:14, 167:11-23 (confirming that most of the in-person or on-campus services that were provided prior to COVID-19 were not provided after the widespread outbreak of COVID-19, with classes transitioning to "100 percent online"); Pl. Ex. K, (J. Droddy) at 449:3-11.

[73] Pl. Ex. P, 1442 Dep. (E. Russell, Associate VP for Accounting Services and Controller) at 170:13-18, 217:23-222:8; Pl. Ex. K, (J. Droddy) at 449:12-23.

[74] Pl. Ex. P, (E. Russell) at 176:15-180:14; *see also* Pl. Ex. Z (1442 Dep. Ex. 10) (Response to Interrog. No. 7); Pl. Ex. AA (Web Archive of LSU's Coronavirus FAQ Web-Page.) (noting that "fees for intercession [and] summer session [would] be lowered since classes [we]re moving online").

[75] *See* Ex. WW (exemplar Spring 2020 Housing Contract); Ex. XX (document discussing housing contract provisions at issue and uniform refund policy); Ex. JJ (Dep. of T. Galligan at 118:15-123:17); Ex. P (1442 Dep. at 212:13-213:15); *see also* Ex. YY (Spreadsheet of Spring 2020 Housing Charges).

[76] *See* Exhibit BB.

notice to advise all Class Members of this action and their rights within 30 days—and then set a schedule on the remainder of discovery.

**LEGAL STANDARD**

On a motion for class certification, the only issue to be considered by the Court is whether this case is one in which the class action procedural device is appropriate and the prerequisites of Article 591(A) and (B) are satisfied. *See Billieson v. Cty of New Orleans*, 1998-1232 (La. App. 4 Cir. 3/3/99), 729 So. 2d 146, 153. In analyzing the propriety of class certification, the Court is not concerned with whether Plaintiff has stated a cause of action or the likelihood that the Class will ultimately prevail on the merits. *Id.* (citing *Elsen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)); *see also Abshire v. State*, 2017 0689 (La. App. 1 Cir. 5/16/18); *Marsh v. U.S. Agencies Cas. Ins. Co.*, 42,176, 5-6 (La. App. 2 Cir. 5/16/07), 957 So. 2d 901, 906, *writ denied*, 07-1286 (La.10/26/07), 966 So. 2d 575; *Baker v. PHC-Minden, L.P.*, 167 So. 3d 528 (La. 2015). The analysis focuses on the statutory prerequisites and not the merits.

Louisiana law sets forth the requirements for class certification in Art. 591 of the Louisiana Code of Civil Procedure. Under Article 591(A), a class action is proper if the class meets the elements of numerosity, commonality, typicality, adequacy, and objective definability. LA. C.C.P. Art. 591(A)(1)-(5). In addition, under Article 591(B)(3), the issues common to the class must predominate over any individual issues that arise and a class action must be superior to other available methods of adjudication. *Id.* at 591(B)(3).

As discussed in turn below, each of these six requirements are met here.

**NUMEROSITY IS SATISFIED UNDER ART. 591(A)(1)**

Numerosity requires the class to be "so numerous that joinder of all members is impracticable." *Id.* at 591(A)(1). Although "[t]here is no set number above which a class is automatically considered so numerous as to make joinder impractical as a matter of law," *Baker*, 167 So. 3d at 542, numerosity is typically satisfied where the interested parties appear so numerous that separate suits would unduly burden the courts, and a class action would be more useful and judicially expedient than the other procedures. *Cotton v. Gaylord*, 96-1958 (La. App. 1 Cir. 3/27/97), 691 So. 2d 760, 768, *writ denied*, 97-0800 (La. 4/8/97), 693 So.2d 147. Numerosity requires the Court to examine "the number of putative class members" and "considerations of judicial economy in avoiding a multiplicity of lawsuits, financial resources of class members, and the size of the individual claim." *Baker*, 167 So. 3d at 542.

Here, the requirements of numerosity are plainly met. For example, LSU has provided, through discovery, a spreadsheet that demonstrates that approximately 26,000 students were enrolled during the Spring 2020 semester at LSU's main campus.[77] But not only does the proposed Class consist of tens of thousands of members, given the similarity of each class member's claims, as well as the fact that individual damages will be relatively modest, the disposition of the claims asserted herein through the class action device will be more efficient and will benefit the parties and the Court by saving time and resources. Thus, by the evidence before the Court, the proposed Class is so numerous that joinder is impracticable.

In opposition, LSU argues that Ms. Gunter has failed to establish a "definable group of aggrieved persons." The problem, according to LSU, is that Ms. Gunter has not provided "proof that any proposed class member is actually 'aggrieved.'" Def. Mem. at 18. However, LSU's requirement of proof of those grievances is misplaced. *See Doe v. S. Gyms, LLC*, 2012-1566 (La. 3/19/13), 112 So. 3d 822, 831.

To meet the criteria for numerosity, the aggrieved group need only be "identifiable in some way," *id.* at 835, and their claims must be "plausible." *Fontcuberta v. Cleco Corp.*, 2016-1477 (La. App. 1 Cir. 6/2/17), 222 So. 3d 235, 247. Louisiana courts have found "definable groups of aggrieved individuals" where a hospital's billing system could provide a list of patients who fit the class definition, *Baker*, 2014-2243, 167 So. 3d at 542, where documentation established victims of an oil well blowout, *Singleton v. Northfield Ins. Co.*, 2001-0447 (La. App. 1 Cir. 5/15/02), 826 So. 2d 55, 63, *writ denied*, 2002-1660 (La. 9/30/02), 825 So. 2d 1200, and where "extensive documentation" listed the number of children in public housing and lead poisoning screenings. *Billieson*, 98–1232, 729 So.2d at 154–155.

Here, like in the afore-cited cases, Ms. Gunter has shown a "definable group of aggrieved persons." Plaintiff Gunter has produced record evidence that thousands of students, identifiable in LSU's spreadsheet, expected and paid for an in-person, on-campus education, but instead received an online education with a lower market price for the second half of the Spring 2020 semester. Accordingly, Ms. Gunter has sufficiently alleged and shown evidence supporting her allegations of overpayment injury and resulting damages.

Contrary to LSU's arguments, Ms. Gunter is not required to provide proof of injury at this stage, as this inquiry would require the Court to improperly consider the merits of the case.

---

[77] *See* Pl. Ex. I.

*Robichaux v. Dept. Health and Hospitals*, 952 So. 2d 27, 33 (La. App. 1 Cir. 12/28/06)

LSU is free to argue at trial that there was no contract with its students and that students received the "same quality education after the transition to online learning," but not at the class certification stage.

While the law is clear that Plaintiff need not prove her right to recover at the class certification stage, Plaintiff has sufficiently alleged and provided ample proof that Plaintiff and class members entered into a contract with LSU for in-person, on-campus services by virtue of paying Tuition and Fees (even if they took some online classes as well), that LSU breached that contract when it shut down campus and moved online following the onset of COVID-19 without providing pro-rata refunds, and that Plaintiff and class members suffered monetary injuries as a result of Defendant's breaches.[78] *See Brooks v. Union Pac. R. Co.*, 2008-2035 (La. 5/22/09), 13 So. 3d 546, 558-59.

In sum, the size of the Class, the financial resources of the class members, the amounts of individual damages, and considerations of judicial economy in avoiding multiple lawsuits of the same nature, all favor a class action of this matter. *See, e.g., Cotton*, 691 So. 2d at 768; *Baker*, 167 So. 3d at 542. Accordingly, the numerosity prong of §591(A) is met.

### COMMONALITY IS SATISFIED UNDER ART. 591(A)(2)

To satisfy "commonality" under § 591(A)(2), a plaintiff must also show that "[t]here are questions of law or fact common to the class." La. C.C.P. Art. 591(A)(2). "[P]laintiffs seeking to satisfy [the commonality] requirement must demonstrate their claims depend on a common contention, and that common contention must be one capable of class-wide resolution—one where the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Baker*, 167 So. 3d at 542-43 (internal quotations omitted).

The test for commonality is not demanding, and it requires only that there be at least one issue, the resolution of which will affect all or a significant number of the putative class members. *Duhe v. Texaco, Inc.*, 1999-2002 (La. App. 3 Cir. 2/7/01), 779 So. 2d 1070, *writ denied*, 2001-0637 (La. 4/27/01), 791 So.2d 637. To satisfy the commonality requirement, there must exist "as to the totality of the issues a common nucleus of operative facts." *McCastle v. Rollins*

---

[78] *See also* Pl. Ex. JJ, Galligan Dep. 245:2–245:10 (acknowledging the contractual relationship between LSU and its students); Pl. Ex. VV, Blossman Dep. 42:8–42:24 (agreeing that when students prepaid for the Spring 2020 semester to attend LSU Baton Rouge, they paid for and expected an on-campus in-person educational experience, which they received in the Fall, but only for the first part of the Spring).

*Environmental Services of Louisiana, Inc.*, 456 So.2d 612, 620 (La.1984).

Here, several common legal and factual questions lend themselves to class-wide resolution. Plaintiff Gunter's claims are based on both uniform LSU documents and uniform LSU conduct that created the alleged LSU-student contract, and which will inform a trier of fact as to "what is expected of ordinary persons of ordinary prudence." *See Jones v. Administrators of Tulane Educ. Fund*, 51 F.4th 101, 109 (5th Cir. 2022) 116-17 ("Louisiana courts interpret performance of implied contracts to conform to, and be governed by, what is expected of ordinary persons of ordinary prudence.") (citing and quoting *Frey v. Amoco Prod. Co.*, 603 So. 2d 166, 175 (La. 1992)).

Further, LSU's actions were uniform as they responded to the COVID-19 pandemic by implementing campus-wide policies, such as closures, and then implemented a "no refund" policy on a campus-wide basis as to tuition, Mandatory Fees, and parking, as well as a uniform policy penalizing students for moving out of on-campus housing after being directed to do so.[79]

Plaintiff Gunter's claims thus turn on an across-the-board analysis and interpretation of the alleged student-LSU contract and LSU's uniform course of conduct following the onset of COVID-19. Indeed, Plaintiff Gunter has put forth several examples of common issues of fact and law that will affect all class members, including: (1) whether a contract exists that required LSU to provide in-person, on-campus educational services when students paid tuition and fees at LSU's Baton Rouge campus; (2) whether LSU breached this contract when it transitioned to online, remote classes and services and decided not to issue refunds at the end of Spring 2020; (3) whether the Class is entitled to pro-rata refunds; (4) whether LSU's unilateral decision to impose monetary penalties on students who moved out of their on-campus housing in Spring 2020 at the direction of LSU constituted a breach of contract; (5) LSU's defense of impossibility; and (6) whether LSU's conversion of Plaintiff's tuition and fees to their own without providing the promised services was lawful.[80]

The answers to these common questions, one way or another, will be determinative of the outcome of this litigation for all putative class members.

This conclusion is consistent with the decisions of other courts. *See, e.g.*, *Vallare v. Ville Platte Med. Ctr., LLC*, 151 So. 3d 984, 989 (La. App., 3 Cir. Nov. 5, 2014) (finding a single

---

[79] *See* Pl. Ex. K, 1442 Dep. (J. Droddy), 452:1-5 ("A. COVID-19 and the way the university had to cope with it, yes, it did affect every student. Q. It was affecting every student in the same way; correct? A. More or less, yes. That's correct.").

[80] *See e.g.*, Ex. A, ¶ 73(a)-(d); ¶ 95.

common question sufficient to predominate and warrant class certification: "whether the billing practice violated [the statutory contractual obligation of the health care provider]"); *Claborne v. Hous. Autho. of New Orleans*, 165 So. 3d 268, 284 (La. App. 4 Cir., April 15, 2015) (finding the common pivotal issue of whether plaintiff's damages from mold exposure were caused by defendant's acts or omissions sufficient to predominate and warrant class certification); *Desselle v. Acadian Ambulance Serv.*, 83 So. 3d 1243, 1253 (3 Cir. Ct. App. Feb. 1, 2012); *Arredondo v. Univ. of La Verne*, 341 F.R.D. 47, 51 (C.D. Cal. 2022) (finding five common questions of law and fact, even where "a single common question of law or fact will do").

In arguing that commonality is not met here, LSU seems to argue that each of the 26,000 different students that attended LSU's Baton Rouge campus during the Spring 2020 semester had their own individualized contracts because each LSU student may have viewed different statements, paid different Tuition and Fees, and had different expectations regarding what in-person and on-campus educational promises were made to them by Defendant. This Court is not convinced, based on the evidence of uniform tuition and fees and uniform policies by LSU, that thousands of contracts exist. Regardless, Plaintiff has shown several questions of law and fact that connect the class member's claims. That is sufficient for commonality.

LSU also argues that damages will not be uniform for each class member. But this too would not defeat certification. Although the specific amount of damages will vary by class member based on how much each student paid, Louisiana case law is clear that so long as there are not predominating individualized issues in determining liability, individualized calculations related to damages does not defeat class certification. As the court in *Abshire* aptly held:

> Like in *Lillie v. Stanford Trust Company*, all of the plaintiffs in this case purchased annuities, life insurance policies, and corporate notes from companies who then allegedly criminally transferred funds out of those companies to invest in failing companies that later collapsed and caused the plaintiffs tremendous financial loss. Similarly, the State Defendants here allegedly acquiesced in, or failed to regulate, the actions of those companies. So, although the plaintiffs may have had different reasons for investing, invested in various financial instruments, and suffered varying types and degrees of damages, the common issue is that they all suffered a loss as a result of the alleged actions or inactions of the defendants in perpetration of the fraudulent scheme.

2017-0689, 2018 WL 2250472; *see also, Gautreaux v. Louisiana Farm Bureau Cas. Ins. Co.*, 2019-17 (La. App. 3 Cir. 10/2/19), 280 So. 3d 694, 710; *Daniels v. Witco Corp.*, 03-1478 (La. App. 5 Cir. 6/1/04), 877 So. 2d 1011, 1016, *writ denied*, 2004-2283 (La. 11/19/04), 888 So. 2d 204, *and writ denied*, 2004-2287 (La. 11/19/04), 888 So. 2d 205 ("It is well settled that the

existence of individual damage issues is not a bar to class certification.").

In arguing that Plaintiff Gunter failed to satisfy the commonality requirement, LSU cites *Garcia De Leon v. New York Univ.*, No. 21-cv-05005, 2022 WL 2237452, at *1 (S.D.N.Y. June 22, 2022). Yet, *De Leon* provides no support for LSU's argument. Unlike the present case in which Plaintiff Gunter was a student attending in-person classes at LSU's main campus, the plaintiff in *De Leon* was a graduate student who "did not take one single class at [the main] campus." *Id.* at *29. While De Leon's complaint focused on the shutdown at NYU's main campus, plaintiff was enrolled in the Rockland County campus, which was an hour away. *Id.* In rejecting her claim of typicality and commonality, the court pointed out that "[t]he injury suffered by a graduate student who is attending classes at a branch campus, and who makes no effort to utilize the services offered by NYU to all its students, is very different from the injury suffered by an undergraduate student who was living on campus in New York City, or even by a fellow graduate student who was attending classes and utilizing facilities there." *Id.* Thus, even though *DeLeon* denied certification, its reasoning supports certification here in that Plaintiff Gunter is exactly the type of undergraduate student *De Leon* suggests would be a typical and appropriate class representative and would establish commonality. It is notable to the Court that the Second Circuit recently concluded that another NYU student pleaded an implied contract with NYU due to their representations about an in-person, on-campus experience. *Rynasko v. New York Univ.*, 63 F.4th 186, 197 (2d Cir. 2023) ("Viewed from the perspective of a pre-COVID world, given NYU's extensive representations about the nature of student life at NYU, as well as historical experience, we conclude that a reasonable factfinder could find that NYU impliedly agreed to provide students in-person services.").

Given the wealth of common factual and legal issues present here, and that these issues can be resolved on a class-wide basis, Plaintiff Gunter has satisfied the commonality requirement of Article 591(A)(2).

**TYPICALITY UNDER ART. 591(A)(3) IS SATISFIED**

To satisfy § 591(A)(3), Plaintiff Gunter must also show that the claims and/or defenses of the representative party are typical of the claims and/or defenses of the other Class members. La. C.C.P. Art. 591(A)(3).

"This element determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a

collective nature to the challenged conduct." *Baker*, 167 So. 3d at 543. The "test for typicality is not demanding," *Abshire*, 2018 WL 2250472, and it is established where, as here, the named plaintiff's claim "rises out of the same event, practice, or course of conduct giving rise to the claims of the other class members and those claims arise from the same legal theory." *Baker*, 167 So. 3d at 543; *see also Howard v. Willis- Knighton Medical Center,* 40,634 (La. App. 2 Cir. 3/8/06), 924 So.2d 1245, 1266; *Andrey v. Murphy Oil, USA, Inc.*, 97-0793 (La. App. 4 Cir. 4/1/98), 710 So.2d 1126, *writ denied*, 98-1178 (La. 6/9/98), 720 So.2d 1214; *Johnson v. Orleans Parish School Board*, 2000-0825 (La. App. 4 Cir. 6/27/01), 790 So.2d 734, 742, *writs denied*, 2001-2216 and 2001-2225 (La.11/9/01), 801 So.2d 378 *and writ denied*, 2001-2215 (La. 11/9/01), 801 So.2d 379.

Here, as reflected by the allegations of the Petition and based on her own testimony, Ms. Gunter satisfies typicality. She asserts the same claims arising from the same uniform student-University contract, based on the same alleged breach and action, and seeks the same relief as every other Class Member.[81]

Plaintiff Gunter's claims are thus typical to the claims of the thousands of other LSU students enrolled in LSU's traditional program at the Baton Rouge campus. Plaintiff Gunter, like those other students, was transitioned to online, remote-only classes, did not have access to the campus or its facilities and in-person services, and did not receive from LSU any pro-rata return of the tuition or fees that she paid for with the expectation of an in-person, on-campus educational experience.

Typicality has been found in similar COVID-19 refund cases on the same facts and same legal analysis. In *Arredondo*, for example, the court noted, "[t]he test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct... Plaintiff [Arredondo] identifies the same or similar injury as a breach of contract for the failure to provide on-campus services during the Spring 2020 semester.... This inquiry was not unique to the named plaintiff because the contract at issue were uniform contracts all students signed... All members have the same injury—the inability to use on-campus services for which they paid...." 341 F.R.D. at 52.

---

[81] Pl. Ex. A at ¶¶ 81-94 ("The terms of this contract were set forth by LSU through . . . its websites, academic catalogs, student handbooks, marketing materials and other circulars, bulletins, and publications."); *see also* Pl. Ex. B, Gunter Dep. 63-64 ("It means I am representing myself and other students who went to LSU who are in a similar position . . . . All other students who went to LSU during this spring 2020 semester."); 76:12-15 ("My understanding as the class representative is that I am representing all students who paid for services and amenities that they did not receive."); 25:18-19 (testifying to seeking "[a]ctual refunds for services I paid for that I did not receive.").

LSU nevertheless argues that Plaintiff Gunter would "not be typical of a student who received no exemptions, scholarships or grants, and paid the full tuition and fee amounts for the Spring 2020 semester." Def. Mem. at 23. But this is merely another version of the same damages argument LSU raised with respect to commonality, which does not defeat class certification. "The fact that the damages of each plaintiff may differ does not defeat typicality." *Lillie v. Stanford Trust Co.*, 2013-1995 (La. App. 1 Cir. 11/1/17), 235 So. 3d 1139, 1152. "[V]arying degrees of damages or the fact that class members must individually prove their right to recover are not grounds for denying class certification." *Id.*

Even if Plaintiff Gunter suffered less damages than another student, which is an issue reserved for the trier of fact and not appropriate for resolution at class certification, such differences are ministerial differences in specific damage amounts that courts have widely held do not affect class certification.

LSU next argues that Ms. Gunter cannot represent students who were penalized for moving off campus at LSU's direction. But Ms. Gunter will necessarily be representing these students with respect to their claims for tuition and Mandatory Fees. LSU's argument thus goes to whether Ms. Gunter can seek damages for these students with respect to housing as well. The Court finds at this stage that, as with the other damages questions addressed herein, the fact that Ms. Gunter did not obtain room and board from LSU for the Spring 2020 semester does not defeat class certification or render Ms. Gunter unable to pursue these damages on those students' behalf.

The court in *Abshire* addressed this same issue, where the class definition encompassed individuals with a wide array of injuries and damages. *Abshire*, 2017-0689, 2018 WL 2250472 . But the court determined that because the plaintiff's claims arose out of the same event and course of conduct and are based on a common legal theory, typicality was not defeated. *Id.* The Court comes to the same conclusion here—variations in facts and damages do not overcome the fact that Ms. Gunter's claims are at a cross-section of the events (LSU's campus closure and move to online classes) and are based on a common legal theory (breach of contract and conversion). "[V]arying degrees of damages or the fact that class members must individually prove their right to recover are not grounds for denying class certification." *Id.* (quoting the lower court decision.)

Thus, the claims of Plaintiff Gunter, as the class representative, are typical of the Class, and the third prong of § 591(A) is satisfied.

**PLAINTIFF SATISFIES ADEQUACY**

Article 591(A)(4) requires Plaintiff Gunter to establish that she and her counsel will fairly and adequately protect the interests of the class. *See Howard*, 40,634 (La. App. 2 Cir. 3/8/06), 924 So. 2d 1245, 1266. In determining adequacy of representation as a prerequisite, a named Plaintiff must show that they: (1) suffered an actual injury; (2) possess first-hand knowledge or experience of the conduct at issue; (3) have a significant enough stake in the litigation as to ensure their conscientious participation in the litigation; and (4) do not have interests seriously antagonistic to or in direct conflict with those of other class members. *Baker*, 167 So. 3d at 544 (citing *Howard*, 924 So. 2d at 1266)). Ms. Gunter satisfies each of these.

First, as already discussed above, Plaintiff Gunter has sufficiently identified her injury—alleging that she did not receive a full semester of the on-campus educational services that she contracted for, paid for, and was promised.[82]

Second, Plaintiff Gunter has demonstrated that she possesses first-hand knowledge of the facts and testified unequivocally during her deposition to the harm and the nature of the action.[83]

Third, Plaintiff has presented evidence demonstrating her stake and interest in the case, as she has already assisted with responsive discovery and been deposed in connection with this case.[84]

This Court also finds that Plaintiff Gunter is represented by counsel who are experienced in and familiar with class actions generally, as well as uniquely qualified and successful in similar cases on behalf of students in this state and across the country against colleges and universities that closed campus following the outbreak of COVID-19, as set forth in the attached resumes of counsel.[85] *See also Arredondo*, 341 F.R.D. at 54 (approving and recognizing

---

[82] I Pl. Ex. B, Gunter Dep. 76:12-15 ("My understanding as the class representative is that I am representing all students who paid for services and amenities that they did not receive."); 25:18-19 ("[I am seeking to recover] Actual refunds for services I paid for that I did not receive ... I paid for on-campus services and I received online services."); 59:2-3 ("I am seeking a refund for the on-campus services that I paid for that I did not receive."); 72:24-25 ("Correct if they paid for [a meal plan or housing] services and did not receive them, yes").
To be clear, Plaintiff's claims are not based on the academic quality of the Spring 2020 semester, but on the price for that semester having a different value that can be measured with analysis of the market or other metrics. *See, e.g., Tulane*, 51 F.4th at 110 ("[S]tudents may be able to support a calculation of damages based not on any subjective evaluation of the quality of the online instruction received but on metrics such as Tulane's preestablished disparate pricing of in-person and online instruction or on market value."). *See also Arredondo*, 341 F.R.D. at 53:
[83] Pl. Ex. B, Gunter Dep. at 64-65 ("It means I am representing myself and other students who went to LSU who are in a similar position ... [including] [a]ll other students who went to LSU during this spring 2020 semester.").
[84] *See id.* at 93-94 (confirming her consultation and involvement in discovery responses); Pl. Ex. L (combined discovery responses from Plaintiff Gunter and her productions).
[85] *See, e.g.*, Pl. Ex. V, Declaration of Anna Haac In Support of Appointment of Tycko & Zavareei LLP as Co-Lead Class Counsel for Plaintiffs and the Class; Pl. Ex. X, Declaration of Michael A. Tompkins, Esq., In Support of Plaintiffs' Motion for Class Certification; *see also* the firm resume of Lynch Carpenter, LLP (Pl. Ex. QQ), The Sultzer Law Group, P.C. (Pl. Ex. SS), Pearson Warshaw, LLP, (Pl. Ex. W) Kopelowitz Ostrow P.A. (Pl. Ex. RR), and Anastopoulo Law Firm, LLC (Pl. Ex. TT). Plaintiff specifically requested that Tycko & Zavareei LLP and Leeds Brown Law, P.C. be appointed as Co- Lead Class Counsel, with Lynch Carpenter, LLP, The Sultzer Law Group, P.C., Pearson Warshaw, LLP, Kopelowitz Ostrow P.A., and Anastopoulo Law Firm, LLC appointed as the Executive Committee, and Andrew Lemmon of the Lemmon Law Firm appointed as Liaison Counsel.

counsel "has demonstrated strong knowledge of the applicable law throughout the briefing process
for this class certification motion.").[86] In short, it is clear that proposed class counsel have the
experience, resources, and expertise to adequately represent the Class.

Furthermore, there is no suggestion that Plaintiff Gunter's interests are antagonistic to the
other class members. She has testified to her willingness to support the claims of her fellow
students.[87] And Plaintiff's claims are so interrelated with the claims of other class members that
her interests and the interests of the other class members certainly align. Indeed, Plaintiff's ability
to prove the existence and breach of the alleged contract for an in-person, on-campus experience
stands or falls with evidence that is uniform vis-à-vis LSU's interactions with its students.

In arguing Plaintiff is not adequate, LSU again revisits its argument that Plaintiff Gunter
"did not suffer an actual injury," which the Court has already addressed. *See Robichaux*, 952 So.
2d at 36 ("Finally, our jurisprudence does not demand of a class representative the sort of
engagement that Defendant seeks to require. This court recently certified a class with a
representative who, despite having a relatively small financial stake in the disputed matter
…wished to pursue that claim through the class action litigation.").

LSU next argues that Plaintiff Gunter did not perfectly articulate her claim and the
proposed Class she seeks to represent at deposition. Def. Mem. at 25. But Plaintiff Gunter's
testimony at deposition demonstrates that she understood the nature of her claims and the fact that
she is seeking to represent other similarly situated students.[88] No more is required.

As in *Robichaux*, "the Plaintiff [has] already shown their willingness to appear personally
on behalf of the class . . . . At this point, we decline to extend the requirements for adequacy beyond
the three factors described above and current relevant jurisprudence." *Robichaux*, 952 So. 2d at
36.

---

[86] LSU identified that one of the firms representing Plaintiff Gunter, the Anastopoulo Law Firm, LLC, was found to
be inadequate in another case. *See De Leon*, 2022 WL 2237452 at *46. But this case involved significantly different
circumstances, as this Court has already discussed, involving much different circumstances that does not render
proposed Class Counsel inadequate. Further, the Court recognizes that PWA has been granted lead appointments in
several high-profile cases and MDLs, including *In re: January 2021 Short Squeeze Trad. Litig.*, *Smith v. Univ. of
Pennsylvania*, 2:20-cv-02086 (E.D. Pa.), *Day v. GEICO Cas. Co.*, 5:21-cv-02103 (N.D. Cal.), and *In re: Recalled
Abbott Instant Formula Prods. Liab. Litig.*, 1:22-cv-04148 (N.D. Ill.).

[87] *See, e.g.*, Ex. B, Gunter Dep. 25, 59, 76:12-15 ("My understanding as the class representative is that I am
representing all students who paid for services and amenities that they did not receive.").

[88] *Id.* 76:12–15 ("My understanding as the class representative is that I am representing all students who paid for
services and amenities that they did not receive."); 25:18–19 ("[I am seeking to recover] Actual refunds for services I
paid for that I did not receive... I paid for on-campus services, and I received online services."); 59:2–3 ("I am seeking
a refund for the on-campus services that I paid for that I did not receive."); 72:24–25 ("Correct if they paid for [a meal
plan or housing] services and did not receive them, yes"); 64–65 ("It means I am representing myself and other students
who went to LSU who are in a similar position … [including] [a]ll other students who went to LSU during this spring
2020 semester.").

Finally, LSU argues that Plaintiff is not adequate because she abandoned the claims of
other schools in the LSU system that she did not attend. But these decisions are routinely made in
class action lawsuits and provide no basis to deny class certification. *See, e.g., id.* at 31 n.3 (Plaintiff
abandoned the claims for injunctive relief); *Duhon v. Harbor Homeowners' Ass'n*, 2015-0582 (La.
App. 4 Cir. 6/3/16), 197 So. 3d 322, 326 (plaintiff voluntarily dismissed all uninsured claims).

Plaintiff Gunter has therefore met the adequacy requirements pursuant to LA. C.C.P. ART.
591(A)(4).

**THE CLASS IS OBJECTIVELY DEFINEABLE UNDER § 591(A)(5)**

The fifth prerequisite under La. C.C.P. Art. 591(A) for certification is that the class be
defined objectively, such that a court may identify the constituency of the class for purposes of the
conclusiveness of any judgment that may be rendered. La. C.C.P. Art. 591(A)(5). Importantly, "the
party seeking class certification does not have to identify each class member at the certification
hearing." *S. Gyms*, 2012-1566, 112 So. 3d at 835. Rather, class members need only be "identifiable
in some way." *Id.*

As the court held in *Abshire*, "[a] person should be able to determine readily if he or she is
a member of the class... [t]his is probably the easiest requirement to meet." 2017-0689, 2018 WL
2250472 (quoting *Display South, Inc. v. Graphics House Sports Promotions, Inc.*, 2007-0925
(La. App. 1 Cir. 6/6/08), 992 So. 2d 510, 520); *see also Chalona v. Louisiana Citizens Property
Insurance Corp.*, 2008-0257 (La. App. 4th Cir. 6/11/08), 3 So. 3d 494, 503 (in response to
defendants' argument that the class definition was vague, indeterminate, and overly broad, the
court held that "it is not the correct venue to decide the merits of the case or defenses the defendants
may allege" and "that the proposed class is sufficiently defined in order to give potential class
members enough information to decide whether they are included within the class and to enable
class members to decide whether to opt out of the class").

Here, the class definition certified by the Court meets this requirement based on LSU's
records without the need to consider the merits of each potential class member's cause of action.

As discussed above, LSU has provided a spreadsheet setting forth each individual student
who was enrolled in LSU's traditional campus-based program during Spring 2020 (with actual
names anonymized with a unique identifier), as well as the amounts each paid in tuition and fees
and the number of "Brick and Mortar Hours" each registered for in-person classroom credit.
Accordingly, class members have already been identified based on the class definition, which is

more than what is required at this stage.

In response, Defendant first argues that that this Court should deny class certification on the grounds that Plaintiff's proposed Class is not "defined objectively in terms of ascertainable criteria" and is "impermissibly vague and overbroad." Def. Mem. at 15–16. But there is no lack of clarity in the Class definition the Court here certifies.

For example, contrary to LSU's lack of clarity, it is apparent from the text of the Class Definition that students enrolled in LSU Online are not part of the Class, which only includes students enrolled at LSU's main Baton Rouge campus, a physical location. Moreover, LSU has already separately identified LSU Online students in the record evidence, making clear that they are easily identified and excluded from Class Members that will receive Notice.[89]

In contrast, LSU students who were enrolled in LSU's traditional, in-person, on-campus program at the Baton Rouge Campus who also took some "web-based" classes *are* still part of the Class. There is nothing unclear about this. The Class definition does not exclude these students because, irrespective of them having taken some "web-based" classes, they paid tuition based upon their enrollment in LSU's traditional program that provided for in-person classes, and all such students paid fees for on-campus services and activities, as LSU's own records makes clear.

Significantly, 99% of the students enrolled in LSU's traditional program took in-person, on-campus classes, what LSU's denominates as "brick and mortar" course hours, at the start of the Spring 2020 semester. [90]

With respect to the definition of fees, Plaintiff has indicated that those include any fees that students enrolled in the traditional campus-based program are required to pay to LSU, as well as for parking and room and board—all of which LSU has identified in various records produced in this case.[91]

LSU's other arguments regard its contention that the Class Definition includes uninjured class members.[92] But the Court is satisfied that the class definition encompasses only students who

---

[89] *See* Ex. I.

[90] *See id.* (representing that only 329 out of 26,811 students had zero brick and mortar hours).

[91] *See* Ex. I (spreadsheet showing payments by traditional on-campus students ("Traditional") for non-resident fees, required activity fees, academic excellence fees, student excellence fee, house, and meal plan fees); Ex. UU (spreadsheet showing Spring 2020 parking fees paid by student); *see also* Pl. Mot. at 22 ("straight pro-rata refund amounts can be calculated for fees such as housing, meals, and parking").

[92] The sole case cited by Defendant in support of their argument that the proposed class is not ascertainable, Marrero v. Central Texas College, 620CV00676ADAJCM, 2021 WL 8082653, (W.D. Tex. June 23, 2021), is distinguishable. First, it was decided on a motion to dismiss (and, therefore, contained no analysis of whether the elements for class certification had been met). Id. Second, it concerned Texas law, not Louisiana law. Id. Thus, is has no bearing on whether the elements of article 591 (A) and (B) have been satisfied.

paid to attend at least one in-person class at LSU in Spring 2020. As LSU's own corporate
representative has testified, all of these students were similarly impacted by LSU's COVID-19
campus closure.[93] Should a factfinder determine that a contract existed and that the campus closure
and failure to issue pro-rata refunds breached that contract, this breach necessarily causes an injury
to any student who paid for in-person classes that semester.

### PLAINTIFF SATISFIES PREDOMINANCE AND SUPERIORITY

In addition to the five factors of Article 591(A), Plaintiff must satisfy one of the factors
Article § 591(B). Article 591(B)(3) requires the court to find that "questions of law or fact common
to the Class members predominate over any questions affecting only individual members, and that
a class action is superior to other available methods for fair and efficient adjudication of the
controversy." Thus, this requirement is broken down into (1) predominance and (2) superiority.
The Court addresses each separately below.

#### Predominance is Satisfied Under § 591(B)(3)

Predominance is satisfied if "the proposed classes are sufficiently cohesive to warrant
adjudication by representation," and thus the proceeding will not "degenerate[e] into a series of
individual trials." *Brooks*, 13 So. 3d at 560. "The inquiry into predominance tests whether the
proposed classes are sufficiently cohesive to warrant adjudication by representation[, which]
entails identifying the substantive issues that will control the outcome, assessing which issues will
predominate, and then determining whether the issues are common to the class [thereby preventing]
the class from degenerating into a series of individual trials." *Dupree v. Lafayette Ins. Co.*, 51 So.
3d 673, 683 (La. 2010); *see also Display South, Inc.*, 992 So. 2d at 510; *Claborne*, 165 So. 3d at
284; *Vallare*, 151 So. 3d at 989 ("In this case, the predominance requirement is unquestionably
met because there is but one question as to all the claimants: whether the billing practice violated
[the statutory contractual obligation of the health care provider]."); *see also Desselle*, 83 So. 3d at
1253 ("If the court eventually resolves this single, paramount, issue in favor of the plaintiffs, the
remaining issues individual to the class members are seemingly ones of accounting insofar as they
relate to calculation of damages.").

Here, the common issues and common proof that exist in this case—whether Defendant
breached its contract with Plaintiff Gunter and the class members by failing to provide them with

---

[93] *See* Ex. K, 1442 Dep. (J. Droddy), 452:1–5 ("A. COVID-19 and the way the university had to cope with it, yes, it did
affect every student. Q. It was affecting every student in the same way; correct? A. More or less, yes. That's
correct.")

an in-person, on-campus instruction, educational services, and use of facilities after March 2020, while still retaining their tuition and fees—predominates over any individual issues that may exist. Moreover, there is a clear "common nucleus of operative fact," namely, that all class members were subject to the same common documents and uniform conduct by LSU.

Further, the contractual arrangements between each LSU student and the University—pursuant to which they were promised (and received for the first half of the Spring 2020 semester) in-person, on-campus instruction, educational services, and use of facilities when they paid tuition and fees at the Main Campus are materially the same in this regard.

Similarly, the nature of LSU's breach is the same for each member of the class, regardless of his or her academic major, scholarships, or any other ancillary criteria—LSU failed to provide in-person, on-campus instruction, educational services, or use of campus facilities and LSU decided (as a University policy) not to provide pro rata refunds of tuition and fees despite its inability to provide services as promised.

Even Defendant's affirmative defenses, such as impossibility of performance, are uniform to Class members.

Cases dealing with consistent documents and practices are generally appropriate for resolution by class action because the documents are the focal point of the analysis. *See Display South, Inc.*, 992 So. 2d at 520-21 (certifying class under predominance based on fax transmissions and records of the permissions for the same); *Desselle*, 83 So. 3d 1243 (concerning standardized "billing records"); *Vallare*, 151 So. 3d at 985 (concerning standardized billing records, insurance agreements, and reimbursement rates); *Lillie*, 235 So. 3d at 1139 (granting certification regarding the sufficiency of disclosures in certificates of deposits); *Gautreaux*, 280 So.3d at 694 (certifying a class based on the uniform assessments generated by a computer software system); *see also Kleiner v. First National Bank of Atlanta* 97 F.R.D. 683, 692 (N.D. Ga. 1983) ("claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such"); *In re Checking Account Overdraft Litig*, 286 F.R.D. 645, 657 (S.D. Fla. 2012) ("[s]ince the reasonable expectations of a party to a standardized form contract are judged objectively, the entire class will win or lose on their contract claims based upon the same evidence and legal standards of contract construction").

Indeed, several courts across the country have granted class certification in analogous cases, finding that common issues predominated over individual ones, and that a common method

existed for determining damages. *See Arredondo*, 341 F.R.D. at 53 ("In the predominance inquiry, plaintiffs must show that damages are capable of measurement on a classwide basis, though damages calculation issues cannot alone defeat class certification. . . . Plaintiff presents an articulable theory of damages that is capable of classwide resolution. For the period class members took online classes in lieu of in-person classes, damages are the difference between what each class member paid and the market value of the education they received.") (internal quotation marks and citations omitted).[94]

LSU's argument pointing to the various course catalogues denying the existence of a contract—all of which example language that is materially identical—merely underscores that the common predominating questions will be answered by common evidence, such that class certification is appropriate here.

Nor does LSU show why the fact that different schools at the main campus are at issue would have any effect on the core predominating question that will drive this litigation, namely whether students were promised, expected to receive, and paid for an in-person, on-campus educational experience and whether LSU breached that promise when it shut down campus and transitioned to a remote only learning environment. LSU pointing to snippets of language in these materials, such Plaintiff's access to an art studio, do not defeat the universal promises that LSU made to students regarding their in-person, on-campus experience.

Predominance is further satisfied here because Plaintiff seeks the same formulation of damages for herself and on behalf of all class members, namely, a prorated amount of tuition and fees. *See, e.g., Arredondo*, 341 F.R.D. at 53 ("Plaintiff presents an articulable theory of damages that is capable of classwide resolution. For the period class members took online classes in lieu of in-person classes, damages are the difference between what each class member paid the market

---

[94] *See also, See Little v. Grand Canyon Univ.*, No. 20-cv-00795, 2022 WL 266726, at *7 (D. Ariz. Jan. 28, 2022) (holding the predominance requirement was satisfied because, "[e]ven though some matters will need to be tried separately, such as which fees students paid (damages), GCU took actions which uniformly affected students and potentially resulted in a breach of contract"); Pl. Ex. T, *Alexander v. Fla. Int'l Univ. Bd. Of Trs.*, No. 2021-009869-CA-01, Dkt. No. 44, at 12-13 (Cir. Ct. Miami-Dade Cty. Dec. 30, 2021), (finding that "common issues predominate over individual issues in this case because Plaintiffs' claims are based on FIU's failure to provide students with services they paid for with their fees," and because "[p]laintiffs and Class members' claims all relate to FIU's common course of conduct."); *Booth v. Molloy College*, 2022 N.Y. Misc. LEXIS 9176 (N.Y. Sup. Ct., Nassau Cty. Dec. 12, 2022); *Staubus v. Regents of the University of Minnesota*, 2022 Minn. Dist. LEXIS 7247 (Minn. Dist.Ct. Nov. 09, 2022); *accord Ninivaggi v. Univ. of Delaware*, No. 20-cv-1478-SB, 2023 WL 2734343, at *7 (D. Del. Mar. 31, 2023) (stating that the "conduct necessary to show that in-person education was part of the bargain will be the same for all class members.... [P]laintiffs might show that all class members enrolled in U. Delaware's in-person program (rather than one of its separate online programs) and attended classes in person for the first half of spring 2020. Such major actions are enough to show an implied contractual term . . . . The terms [] cannot depend on students' subjective beliefs, as the school suggests" and notes that the *Ninivaggi* decision was issued after the March 17, 2023 hearing in this case).

value of the education they received. . . . Without deciding the correct calculation of market damages, the Court concludes Plaintiff has demonstrates that the damages are capable of measurement on a classwide basis when considering what damages are attributable to Defendant's allegedly harmful conduct.").

Specifically, Plaintiff provides the Report of Hal J. Singer, Ph.D., which illustrates that damages can be calculated using a common methodology.[95] Plaintiff has identified three possible methods for calculating damages that can be applied uniformly across the Class.

First, Mr. Singer testifies that the tuition and fees charged to LSU's online distance learning students can be used to compare the market price that LSU sets for the type of online instruction that its corporate representatives testified the University transitioned to following the onset of COVID-19.[96]

Second, Mr. Singer testifies that the 15% discount that LSU actually applied across-the-board for the Spring Intercession 2020, Summer 2020, and Summer Intercession 2020 could likewise be applied to Spring 2020 tuition and Mandatory Fee payments.[97]

Third, Mr. Singer testifies that a Choice-Based Conjoint analysis could be conducted to "estimate student disutility (the downward shift in the demand curve) assuming students had known, at the time of Spring 2020 semester registration and enrollment for classes, that partway through the semester classes would shift from in-person to online and that campus would close."[98]

In addition, Plaintiff proposes that straight pro-rata refund amounts can be calculated for fees such as housing, meals, and parking—based on the number of days that students were not provided housing, meals, or parking as contracted for.

These common methodologies can all be used to determine damages given that LSU charged students uniform amounts for tuition and set categories of fees and uniformly refused to issue pro-rata refunds for its alleged breach of its obligation to provide in-person, on-campus services.[99]

Accordingly, just as LSU's tuition and fee schedules applied across the Class, like its contract formation and refusal to refund, this Court finds that so too can damages be uniformly

---

[95] See Pl. Ex. BB.

[96] See id. at ¶ 56; Pl. Ex. G, [1442 Dep. of K. Mumphrey] at 386:7-23 (testifying that in-person courses were "transitioned to remote or distance learning" (online distance learning) as professors taught the courses via Zoom).

[97] See Pl. Ex. BB, Singer Rep. at ¶¶ 54-55.

[98] Id. at § II.

[99] Pl. Ex. DD & Pl. Ex. EE.

calculated using a common methodology, including as set forth in the Singer Report.[100] *See* La. C.C. Art. 1995 ("Damages are measured by the loss sustained by the oblige and the profit of which he has been deprived."); La. C.C. Art. 2529 ("When the thing the seller has delivered, though in itself free from redhibitory defects, is not of the kind or quality specified in the contract or represented by the seller, the rights of the buyer are governed by other rules of sale and conventional obligations."); *Cook v. Stowe*, 914 So. 2d 1135, 1142-43 (La. App. 2 Cir. Oct. 26, 2005) (holding damages to be "the difference between what the cows should have sold for, and what they did in fact sell for, along with the cost of keeping the cows longer than expected."); *Guitreau v. Juneau*, 479 So.2d 431, 434 (La. App. 1 Cir. Nov. 19, 1985) (holding the measure of damages to be the loss in property value in a breach of contract case concerning a contractor's failure to complete a drainage system); *see also Daily Advertiser v. Trans-La, Div. of Atmos Energy Corp.*, 612 So.2d 7, n.33 (La. 1993) (noting that measure of damages for overcharged services is reparations or refunds of the overcharges).

Any individual variations in specific damages amounts, such as those based on the number of traditional in-person, on-campus classes for which a particular student registered, can be performed using ministerial calculations that will only vary based on what a particular student paid.[101]

And "the mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove their right to recover does not preclude class certification." *Brooks*, 13 So. 3d at 558-59 (internal quotation omitted).

LSU's argument that the alleged injuries differ by Class member is thus unpersuasive. As already discussed above, the Class is defined to include *only* those who would have *overpaid* for Tuition and Fees in Spring 2020 if a factfinder finds in favor of Plaintiff on liability. That different class members may have overpaid in different amounts is a damages question, not an injury question. And damages questions generally do not defeat class certification, as Louisiana law makes clear, and the Court explained above.

Similarly, whether LSU continued to provide certain services and how that should affect a damages award does not create individualized issues because LSU's conduct in that regard would

---

[100] *See* Pl. Ex. BB, (Singer Report).
[101] Pl. Ex. BB, Singer Report at ¶¶ 38-39.

have applied equally to all class members. LSU's arguments regarding certain Mandatory Fees not promising services fail on the same grounds. This is a merits question, one that is unsuitable for decision at class certification, and would also be applied equally to all class members.

LSU does not dispute that all students were transitioned to online learning as of March 16, 2020, and that campus was closed to all students as of March 30, 2020, meaning all students were subjected to the same transition to a remote only learning environment. No burdensome individualized review of records is necessary to confirm whether a student was transitioned to online classes or had access to campus, as LSU claims. Whether a factfinder should or would ultimately award damages flowing from that occurrence is a different matter, but it does not affect the propriety of class certification.

The same is true with respect to whether students who paid for meals plans and housing should receive a refund and how much. The substantive liability question going to whether students received a fair and proportionate refund will not differ by student, just as LSU's refund policy did not vary by student. Whether LSU's imposition of a 75% penalty on students who moved out of their on-campus housing at LSU's direction pursuant constituted a breach of the form housing contract that all LSU students signed will be answered the same for all students who paid for housing and were required to vacate that housing upon LSU's campus closure.

Once this central and predominating liability question is resolved, the individual amount of damages attributable to fees paid for housing and meal plans may vary, but those variations are easily calculated and do not defeat certification. They will not give rise to individualized trials. Nor will the fact that the Law Center refunded the SBA fee. If a fee was refunded pursuant to Plaintiff's pro-rata damages theory, it will not be part of the damages Plaintiff will seek. But a refund policy that applied uniformly across students does not give rise to individualized issues. If anything, it only supports class treatment here.

Furthermore, LSU argues that different students may have valued the quality of the education they received in the latter half of Spring 2020 differently, pointing to the fact that Plaintiff Gunter took Summer 2020 "web-based" classes as showing that she valued the education the same. Although LSU is free to make these arguments in defense of Plaintiff's claims, they are irrelevant to the liability question of whether LSU breached its contract with its students.

Ultimately, the price that LSU and the market sets for tuition or fees is not individualized according to how much any given student values different types of education. Indeed, LSU

discounted Summer 2020 tuition for all students, and LSU did not thereafter change its pricing model for Plaintiff Gunter merely because she took advantage of that discount. Plaintiff has offered numerous damages models that captures the discounted price the market would have set had LSU offered and students signed up for an online only program. That is more than is required at this stage of litigation.

Accordingly, just like in other Louisiana cases and similar COVID-19 refund cases against colleges and universities, there are no individual questions that predominate over the overarching common liability questions as to whether a contract promising in-person, on-campus services existed between LSU and its students and, if so, whether, when LSU closed its campus and transitioned to remote learning without providing pro-rata refunds, LSU breached that contract. These central issues, which will drive this litigation and are subject to common proof across the Class, predominate over all others.

**Plaintiff Gunter Satisfies Superiority Under § 591(B)(3)**

Under § 591(B)(3), the Court must also find that "a class action is superior to other available methods for the fair and efficient adjudication of this litigation." *See Chalona*, 3 So. 3d at 494 ("The district court stated that the class action procedure is superior because the prosecution of sperate actions would risk inconsistent adjudications and could be dispositive of the interests of class members who are not parties to this suit, thereby substantially impairing the ability for them to pursue just adjudication. We agree. When a common character of rights exists, a class action is superior.").

Here, adjudication of each Class member's contract would be inefficient and wasteful because it will be based on the same documents that govern the LSU-student agreement and the same evidence would be required to prove the breach because it was based on LSU's campus-wide policy of not issuing a pro-rata refund and closing down campus services.

Thus, it would conserve judicial resources to have the common proof as to the contract formation, the contract covenants, breach, and the alleged harm tried once, instead of risking inconsistent verdicts and lengthy delays resulting from individual trials. *See Mire v. Eatelcorp, Inc.*, 849 So.2d 608 (La. App. 1 Cir. May 9, 2003) ("When a common character of rights exists, a class action is superior to other available adjudicatory methods for the purpose of promoting the basic aims and goals of a procedural device: (1) implementing the substantive law at issue in the case; (2) providing judicial efficiency in carrying out the substantive law; and (3) insuring

individual fairness to all parties involved."). Individual litigation presents the potential for inconsistent or contradictory judgments, and the prospect of a race to judgment and an inequitable allocation of recovery among those with equally meritorious claims.

Thus, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court. Considering judicial economy and the desire for consistent judicial rulings, the class mechanism is far superior to any alternative, as numerous courts have likewise held in these types of cases. *See Arredondo*, 341 F.R.D. at 53-54; *Ninivaggi*, 2023 WL 2734343, at \*9-10; *Little*, 2022 WL 266726, at \*7; *Alexander*, No. 2021-009869-CA-01, Dkt. No. at 14-15; *Booth*, 2022 N.Y. Misc. LEXIS 9176; *Staubus*, 2022 Minn. Dist. LEXIS 7247.

### Plaintiff Also Satisfies § 591(B)(1)

Similar to the "superiority" factor discussed above, this action is also maintainable as a class action under La. C.C.P. Art. 591 (B)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendant.