1   COOLEY LLP
    MICHELLE C. DOOLIN (179445)
2   (mdoolin@cooley.com)
    LEO P. NORTON (216282)
3   (lnorton@cooley.com)
    10265 Science Center Drive
4   San Diego, CA  92121
    Telephone: (858) 550-6000
5   Facsimile:  (858) 550-6420

6   ALEXANDRA R. MAYHUGH (300446)
    (amayhugh@cooley.com)
7   1333 2nd Street
    Suite 400
8   Santa Monica, CA  90401
    Telephone: (310) 883-6400
9   Facsimile:  (310) 883-6500

10  MICHAEL N. SHEETZ *(Pro hac vice)*
    (msheetz@cooley.com)
11  500 Boylston Street
    Boston, MA  02116-3736
12  Telephone: (617) 937-2300
    Facsimile:  (617) 937-2400

13

14  Attorneys for Defendants
    UNIVERSITY OF SOUTHERN CALIFORNIA and THE
15  BOARD OF TRUSTEES OF THE UNIVERSITY OF
    SOUTHERN CALIFORNIA

16

17              UNITED STATES DISTRICT COURT

18       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

19  *In re University of Southern California*      Case No. 2:20-cv-4066-DMG-PVC
    *Tuition and Fees COVID-19 Refund*
20  *Litigation*                                   **DECLARATION OF LEO P. NORTON IN
                                                   SUPPORT OF DEFENDANTS'
21                                                 OPPOSITION TO PLAINTIFFS' MOTION
                                                   FOR SUMMARY JUDGMENT OR
22                                                 PARTIAL SUMMARY JUDGMENT OR
                                                   SUMMARY ADJUDICATION AS TO
23                                                 QUASI-CONTRACT CLAIM (COUNT II)**

24                                                 Date: March 1, 2024
                                                   Time: 2:00 p.m.
25                                                 Courtroom: 8C

26                                                 Action filed: May 7, 2020
                                                   Consolidated: July 17, 2020
27                                                 Trial Date: May 21, 2024

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

NORTON DECL. ISO DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MSJ
CASE NO. 2:20-CV-4066-DMG-PVC

1    I, Leo P. Norton, declare:

2    1.    I am a Special Counsel with the law firm Cooley LLP, counsel of record

3    for Defendants University of Southern California ("USC") and The Board of Trustees

4    of the University of Southern California (collectively, "Defendants").  I submit this

5    declaration in opposition to Plaintiffs' Motion for Summary Judgment or, in the

6    Alternative, Partial Summary Judgment or Summary Adjudication as to Their Quasi-

7    Contract Claim (Count II).

8    2.    I am an attorney licensed to practice law before the courts of the State of

9    California and this district court. I am over 18 years of age and have personal knowledge

10    of the facts set forth below.  If called as a witness, I could and would competently testify

11    thereto, and have personal knowledge of such facts as counsel of record for Defendants.

12    3.    Attached as **Exhibit 1** is a true and correct excerpted copy of the

13    Deposition Transcript of Injune David Choi, dated October 23, 2022.

14    4.    Attached as **Exhibit 2** is a true and correct excerpted copy of the

15    Deposition Transcript of Gregory Condell, dated October 28, 2022.

16    5.    Attached as **Exhibit 3** is a true and correct excerpted copy of the

17    Deposition Transcript of Christina Gloria Shu Diaz, dated October 16, 2022.

18    6.    Attached as **Exhibit 4** is a true and correct excerpted copy of the

19    Deposition Transcript of Chile Mark Aguiniga Gomez, dated October 11, 2022.

20    7.    Attached as **Exhibit 5** is a true and correct excerpted copy of the

21    Deposition Transcript of Jenna Julia Greenberg, dated October 10, 2022.

22    8.    Attached as **Exhibit 6** is a true and correct excerpted copy of the

23    Deposition Transcript of Justin Kerendian, dated October 12, 2022.

24    9.    Attached as **Exhibit 7** is a true and correct excerpted copy of the

25    Deposition Transcript of Hal J. Singer, Ph.D., dated February 27, 2023.

26    10.    Attached as **Exhibit 8** is a true and correct excerpted copy of the

27    Deposition Transcript of Andrew Stott, dated October 13, 2022.

28    11.    Attached as **Exhibit 9** is a true and correct excerpted copy of the

Cooley LLP
ATTORNEYS AT LAW
SAN DIEGO

2

NORTON DECL. ISO DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MSJ
CASE NO. 2:20-CV-4066-DMG-PVC

Deposition Transcript of Latisha Monique Watson, dated October 14, 2022.

12. Attached as **Exhibit 10** is a true and correct excerpted copy of the Deposition Transcript of Ronald T. Wilcox, Ph.D., dated February 23, 2023.

13. Attached as **Exhibit 11** is a true and correct copy of a declaration by Hal J. Singer, Ph.D., dated March 1, 2023 and submitted in the case *Miazza v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, Docket No. C-696,918, Section 24 (La. Dist. Ct.) obtained from the public record in that case. The declaration in turn attaches the Report of Hal J. Singer, Ph.D. dated November 9, 2022.

14. Attached as **Exhibit 12** is a true and correct copy of Cal. Civ. Code § 1514.

I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct. Executed on this 9th day of February 2024, in Oceanside, California.

*/s/ Leo P. Norton*
Leo P. Norton

Cooley LLP
Attorneys At Law
San Diego

3

Norton Decl. ISO Defendants'
Opposition to Plaintiffs' MSJ
Case No. 2:20-cv-4066-DMG-PVC

# EXHIBIT 1

1           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4

5    IN RE:  UNIVERSITY OF SOUTHERN)

     CALIFORNIA TUITION AND FEES    )Case No.

6    COVID-19 REFUND LITIGATION,    )2:20-CV-4066-DMG-PVC

                                    )

7    _____)

8

9

10              CORRECTED TRANSCRIPT

11         VIDEOCONFERENCE DEPOSITION OF

12              INJUNE DAVID CHOI

13             OCTOBER 23, 2022

14

15

16

17

18

19

20

21

22

23

24    REPORTED BY:  VICTORIA I. WERTZ, RPR, CSR NO. 7999

25    File No. 5521742

                                        Page 1

| | | |
|---|---|---|
| 1 | Q   And why do you say that? | 11:42:05 |
| 2 | A   I just think on campus classes and on | 11:42:08 |
| 3 | campus opportunities and services provided by the | 11:42:12 |
| 4 | university -- they are included in the tuition, so | 11:42:15 |
| 5 | when that went online and not on campus, then I | 11:42:18 |
| 6 | don't think it was the same services that I agreed | 11:42:24 |
| 7 | upon when I was paying my tuition. | 11:42:26 |
| 8 | Q   What do you mean by "they were included in | 11:42:30 |
| 9 | the tuition"?  Can you expand on that? | 11:42:33 |
| 10 | A   I think it's, like, implied.  When I | 11:42:36 |
| 11 | enroll in classes, it's implied that I would be | 11:42:39 |
| 12 | getting access to facilities -- just on campus | 11:42:44 |
| 13 | classes and ability to have face-to-face | 11:42:49 |
| 14 | interactions with my professors, classmates, | 11:42:52 |
| 15 | potential networking opportunities. | 11:42:56 |
| 16 | Q   So you believe it was implied, but not | 11:42:58 |
| 17 | explicit? | 11:43:01 |
| 18 | MR. KIM:  Objection, calls for a legal | 11:43:02 |
| 19 | conclusion. | 11:43:03 |
| 20 | THE WITNESS:  I don't know what that means | 11:43:05 |
| 21 | in a legal matter, so I would have to consult my | 11:43:06 |
| 22 | attorney for that. | 11:43:08 |
| 23 | BY MR. SLADEK DE LA CAL: | 11:43:10 |
| 24 | Q   I'm not asking you in a legal sense.  You | 11:43:10 |
| 25 | just used the word, right? | 11:43:12 |

Page 71

```
 1    part of the contractual relationship you had with      02:21:15

 2    USC?                                                    02:21:19

 3         A   I do.                                          02:21:21

 4             MR. KIM:  Legal conclusion.                    02:21:22

 5             THE WITNESS:  I do -- because I think it       02:21:23

 6    states what the standards of conduct is on campus.      02:21:24

 7    I think there wouldn't be any rules -- like, that       02:21:30

 8    if there's no understanding from both parties that      02:21:33

 9    I'm going to be on campus interacting with fellow       02:21:36

10    students or professors or whoever.                      02:21:41

11    BY MR. SLADEK DE LA CAL:                                02:21:45

12         Q   So without looking at the document,           02:21:45

13    though, and you are saying -- without kind of          02:21:53

14    recalling specifically what's in it, you believe       02:21:56

15    that the student handbook guaranteed you in-person     02:21:59

16    instruction?                                           02:22:03

17             MR. KIM:  Misstates testimony.  Legal         02:22:04

18    conclusion.                                            02:22:06

19             THE WITNESS:  Implied.  Implied guarantee.    02:22:08

20    BY MR. SLADEK DE LA CAL:                               02:22:13

21         Q   Can you point to any specific language in     02:22:14

22    the student handbook that you recall right now --      02:22:16

23         A   No.                                           02:22:20

24         Q   -- that guaranteed in-person instruction?     02:22:20

25         A   I can't point to a specific language.         02:22:22
```

Page 155

# EXHIBIT 2

1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4

5

6   IN RE: UNIVERSITY OF SOUTHERN      No. 2:20-cv-04066-DMG-PVC
    CALIFORNIA TUITION AND FEES
7   COVID-19 REFUND LITIGATION

8

9

10  _____/

11

12

13          *C O N F I D E N T I A L*

14   REMOTE VIDEO DEPOSITION OF 30(B)(6) WITNESS

15      GREGORY CONDELL, DESIGNEE OF THE

16     UNIVERSITY OF SOUTHERN CALIFORNIA

17          October 28, 2022

18              9:36 a.m.

19

20

21

22  REPORTED BY:

23  Kristi Caruthers

24  CLR, CSR No. 10560

25  JOB NO. 2022-865879

In Re: USC Tuition and Fees COVID-19 Refund Litigation    Gregory Condell
30(b)(6), Confidential    October 28, 2022

43

```
 1   BY MS. DRAKE:

 2        Q.  And those were provided to both graduate

 3   students and undergraduate students; correct?

 4        A.  To the extent that they had contracts with

 5   us, yes.

 6        Q.  You were part of conversations also

 7   considering whether to offer students a refund or a

 8   partial refund of tuition; correct?

 9            MR. NORTON:  Objection; outside the scope,

10   lacks foundation.

11            THE WITNESS:  The possibility of student

12   tuition refunds was explored and I was part of those

13   conversations, yes.

14   BY MS. DRAKE:

15        Q.  And ultimately, it was decided not to

16   provide students with tuition refunds; correct?

17            MR. NORTON:  Objection; outside the scope,

18   vague and ambiguous.

19            THE WITNESS:  Correct, given that tuition

20   is not a -- is a subsidized -- instruction is a

21   subsidized activity at USC.  That -- I was part of

22   that conversation, and that factored into our --

23   factored into our discussions.

24   BY MS. DRAKE:

25        Q.  So no refunds were given; correct?
```

In Re: USC Tuition and Fees COVID-19 Refund Litigation                    Gregory Condell
30(b)(6), Confidential                                                   October 28, 2022

58

```
 1    undergraduate and graduate programs during the

 2    COVID-19 pandemic?

 3              MR. NORTON:  Objection; outside the scope.

 4              THE WITNESS:  I am not aware of those

 5    conversations, personally.

 6    BY MS. DRAKE:

 7         Q.  Did McKinsey ultimately present findings

 8    as to whether the university should provide refunds

 9    to students or what the financial impact of such

10    refunds would be?

11              MR. NORTON:  Objection; outside the scope.

12              THE WITNESS:  McKinsey did not assemble

13    any financial analysis on tuition refunds, no.

14    BY MS. DRAKE:

15         Q.  What did they -- what did they present?

16    Did they present preliminary analysis or interim

17    analysis?

18              MR. NORTON:  Objection; outside the scope,

19    vague and ambiguous, assumes facts.

20              THE WITNESS:  Very early on, there were

21    discussions at high-level estimates of what a refund

22    might entail, but there was -- there wasn't

23    anything, you know, presented, as far as a -- a

24    refund scenario.

25    ///
```

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 12 of 147
Page ID #:5092
In Re: USC Tuition and Fees COVID-19 Refund Litigation
30(b)(6), Confidential
Gregory Condell
October 28, 2022

59

```
 1   BY MS. DRAKE:

 2         Q.  Why not?

 3              MR. NORTON:  Same objection.

 4              THE WITNESS:  Given that instruction is

 5   already a subsidized activity, given that we were

 6   keeping students on pace with their academic career,

 7   and given that we really didn't know how long the

 8   pandemic would last as far as whether we'd be

 9   starting classes up again on prem at that time, it

10   just wasn't something that we, you know, devoted a

11   lot of analysis to.

12   BY MS. DRAKE:

13         Q.  I believe you testified that one of your

14   responsibilities relates to determining tuition

15   levels?

16         A.  Correct.

17         Q.  What -- what analysis do you conduct on an

18   annual basis to determine what the tuition level

19   will be?

20              MR. NORTON:  Objection; vague and

21   ambiguous.

22              THE WITNESS:  The analysis that we conduct

23   is a -- an estimate of inflation rates in the L.A.

24   metro market, inflation rates at -- at -- that face

25   institutions of higher education, market
```

In Re: USC Tuition and Fees COVID-19 Refund Litigation                    Gregory Condell
30(b)(6), Confidential                                                    October 28, 2022

66

```
 1   tuition refunds to students?

 2            MR. NORTON:  Objection; outside of the

 3   scope.  And also, I'll caution that if you expressed

 4   it to counsel not to mention that.

 5            THE WITNESS:  As part of discussions

 6   contemplating whether a refund should be awarded or

 7   not, yeah, that's the basis of the discussion.

 8   BY MS. DRAKE:

 9        Q.  Did you express an opinion on that issue?

10            MR. NORTON:  Same objection and

11   instruction.

12            THE WITNESS:  Given that we are

13   subsidizing the cost of instruction already, I did

14   give an opinion as to whether we should refund or

15   not.

16   BY MS. DRAKE:

17        Q.  And what was that opinion?

18            MR. NORTON:  Same objection.

19            THE WITNESS:  My opinion was as long as we

20   could keep the students on pace in their academic

21   career and continue to deliver university credits

22   that we should not process a refund for fiscal year

23   '20.

24            MS. DRAKE:  We can go off the record.

25            THE VIDEOGRAPHER:  We're off the record at
```

# EXHIBIT 3

1                UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3    _____

4    In re University of Southern      Case No:

     California Tuition and Fees        2:20-cv-4066-DMG-PVC

5    COVID-19 Refund Litigation

     _____

6

7

8                    CORRECTED TRANSCRIPT

9        Portions of the Transcript have been designated

10           as Confidential or Highly Confidential

11

12

13

14

15     VIDEO-RECORDED ZOOM VIDEOCONFERENCE DEPOSITION OF

16                CHRISTINA GLORIA SHU DIAZ

17                Sunday, October 16, 2022

18

19

20

21

22

     Reported by:

23   Michelle Bulkley

     CSR #13658

24   Job No. 5512827

25   Pages 1 - 202

                                            Page 1

```
 1   on the professor.                                    10:57

 2       Q    So some classes may not change, but some

 3   classes do change?

 4       A    Correct.

 5       Q    And did any of these syllabi explicitly     10:58

 6   promise in-person education?

 7            MR. KATRIEL:   Objection.   Asked and

 8   answered.

 9            You can still answer the question.   I'm

10   just objecting for the record.                       10:58

11            THE WITNESS:   Okay.   I mean, there is --

12   like, that was the standard.   There -- it's --

13   everything is in person.   It's not saying it's not

14   in person.

15   BY MS. MAYHUGH:                                       10:58

16       Q    Do you know if the syllabi used the words

17   "in person"?

18       A    I don't recall, but when it says it's

19   taking place in studio and in this place and this

20   place that's physically on campus, then, yes, I am   10:58

21   taking that it is in person.

22       Q    And I think you testified you don't recall

23   any of the specific syllabi that you reviewed before

24   applying to USC; is that right?

25       A    No.                                          10:59
```

Page 35

```
 1    I -- I need a bit more context.  I'm not sure which      01:57

 2    forms you're asking about.

 3            (Exhibit 93 marked.)

 4        Q    Let me know when you have Exhibit 93 up.

 5            MS. MAYHUGH:  And while you're waiting,           01:58

 6    for the record, I'll state that this is a 12-page

 7    document.  The first page has Bates Number

 8    USC000130441.  I'm introducing as Exhibit 93.

 9            THE WITNESS:  Yes.  I have the document.

10    BY MS. MAYHUGH:                                          01:59

11        Q    Do you recognize this document?

12        A    Yes.

13        Q    What is it?

14        A    It's a document for the study abroad --

15    the Italy study abroad program.                         01:59

16        Q    And I realize it's a 12-page document, so

17    feel free to take your time if you'd like to scroll

18    through it.

19        A    Uh-huh.

20        Q    Is this a document that you signed before      01:59

21    studying abroad?

22        A    I'm assuming so, or else I would not have

23    been able to go.

24        Q    Do you still have a copy of this document

25    anywhere, whether a hard copy or electronic?            01:59
```

                                            Page 114

| | | |
|---|---|---|
| 1 | A   I don't.   I can't say I do at the moment. | 02:00 |
| 2 | Q   Have you searched for this document or any | |
| 3 | others related to your study abroad program? | |
| 4 | A   I'm not sure.   Possibly.   I don't recall | |
| 5 | being asked to search for this document. | 02:00 |
| 6 | Q   Are you aware that USC asked you to | |
| 7 | produce in this case documents and communications | |
| 8 | between or among you and USC or any person | |
| 9 | concerning your study abroad program? | |
| 10 | A   I don't recall them asking specifically | 02:00 |
| 11 | for this document.   And, again, I -- I -- perhaps I | |
| 12 | searched for it.   I'm not sure. | |
| 13 | Q   Okay.   And sitting here today, you're not | |
| 14 | sure if you have it, whether in hard copy or | |
| 15 | electronic form? | 02:00 |
| 16 | A   Yes. | |
| 17 | Q   If you scroll down to page 2 of the | |
| 18 | document -- | |
| 19 | A   Uh-huh -- | |
| 20 | Q   -- the second-to-last paragraph there | 02:01 |
| 21 | states -- | |
| 22 | A    okay. | |
| 23 | Q   -- "The student also acknowledges that the | |
| 24 |      USC assumes no responsibility, in whole or | |
| 25 |      in part, for any delays, delayed, or | 02:01 |

Page 115

CONFIDENTIAL

1    changed departure or arrival times, fare          02:01

2    changes, dishonors of hotel, airline, or

3    vehicle rental reservations, missed

4    carrier connections, sickness, disease,

5    injuries, including death, losses,                02:01

6    damages, weather strikes, acts of God,

7    circumstances beyond the control of the

8    USC, force majeure, war, quarantine, civil

9    unrest, public health risk, criminal

10   activity, terrorism, expense, accident,           02:02

11   injuries, or damage to property,

12   bankruptcies of airlines or other service

13   providers, inconveniences to station of

14   operations, mechanical defects, failure or

15   negligence of any nature, howsoever caused        02:02

16   in connection with any accommodations,

17   restaurant, transportation, or other

18   service or for any substitution of hotels

19   or common carrier beyond USC's control,

20   with or without notice, for any additional        02:02

21   expenses occasioned by any of the

22   foregoing.  If due to weather, flight

23   schedules, or other uncontrollable

24   factors, student is required to spend

25   additional nights, USC will not be                02:02

Veritext Legal Solutions
866 299-5127

| | | | |
|---|---|---|---|
| 1 | | responsible for student's hotel, | 02:02 |
| 2 | | transfers, meal costs, or other expenses. | |
| 3 | | Student's baggage and personal property | |
| 4 | | are completely at the student's own risk." | |
| 5 | | Did I read that correctly? | 02:02 |
| 6 | A | Yes. | |
| 7 | Q | Okay.  And if you scroll down to page 3, | |

and I believe it's the fifth paragraph on the page.

And it says:

| | | | |
|---|---|---|---|
| 10 | | "USC reserves the right, in its whole | 02:03 |
| 11 | | discretion, to cancel or suspend the | |
| 12 | | Program for any events or circumstances | |
| 13 | | that may, in USC's determination, place | |
| 14 | | Student at risk of mental, emotional, or | |
| 15 | | physical harm or bodily injury, including, | 02:03 |
| 16 | | but not limited to, war, political | |
| 17 | | upheaval, riots, or other events in or | |
| 18 | | around the location of the Program.  USC | |
| 19 | | may rely on travel advisories issued by | |
| 20 | | the U.S. State Department in determining | 02:03 |
| 21 | | whether to cancel or suspend the program. | |
| 22 | | USC may cancel or suspend the program or | |
| 23 | | substitute classes due to low enrollments | |
| 24 | | or unavailability of faculty or | |
| 25 | | facilities." | 02:04 |

Page 117

CONFIDENTIAL

1          Did I read that accurately?                    02:04

2     A    Yes.

3     Q    You can put that document to the side for

4 now.

5     A    Okay.                                          02:04

6     Q    When did your study abroad program start

7 in spring 2020, if you can recall?

8     A    I can't recall the specific date.

9     Q    Was it in January of 2020?

10    A    I don't remember.                              02:04

11    Q    Could it have been in December of 2019?

12    A    I really don't remember.  I would need to

13 look it up.

14    Q    Okay.  So from the start of the program to

15 approximately March -- sometime in March of 2020,     02:04

16 did the program proceed in person?

17    A    Yes.

18    Q    Do you recall when you first learned about

19 the spread of COVID 19 in Italy?

20    A    It was pretty early on, at least before       02:05

21 the United States knew anything about it.

22         (Exhibit 94 marked.)

23    Q    Ms. Diaz, you should have Exhibit 94 in

24 your folder.  Let me know when you can see it.

25    A    Yes.                                           02:06

                                        Page 118

```
 1    the architecture.                                    03:35

 2         Q    Okay.   And then those conversations,

 3    though, no one said that all of your classes would

 4    be held in person; right?

 5         A    No.   They did not use the word "all" --    03:35

 6    specifically quote by quote, "All of your classes

 7    will be held in person," but it is implied through

 8    the schedule that was quite specific of where we're

 9    going, when we're going, who we're meeting, what

10    we're doing.                                          03:35

11         Q    Are you familiar with the USC Catalogue?

12         A    Yes.

13         Q    Do you recall reviewing the 2019-2020

14    version of the catalogue?

15         A    I don't remember.                           03:36

16         Q    Do you recall when you reviewed the USC

17    Catalogue?

18         A    I don't.

19         Q    Do you know if USC makes the USC Catalogue

20    available to its students?                            03:36

21         A    I don't.

22         Q    And even if you can't remember when, do

23    you recall how many times you've looked at the USC

24    Catalogue?

25         A    I don't know.                               03:37
```

Page 172

 **USC**University of
Southern California

☐ **RESPONSIBILITY FOR READING OVERSEAS STUDIES HANDBOOK**

I, **CHRISTINA DIAZ,** have applied to and have been accepted to study abroad with the **USC SCHOOL OF ARCHITECTURE** in **ITALY** during the **SPRING 2020** term.

I have received the USC Office School of Architecture Study Abroad Handbook and I agree to read the Handbook thoroughly and carefully.

☐ **RESPONSIBILITY FOR OBTAINING A STUDENT VISA**

I understand that it is my sole responsibility to apply for and obtain a student visa for the country in which I intend to study. I will research the application details and deadlines for my visa application, including the appropriate consulate at which to apply and the requirements for that particular consulate. I will apply for my visa at the earliest possible time, which I understand to be as soon as I am accepted into my intended program of study and have received the appropriate documents. I am responsible for staying up-to-date regarding changes to the visa application process for the consulate at which I will apply for my student visa.

☐ **WITHDRAWAL/REFUND POLICY ACKNOWLEDGEMENT**

I, **CHRISTINA DIAZ** acknowledge that I have read and understand the USC Withdrawal and Refund Policy of my study abroad program in **ITALY.**

_____          _____
Signature of Student/Participant                                              Date

**Exhibit
Defs 0093**



**USC** University of
Southern California

**UNIVERSITY OF SOUTHERN CALIFORNIA
TRAVEL RELEASE**

The parties to this Release are **CHRISTINA DIAZ,** (Student), _____(Student's parents or legal guardian, if student is under 18) (both referred to hereafter jointly and severally as "Student"), and the University of Southern California (hereafter "USC").

The Student, with the consent of the Student's parents or legal guardian if necessary, has chosen to participate in the USC School of Architecture **ITALY** Program (hereafter "Program"), during the **SPRING 2020** semester.

All students are considered adults and are expected to take responsibility for their actions while taking part in the Program. As adults, any activities that Student takes part in, whether as a part of a Program or separate from the Program, will be considered to have been done with their approval and understanding of any and all risks involved. Any students under 18 and/or considered dependents of their parents or guardians are responsible for giving all background or other relevant information about the Program to their parents or guardians.

Although USC may offer information to Student on aspects of foreign travel and particular destinations, Student agrees that he/she is responsible for determining the potential dangers of particular destinations, and the Student acknowledges that USC is under no duty to warn the Student of any particular danger or potential injury. Before deciding whether to visit a site under a travel warning, USC recommends that Student check with the U.S. Department of State website (http://travel.state.gov/travel_warnings.html) and the U.S. Centers for Disease Control website (http://www.cdc.gov/travel/) and read carefully the current travel warning/advisory, public announcements, and consular information sheet for the site in which Student seeks to study. Notwithstanding the foregoing, USC recommends that Student elects not to study in a site under a travel warning. Student acknowledges that Student has been made aware of the risks of foreign travel, and more specifically, the risks of travel to the subject destination, and further acknowledges reading and understanding any applicable U.S. Department of State travel warnings. Student is participating in the Program with full knowledge of the risks inherent in such participation, including possible physical injury or other loss or damage and agrees to accept and assume any and all risks associated with participation in the Program. In consideration of USC's accepting Student into the Program, Student, her/his heirs, executors, administrators, employers, agents, representatives, insurers and attorneys, hereby releases and discharges USC, its officers, trustees, facility, employees, agents and representatives (hereafter "released parties") from any and all claims which may arise from any cause whatsoever, regardless of the source. The Student further releases and discharges the released parties from responsibility for any accident, illness, negligence, passive or active, or injury or any other consequences arising or resulting directly or indirectly from Student's participation in the Program.

The Student also acknowledges that the USC assumes no responsibility in whole or in part, for any delays, delayed or changed departure or arrival times, fare changes, dishonors of hotel, airline or vehicle rental reservations, missed carrier connections, sickness, disease, injuries (including death), losses, damages, weather, strikes, acts of God, circumstances beyond the control of the USC, force majeure, war quarantine, civil unrest, public health risks, criminal activity, terrorism, expense, accident, injuries or damage to property, bankruptcies of airlines or other service providers, inconveniences, cessation of operations, mechanical defects, failure or negligence of any nature howsoever caused in connection with any accommodations, restaurant, transportation, or other service or for any substitution of hotels or of common carrier beyond USC's control, with or without notice, for any additional expenses occasioned by any of the foregoing. If due to weather, flight schedules or other uncontrollable factors Student is required to spend additional nights, USC will not be responsible for Student's hotel, transfers, meal costs or other expenses. Student's baggage and personal property are completely at the Student's own risk.

Student hereby represents and warrants that he/she is and will be covered throughout the Program by a policy of comprehensive health and accident insurance which provides coverage for injuries and illnesses that Student sustains or experiences overseas, and, more specifically, in the countries in which Student will be living and/or traveling while on the Program. By Student's signature below, the Student certifies that his/her health insurance policy will adequately cover Student while outside the United States; and, Student absolves USC of all responsibility and liability for any charges, bills and/or expenses Student may incur while he/she is abroad. Student agrees to report to USC's Program directors any physical or mental condition that he/she has which may require special medical attention or accommodation during the Program at least ninety (90) days prior to departure.

2

Confidential    USC000130442


USC University of
Southern California

Student hereby agrees to indemnify and hold harmless the released parties from any loss or liability whatsoever including reasonable attorneys' fees, caused by any act or omission of Student resulting from Student's participation in the Program.

Student understands and agrees that Student will obey all rules, regulations, and laws of the respective countries to be visited, and all travel regulations, any rules or precautions issued by USC, its representatives or by any associated institutions or organizations or the United States government. Student also understands that in the sole discretion of the Program representative, a violation of the above may result in an immediate expulsion from the Program. USC reserves the right to decline to accept or retain student in the Program at any time should Student's actions or general behavior impede the operation of the Program or the rights or welfare of any person. In such an event, no refund will be made for any remaining portion of the Program.

Student understands and agrees to attend and participate in all excursions that are a part of the Program. Student understands that failure to do so will result in a reduction of grade including the possibility of course failure.

It is understood and agreed that should Student elect to remain overseas at the location of the Program or elsewhere after participation in the Program, Student will cease to be part of the Program. Should Student drop out of the Program voluntarily or involuntarily, Student understands that any relationship between Student and the Program will be terminated thereafter. In both of the foregoing events, this release shall remain in full force and effect.

USC reserves the right in its sole discretion to cancel or suspend the Program for any events or circumstances that may, in USC's determination, place Student at risk of mental, emotional or physical harm or bodily injury, including but not limited to war, political upheaval, riots or other events in or around the location of the Program. USC may rely on travel advisories issued by the U.S. State Department in determining whether to cancel or suspend the Program. USC may cancel or suspend the Program or substitute classes due to low enrollments or unavailability of faculty or facilities.

By signing below, Student represents that he/she is a student in good standing at USC and has never had charges brought against him/her before the USC Office of Student Conduct. Student hereby gives the Office of Student Affairs the right to access student's records maintained by the USC Office of Student Conduct, and to provide relevant information from such records to the Faculty/Program Coordinator.

It is understood and agreed that if any provision of this Release or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of this Release which can be given effect without the invalid provisions or applications and to this end the provisions of this Release are declared severable.

This Release shall be construed in accordance with, and governed by, the laws of the State of California. Subject to approval from USC's insurance carrier, any dispute arising from this Release shall be submitted for full and final resolution to arbitration in accordance with the rules promulgated by the American Arbitration Association. The arbitration shall take place in Los Angeles, California.

This Release is the only, sole, entire and complete agreement of the parties relating in any way to the subject matter hereof. No statements, promises or representations have been made by any party to any other, or relied upon, and no consideration has been offered, promised other than as may be expressly provided herein. This Release supersedes any earlier written or oral understanding or agreements between the parties.

Student acknowledges that she/he has read this Release and that she/he understands its meaning and effect.

_____
Signature of Student/Participant                                        Date


_____
USC                                                                     Date


3



**USC**University of
Southern California

## USC STUDY ABROAD PROGRAM
## HEALTH INSURANCE SELECTION FORM

Indicate below which health insurance policy applies to you.

Name    **CHRISTINA DIAZ**

USC Student ID Number (10 digit)          **2696860491**

Study Abroad Program Location    **ITALY**

Signature of Student/Participant                                    Date

☐ **Spring/Summer 2020 USC Student Health Insurance Plan** (coverage in US and abroad)
**Coverage dates are dependent on the Program start/end dates**
Includes important medical evacuation and repatriation coverage (through International SOS) not normally covered under domestic plans.

Approximate cost (based on Spring/Summer 2020 cost): $1,365

☐ **USC Overseas Policy** (coverage abroad only)
If you normally waive OUT of the USC Student Health Insurance plan and have coverage through a family member (i.e. Aetna, Blue Cross, United, Kaiser, etc.) you will AUTOMATICALLY be issued this USC Overseas Insurance Policy.

Approximate month cost: $97/month (Not prorated.  Cost is based on the month of your departure and the month of your return.)

4

                                    USC000130444

**USC** University of
Southern California

## USC SCHOOL OF ARCHITECTURE
## MEDICAL TREATMENT AUTHORIZATION 2020-2021

I, **CHRISTINA DIAZ,** am a willing participant in the USC sponsored overseas study program in

**ITALY,** I understand that I am financially responsible for any injury or illness I may sustain

while overseas. I understand that the University of Southern California is not in any way

responsible to pay for medical treatment on my behalf. In the event I am incapacitated due to a

medical emergency, and am unable to authorize treatment to alleviate my condition, I authorize

the University of Southern California's employees, faculty or agents to act on my behalf and

authorize such emergency treatment. I acknowledge that this authorization does not create a duty

on the part of the University, and I hereby release the University of Southern California and its

trustees, employees, agents and representatives from any and all claims, causes of action, losses,

liabilities, costs, fees and expenses arising or resulting from any injury or damage I may incur in

the course of receiving medical care overseas.

_____
Signature of Student/Participant                              Date

5

Confidential                                                                    USC000130445

**USC** University of
Southern California

## KNOW BEFORE YOU GO
## RECOMMENDATIONS FOR A HEALTHY STUDY ABROAD EXPERIENCE

Studying abroad may be a stressful event and we would like to assist you in better preparing you for your experience. It is important to note that studying away from home can be risky for those with medical or psychological health conditions that are not managed properly before departure. Therefore, students should take into consideration any underlined special medical, physical, or psychological needs that may impact their participation in the program prior to departure. Please keep in mind that study abroad sites may not be able to accommodate all reported individual needs or circumstances.

**Pre-departure Checkups:**
You are strongly encouraged to schedule a medical exam at the USC Student Health Center https://studenthealth.usc.edu/medical-care/ or with your family physician prior to departure. A thorough dental exam is also strongly recommended.

For information on necessary or suggested vaccination for travel abroad, consult your family physician or the USC Student Health Center Travel Clinic: https://studenthealth.usc.edu/medical-care/

**Students Using Medications:**
If you use medication/s, including asthma inhalers, on a regular basis you should take a supply to last throughout your stay and carry a letter from your physician explaining the medical necessity and treatment. Any medications taken overseas should be left in their original containers and be clearly labeled.

Prescription medication for legitimate health conditions may be scrutinized by foreign officials when going through Customs. In some countries drugs that are legal and readily available in the United States will be considered illegal, require a prescription, or a host country authorization to be allowed in the country.

If you are being treated for a psychological health condition work closely with your physician or mental health professional to understand possible triggers and how to reach out for help. It is in your best interest, if you are taking psychotropic medications, to be stable in your medication before starting your overseas experience. Discuss proper medication management with your doctor or mental health professional prior to your departure.

Mailing medication abroad: Most countries have very strict regulations on having medications shipped abroad. Students regularly find that refills of regularly taken medications in the U.S. get stopped by the host country's Customs. Decisions on what medications may be mailed legally into some foreign countries are made by the host country government, not the U.S. Post Office. Students should call the host country government office in the U.S.

**Students with Different Abilities**
Passage of legislation such as the Individuals with Disabilities Education Act and the American with Disabilities Act has spurred schools in the U.S. to accommodate students with varying abilities. It is important to know that other countries are not bound by U.S. legislation, and physical facilities and academic resources vary significantly from one overseas site to another. If you are currently receiving disability-related accommodations at USC or anticipate needing them at your program site, please contact Disability Services and Programs (DSP) located in the Student Union 301 or call (213) 740-0776, to discuss appropriate responses to your needs.

6

USC000130446



## INFORMED CONSENT FOR STUDY ABROAD PROGRAMS

Students are expected to consider their physical and mental health and any special needs when deciding whether or not to study abroad and when choosing a program. Studying abroad involves challenges related to differences in facilities and physical conditions, cultural norms and expectations, and types of stress. Students studying abroad are also separated by distance from their familiar support networks and healthcare providers. All students--especially those with different physical or learning abilities, those with medical conditions, and those with psychological issues--are strongly encouraged to consider all potential challenges and consider whether studying abroad at the selected location is appropriate for them. Student may then take necessary steps to have a healthy experience abroad.

Examples of psychological issues that can be exacerbated or triggered while studying abroad include depression, anxiety, body image and eating disorders, panic attacks, and addictive behaviors. Examples of challenges for students with physical and learning disabilities include lack of wheelchair access, pedestrian-unfriendly infrastructures, and little or no accommodation for alternate testing situations.

Students are strongly encouraged to take the following measures to help increase the likelihood of a healthy and successful study abroad experience:

- ☐ Get a thorough medical exam and explain to the physician the location and nature of the study abroad program.
- ☐ Get any immunizations or take any medications (e.g. *anti-malarial*) necessary or suggested for the study abroad location and locations in which you plan to travel extensively.
- ☐ Bring a sufficient supply of needed medications, including asthma inhalers, along with prescriptions. Don't respond to the stresses of adjusting to a new culture by taking more than the prescribed doses of your medication, discontinuing medication without advice from a doctor, or taking medication prescribed to another student.
- ☐ In the case of a history of any psychological issues, consult with a physician or mental health professional and explain to the practitioner the location and nature of the study abroad program.
- ☐ In the case of disabilities (e.g. *learning disabilities, physical disabilities*), consult with Disability Services and Programs (DSP), Student Union 301, 213-740-0776.

I, **CHRISTINA DIAZ,** acknowledge that I have read this informed consent and the attached "Know Before You Go" document and that she/he understands their meaning and effect.

_____
Signature of Student/Participant                                        Date

7

                                                                USC000130447



The **USC STUDENT HEALTH RELATIONSHIP AND SEXUAL VIOLENCE PREVENTION AND SERVICES (RSVP)** provides immediate therapy services for situations related to gender and power-based harm (e.g., sexual assault, domestic violence, stalking). In case of an emergency or if you need immediate assistance, please call **(213) 740-9355** (after hours, press zero "0" to speak to an on-call counselor). Relationship and Sexual Violence Prevention and Services on-call counselors aid in discussing medical options, reporting options and provide crisis support and advocacy.

When referring to sexual and gender-based harm, this includes violence that disproportionately affects a person or group based on gender, and may be linked to gendered expectations and/or power dynamics. This term will be used interchangeably with power-based violence, which occurs when a person uses the assertion of power, control, intimidation, and/or coercion to harm another person. These acts may be committed by friends, partners, family members, strangers, acquaintances, or others.

Victims of sexual assault may be men or women. Ninety-nine percent of perpetrators are male regardless of the victim's gender. In this document the victim is referred to as "her", with the acknowledgement that this is for the sake of clarity and continuity

In the event a sexual assault occurs during your supervision of an overseas study trip, you may be called upon by the victim to provide assistance and referral for medical, emotional, and legal care. Following are some steps that should be taken pre-assault and post-assault.

**WHAT ADMINISTRATORS AND PROGRAM DIRECTORS SHOULD DO PRE-DEPARTURE**
Taking the following proactive steps will help to reduce the risk of sexual assault and facilitate better care for the victim should a sexual assault occur:

- **Discuss the Issue with Students Before Departure**
  Make sure at pre-departure orientation the issue of sexual assault is addressed. Emergency contact information and other materials should be given to students and there should be written verification that they received them.

- **Keep a Current File**
  All information regarding what to do and who to contact should be kept in a file and updated so that it is always current.

- **Discuss the Importance of Notification**
  Let students know that reporting *any type* of gender based harm, including sexual assault, is considered courageous and will be met with empathy. The university will advocate on behalf of the victim as is deemed appropriate.

**WHAT ADMINISTRATORS AND PROGRAM DIRECTORS SHOULD DO AFTER AN ASSAULT**
The first concern is always the immediate physical and emotional well-being of the student. But there are many post assault related issues. There is no *typical* reaction to being sexually assaulted. Victims present with varying affect and concerns. Some victims cry, some appear blunted, and some express rage. Be empathetic and accepting. Following are steps that Administrators and Program Directors should take after an assault has been reported.

- **Let the Student Make Decisions**
  The victim may feel helpless and powerless. Allowing the victim to make decisions regarding her emotional and physical well-being helps to re-establish her feeling of self-determination. Ask her clear and focused questions and accept her choices, "Do you want to go to the police?" "Where would you like to stay tonight?" "Who do you want to stay with you?" Honor her decisions even if they conflict with your beliefs.

- **Be Supportive**
  Remember your first priority is to be supportive. Do not attempt to persuade the student to follow a certain course of action or try to force her to do something she doesn't want to do. Maintain your role as advocate for the choices she makes. Provide an empathetic and compassionate listening ear. Be careful to avoid questions that may insinuate blame or guilt such as, "How could you go to a place like that?" Or "Why would you go out with a man you barely know?" Remember, sexual assault is a crime of power and she is a victim of the crime.

8

USC000130448

USC University of
Southern California

The victim may feel embarrassment, shame, anger, anxiety, fear, and helplessness. Accept her feelings by actively listening to her concerns and validating her decision to seek out help.

- **Make Sure the Student Feels Safe**
  Help to restore a sense of security for the student. If she does not feel safe in her apartment or with her host family, arrange for her to stay in a hotel with a friend. Allow the student to tell you what she thinks would make her feel safe. Explore suggested options with the student.

- **Activate Your Contact List**
  After you have spoken with the student using the above guidelines, make contact with other entities *as appropriate* and based on student's wishes.

  1. *International SOS (ISOS) – As soon as possible after a report of a sexual assault, call ISOS at the phone number listed on your ISOS identification card or call collect from anywhere in the world to (215)245-4707.* International SOS can tell you where to take the student for medical and psychological acute and follow-up treatment, and they will contact USC for payment guarantees to foreign medical providers. They will also speak to local medical providers, in the country where the student was assaulted, to discuss proper sexual assault forensic evidence collection and chain of evidence protocol for potential prosecution. International SOS is willing to consult and have access to the Santa Monica Rape Treatment Center at (310) 319-4000. Information provided by the Santa Monica Rape Treatment Center is also available at www.911rape.org. International SOS will also notify the International Security Officer in their office to work with law enforcement and embassies located in the country where the student was assaulted. They will always try to obtain a copy of the police report for the student and will obtain necessary release of information permission from the student so they can discuss the case with appointed University of Southern California contacts.
  2. Local police
  3. USC 24-hour travel emergency number: (213) 821-1042
  4. U.S. Embassy -- report the incident
  5. Suggest the student call her parents or guardians
  6. Remind student of resources upon returning to USC such as the USC Student Health Relationship and Sexual Violence Prevention and Services (RSVP) and the USC Student Counseling Center.

- **Provide Accompaniment**
  Someone of her choosing should accompany the student on assault related follow up: to the hospital, to the police station, to her apartment, etc.

- **Maintain a level of confidentiality**
  Let her know that you are obligated to contact the university and report the incident. Advise the student who you're calling and why. Allow her to choose whether or not to contact additional support and resources.

- **Document Everything**
  o   Take copious notes. Create a chronology of events. What you want to capture is the following:
  o   A description of the assault: Who, where, when, how. Include date and time.
  o   Location of medical facility and date/time taken there. Record what was said between the medical staff, the student and whoever else is present.
  o   The time of each of your contacts and what transpired.
  o   Document the conversations you have with the student. Identify who is present, what's discussed, and what decisions the student makes.
  o   Date and time the police are notified. Document what transpires between the student and the police.
  o   Keep documenting until the designated university contact tells you to stop.

This document is a condensed version of the U.S. Peace Corps "Rape Response Handbook". It can be found at the Center for Global Education website:
http://globaled.us/peacecorps/rape-response-handbook.asp.

9

                                                                 USC000130449

**USC** University of
Southern California

## PROGRAM EVALUATION EXPECTATIONS AGREEMENT

I, **CHRISTINA DIAZ,** as a participant of the **ITALY** study abroad program, do hereby promise to follow the evaluation rules set forth by the University of Southern California and the School of Architecture. I understand that I am required to fill out multiple evaluations as part of the completion of this program. **I will not list more than one class on each evaluation sheet, despite the temptation to do so.** If I do combine courses or neglect to complete my set of evaluations, I understand that I will be required to complete them in the Architecture Student Services office upon my return, as the evaluations are invalid. Should this occur, I will maintain a professional demeanor, upholding the commitments made when signing this agreement. I realize the evaluations are mandated for the continuation of this program and affect many people who work to make this program possible. I also realize these evaluations are the source for improving the program for future groups of students.

*I understand that I am required to fill out the following evaluations:*

☐ **Full Program Online Evaluation** required by the Provost's Office (including all essay questions, elaborating in short sentences rather than one-word responses, in a professional manner, whether giving positive or negative feedback)

☐ **End of semester online evaluation for the following courses**
      ARCH 316, ARCH 402, ARCH 406, ARCH 424, ARCH 425, ARCH 426

_____

Signature of Student/Participant                 Date

10

Confidential
USC000130450

 USC University of Southern California

## COMMITMENT TO PROGRAM LOGISTICS AGREEMENT

I, CHRISTINA DIAZ, as a participant of the ITALY study abroad program, do hereby acknowledge that I shall not deviate from the presented program set out by the Program Director, and the USC School of Architecture. Any unauthorized deviation will result in my liability for any additional costs and repercussions incurred as a result. If I feel I have established an agreement that differs from the specifics of the program's itinerary, whether it be travel, accommodations, costs, etc. I will ensure to have it expressed clearly in writing from the Program Director and have any and all documentation of proof sent to the Director of Global Studies Valery Augustin and to Global Studies Program Coordinator Jennifer Park at the School of Architecture. I will not assume that this requested discrepancy from the program is approved until I receive acknowledgment in return from the Global Studies Director and/or Program Coordinator as evidence of consent.

***I understand the above and will not unexpectedly deviate from the program.***

Signature of Student/Participant Date

*Please note: The purpose of this agreement is to ensure the safety of all participants and endeavor to keep costs close to the proposed budget.*

**USC** University of
Southern California

## FINANCIAL AID AGREEMENT

I, **CHRISTINA DIAZ,** hereby acknowledge that I am responsible for completing the following procedures for my USC financial aid for 2019-2020 while I am abroad during the overseas study program in **ITALY.**

1.     I will arrange for all important financial aid correspondence to be forwarded to me abroad.

2.     It is my responsibility to meet all 2020-2021 USC Financial Aid deadlines, including those set for *(PLEASE CHECK THE USC FINANCIAL AID WEBSITE REGULARLY)*:

   a.   CSS Profile
   b.   FAFSA
   c.   Copies of Tax Forms/Non-filing Statement

3.     It is my responsibility to notify the School of Architecture of special circumstances or problems relating to my financial aid, including the following:

   d.     Loan processing
   e.     Loan disbursement
   f.     Scholarship checks
   g.     Scholarship applications

_____

Signature of Student/Participant                                      Date

12

                                                  USC000130452

# EXHIBIT 4

HIGHLY CONFIDENTIAL

```
 1                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
 2
                  CASE NO.:  2:20-CV-4066-DMG-PVC
 3
 4
           IN RE:  UNIVERSITY OF SOUTHERN
 5         CALIFORNIA TUITION AND FEES
 6         COVID-19 REFUND LITIGATION,
 7
 8         _____/
 9
10
11
12              REMOTE VIDEOTAPED DEPOSITION OF
13
14                 CHILE MARK AGUINIGA GOMEZ
15
16
17                 Tuesday, October 11, 2022
18              10:00 a.m. - 4:02 p.m. (PDT)
19
20
21
22
23              Stenographically Reported By:
24               Kimberly Fontalvo, RPR, CLR
25              Realtime Systems Administrator

                                         Page 1
```

HIGHLY CONFIDENTIAL

```
 1              Calls for legal conclusion.
 2                   Sorry about that.
 3                   MR. NORTON:  No problem.
 4        BY MR. NORTON:
 5           Q.   And then when registering for Spring 2020,
 6        did you review or see any documents from USC that
 7        explicitly promised that classes would be delivered
 8        in person?
 9                   MS. KENNER:  Calls for a legal conclusion.
10                   You can answer.
11           A.   No.
12        BY MR. NORTON:
13           Q.   If you can look at Exhibit 39, please.
14        Okay.
15                   (Thereupon, marked as Exhibit 39.)
16        BY MR. NORTON:
17           Q.   And for the record, Exhibit 39 is a letter
18        from the University of Southern California to Chile
19        Gomez at an address in Long Beach, and it's
20        Bates-numbered USC000129722 to 29723.  Or 129723.
21                   Have you seen this document before?
22           A.   Yes, sir.
23           Q.   And this is the admission or acceptance
24        letter you received from USC, correct?
25           A.   Yes.
```

Page 48

# EXHIBIT 5

HIGHLY CONFIDENTIAL

```
 1                UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3                            - - -

 4    In Re University of        )
      Southern California Tuition )
 5    and Fees COVID-19 Refund    ) No. 2:20-cv-4066-DMG-PVC
      Litigation,                 )
 6                                )

 7

 8

 9

10

11

12              ***** HIGHLY CONFIDENTIAL *****

13                     DEPOSITION OF

14                JENNA JULIA GREENBERG

15               Monday, October 10, 2022

16          ******************************

17

18

19

20

21

22    Reported By:

23    MICHELLE K. BAILEY
      RPR, CSR No. 10713

24    Job No. 5512807

25    Pages 1 - 198
```

Page 1

HIGHLY CONFIDENTIAL

```
1    And then let's go to the next exhibit.              12:59:18

2            All right.  This is going to be Exhibit 10.  12:59:36

3        (Exhibit 10 marked)                              12:59:43

4    BY MR. NORTON:                                       12:59:43

5        Q.  Go ahead and take a look at Exhibit 10 while I  12:59:44

6    read some information into the record.  This document is  12:59:47

7    another USC schedule of classes for spring of 2020, and  12:59:51

8    it is Bates-numbered USC000129776 to 77.             12:59:54

9            Let me know when you've read that.           13:00:07

10       A.  I've reviewed this.                          13:00:08

11       Q.  Okay.                                        13:00:10

12           Did you review this document before registering  13:00:15

13   for classes?                                         13:00:17

14       A.  I did.                                       13:00:17

15       Q.  And for this class, the description of        13:00:24

16   information provided, does it contain any language   13:00:26

17   explicitly promising in-person education?           13:00:31

18           MS. SIEHL:  Object to form.                  13:00:34

19           THE WITNESS:  Again, no.  It was implied that  13:00:35

20   it was in person.  No written words.               13:00:37

21   BY MR. NORTON:                                       13:00:40

22       Q.  And, again, this is based on the location    13:00:40

23   information provided; correct?                       13:00:42

24       A.  The location information as well as the fact  13:00:45

25   that it had previously been offered in person.  And I  13:00:47
```

Page 75

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | was told by my advisor that it has historically been in | 13:00:56 |
| 2 | person. | 13:01:02 |
| 3 |     Q.  And your advisor used that language, "in | 13:01:02 |
| 4 | person"? | 13:01:07 |
| 5 |     A.  I don't have a quote, but it was implied. | 13:01:07 |
| 6 |     Q.  But you're not sure if that was the specific | 13:01:10 |
| 7 | words stated? | 13:01:12 |
| 8 |         MS. SIEHL:  Object to the form.  Misstates | 13:01:13 |
| 9 | testimony. | 13:01:15 |
| 10 |         THE WITNESS:  I'm not sure of the wording. | 13:01:15 |
| 11 | BY MR. NORTON: | 13:01:16 |
| 12 |     Q.  Okay. | 13:01:16 |
| 13 |         And then the location information here, again, | 13:01:16 |
| 14 | it's logistical; correct? | 13:01:19 |
| 15 |     A.  Correct. | 13:01:21 |
| 16 |     Q.  And the type of classes listed as a lecture; | 13:01:22 |
| 17 | correct? | 13:01:26 |
| 18 |     A.  Correct. | 13:01:26 |
| 19 |     Q.  Is there any field work or any internship | 13:01:26 |
| 20 | aspect of this course? | 13:01:35 |
| 21 |     A.  No. | 13:01:36 |
| 22 |     Q.  And is there any sort of aspect of this class | 13:01:37 |
| 23 | that took place outside of the lecture? | 13:01:40 |
| 24 |     A.  Not that I recall. | 13:01:54 |
| 25 |     Q.  And for this class, did you -- pre-pandemic, so | 13:01:55 |

Page 76

HIGHLY CONFIDENTIAL

```
 1   BY MR. NORTON:                                        13:03:24

 2       Q.  Take a look at that, and I will read some     13:03:24

 3   information into the record.                          13:03:26

 4           This document is, again, titled "USC Schedule 13:03:28

 5   of Classes, Spring 2020."  It is BUAD 215X.  And the  13:03:31

 6   Bates No. Is USC000129778 to 779.                     13:03:42

 7       A.  I've reviewed it.                             13:03:56

 8       Q.  Okay.                                         13:03:57

 9           And for this class description and information 13:03:57

10   provided here, did you review it before registering for 13:03:59

11   classes?                                              13:04:02

12       A.  I did.                                        13:04:05

13       Q.  And is there any explicit language promising  13:04:06

14   in-person education?                                  13:04:10

15           MS. SIEHL:  Object to the form.  Calls for a  13:04:12

16   legal conclusion.                                     13:04:13

17           You can answer.                               13:04:14

18           THE WITNESS:  No explicit language.  Again,   13:04:14

19   just implied.                                         13:04:23

20   BY MR. NORTON:                                        13:04:24

21       Q.  And that would be implied from what?          13:04:24

22       A.  From the location details as well as knowing  13:04:26

23   it's been in-person semesters before.                 13:04:30

24       Q.  And the location information is logistical in 13:04:34

25   nature; correct?                                      13:04:40
```

Page 78

| | | |
|---|---|---|
| 1 | of USC schedule of classes for spring 2020.  And it's | 13:16:51 |
| 2 | Bates-numbered USC000 -- or 00012980 to 81.  And it is | 13:16:59 |
| 3 | an entry for the course, ANTH 325, global studies | 13:17:10 |
| 4 | research methods. | 13:17:20 |
| 5 | A.  I've reviewed it. | 13:17:33 |
| 6 | Q.  Okay. | 13:17:34 |
| 7 | And did you review this document or something | 13:17:35 |
| 8 | similar to it prior to registering for classes? | 13:17:40 |
| 9 | A.  I did. | 13:17:43 |
| 10 | Q.  And is there any language in this description, | 13:17:44 |
| 11 | explicit language that promises in-person education for | 13:17:47 |
| 12 | this class? | 13:17:52 |
| 13 | MS. SIEHL:  Object to the form.  Calls for a | 13:17:53 |
| 14 | legal conclusion. | 13:17:55 |
| 15 | You can answer. | 13:17:56 |
| 16 | THE WITNESS:  No exact wording, but it is | 13:17:57 |
| 17 | implied in the research methods.  It is talking about us | 13:18:04 |
| 18 | practicing throughout the timing of the course. | 13:18:13 |
| 19 | BY MR. NORTON: | 13:18:15 |
| 20 | Q.  Well, the description says "methods for field | 13:18:15 |
| 21 | research"; correct? | 13:18:19 |
| 22 | A.  That's correct. | 13:18:22 |
| 23 | MS. SIEHL:  Object to form.  Argumentative. | 13:18:22 |
| 24 | THE WITNESS:  Correct. | 13:18:29 |
| 25 | /// | |

Page 86

# EXHIBIT 6

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3                        - - -

 4   In Re University of        )

 5   Southern California Tuition ) Case No.

 6   and Fees COVID-19 Refund    ) 2:20-cv-4066-DMG-PVC

 7   Litigation,                )

 8   _____)

 9

10

11              ******* CONFIDENTIAL *******

12

13              VIDEOTAPED DEPOSITION OF

14                  JUSTIN KERENDIAN

15              Wednesday, October 12, 2022

16

17

18

19

20   Reported By:

21   MICHELLE K. BAILEY

22   RPR, CSR No. 10713

23   JOB No. 5512810

24

25   PAGES 1 - 182
```

                                                    Page 1

| | | |
|---|---|---|
| 1 | A.  Well, I believe that I did not get my end of | 10:39:20 |
| 2 | the bargain when school was remote in spring of 2020. | 10:39:23 |
| 3 | Q.  And why do you feel that you did not get your | 10:39:26 |
| 4 | end of the bargain when school was remote in spring of | 10:39:29 |
| 5 | 2020? | 10:39:33 |
| 6 | A.  Well, before applying to USC, I was promised -- | 10:39:33 |
| 7 | the school was boasting about their in-person faculty | 10:39:43 |
| 8 | resources, everything that -- the advantages of being in | 10:39:49 |
| 9 | an in-person university.  And spring of 2020, I did not | 10:39:50 |
| 10 | receive that.  So I did not believe that I was getting | 10:39:54 |
| 11 | my end of the bargain of what I was paying for. | 10:39:57 |
| 12 | Q.  And you say that you were promised in-person | 10:39:59 |
| 13 | faculty resources.  When you were applying to USC, were | 10:40:12 |
| 14 | there any documents that specifically used the language | 10:40:16 |
| 15 | USC promises in-person faculty? | 10:40:20 |
| 16 | MS. SZETO:  Objection; argumentative. | 10:40:25 |
| 17 | THE WITNESS:  So I would see documents that | 10:40:26 |
| 18 | would show the advantages of being in person, all the | 10:40:28 |
| 19 | faculties and resources.  They would boast about | 10:40:33 |
| 20 | basically core class, everything in lectures and in | 10:40:38 |
| 21 | person. | 10:40:44 |
| 22 | BY MR. NORTON: | 10:40:45 |
| 23 | Q.  Did they actually use the words "in person"? | 10:40:45 |
| 24 | MS. SZETO:  Objection; argumentative. | 10:40:49 |
| 25 | THE WITNESS:  Well, the classes were all in | 10:40:50 |

Page 25

```
 1    person that were -- like the ones that I would be      10:40:52

 2    registering in.  They do not apply for -- courses were 10:40:55

 3    meant for in person.  So it was just like implied.     10:40:59

 4    BY MR. NORTON:                                         10:41:02

 5        Q.  So they -- the materials that you reviewed did  10:41:04

 6    not actually use the words "in person."  It was just  10:41:06

 7    implied to you; correct?                              10:41:08

 8            MS. SZETO:  Objection, calls for speculation,  10:41:09

 9    argumentative.                                        10:41:13

10            THE WITNESS:  Well, the classes were -- they   10:41:16

11    would give a building where the location was.  So it was 10:41:18

12    like in another way saying it was in person.          10:41:23

13    BY MR. NORTON:                                         10:41:25

14        Q.  Besides the logistical information in terms of 10:41:25

15    buildings where classes were, was there any other     10:41:30

16    language that expressly stated that the class would be 10:41:36

17    in person to you?                                     10:41:40

18            MS. SZETO:  Objection; argumentative.          10:41:44

19            THE WITNESS:  I mean, it would say where the    10:41:49

20    classes were located, the hours, and where the        10:41:51

21    professors' office hours were in the fall and spring.  10:41:57

22    BY MR. NORTON:                                         10:42:00

23        Q.  But those descriptions did not actually use the 10:42:00

24    term "in person"?                                     10:42:03

25            MS. SZETO:  Objection; argumentative.          10:42:06
```

Page 26

```
 1        A.  This, yes.                                11:03:05

 2        Q.  And if you go to where it's expanded a    11:03:06

 3   little -- maybe a third of the way down the page, it   11:03:13

 4   says "WRIT 340:  Advanced writing."              11:03:15

 5            Do you see where it says that?            11:03:19

 6        A.  Yes.                                      11:03:21

 7        Q.  And this is a course that you took in the 11:03:21

 8   spring 2020 semester; correct?                    11:03:23

 9        A.  Yes.                                      11:03:25

10        Q.  And is there anything in this course      11:03:25

11   description that says that this class will be delivered  11:03:32

12   in person?                                        11:03:35

13            MS. SZETO:  Objection; argumentative.  The  11:03:36

14   document speaks for itself.                       11:03:38

15            THE WITNESS:  So it did give the location of  11:03:44

16   where the class was.  So to me it was implied that it  11:03:46

17   was in person.                                    11:03:49

18   BY MR. NORTON:                                    11:03:50

19        Q.  Okay.                                     11:03:50

20            But this description doesn't use the language  11:03:50

21   "in person," does it?                             11:03:54

22        A.  In the description, I would have to read it.  11:03:55

23            MS. SZETO:  Objection; argumentative.  The  11:04:04

24   document speaks for itself.                       11:04:06

25            THE WITNESS:  So here it says:  "In the  11:04:24
```

                                                    Page 40

| | | |
|---|---|---|
| 1 | relevant administrative office, at the Dornsife College | 11:04:26 |
| 2 | Writing Program, the Marshall Center for Management | |
| 3 | Communication, or the Viterbi Engineering Writing | 11:04:32 |
| 4 | Program." | 11:04:33 |
| 5 | BY MR. NORTON: | 11:04:47 |
| 6 | Q.  And where it says that, that note is in | 11:04:47 |
| 7 | relation initiating an exception request; correct? | 11:04:49 |
| 8 | A.  Yes. | 11:04:55 |
| 9 | Q.  It's not referring to that this class would be | 11:04:57 |
| 10 | conducted in person, does it? | 11:05:03 |
| 11 | A.  Let's see here.  But I do see under it the | 11:05:04 |
| 12 | locations of where each course is. | 11:05:16 |
| 13 | Q.  Okay. | 11:05:19 |
| 14 | And the location provides logistical | 11:05:19 |
| 15 | information as to where to go for the course; correct? | 11:05:24 |
| 16 | A.  Yes. | 11:05:28 |
| 17 | MS. NGUYEN:  Objection; argumentative. | 11:05:28 |
| 18 | BY MR. NORTON: | 11:05:29 |
| 19 | Q.  But the location information doesn't state that | 11:05:29 |
| 20 | the class will be delivered in person, does it? | 11:05:32 |
| 21 | MS. SZETO:  Objection; argumentative, misstates | 11:05:35 |
| 22 | his testimony. | 11:05:37 |
| 23 | THE WITNESS:  To me it's implied that it's in | 11:05:38 |
| 24 | person. | 11:05:42 |
| 25 | /// | |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
1    BY MR. NORTON:                                          15:06:28

2         Q.  Is it referring to USC or the City of Los     15:06:29

3    Angeles?                                                15:06:32

4              MS. SZETO:  Objection; argumentative.        15:06:32

5              THE WITNESS:  Where USC is located, for the  15:06:34

6    most part.                                              15:06:38

7    BY MR. NORTON:                                          15:06:39

8         Q.  But doesn't the first sentence say:  "Beyond  15:06:40

9    the tall trees of our beautiful campus"?  So does that 15:06:43

10   not --                                                  15:06:46

11        A.  It has to be relative to where USC is.        15:06:47

12        Q.  It's not referring to the campus it's itself. 15:06:50

13   It's referring to beyond in the Greater Los Angeles     15:06:54

14   area; right?                                            15:06:58

15             MS. SZETO:  Objection; argumentative.        15:06:58

16             THE WITNESS:  I guess so.                    15:06:59

17   BY MR. NORTON:                                          15:07:01

18        Q.  And during your time at USC, you lived in     15:07:03

19   Los Angeles the whole time; correct?                    15:07:07

20        A.  Yes.                                           15:07:09

21        Q.  And that paragraph does not contain the words 15:07:09

22   "in person," does it?                                   15:07:16

23             MS. NGUYEN:  Objection; argumentative.       15:07:18

24             THE WITNESS:  It's not saying in person, but 15:07:21

25   it's saying of in-person areas around campus.           15:07:22
```

Page 144

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | BY MR. NORTON: | 15:07:27 |
| 2 | Q.  It doesn't use the words "in person," does it? | 15:07:27 |
| 3 | MS. SZETO:  Objection; argumentative. | 15:07:29 |
| 4 | THE WITNESS:  It's using words that are implied | 15:07:30 |
| 5 | that you would have to be in person, like the beaches. | 15:07:35 |
| 6 | It's in person. | 15:07:41 |
| 7 | BY MR. NORTON: | 15:07:41 |
| 8 | Q.  But does it say the words "in person"? | 15:07:42 |
| 9 | MS. SZETO:  Objection; argumentative. | 15:07:45 |
| 10 | THE WITNESS:  I do not see the words "in | 15:07:46 |
| 11 | person" specifically. | 15:07:48 |
| 12 | BY MR. NORTON: | 15:07:48 |
| 13 | Q.  Okay. | 15:07:49 |
| 14 | You can put that one aside. | 15:07:50 |
| 15 | When you transferred to USC back in fall 2018, | 15:07:55 |
| 16 | was your plan to graduate -- well, strike that. | 15:08:04 |
| 17 | When you started at USC in fall 2018, when did | 15:08:07 |
| 18 | you expect to graduate? | 15:08:13 |
| 19 | A.  When I completed all the course requirements | 15:08:15 |
| 20 | and credits. | 15:08:17 |
| 21 | Q.  Okay. | 15:08:19 |
| 22 | And was that forecasted to be December 2020? | 15:08:20 |
| 23 | A.  Yes. | 15:08:30 |
| 24 | Q.  So notwithstanding the pandemic and the | 15:08:30 |
| 25 | transition to remote learning, you were able to still | 15:08:34 |

Page 145

# EXHIBIT 7

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4                                        )

                                         )

5    In re University of Southern        ) CASE NO.

     California Tuition and Fees         ) 2:20-cv-4066-DMG-

6    COVID-19 Refund Litigation          ) PVC

                                         )

7    _____)

8

9

10

11          VIDEO-RECORDED DEPOSITION OF HAL J. SINGER

12                  MONDAY, FEBRUARY 27, 2023

13                      12:32 p.m. EST

14

15

16

17

18

19

20

21

22

23   REPORTED BY:

     ERIKA SJOQUIST, CSR, RPR, CRR

24   CA CSR No. 12350

25   Job No. 5766373

                                              Page 1

```
 1    separate theories for restitution.                    14:21:48

 2          Is that what you mean by refund or do you mean  14:21:51

 3    something else by refund when you just testified?     14:21:54

 4    A.    Let me just read 10 really quick.               14:22:01

 5          I would say that these -- this is just an       14:22:24

 6    elaboration on the plaintiffs' theory of harm.  I think 14:22:27

 7    that there's another place in my report, and I think  14:22:30

 8    it's in the initial.  It could be in the reply, but I 14:22:33

 9    think it's in the initial, in which I mention that    14:22:36

10    unfair -- you might remember this -- you remember the 14:22:38

11    word unfair, unfair trade practices or unfair practices 14:22:41

12    that concerned USC allegedly failing to issue a refund. 14:22:46

13    Q.    And do you understand that Plaintiffs are       14:22:54

14    seeking damages as well as or in the alternative      14:22:57

15    restitution?                                          14:23:01

16          MS. NOTEWARE:  Objection to the form to the     14:23:04

17    extent it calls for a legal conclusion.               14:23:06

18          You can answer if you understand.               14:23:08

19          THE WITNESS:  Yeah, I wouldn't be able to       14:23:09

20    distinguish between damages and restitution from an   14:23:15

21    economic matter.                                      14:23:21

22    BY MR. NORTON:                                        14:23:21

23    Q.    Okay.  But in footnote -- so, in paragraph 3,   14:23:23

24    you refer to theories of harm, correct?               14:23:25

25    A.    Correct.                                        14:23:28
```

Page 62

| | | |
|---|---|---|
| 1 | these are instructions from counsel. And so, counsel is | 14:24:39 |
| 2 | letting me know that they are pursuing two different | 14:24:42 |
| 3 | theories of restitution. | 14:24:47 |
| 4 | I think this would be compensation under the | 14:24:48 |
| 5 | theory of harm. | 14:24:51 |
| 6 | Q. Okay. So, for purposes of your report, it | 14:24:53 |
| 7 | doesn't matter whether the payment, the potential | 14:25:01 |
| 8 | payment to Plaintiffs in the class is characterized as | 14:25:06 |
| 9 | damages or restitution; is that right? | 14:25:13 |
| 10 | MS. NOTEWARE: Objection to the form. Calls | 14:25:14 |
| 11 | for a legal conclusion. | 14:25:15 |
| 12 | You can answer to the extent you understand the | 14:25:15 |
| 13 | question. | 14:25:17 |
| 14 | THE WITNESS: Yeah, I'm going to have to | 14:25:18 |
| 15 | acknowledge that you are pressing up against the limits | 14:25:21 |
| 16 | of my understanding of these legal niceties. | 14:25:23 |
| 17 | I'm asked to come up with a damages methodology | 14:25:26 |
| 18 | that flows from a theory of harm, and that's about the | 14:25:30 |
| 19 | -- the limits of my pay grade. I feel like getting into | 14:25:33 |
| 20 | these niceties of restitution versus damages is probably | 14:25:40 |
| 21 | not something that I can comment on or I've studied. | 14:25:42 |
| 22 | BY MR. NORTON: | 14:25:42 |
| 23 | Q. Okay. But you wrote -- I just want to clarify, | 14:25:46 |
| 24 | though, in your report, you don't -- you arrive at one | 14:25:49 |
| 25 | total figure; is that correct? | 14:25:53 |

Page 64

```
 1        A.    Correct.  I arrive at one figure that,        14:25:54

 2   according to my economic model, would make the class     14:25:59

 3   whole for the diminution and the value of services they  14:26:03

 4   received.                                                 14:26:06

 5        Q.    And to you, it doesn't matter whether that    14:26:07

 6   characterizes damages or restitution; is that correct?   14:26:10

 7             MS. NOTEWARE:  Objection to the form.          14:26:13

 8             You can answer if you understand the question. 14:26:14

 9             THE WITNESS:  Yeah.  "It doesn't matter" sounds 14:26:16

10   so harsh, but let's just say I'm agnostic.  I'm agnostic 14:26:20

11   to that terminology.  I just don't -- don't really       14:26:25

12   appreciate those -- those -- those niceties.  Had I gone 14:26:28

13   to law school, maybe I would.                            14:26:33

14   BY MR. NORTON:                                           14:26:33

15        Q.    Okay.  One other question.  In your report,   14:26:34

16   when you give this sum total figure, you don't           14:26:37

17   distinguish between damages and restitution; is that     14:26:43

18   correct?                                                 14:26:44

19        A.    I think that's fair.  I'm thinking about a    14:26:45

20   payment that would go from USC to the class to make the  14:26:49

21   class whole.                                             14:26:54

22        Q.    And so, the characterization of damages or    14:26:55

23   restitution is of no import?                             14:26:59

24             MS. NOTEWARE:  Objection to the form.  Calls   14:27:04

25   for a legal conclusion.  Misstates the testimony.        14:27:05
```

Page 65

```
 1          You can answer if you understand the question.    14:27:07

 2          THE WITNESS:  I just don't -- I don't have an     14:27:09

 3  opinion on that matter, damages v. restitution.          14:27:11

 4  BY MR. NORTON:                                            14:27:11

 5      Q.   Okay.  And you didn't calculate separate         14:27:16

 6  amounts for damages versus restitution; is that correct? 14:27:20

 7          MS. NOTEWARE:  Objection to the form.  Vague      14:27:24

 8  and ambiguous.  Calls for legal conclusion.              14:27:27

 9          You can answer to the extent you understand the   14:27:29

10  question.                                                 14:27:31

11          THE WITNESS:  I just have one damages estimate    14:27:32

12  that flows from a theory of harm.  That's all I've got.  14:27:34

13  BY MR. NORTON:                                            14:27:34

14      Q.   Okay.  Let's look at your report at             14:27:38

15  paragraph 7.  This is still, for the record, Exhibit 1.  14:27:42

16      A.   Okay.  I'm at 7.                                 14:28:03

17      Q.   Okay.  And if you go... it's going to bleed     14:28:04

18  onto two pages.  So, if you go to the second page, it    14:28:07

19  will be the second full sentence on what's labeled as    14:28:10

20  page 6 of your report at the top.                         14:28:17

21      A.   Uhm-hum.                                         14:28:17

22      Q.   I will read into the record -- do you see where 14:28:19

23  it says:                                                  14:28:21

24                    "Damages to the class (the             14:28:21

25                    difference between what class members paid 14:28:24
```

Veritext Legal Solutions
866 299-5127

```
 1    agreement with the experts, which is kind of exciting.    17:04:29

 2            But, even so, I did it because I recognized        17:04:31

 3    that many courts have required a damages expert to at      17:04:37

 4    least consider the supply side.  So, what I say is, even   17:04:38

 5    in light of all these considerations, I can go through     17:04:41

 6    and figure out what the -- what the price effect will be   17:04:44

 7    if you conservatively allow USC to mitigate the loss.      17:04:50

 8            And, you know, and that turns out to be a          17:04:58

 9    smaller price effect.  But just to be absolutely clear,    17:05:00

10    it is not -- it is not my ultimate objective to simulate   17:05:05

11    a but-for price.  That's not what I'm trying to get at.    17:05:11

12            What I'm trying to get at is I'm trying to get     17:05:15

13    to a damages estimate for the remuneration or the          17:05:19

14    repayment necessary to make class members whole for        17:05:23

15    having not achieved the services or the experience for     17:05:28

16    which they had contracted for.                             17:05:33

17    BY MR. NORTON:                                             17:05:36

18        Q.   In paragraph 72 of Exhibit 1 --                   17:05:36

19        A.   Okay.                                             17:05:40

20        Q.   -- and I'm cognizant that we're going to have     17:05:41

21    to change the tape soon, so we will take a break in        17:05:44

22    about 5 minutes.                                           17:05:48

23        A.   Okay.                                             17:05:50

24        Q.   But paragraph --                                  17:05:50

25        A.   One second.                                       17:05:51
```

Page 161

| | | |
|---|---|---|
| 1 | that's going to make you largely immobile and I think | 08:00:27 |
| 2 | beholden to USC and accepting of really whatever USC | 08:00:29 |
| 3 | wants to do to you at that point. | 08:00:33 |
| 4 | So for that reason, I would not feel | 08:00:34 |
| 5 | comfortable using fall prices as a benchmark. | 08:00:36 |
| 6 | Q.   Couldn't students have paused their education | 08:00:36 |
| 7 | or withdrawn from the Fall 2020 semester if they so | 08:00:51 |
| 8 | choose? | 08:00:54 |
| 9 | A.   They could have paused.  That's a fairly | 08:00:54 |
| 10 | radical solution in the sense that you are basically | 08:01:00 |
| 11 | just putting your life on hold at that point and all of | 08:01:04 |
| 12 | your other peers are moving forward.  So I think that | 08:01:07 |
| 13 | students were put in a particularly just bad situation | 08:01:11 |
| 14 | and presented a set of bad options.  And, you know, I'm | 08:01:13 |
| 15 | aware that many, if not most, decided to keep plowing | 08:01:17 |
| 16 | forward despite, you know, the environment. | 08:01:22 |
| 17 | MS. NOTEWARE:  I'm going to object to that last | 08:01:25 |
| 18 | question as calling for a legal conclusion and | 08:01:27 |
| 19 | speculation.  But he already answered, so go ahead. | 08:01:31 |
| 20 | BY MR. NORTON: | 08:01:35 |
| 21 | Q.   Does your CBC analysis account for the Fall of | 08:01:35 |
| 22 | 2020 enrollment statistics? | 08:01:43 |
| 23 | A.   No.  Because I'm trying to replicate the | 08:01:48 |
| 24 | environment that existed as the time of the contract | 08:01:51 |
| 25 | leading into the spring semester.  So I don't want | 08:01:55 |

Page 243

1    Covid.  I don't want anything that occurred in the fall    08:01:58

2    to contaminate the discounts that I'm calculating in my    08:02:00

3    CBC.    08:02:05

4        Q.   Okay.  Shifting gears, you testified earlier    08:02:07

5    that you conducted a CBC analysis in connection with the    08:02:13

6    Boston University case; is that correct?    08:02:18

7        A.   Correct.    08:02:21

8        Q.   And are there difference in the conjoint    08:02:21

9    analysis that you are applying or that you are applying    08:02:31

10   here versus what you applied in that case?    08:02:35

11       MS. NOTEWARE:  Objection to the form.    08:02:37

12       THE WITNESS:  There are some differences.  I    08:02:39

13   think that there are a lot of similarities, and I can go    08:02:40

14   into the differences if you are interested.    08:02:45

15   BY MR. NORTON:    08:02:47

16       Q.   Yeah.  Let's start with differences.    08:02:47

17       A.   Yeah, okay.  The differences is that we are    08:02:49

18   aiming for a slightly different demographic when we are    08:02:54

19   looking at Boston University compared to USC.  So we did    08:02:57

20   the same thing.  We went and got the -- what the profile    08:03:01

21   of the students looked like for both undergraduate and    08:03:04

22   graduates, and those are going to be different.    08:03:07

23       And they are both great schools, but to the    08:03:09

24   extent they are different, those differences would be    08:03:11

25   reflected in our gating or screening questions to try to    08:03:13

Page 244

# EXHIBIT 8

2

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4    _____
                                  )
5    IN RE: UNIVERSITY OF         )  NO. 2:20-cv-04066-DMG-PVC
     SOUTHERN CALIFORNIA          )
6    TUITION AND FEES COVID-19)
     REFUND LITIGATION,           )
7    _____)

8

9

10

11

12

13

14            Videotaped deposition of ANDREW STOTT,

15   taken on behalf of Plaintiffs at 355 South Grand

16   Avenue, Suite 900, Los Angeles, California,

17   commencing at 9:42 a.m., and ending at 7:24 p.m., on

18   Thursday, October 13, 2022, before KYUNG LEE-GREEN,

19   Certified Shorthand Reporter No. 12655 for the

20   State of California, Certified Court Reporter

21   No. 22010633 for the State of Washington, and CLR.

22

23

24

25

In Re - University of Southern California Tuition and Fees

Andrew Stott

Confidential

October 13, 2022

51

10:40:33    1          Q    Okay.  Is it your understanding that

2    internships and service learning opportunities prior

3    to COVID were in person?

4          A    Not all of them by any means.

10:40:47    5          Q    So when USC was referring to internships

6    and service learning opportunities, they weren't

7    referring to in person in your view?

8                    ATTORNEY DOOLIN:  Objection.  Vague and

9    ambiguous.  Outside the scope.

10:40:56   10                    You can answer.

11                    THE WITNESS:  They are -- they were

12    applying the -- to what it says, to internship and

13    service learning opportunities.  There's no -- it

14    doesn't say in person.  It doesn't say anything

10:41:09   15    about the mode.

16                    They're applying -- they're -- they're --

17    they're discussing those opportunities, and they

18    exist in different modalities.

19    BY ATTORNEY NOTEWARE:

10:41:16   20          Q    When COVID hit in 2020, there was a pro --

21    problems that came to light about experiential and

22    service learning internships that were in person;

23    correct?

24                    ATTORNEY DOOLIN:  Objection.  Vague and

10:41:28   25    ambiguous.  Overbroad and outside the scope.

In Re - University of Southern California Tuition and Fees                    Andrew Stott
Confidential                                                                October 13, 2022

52

10:41:35    1              THE WITNESS:  Certainly as the scale of

2      the pan -- pandemic unfolded, we had to pivot and

3      make alternative arrangements.  But, you know, our

4      principal objective throughout the entire period was

10:41:46    5      continuity of education.  So if a student had an

6      internship or was in the course of a service

7      learning opportunity that was being offered in

8      person, we provided them with opportunities to

9      complete those experiences online.

10:41:58   10              So the modality was somewhat agnostic.

11      What we did and what we put enormous amount of

12      effort in is to ensuring the continuity of the

13      experience and making sure those students got to

14      complete the thing that they were signed up for.

10:42:11   15      BY ATTORNEY NOTEWARE:

16          Q    So to your mind, as you sit here today,

17      you're testifying under oath that there weren't

18      complaints and problems with service learning and

19      internships that were in person that were

10:42:23   20      interrupted as a result of COVID; is that your

21      testimony?

22              ATTORNEY DOOLIN:  Objection.  Outside the

23      scope.  Misstates his testimony.  Argumentative.

24      Vague and ambiguous.  Overbroad.

10:42:31   25              You can answer.

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 65 of 147
Page ID #:11765

In Re - University of Southern California Tuition and Fees
Confidential

Andrew Stott
October 13, 2022

102

| | | |
|---|---|---|
| 11:38:19 | 1 | scope. |
| | 2 | Go ahead. |
| | 3 | THE WITNESS:  Online programs does.  But |
| | 4 | we don't have a binary between online and on-campus |
| 11:38:27 | 5 | as it says here.  We have online programs, and we |
| | 6 | have programs.  We do not differentiate around |
| | 7 | modality with those others. |
| | 8 | BY ATTORNEY NOTEWARE: |
| | 9 | Q    Okay.  So the promotional material that |
| 11:38:38 | 10 | USC sent out to graduate students said -- the |
| | 11 | first 8 or so pages "Why USC?  Graduate Study."  And |
| | 12 | then on the 10th page where it says, "Other Ways to |
| | 13 | Attend," "Online Programs," you're saying, to your |
| | 14 | mind, those aren't two distinct programs -- |
| 11:38:54 | 15 | ATTORNEY DOOLIN:  Objection.  Outside -- |
| | 16 | BY ATTORNEY NOTEWARE: |
| | 17 | Q    That the recruiter got it wrong? |
| | 18 | ATTORNEY DOOLIN:  Objection.  Outside the |
| | 19 | scope.  Vague and ambiguous.  Overbroad. |
| 11:39:01 | 20 | Argumentative.  Misstates his testimony. |
| | 21 | THE WITNESS:  So I think my objection here |
| | 22 | is between the idea of online and on-campus.  There |
| | 23 | are online programs, and there are non-online |
| | 24 | programs.  And non-online programs does not |
| 11:39:15 | 25 | necessarily mean that its modality will be fully |

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 66 of 147
In Re - University of Southern California Tuition and Fees
Page 10 of 45 1986
Confidential
Andrew Stott
October 13, 2022

103

```
11:39:18   1    in-person at all times or that students will be

           2    located on campus at all times because there are

           3    many, many reasons and many programs why -- why they

           4    would not.

11:39:27   5    BY ATTORNEY NOTEWARE:

           6         Q    Okay.  So if I understand you correctly,

           7    what you're saying is some of the full-time,

           8    on-campus graduate programs might have an online

           9    lecture or something in another modality --

11:39:39  10              ATTORNEY DOOLIN:  Objection.  Out --

          11    BY ATTORNEY NOTEWARE:

          12         Q    -- is that what you're quibbling with?

          13              ATTORNEY DOOLIN:  Ob -- objection.

          14    Outside the scope.  Vague and ambiguous.

11:39:45  15              THE WITNESS:  It's not a quibble.  It's a

          16    fact --

          17    BY ATTORNEY NOTEWARE:

          18         Q    Okay.  I -- I take that back --

          19         A    -- that we don't -- we don't have

11:39:49  20    on-campus -- we don't have on-campus programs as a

          21    category of program.

          22         Q    Even though that's what it says in --

          23              ATTORNEY DOOLIN:  Ob -- objection --

          24              THE WITNESS:  This is -- this is

11:39:57  25    recruitment materials that tells you that you'll
```

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 67 of 147
In Re - University of Southern California Tuition and Fees

Andrew Stott
October 13, 2022

Page 00 of 117
Confidential

104

11:39:59  1    have the best time ever.

2    BY ATTORNEY NOTEWARE:

3        Q    It -- does it?  It --

4        A    No, well, it doesn't --

11:40:04  5        Q    It doesn't actually say that.

6        A    No.  Right --

7        Q    It doesn't say that --

8        A    I -- I --

9        Q    -- but it does say commit to -- those who

11:40:06 10   are unable to commit to a full-time, on-campus

11   graduate program can do an online program.

12            ATTORNEY DOOLIN:  Objection.  Outside the

13   scope.  Asked and answered.  The document -- you can

14   read what the document says.  He's answered this

11:40:21 15   question many times.

16            THE WITNESS:  Yes.  There is a

17   differentiation between online programs, which

18   were -- which are fully online all the time and

19   other programs.  But we do not describe those in the

11:40:36 20   catalog or in, you know, when we're developing

21   programs and they're going through university

22   course-development processes as on campus.  That's

23   not a category of program.

24        Q    But they do call them "online"; right?

11:40:49 25        A    They do --

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 68 of 147
In Re - University of Southern California Tuition and Fees                                          Andrew Stott
Page 68 of 88                                                October 13, 2022
Confidential

105

| 11:40:51 | 1 | ATTORNEY DOOLIN:  Objection.  Vague and |
| | 2 | ambiguous.  Overbroad. |
| | 3 | THE WITNESS:  They do -- |
| | 4 | BY ATTORNEY NOTEWARE: |
| 11:40:53 | 5 | Q    So someone who is registering for class at |
| | 6 | USC for the spring 2020, they look at the course |
| | 7 | catalog and they can pick an online certificate |
| | 8 | program as a graduate student; right? |
| | 9 | ATTORNEY DOOLIN:  Objection.  Outside the |
| 11:41:09 | 10 | scope.  Vague and ambiguous.  Overbroad. |
| | 11 | THE WITNESS:  Yes, they can. |
| | 12 | BY ATTORNEY NOTEWARE: |
| | 13 | Q    Okay. |
| | 14 | And they can also pick something that says |
| 11:41:15 | 15 | on campus. |
| | 16 | ATTORNEY DOOLIN:  Objection.  Vague and |
| | 17 | ambiguous.  Overbroad.  Outside the scope -- |
| | 18 | THE WITNESS:  No.  No, they cannot.  I |
| | 19 | mean, what they can pick are courses and sections |
| 11:41:27 | 20 | that have room numbers associated with them.  But |
| | 21 | they won't find a category that says on campus or -- |
| | 22 | or -- or search for that. |
| | 23 | (Exhibit 6 marked.) |
| | 24 | BY ATTORNEY NOTEWARE: |
| 11:42:47 | 25 | Q    Okay.  Okay.  What's been marked as |

110

| | |
|---|---|
| 11:46:26 | 1 |

1        A     In response to the pandemic, the

2    university switched all of its courses to an online

3    modality.

4        Q     Every single student?

11:46:34    5        A     Every single one.

6        Q     Great.

7              So if you wanted to do an on-campus

8    program and you had -- you had clients in -- at your

9    internship that you were serving, you no longer

11:46:54   10    served them once that happened, once the shutdown

11    happened.  There were no in-person experiences;

12    right?

13              ATTORNEY DOOLIN:  Objection.  Vague and

14    ambiguous.  Overbroad.

11:47:02   15              THE WITNESS:  You could still serve your

16    clients.  We had literally hundreds, if not

17    thousands, of virtual internships and internships

18    sites that moved to the online modality because,

19    bear in mind, those people on site also had to

11:47:17   20    comply to a stay-at-home order and were also

21    migrated their work life -- working lives to online.

22    So it happened to everybody.

23    BY ATTORNEY NOTEWARE:

24        Q     Right.

11:47:25   25              But someone who enrolled in an online

In Re - University of Southern California Tuition and Fees                        Andrew Stott
Confidential                                                                      October 13, 2022

```
11:47:29   1    program wasn't expecting to do an on-campus program;

           2    right?

           3              ATTORNEY DOOLIN:  Objection.  Vague and

           4    ambiguous.  Overbroad.

11:47:37   5    BY ATTORNEY NOTEWARE:

           6         Q    If you picked the online Masters of Social

           7    Work, you didn't expect to do an on -- on-campus

           8    program --

           9         A    No.  You enrolled for an online program.

11:47:47  10         Q    The other is true, if you enrolled in an

          11    on-campus program, you didn't expect, when you

          12    enrolled and you paid your fees, at that -- that

          13    there would -- that your classes would be all

          14    virtual; right --

11:47:57  15              ATTORNEY DOOLIN:  Objection.  Outside the

          16    scope.  Vague and ambiguous.  Overbroad --

          17    BY ATTORNEY NOTEWARE:

          18         Q    Correct?

          19         A    They certainly didn't expect a global

11:48:03  20    pandemic.  Neither did anybody.

          21         Q    And part of not expecting the global

          22    pandemic is that they didn't expect to have all of

          23    their classes and interactions with clients be

          24    virtual and online; correct --

11:48:14  25              ATTORNEY DOOLIN:  Objection.  Objection.
```

In Re - University of Southern California Tuition and Fees                Andrew Stott
Confidential                                                             October 13, 2022

112

```
11:48:14   1    Outside the scope.  Vague and ambiguous.  Overbroad

           2    asked and answered --

           3               THE WITNESS:  I don't -- I don't believe

           4    anybody in the world expected or anticipated any of

11:48:21   5    the impacts of the COVID-19 pandemic.  One thing I

           6    will say, if you'll allow me, is that everybody

           7    we -- we've maintained continuity of education.  We

           8    provided --

           9    BY ATTORNEY NOTEWARE:

11:48:34  10         Q    You said that --

          11         A    -- the same syllabus.

          12              I know I did.

          13         Q    You can keep saying that --

          14         A    The same syllabus --

11:48:36  15         Q    This is not responding to my question --

          16         A    -- the same faculty, the same curriculum.

          17              Plus, students had the opportunity to

          18    with -- withdraw if they chose.  If this wasn't for

          19    them, they could opt out.

11:48:47  20         Q    So a student who enrolled in an on-campus

          21    social work program did not expect to have online

          22    classes in social work as all of their classes

          23    ever --

          24              ATTORNEY DOOLIN:  Objection.  Vague and

11:49:01  25    ambiguous.  Outside the scope.  Asked and answered.
```

In Re - University of Southern California Tuition and Fees                    Andrew Stott
Confidential                                                              October 13, 2022

179

02:05:52  1      ambiguous.

          2              You can answer.

          3              THE WITNESS:  So, you know, there -- there

          4      was a lot of discussion.  There was a lot of

02:05:58  5      internal debate.  There was lot of -- many voices

          6      were heard.

          7              But the fact of the matter is that

          8      students continued to receive the benefit of their

          9      tuition because they received the instruction, the

02:06:10 10      same professors, the same syllabus, the same

         11      curriculum.  And indeed, you know, we went over and

         12      above to make sure we took care of our students and

         13      all of their needs and to make sure that they had

         14      the high-quality educational experience they paid

02:06:25 15      for.

         16              So it was considered, it was debated, and

         17      it was decided that we offer world-class education,

         18      agnostic to modality.

         19              ATTORNEY NOTEWARE:  Move to strike

02:06:35 20      everything after the first sentence when you

         21      discussed the petition.

         22      BY ATTORNEY NOTEWARE:

         23          Q    So getting back to the CFO, you heard

         24      discuss the change.org position?  Or did you see

02:06:48 25      correspondence from the CFO about the change.org

In Re - University of Southern California Tuition and Fees
Confidential
Andrew Stott
October 13, 2022

229

| | |
|---|---|
| 03:12:11 | 1 |

03:12:11  1          THE WITNESS:  I think we just saw that.

2    BY ATTORNEY NOTEWARE:

3        Q    And that's also true for the libraries

4    that were depicted?

03:12:16  5          ATTORNEY DOOLIN:  Objection.  Outside the

6    scope.  Lacks foundation.

7          THE WITNESS:  Yes.

8    BY ATTORNEY NOTEWARE:

9        Q    And then there was also the COVID-19

03:12:21 10    pandemic, students in the spring of 2020 did not

11    experience the types of the interactions that were

12    shown in that video; correct --

13          ATTORNEY DOOLIN:  Objection.  Lacks

14    foundation.

03:12:34 15          THE WITNESS:  So students continued to

16    have interactions with -- with faculty, with their

17    classmates, and student affairs professionals, and

18    others at the university in considerable volume.

19    They moved it to a virtual platform by virtue of an

03:12:53 20    unprecedented pandemic.

21              So they continued to have those

22    interactions.  They didn't have them in the library

23    anymore 'cause there was a stay-at-home order and

24    people were not allowed on campus.  But they

03:13:04 25    certainly continued to build community and interact.

In Re - University of Southern California Tuition and Fees                    Andrew Stott
Confidential                                                                 October 13, 2022

261

| | |
|---|---|
| 03:47:48 | 1    associate at an architecture firm. |
| | 2         Q    Mr. Ellars writes, in the fourth paragraph |
| | 3    of his e-mail (as read): |
| | 4              "There really isn't a good substitute |
| 03:48:11 | 5              for in-person classes.  If online |
| | 6              education was actually superior to the |
| | 7              in-person experience, then MOOCs would |
| | 8              have completely taken over by now.  (And |
| | 9              it isn't for lack of trying.)  Some |
| 03:48:24 | 10             courses (especially non-studio electives |
| | 11             like mine) are probably not as adversely |
| | 12             affected by going online, but just can't |
| | 13             imagine studio class being super |
| | 14             effective without the intense in-person |
| 03:48:34 | 15             collaborative environment of actually |
| | 16             being in studio in person.  There is a |
| | 17             very good reason the School of |
| | 18             Architecture has a policy for deducting |
| | 19             entire grade points for excessive |
| 03:48:42 | 20             absences." |
| | 21             Were you aware that there were people |
| | 22    teaching at the architecture school who did not |
| | 23    think that online classes were -- very distracting-- |
| | 24    I'm sorry.  Could you keep it down? |
| 03:49:04 | 25             I'll start over. |

In Re - University of Southern California Tuition and Fees                     Andrew Stott
Confidential                                                                   October 13, 2022

262

| | |
|---|---|
| 03:49:06 | 1   Did you -- were you aware that there were |
| | 2   faculty in the architecture school that did not |
| | 3   think that online classes were sufficient for |
| | 4   architectural education? |
| 03:49:22 | 5   ATTORNEY DOOLIN:  Objection.  Outside the |
| | 6   scope.  Lacks foundation. |
| | 7   THE WITNESS:  So architecture school, many |
| | 8   schools across campus, there were faculty who had |
| | 9   their doubts and reservations.  Look at the date of |
| 03:49:33 | 10  which the e-mail is sent in the middle of spring |
| | 11  break.  They haven't actually yet come back and used |
| | 12  these online tools and begun to interact with |
| | 13  students and complete their curriculum.  So this is |
| | 14  totally editorial at this point. |
| 03:49:44 | 15  This person is looking at the changes that |
| | 16  are being forced upon him, and indeed all of us, and |
| | 17  having, I think, a completely understandable |
| | 18  reaction, which is just to say that this is going to |
| | 19  be really hard, and I don't know how it's going to |
| 03:50:01 | 20  work.  Hindsight shows us that it worked extremely |
| | 21  well and that everybody adapted. |
| | 22  Also, I mean, there is some -- there's |
| | 23  some, I think, lack of education about what an |
| | 24  online class here demonstrated in this paragraph as |
| 03:50:15 | 25  well.  And MOOC is a massively open online course. |

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 76 of 147
In Re - University of Southern California Tuition and Fees                    Andrew Stott
Page 76 of 146                    October 13, 2022
Confidential

263

03:50:19  1    We did not provide MOOCs.

2              We provided exactly the same syllabus,

3    exactly the same professor, exactly the same cohort

4    in the class, just in a virtual format by necessity

03:50:32  5    due to COVID.

6    BY ATTORNEY NOTEWARE:

7         Q    What's your basis for saying that the

8    online model that USC adopted worked extremely well

9    for architecture students?

03:50:44 10       A    Well, one of the -- one basis I would have

11   is the student evaluations at the end of the

12   semester, which showed no variation on previous

13   semesters.  I think that's a pretty good piece of

14   evidence.

03:50:56 15       Q    For the -- for the architecture --

16        A    Yeah, for the architecture and across the

17   entire school.

18        Q    What's was the response rate?

19             ATTORNEY DOOLIN:  Objection.  Vague and

03:51:03 20   ambiguous.

21             THE WITNESS:  So I think the response rate

22   was equal to previous semesters.  And the response

23   rate varies by discipline and by program.

24             If you have the materials, I'd be happy to

03:51:13 25   review them.

In Re - University of Southern California Tuition and Fees                                    Andrew Stott
Confidential                                                                         October 13, 2022

267

```
03:54:34   1   BY ATTORNEY NOTEWARE:

           2        Q    The reservation of rights says that --

           3   explicitly that USC can change the modality of its

           4   courses?  Does the term "modality" appear in the

03:54:44   5   re -- reservation of rights?

           6        A    No.  But the reservation of rights

           7   language is clearly comprehensive enough to

           8   incorporate the modality and delivery of courses.

           9        Q    As a legal matter, it's your opinion that

03:54:56  10   that's true?

          11             ATTORNEY DOOLIN:  Objection.  Vague and

          12   ambiguous.  Calls for a legal conclusion.

          13             THE WITNESS:  Yeah.  I can't draw a legal

          14   conclusion on that because I don't have the

03:55:04  15   training.  But the language is unambiguous as far as

          16   I'm concerned.

          17   BY ATTORNEY NOTEWARE:

          18        Q    Even though the term "modality" does not

          19   appear anywhere in the reservation of rights?

03:55:17  20        A    So I think this would be a wonderful

          21   moment to review the language of the reservation of

          22   rights if you have it because I think it's

          23   comprehensive and universal and absolutely gives us

          24   the right to change the modality.

03:55:29  25        Q    Okay.  So if I understand you correctly,
```

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 78 of 147
In Re - University of Southern California Tuition and Fees    Andrew Stott
Page 267 of 1598    October 13, 2022
Confidential

268

03:55:33    1    the reservation of rights that appears only in -- on

2    one page of the catalog is broad enough to prevent

3    students from getting a refund for -- for classes

4    that change modalities?

03:55:58    5            ATTORNEY DOOLIN:  Objection.  Lacks

6    foundation.  Overbroad.  Compound.

7            THE WITNESS:  So the reservation of rights

8    allows us to change any element discussed in the

9    catalog for any reason whatsoever.

03:56:14   10            Now, of course, this is never done

11    capriciously, it's done following an extremely

12    robust decision-making process.  And we also

13    consider the well-being of our students, our staff,

14    and our faculty in every decision we make.  And so

03:56:32   15    the university, while it has the reservation of

16    rights, is always thinking about the welfare of its

17    students.

18            But, yeah, it certainly does allow us to

19    change the modality.  And it does not give students

03:56:44   20    a de facto right to a partial tuition refund when we

21    change the modality because academic content is

22    agnostic to modality.  Our students benefited from

23    the education provided by our world-class faculty,

24    and they made progress toward their degree, which is

03:57:04   25    what their tuition paid for.

In Re - University of Southern California Tuition and Fees                    Andrew Stott
Confidential                                                                  October 13, 2022

269

03:57:06  1    BY ATTORNEY NOTEWARE:

2         Q    So the fact that USC has promotional

3    material that promises students access to campus and

4    to in-person classes and lecture halls and campus

03:57:19  5    events, that has no -- that's inconsequential to the

6    decision of whether they should get a tuition refund

7    if -- if the school shuts its campus and switches

8    all in-person education to online education?

9              ATTORNEY DOOLIN:  Objection.  Outside the

03:57:47 10    scope.  Compound.  Vague and ambiguous.  Overbroad.

11    Lacks foundation.

12              THE WITNESS:  So the reservation of rights

13    does allow us to do that.  And it's very clear and

14    unambiguous that tuition pays for units earned

03:58:04 15    towards the completion of a degree.  I'll also note

16    that students were given fair warning, well in

17    advance, that academic year 2020 to '21 was going to

18    be fully online, and we didn't discount tuition for

19    that either.

03:58:20 20    BY ATTORNEY NOTEWARE:

21         Q    So if USC changed the number of units of

22    the class, would that entitle a student to a refund

23    under the reservation of rights if USC can change

24    anything about a class --

03:58:40 25              ATTORNEY DOOLIN:  Objection.  Outside the

273

04:01:27  1    assumptions and have expectations, but that has no

2    bearing on what will actually happen.  And the

3    university will have to adjust accordingly, while

4    always having the welfare of its students, staff,

04:01:37  5    and faculty topmost in mind.

6        Q    So if the university changes the room that

7    its course is taught in, you wouldn't issue a

8    tuition refund; right?

9            ATTORNEY DOOLIN:  Objection.  Outside the

04:01:51  10    scope.

11    BY ATTORNEY NOTEWARE:

12        Q    Under the reservation of rights, it would

13    be covered; right?

14            ATTORNEY DOOLIN:  Objection.  Outside the

04:01:56  15    scope.  Lacks foundation.

16            THE WITNESS:  So absolutely.  Because

17    the -- the schedule of classes is -- is a -- a --

18    logistical document.  As you can imagine, with over

19    4,000 sections, you know, 44,000 students, large

04:02:13  20    campuses, it's an enormous puzzle building a

21    schedule of classes.

22            And there are any number of reasons why a

23    room might change, an instructor might change, or a

24    facul -- or a -- a section may be added or deleted

04:02:28  25    from the -- the schedule of classes.  That happens

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 81 of 147
In Re - University of Southern California Tuition and Fees    Andrew Stott
Page 274 of 1051    October 13, 2022
Confidential

274

04:02:30  1    all the time, COVID or no COVID.

2              Faculty members go on leave, they get jobs

3    elsewhere.  Students don't enroll in sufficient

4    numbers to run the section, so the section is

04:02:40  5    canceled.  You get a room -- I once had a room that

6    was malodorous, so I asked for it to be moved.  So,

7    you know, there are all kinds of different things

8    can happen.

9              So that's not a concretized document that

04:02:52  10   makes a promise of any kind about the lo -- the

11   location.  It's our best guest based on our logis --

12   logistical mapping of how this complex puzzle of --

13   of scheduling fits together.

14   BY ATTORNEY NOTEWARE:

04:03:04  15        Q    What if I sign up for a class in Spanish

16   and the professor decides to teach Russian, would I

17   be entitled to a refund?

18              ATTORNEY DOOLIN:  Objection.  Outside the

19   scope.  Improper hypothetical --

04:03:13  20   BY ATTORNEY NOTEWARE:

21        Q    Or the reservation of rights covers that?

22              ATTORNEY DOOLIN:  Okay.  Objection.

23   Outside the scope.  Miss -- improper hypothetical.

24              THE WITNESS:  So in that instance, I would

04:03:23  25   expect the student to alert the administration

285

04:35:42  1    changed.  But was it still of a quality?  Was it --

          2    was it still rigorous?  Was it still provided?  Did

          3    we go over and above to make sure our students were

          4    well cared for?  Yes, of course we did.  And we did

04:35:56  5    it in abundance.

          6                I'd also note that the student makes an

          7    unreasonable request in the penultimate line.  A

          8    75 percent discount on tuition?  Is that a partial

          9    tuition refund, or is that a major markdown in a --

04:36:12 10    in a kind of fire sale?

         11                I mean, this student is getting the

         12    education that they provided -- that we provided and

         13    tuition pays for your education.

         14    BY ATTORNEY NOTEWARE:

04:36:21 15         Q    So the things that were promised to this

         16    student -- laboratories, workshops, professorial

         17    research, gyms, pools, dining halls, on-campus

         18    employment -- those were not things that are covered

         19    by the tuition and fees that students pay to USC?

04:36:39 20                ATTORNEY DOOLIN:  Objection.  Outside the

         21    scope -- outside the scope.  Vague and ambiguous.

         22    Overbroad.

         23                THE WITNESS:  So the -- as -- as the

         24    catalog states quite clearly, tuition pays for units

04:36:51 25    attempted towards the degree.

In Re - University of Southern California Tuition and Fees
Confidential

Andrew Stott
October 13, 2022

286

04:36:53  1   BY ATTORNEY NOTEWARE:

2         Q    What about the fees?

3         A    So the fees pay for -- there are several

4    fees.  They pay for a number of things.  And as

04:37:04  5   we've discussed, students receive pro-rated refunds

6    for those fees for which they could no longer

7    receive the benefit.  And for those fees where the

8    benefits were ongoing, they did not receive a

9    partial or pro-rated refund.

04:37:20 10        Some things, I concede, as any reasonable

11   person would, they could not access -- gyms, pools,

12   dining halls, absolutely, because there was a

13   stay-at-home order.  There was a global pandemic.

14   Nobody was allowed on campus.

04:37:31 15        But in terms of laboratories, workshops,

16   libraries, professorial research, they had access to

17   all of that in abundance, and that was ongoing.

18        Q    What laboratories were they --

19   physically -- were there any laboratories that they

04:37:44 20  were physically available to students?

21             ATTORNEY DOOLIN:  Objection.  Vague and

22   ambiguous.  Overbroad.

23   BY ATTORNEY NOTEWARE:

24        Q    When you say "laboratories" --

04:37:49 25            ATTORNEY DOOLIN:  Asked and answered.

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 84 of 147
Page ID #:11074

In Re - University of Southern California Tuition and Fees
Confidential
Andrew Stott
October 13, 2022

287

04:37:52  1   BY ATTORNEY NOTEWARE:

2        Q    -- what are you -- what are you -- I'll

3   change my question.  I'll withdraw that question.

4             What laboratories are you referring to

04:37:53  5   that were available to students during the

6   pandemic --

7             ATTORNEY DOOLIN:  Objection.

8   BY ATTORNEY NOTEWARE:

9        Q    -- you've said that several times?

04:37:57 10           ATTORNEY DOOLIN:  Objection.  Asked and

11   answered.

12             THE WITNESS:  The virtual laboratories

13   that the university faculty provided for the

14   students.

04:38:05 15   BY ATTORNEY NOTEWARE:

16        Q    What is a virtual laboratory?  What does

17   that consist of?

18        A    Well, it depends on the discipline, but it

19   can -- it varies by discipline.  I think I gave some

04:38:14 20   examples earlier where faculty actually mailed

21   physical resources to students.

22             But there are also virtual lab platforms

23   and exercises that they can do.  In many of the

24   non-wet lab environments.  Really what a lab

04:38:31 25   consists of is actually analyzing and working with

Case 2:20-cv-04066-DMG-PVC    Document 239-3    Filed 02/09/24    Page 85 of 147
In Re - University of Southern California Tuition and Fees
Page 82 of 1805
Confidential

Andrew Stott
October 13, 2022

288

04:38:33  1    data.  So that happens in a virtual workspace

2    anyway.

3            So if you think of something like the

4    quantitative biology program, that's what they do.

04:38:42  5    They take huge data sets and they work with them,

6    and that's a lab.  Same with computer science,

7    computer science is one of the most enrolled

8    programs at university -- at the University of

9    Southern California across the undergraduate and

04:38:57 10   graduate spaces.  And their labs consist of working

11   with data and data analysis.  That does not require

12   a physical facility.

13       Q    Did the dean of the med school report that

14   every student in the medical school had not --

04:39:09 15   had -- was impacted by COVID because they weren't

16   able to do clinical rotations?

17            ATTORNEY DOOLIN:  Objection.  Outside the

18   scope.  Vague and ambiguous.  Overbroad.

19   BY ATTORNEY NOTEWARE:

04:39:19 20       Q    Do you know?

21       A    So the clinical students returned to

22   clinical ro -- rotations much earlier than everybody

23   else.  So I believe it was fourth-year medical

24   students were back in May.  And then all clinical

04:39:34 25   students were back in June because the COVID

# EXHIBIT 9

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

 3     _____

 4    In re University of Southern     Case No:

      California Tuition and Fees      2:20-cv-4066-DMG-PVC

 5    COVID-19 Refund Litigation

      _____

 6

 7

 8

                      CORRECTED TRANSCRIPT

 9

10      Portions of the Transcript have been designated

11          as Confidential or Highly Confidential

12

13

14

15

16    VIDEO-RECORDED ZOOM VIDEOCONFERENCE DEPOSITION OF

17                LATISHA MONIQUE WATSON

18              Friday, October 14, 2022

19

20

21

22

      Reported by:

23    Michelle Bulkley

      CSR #13658

24    Job #5512818

25    Pages 1 - 285
```

                                              Page 1

```
1    was on-campus classes with the in-person internship.        12:17

2    BY MS. MAYHUGH:

3         Q    You agree with me, though, that this

4    admission letter does not use the words "in person";

5    correct?                                                     12:17

6              MS. NOTEWARE:   Objection to the form.

7    Calls for a legal conclusion.

8              You can answer.

9              THE WITNESS:   It doesn't explicitly say

10   "in person," but it does say that I do have to             12:17

11   attend a community immersion, which is in person.

12   So, again, it's assumed that it's in person if I

13   have to attend it and it gives me a date and a time

14   and a place.

15   BY MS. MAYHUGH:                                             12:18

16        Q    And you did attend that in person; right?

17        A    Yes.

18        Q    The letter references an electronic

19   acceptance packet.  I believe it's in the second

20   full paragraph --                                           12:18

21        A    Uh-huh.

22        Q    -- of that letter.  So let's turn to that

23   now.

24             MS. MAYHUGH:  Linh, can you please mark

25   Tab 14 as Exhibit 73.                                       12:18
```

Page 94

CONFIDENTIAL

```
 1    community immersion event, which, again, I know is        12:33
 2    in person.
 3            And then also new-student welcome events,
 4    this informal gathering -- a gathering means in
 5    person to me.  I don't know.  It's hard to say.          12:34
 6    But, you know, and offers new students the
 7    opportunity to mingle with current students, alumni,
 8    faculty, and staff.
 9            So, again, I feel like those -- those
10    words means that it's going to be in person.             12:34
11        Q   And I think you've testified to this
12    already today, but to confirm, you did attend the
13    orientation events, new-student events, and the
14    immersion event in person; is that right?
15        A   Yes.                                              12:34
16            MS. NOTEWARE:  Objection as to form; asked
17    and answered.
18            Go ahead.
19            THE WITNESS:  Yes.
20    BY MS. MAYHUGH:                                           12:34
21        Q   And of the text that you just listed from
22    this document, did any of that text say explicitly
23    "in person"?
24            MS. NOTEWARE:  Objection to the form.
25            THE WITNESS:  The text did not explicitly         12:34
```

Page 107

CONFIDENTIAL

```
 1    say "in person," but it did say that I would get to        12:34

 2    mingle and gather with other students and faculty,

 3    which is the same meaning.

 4    BY MS. MAYHUGH:

 5         Q   You can put this document to the side.          12:35

 6             And you enrolled in the School of Social

 7    Work in fall 2018 for the 2018-2019 school year; is

 8    that right?

 9         A   Yes.

10             MS. MAYHUGH:  Linh, can you please mark         12:35

11    Tab 17 as Exhibit 76.

12             (Exhibit 76 marked.)

13             THE WITNESS:  76?

14             MS. MAYHUGH:  It is.

15             THE WITNESS:  Okay.                             12:36

16    BY MS. MAYHUGH:

17         Q   Let me know -- you have it up?

18         A   Uh-huh.

19         Q   Do you know what Exhibit 76 is?

20         A   Yes.                                            12:36

21         Q   What is it?

22         A    It was a transcript of my coursework up

23    until spring semester 2020.

24             Oh, it actually has the whole thing.  But,

25    yeah, it -- this looks like my transcript, so.          12:36
```

# EXHIBIT 10

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4

5    In re University of    )

     Southern California    ) No. 2:20-cv-04066-DMG-PVC

6    Tuition and Fees       )

     COVID-19 Refund        )

7    Litigation             )

                            )

8    _____)

9

10

          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

11

12      REMOTE DEPOSITION OF RONALD T. WILCOX, Ph.D.

13            (Via Zoom Videoconference)

14            Thursday, February 23, 2023

15

16

17    REPORTED BY:  Michelle Milan Fulmer

                 CSR No. 6942, RPR, CRR, CRC

18

19

20

21

22

23

24

25

                                              Page  1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1     understanding of yours in mind, do you have an

 2     opinion as to whether any of the plaintiffs in this

 3     case actually suffered economic harm if they're

 4     able to prove the allegations that they've put

 5     forth in the complaint as you understand them to        10:39:47

 6     be?

 7          A    I only have an understanding of what

 8     Dr. Singer put forward.   What I can tell you is what

 9     Dr. Singer put forward didn't establish that anybody

10     was harmed in this case.                                10:40:01

11          Q    Well, that's perfectly fine.  I understand

12     that.

13               I'm asking a different question because I

14     want to make sure I understand the universe of the

15     opinions that you expect to give in this case if        10:40:10

16     you're called as an expert.  So my question is

17     different.

18               My question is, as you sit here today, do

19     you have an opinion, one way or the other, as to

20     whether any of the plaintiffs named in the complaint    10:40:22

21     suffered harm, economic harm as a result of the

22     conduct that they allege in their complaint?

23               MR. NORTON:  Objection.  Asked and

24     answered.

25               THE WITNESS:  I don't have an opinion on      10:40:35
```

Page 36

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1     any of the individual named plaintiffs in this case.

 2             My opinions are about the analysis that

 3     Dr. Singer did to come to a damages estimate.

 4     BY MR. KATRIEL:

 5        Q    Do you have an opinion as to whether        10:40:51

 6     members of the class that the main plaintiffs in

 7     this action seek to represent suffered financial

 8     harm, economic harm as a result of the conduct

 9     that's alleged in the complaint?

10        A    I don't have a view whether any particular  10:41:06

11     individual in this case was harmed.

12        Q    Do you have a view or understanding as to

13     whether the class, as a whole, suffered no harm,

14     that is was unharmed, even if the allegations in the

15     complaint were proven to be true?                   10:41:24

16        A    I don't have an opinion that no one was

17     harmed.

18             I have an opinion that the analysis

19     presented by Dr. Singer did not show anyone was

20     harmed.                                             10:41:41

21        Q    Well, based on your review of the complaint

22     and the other materials that you reviewed in

23     connection with your assignment in this case, can

24     you imagine a plausible scenario in your mind, as an

25     expert, where a student in the spring 2020 semester  10:42:02
```

Page 37

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1            I take it you've formed no opinion, sir,

 2     whether the damages that Dr. Singer purports to

 3     calculate as reported in his opening expert report

 4     would have been higher or lower if the criticisms

 5     that you have levied in your rebuttal report as to      10:43:35

 6     his work would have been accounted for; right?

 7            MR. NORTON:  Objection.  Mischaracterizes

 8     testimony.  Lacks foundation.

 9            THE WITNESS:  I don't -- my testimony with

10     respect to Dr. Singer is that his analysis is so        10:43:54

11     incomplete and so flawed that his results are

12     completely unreliable.  I do have writing in my

13     report that indicates that I believe some of the

14     flaws artificially inflated his estimates.  That is

15     in my report.                                           10:44:18

16     BY MR. KATRIEL:

17         Q    Can you envision a condition under which

18     some of the criticisms that you've levied in your

19     rebuttal report as to Dr. Singer's work would cause

20     the damages that he's calculated to have been           10:44:34

21     undervalued?

22         A    No.

23         Q    Okay.  Let's look at your report again,

24     which I know you have a paper copy in front of you

25     and it's also Exhibit 1.                                10:45:01
```

Page 39

# EXHIBIT 11

**NINETEENTH JUDICIAL DISTRICT COURT**

**STATE OF LOUISIANA**

**PARISH OF EAST BATON ROUGE**

| | |
|---|---|
| MICHAEL MIAZZA, | DOCKET NO. C-696,918 |
| VERSUS | DIVISION C |
| BOARD OF SUPERVISORS OF LOUSIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE | |

***CONSOLIDATED WITH***

| | |
|---|---|
| TAYLOR GUNTER | DOCKET NO. C-698,930 |
| VERSUS | SECTION 24 |
| LOUSIANA STATE UNIVERSITY SYSTEM, and other affiliated entities and individuals MARY L. WERNER, ROBERT S. DAMPF, JAMES M. WILLIAMS, RONALD R. ANDERSON, LEE MALLETT, RICHARD E. ZUSCHLAG, JACK A. BLOSSMAN, REMY VOISIN STARNS, JIMMIE M. WOODS, GLENN ARMENTOR, VALENCIA S. JONES, B. WAYNE BROWN, PATRICK C. MORROW, RAYMOND R. MORRIS and COLLIS B. TEMPLE | |

---

**DECLARATION OF HAL J. SINGER, PH.D.**
**March 1, 2023**

---

-2-

### INTRODUCTION AND ASSIGNMENT

1.     Counsel for Plaintiff has asked me to estimate damages to Plaintiff Gunter based on Plaintiff Gunter's Tuition & Fees for the Spring 2020 semester, as provided by LSU, and the benchmark damages methodologies as described in my initial report in this case (November 9, 2022, "Initial Report"), which is also attached hereto. Counsel for Plaintiff has also asked me to briefly review and evaluate LSU's Memorandum in Support of Motion for Summary Judgment ("MSJ") and its related Statement of Undisputed Facts ("SUF").

### I.    LSU's MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED FACTS

2.     I have reviewed LSU's MSJ and SUF, which reflect figures LSU claims show the amount of Tuition & Fees charged by LSU to Plaintiff Gunter for the Spring 2020 semester and the amounts of exemptions, awards, grants, and other payments that LSU asserts constitute "offsets" to Plaintiff Gunter's Tuition & Fees for the Spring 2020 semester.[1] Before proceeding, I note two possible errors by LSU in the MSJ calculations. *First,* in the MSJ, LSU claims that the six exemptions, awards, grants, and other payments Plaintiff Gunter received total $5,486.20. By my calculation, the total amount adds to **$6,486.20**.[2] *Second,* in the MSJ, LSU claims that Plaintiff Gunter's total Tuition and Fees for the Spring 2020 semester comes to $5,953. However, in the data from LSU that was provided to me, Plaintiff Gunter was charged $5,980 in Tuition and Fees.[3] I use this figure in my calculations below.

### II.    DAMAGES TO PLAINTIFF GUNTER

3.     In support of Plaintiff's Motion for Class Certification ("MCC"), I submitted an expert report, my Initial Report, reflecting the application of potential competitive benchmark methodologies,[4] as well as a template for estimating damages with a proposed conjoint model, for calculating Tuition & Fees damages incurred by Class Members.[5] As described in my Initial Report, to arrive at the damages estimates under the benchmark methodology I presented under (i) LSU's 15% Discount (benchmark method one) and (ii) LSU's Pricing for ODL (online distance learning, benchmark method two), I relied upon LSU records indicating Tuition & Fee charges.[6]

4.     Both competitive benchmark methods that I employ in my initial report can also be used for individual Class members, such as Plaintiff Gunter. These methods and data are common to the Class Members.

5.     For example, I can use LSU's 15% Discount benchmark methodology that I employed in my Initial Report if I restrict the Tuition & Fees to just those charged to Plaintiff Gunter in column one of Table 1 of my Initial Report. The record evidence indicates that Plaintiff

---

1.    MSJ at 3-7; SUF ¶¶10-12, 15.
2.    MSJ at 3-4. The awards are: Academic Excellence Fee Exemption ($125.00), Student Excellence Fee Exemption ($514.20), College of Art & Design Award ($1000.00), LA Go Grant ($750.00), Pell Grant ($3,097.00), Student Relief Fund ($1,000.00). These sum to $6,486.20,
3.    Section 1442 Deposition, Exhibit 4. *See* my workpapers for details.
4.    Report of Hal J. Singer, Ph.D., November 9, 2022 ¶¶53-56.
5.    *Id.* ¶3.
6.    *Id.* ¶¶53-56.

Privileged & Confidential

-3-

Gunter was charged $5,980. Using the calculations in Table 1 from my Initial Report, I estimate Plaintiff Gunter would have been charged $5,543 had she received a 15% discount for the portion of the year she took classes online. Plaintiff Gunter's damages are the difference between the actual amount charged and the but-for amount charged, or $437 under the 15% benchmark methodology. These calculations are reflected in the following Table 1-Gunter.

TABLE 1-GUNTHER: BENCHMARK ESTIMATE, LSU'S 15% DISCOUNT

| (1) | (2) | (3) =<br>[100% - (2)]*(1)<br>+[(2)*(1)*[100%-<br>15%]] | (4) = (1) - (3) |
|---|---|---|---|
| **Spring 2020 Semester, Tuition & Fees Paid** | **Portion of Spring 2020 Semester Subject to Online, Remote-Only** | **Spring 2020 Semester, Tuition & Fees with 15% Discount** | **Estimate** |
| $5,980 | 48.7% | $5,543 | $437 |

6.    Similarly, I apply the LSU's Pricing for ODL benchmark methodology that I employed in my Initial Report, by restricting the credit hours taken to just those for Plaintiff Gunter. The record evidence indicates Plaintiff Gunter enrolled for 15 credit hours. Using the same calculations as in the tables in my Initial Report (Table 2A and Table 2B), I estimate Plaintiff Gunter's but-for Tuition and but-for Fees using LSU's Pricing for ODL model, as reflected in Tables 2A-Gunther and 2B-Gunther below. Damages to Plaintiff Gunter sum to $933 ($616 in tuition + $317 in fees).

TABLE 2A-GUNTHER: BENCHMARK ESTIMATE, TUITION, LSU'S PRICING FOR ODL

| (1) | (2) | (3) | (4) | (5) = [100% -<br>(4)] * (2)<br>+ (4) * (3) | (6) = (2) - (5) |
|---|---|---|---|---|---|
| **Spring 2020 Semester, Total Credit Hours** | **Spring 2020 Semester, Tuition Paid** | **Spring 2020 Semester Tuition, ODL Equivalent** | **Portion of Spring 2020 Semester Subject to Online, Remote-Only** | **Spring 2020 Semester, Tuition with Pro-Rata ODL Discount** | **Estimate** |
| 15 | $4,025 | $2,760 | 48.7% | $3,408 | $616 |

TABLE 2B-GUNTHER: BENCHMARK ESTIMATE, FEES, LSU'S PRICING FOR ODL

| (1) | (2) | (3) | (4) | (5) = [100% -<br>(4)] * (2)<br>+ (4) * (3) | (6) = (2) - (5) |
|---|---|---|---|---|---|
| **Spring 2020 Semester, Total Credit Hours** | **Spring 2020 Semester, Fees Paid** | **Spring 2020 Semester Fees, ODL Equivalent** | **Portion of Spring 2020 Semester Subject to Online, Remote-Only** | **Spring 2020 Semester, Fees with Pro-Rata ODL Discount** | **Estimate** |
| 15 | $1,955 | $1,305 | 48.7% | $1,639 | $317 |

Privileged & Confidential

-4-

## CONCLUSION

7.    For the foregoing reasons, I conclude that damages can be reliably demonstrated for Plaintiff Gunter, including as set forth herein, as well as for any individual member of the Class, all using common methods and data.

\*        \*        \*

I declare under penalty of perjury that I am an adult and otherwise competent to testify to the matters set forth herein and attached. I further declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Hal J. Singer, Ph.D.:

Executed on March 1, 2023

Privileged & Confidential

# ATTACHMENT

**NINETEENTH JUDICIAL DISTRICT COURT**

**STATE OF LOUISIANA**

**PARISH OF EAST BATON ROUGE**

| | |
|---|---|
| MICHAEL MIAZZA | DOCKET NO. C-696,918 |
| VERSUS | DIVISION C |
| BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE | |

*CONSOLIDATED WITH*

| | |
|---|---|
| TAYLOR GUNTER | DOCKET NO. C-698,930 |
| VERSUS | SECTION 24 |
| LOUISIANA STATE UNIVERSITY SYSTEM, and other affiliated entities and individuals MARY L. WERNER, ROBERT S. DAMPF, JAMES M. WILLIAMS, RONALD R. ANDERSON, LEE MALLETT, RICHARD E ZUSCHLAG, JACK A BLOSSMAN, REMY VOISIN STARNS, JIMMIE M WOODS, GLENN ARMENTOR, VALENCIA S JONES, B. WAYNE BROWN, PATRICK C. MORROW, RAYMOND R. MORRIS and COLLIS B. TEMPLE | |

_____

**REPORT OF HAL J. SINGER, PH.D.**
**November 9, 2022**
_____

-2-

**TABLE OF CONTENTS**

Introduction and Assignment ................................................................................... 3

Qualifications ........................................................................................................... 5

I.  Choice-Based Conjoint Analysis Can Be Used to Demonstrate Economic Injury and
   Assess Aggregate Damages Using Data and Methods Common to the Class .................... 7

   A.  Choice-Based Conjoint Analysis Is a Standard Method Common to the Class ..... 7

   B.  CBC Analysis Enjoys Widespread Acceptance in the Education Literature .......... 9

II.  Applying CBC Analysis to the Instant Case .................................................... 10

   A.  Design of CBC Survey ................................................................................. 11

   B.  Administration of CBC Survey ..................................................................... 16

   C.  Calculation of Consumer Demand Sensitivity ............................................... 17

   D.  Demonstrating Impact and Estimating Aggregate Damages Using the CBC
       Framework ................................................................................................. 19

III. Incorporating More Complex Supply-Side Considerations .................................. 20

   A.  Evaluating Supply-Side Considerations in the Context of Higher Education ...... 20

   B.  Standard Economics Shows How Profit-Maximizing Firms Decrease Their Prices
       in Response to Decreased Demand ............................................................... 24

IV. Competitive Benchmark Methodologies ........................................................ 26

Conclusion ............................................................................................................. 29

Appendix 1 : Curriculum Vitae of Hal J. Singer .................................................... 30

Appendix 2: Materials Considered ........................................................................ 41

Privileged & Confidential

-3-

### INTRODUCTION AND ASSIGNMENT

1.    Counsel for Plaintiffs has asked me to assess whether economic injury and aggregate damages to Class Members flowing from the conduct challenged in the Petition[1] (the "Challenged Conduct") against Louisiana State University ("LSU" or "Defendant") can be reliably determined using data and methods common to the Class.

2.    The theory of harm in this matter, as alleged in the Petition, is that Defendant failed to appropriately reimburse or otherwise compensate Class Members upon failing to deliver "promised benefits and services"—specifically, "in-person," on-campus "educational services, experiences, opportunities, and other related services" during the Spring semester 2020.[2] Consumer injury (here, student injury) flows from the difference between what Defendant promised students in return for tuition and fee payments and what students actually received.

3.    I understand that Plaintiffs are seeking to certify a class to include all persons registered as students in LSU's traditional in-person, on-campus program during the Spring 2020 semester ("Class Members").[3] Further, I understand that this traditional, in-person, on-campus program was associated with both a tuition charge ("Tuition"), as well as various fee charges, in particular, several mandatory fees ("Mandatory Fees").[4] Unless otherwise noted, I use the term "Tuition and Fees" to refer to Tuition and Mandatory Fees in aggregate.

4.    I conclude that economic injury and aggregate damages can be demonstrated under

---

1.    *See* Consolidated Petition for Damages, Michael Miazza, individually and on behalf of all others similarly situated, *Plaintiffs* v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, *Defendant*, Docket No.: C-696918 (19th D., E. Baton Rouge Parish, La. March 25, 2021)[hereafter *Petition*].

2.    *Id.* ¶¶1-3.

3.    I understand the Class to be defined as follows:

All students who, as of March 13, 2020, were enrolled at Louisiana State University's main campus in Baton Rouge who paid Tuition and/or Fees for the Spring 2020 semester, or on whose behalf such payment was made.

Unless otherwise noted, defined terms used herein, *i.e.* capitalized terms such as Class Members, have the same meaning here as that set forth in the Consolidated Petition for Damages.

4.    *Id.* ¶18.

Privileged & Confidential

-4-

the theory of harm in this matter, including by using Choice-Based Conjoint ("CBC") analysis. I demonstrate that aggregate damages can be reliably estimated using CBC analysis coupled with a traditional, consumer-driven damages calculation. I further demonstrate that, although I do not believe LSU is a traditionally short-term profit-maximizing entity, additional supply-side considerations could be taken into account for a more conservative damages estimate.

5.      My report is organized in three parts. In Part I, I provide background on using CBC analysis. In Part II, I explain how an economist can estimate student disutility—the downward shift in the demand curve for LSU's education services—had students known at the time of Spring 2020 semester registration and enrollment for classes, that partway through the semester classes would shift from in-person to online and that campus would close. This is a traditional approach that has been regularly employed to estimate damages to class members in several litigation matters of various types.[5] This approach assumes the supply curve—LSU's provision of education services—would have remained fixed (vertical) in the "but-for world,"—that is, the world that would have occurred but for the Challenged Conduct. This assumption is particularly applicable given that LSU would not have reduced the number of enrollment slots available to students in the but-for world, particularly give LSU's educational mission, profit and cost structure, and the long-term nature of student enrollment decisions.

6.      In Part III, I explain how an economist can, nevertheless, incorporate more complex, supply-side considerations by using the output of the CBC analysis and then accounting for the possibility that LSU could have reduced the number of enrollment slots (and thus possibly incurred lower costs) in the but-for world—perhaps allowing it to charge a higher price than it

---

5.      *See, e.g., Apple Electronics Co. Ltd. v. Samsung Electronics Co. Ltd.*, No. 11-CV-1846 (N.D. Cal. Dec. 2, 2011); *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018).

Privileged & Confidential

-5-

otherwise could have in the but-for world (albeit still lower than prices charged in the actual world).

7.    In Part IV, I show how aggregate damages can, based on LSU's own pricing conventions, also be computed using as competitive benchmarks. These benchmarks are: (1) LSU's own reduction in Tuition and Fees for its Spring Intersession 2020, Summer 2020, and Summer Intersession 2020; and (2) the difference in the tuition and fee structure between LSU's traditional, in-person on-campus program and LSU's online distance learning ("ODL") course offerings.

## QUALIFICATIONS

8.    I am a Managing Director at Econ One Research, Inc. ("Econ One"), an adjunct professor at the Georgetown University McDonough School of Business where I teach Advanced Pricing to MBA candidates, a visiting professor at the University of Utah College of Social & Behavioral Science where I teach antitrust economics to graduate economic students, and serve as director of the Utah Project on Antitrust and Consumer Protection.[6] My testifying experience has focused on antitrust and consumer protection matters, with a special emphasis in assessing common impact in class action litigation.

9.    I am an applied microeconomist with an emphasis on industrial organization and regulation. In an academic capacity, I have published several books and book chapters, spanning a range of industries and topics, and my articles have appeared in dozens of legal and economic journals. My competition-related articles have appeared in multiple American Bar Association (ABA) Antitrust Section journals, and I have been a panelist at several ABA Antitrust events. In a consulting capacity, I have been nominated for antitrust practitioner of the year among economists

_____

6.  *See Utah Project on Antitrust and Consumer Protection,* THE UNIVERSITY OF UTAH, *available at* https://utahproject.utah.edu/.

Privileged & Confidential

-6-

by the American Antitrust Institute (AAI) for my work in *Tennis Channel v. Comcast*, and AAI namel me as co-Honoree in the same category in 2018 for my work in *In Re Lidoderm Antitrust Litigation*.

      10.    I have testified as an economic expert in state and federal courts, as well as before regulatory agencies. I also have testified before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on the interplay between antitrust and sector-specific regulation. While I have served as expert for both plaintiffs seeking class certification and defendants opposing class certification, courts have relied on my work in certifying seven classes in antitrust matters,[7] and two classes in consumer protection matters.[8] In addition, with regard to consumer protection matters, I have specific experience and expertise using CBC to evaluate damages based on declines in consumer utility.

      11.    My full curriculum vitae appears as Appendix 1 to this report and reflects a full list of the cases in which I have served as a testifying expert since 2014 and a list of publications I have authored in the last ten years. The data and other information I considered in forming the opinions set forth herein appear in Appendix 2 to this report.

      12.    I have no financial stake in the outcome of this case. Econ One is being

---

7.  *See Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (Granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008) (Granting Motion to Certify Class); *Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) (Granting in Part Motion for Class Certification); *Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (Granting in Part Motion for Class Certification); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 665 (N.D. Ga. 2016) (Granting Motion to Certify Class); *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (Granting Motions for Class Certifications and Denying *Daubert* Motions); *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781 (announcing the court's intention to grant the Plaintiffs' Motion for Class Certification). As of the time of this report, the court has not issued the written opinion certifying the class in *Zuffa*.

8.  *See In re MacBook Keyboard Litigation*, Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021) (Granting Motion to Certify Class); *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal. Jun. 28, 2022) (Granting Motion For Class Certification and Denying *Daubert* Motions).

Privileged & Confidential

-7-

compensated for my work in this matter at my standard rate of $885 per hour whether Plaintiffs prevail or not.

**I.  CHOICE-BASED CONJOINT ANALYSIS CAN BE USED TO DEMONSTRATE ECONOMIC INJURY AND ASSESS AGGREGATE DAMAGES USING DATA AND METHODS COMMON TO THE CLASS**

13.    In this section, I demonstrate that CBC analysis can be used to calculate economic injury and assess aggregate damages using data and methods common to all Class Members. I outline how a survey may be conducted in order to empirically assess the theory of harm under consideration. A CBC analysis can also be used to further evaluate the theory of harm for variable student populations, should such evaluation become necessary at summary judgment or trial, and I have included such considerations in my outline below. In Parts II and III below, I further demonstrate that CBC methods can incorporate additional supply-side factors using data and standard economic methods common to all Class Members.

**A.    Choice-Based Conjoint Analysis Is a Standard Method Common to the Class**

14.    Economists have used CBC analysis for decades to study and to empirically quantify consumer preferences. CBC analysis is grounded in economic modeling techniques pioneered by (among others) Nobel Prize-winning economist Daniel McFadden.[9] The economic modeling frameworks that provide the underpinning for CBC analysis have been widely used by economists to study markets for differentiated consumer products and services, in applications ranging from merger analysis to the competitive effects of introducing new products and

---

9.    *See, e.g.,* Daniel McFadden, *The Choice Theory Approach to Market Research*, 5(4) MARKETING SCIENCE 275-297 (1986); *see also* Lisa Cameron, Michael Cragg, and Daniel McFadden, *The Role of Conjoint Surveys in Reasonable Royalty Cases*, LAW360 (2013)[hereafter McFadden et al (2013)]; Paul Green and V. Srinivasan, *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice*, 54 JOURNAL OF MARKETING 3-19 (1990).

Privileged & Confidential

-8-

services,[10] including in the context of college and university services.[11]

      15.     Further, conjoint analysis has been widely adopted by the private sector. As of the early 1980s, one study estimated that there were hundreds of commercial applications of conjoint analysis each year.[12] More recently, it has been estimated that there are tens of thousands of such applications annually.[13] Applied conjoint analysis frequently focuses on products and services marketed to a wide variety of consumers.[14]

      16.     CBC can be used to objectively quantify consumer valuations of product and service features that are not priced separately. CBC uses survey responses to quantify the tradeoffs that consumers reveal they are willing to make when selecting among different products or services comprised of different combinations of features.[15] The economic models underlying CBC analysis express the utility that a consumer derives from a particular product or service in terms of the salient features of that product or service. Each product or service is expressed as a bundle of features, and each feature contributes something to the overall utility that the consumer derives from the product or service. By selecting the most-preferred bundle of features among the choices presented to them—that is, the choice that maximizes each respondent's utility—respondents

_____

    10.  *See, e.g.,* Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry,* 31 RAND JOURNAL OF ECONOMICS (2000); *see also* Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan,* 110 (4) JOURNAL OF POLITICAL ECONOMY (2002).

    11.  *See* I.B, *infra.*

    12.  *See* Green and Srinivasan, *supra,* at 3 (citing Dick Wittnick & Phillippe Cattin, *Commercial Use of Conjoint Analysis: An Update,* 53 JOURNAL OF MARKETING 91-96 (1989)).

    13.  *See* Bryan K. Orme, GETTING STARTED WITH CONJOINT ANALYSIS: STRATEGIES FOR PRICING RESEARCH (Research Publishers 2nd ed. 2005).

    14.  Green & Srinivasan, *supra,* at 3-4 ("Conjoint analysis continues to be popular….The large majority of conjoint studies pertain to consumer goods (59%) and industrial goods (18%)….New product/concept evaluation, repositioning, competitive analysis, pricing, and market segmentation are the principal types of applications."). *See also* Vithala Rao, *Applied Conjoint Analysis,* 133-36 (Springer-Verlag 2014).

    15.  Conjoint studies sometimes attempt to create "incentive alignment" mechanisms for their respondents by (for example), offering the respondent a positive probability that every stated choice will result in an actual transaction. However, as Professor McFadden has noted, "there is also considerable evidence that while it is important to get subjects to pay attention and answer carefully, they are mostly honest in their responses irrespective of the incentives offered or how well they are understood." *See* Moshe Ben-Akiva, Daniel McFadden and Kenneth Train, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis,* 10(1-2) FOUNDATIONS AND TRENDS IN ECONOMETRICS 1-144, 23-24 (2019) [hereafter McFadden et al (2019)].

Privileged & Confidential

-9-

indirectly reveal the value they derive from individual features.[16] In this way, CBC enables the researcher to elicit consumers' valuation of an individual dimension of a multidimensional product or service.

17.    In the litigation context, CBC can use data and methods common to all class members, such as the students proposed as Class Members in this matter. The survey dataset that forms the basis for CBC analysis here, as described further below, is the same for all Class Members. The econometric techniques used to analyze the survey dataset here, as described further below, are likewise common to all Class Members. And any data on additional supply-side factors here, as described  further below, would also be common to all Class Members.

**B.    CBC Analysis Enjoys Widespread Acceptance in the Education Literature**

18.    Researchers routinely employ CBC analysis and, more broadly, Discrete-Choice Experiment ("DCE") methodologies in general, to investigate demand drivers for higher education.[17] Two articles in particular informed the design, administration, and application of my CBC analysis described below: Duncan (2020)[18] and Manley *et al* (2019).[19]

19.    Duncan (2020) examined the effects of various levels of course delivery and cost attributes on consumers' preferences. The author determined student preferences associated with the following attributes: course delivery, tuition and fees, and federal CARES scholarship support.

---

16.  *See, e.g.,* RAO , *supra*, at 16-23.
17.  *See* Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19*, 35(3) JOURNAL OF HIGHER EDUCATION MANAGEMENT 35-43 (2020); Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) JOURNAL OF EDUCATION FINANCE 232-252 (2019) [hereafter Manley et al (2019)]; John T. Mann and Shida R. Henneberry, *Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes*, AAEA ANNUAL MEETING (2012); Mikolaj Czajkowski, Tomasz Gajderowicz, Marek Giergiczny, Gabriela Grotkowska, and Urszula Sztandar-Sztanderska, *Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method*, 61 RESEARCH IN HIGHER EDUCATION 510-539 (2020).
18.  *See, e.g.,* Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19*, 35(3) JOURNAL OF HIGHER EDUCATION MANAGEMENT 35-43 (2020).
19.  *See* Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) JOURNAL OF EDUCATION FINANCE 232-252 (2019).

Privileged & Confidential

-10-

The study's results indicated that "course delivery is the most important criteria and face-to-face instruction is more important than CARES scholarship support and also as important as tuition and fees."[20]

20.    Manley *et al* (2019) surveyed the preferences of currently enrolled students "in a regional university in the southeastern U.S." regarding their willingness to pay for online classes.[21] Using DCE analysis, the authors found that students expressed a preference for "a traditional face-to-face class over an online class."[22]

21.    Both Duncan (2020) and Manley *et al* demonstrate the acceptance of applying results derived from the CBC or DCE approach to broader classes of individuals, as I will with the results of my methodology presented below.

22.    My CBC analysis and product attribution descriptions will be consistent with the survey methodologies described in these studies. For example, my *Class Modality* and *Price per Semester* features, described in further detail below, are broadly consistent with the inclusion of the course delivery attribute and tuition and fees attribute in Duncan (2020). My description of the *Campus Access* attribute, also described in further detail below, is consistent with several factors included in Manley *et al* (2019), including "Less Interaction with instructor" and "Interaction with students."[23] For the foregoing reasons, my methodology is firmly tethered to the academic literature investigating demand for higher education, especially in the context of online learning.

## II.  APPLYING CBC ANALYSIS TO THE INSTANT CASE

23.    In this section, I describe the CBC analysis designed to test the theory of harm in this matter. I describe the design and administration of the CBC survey, the calculation of

---

20.    Duncan (2020), *supra,* at 41.
21.    Manley et al (2019) at 237.
22.    *Id.* at 242.
23.    *Id.* at 241.

Privileged & Confidential

-11-

consumer utilities related to the shift from the traditional in-person, on-campus LSU program to online, remote-only in the Spring 2020 semester, and how one could account for additional supply-side considerations.

**A.      Design of CBC Survey**

24.      I will use Qualtrics Design XM to design and implement the survey, and to analyze the consumer utilities interpolated from its results. Qualtrics is an industry standard survey platform.[24]

25.      The survey will contain three distinct modules: the "Screener" module; the "Attributes" module; and the "Conjoint" module. The Screener module will filter respondents from the relevant target population. The Attributes module will describe to eligible respondents the service—a "Semester Package" of college/university educational services—as well as all of the features that compose it. The Conjoint module will present respondents with random combinations of features and then elicit several selections by the respondent to those combinations in order to develop each respondent's utility model.

26.      The first step of CBC survey design is to define a target population from which to draw a representative sample. The Screener module will filter out respondents who do not belong to the target population through a series of population-validation questions. In this matter, the CBC survey will target eligible individuals who could plausibly attend or have attended LSU's

---

24.   Qualtrics has been relied upon by over 16,000 brands and 75 percent of the Fortune 100. Qualtrics is cited in various professional and academic publications. *See, e.g.*, William G. Zikmund et al., BUSINESS RESEARCH METHODS (with Qualtrics Printed Access Card) (Cengage Learning 9th ed. 2012).

Privileged & Confidential

-12-

undergraduate program.[25] Respondents for this survey will be individuals who:[26]

- Have not recently taken a survey regarding online education;
- Reside within the United States;
- Have taken within the past five years, or plan to take within the next two years, undergraduate, in-person, on-campus courses at a college or university;
- Are between the ages of 18 and 30;[27]
- Obtained an unweighted high school GPA between 2.50 and 4.00;[28] and
  - Either achieved a composite score between 1000 and 1600 on the SAT standardized test;[29] or
  - Achieved a composite score between 18 and 36 on the ACT standardized test.[30]

The survey will phrase such population filters such that respondents will be unaware of the specific topic of the survey until they prequalify.

27.    The Attributes module will then explain the service (a Semester Package) and all features to the respondents. Respondents will be told that the topic of the survey is semester offerings at LSU.

28.    Respondents will then be instructed regarding how the survey is to proceed,

---

25. One can modify the CBC survey methodology described herein to focus on graduate students and law students. In order to do so, one would modify the target population criteria (*e.g.* replace SAT score with the relevant graduate admission test score) and the Tuition and Fee rates shown in the conjoint survey in order to reflect the characteristics and pricing structure borne by these students. LSU similarly groups and has specific pricing for these specific student populations, as it does for undergraduates. *See, e.g Fall 2019 Semester Fees- Undergraduate Students*, LOUISIANA STATE UNIVERSITY, *available at* https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/undergrad.pdf (undergraduate student pricing); *Fall 2019 Semester Fees- Graduate Students*, LOUISIANA STATE UNIVERSITY, *available at* https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/grad.pdf (graduate student pricing); *Tuition and Fee Schedule,* PAUL M. HEBERT LAW CENTER, *available at* https://www.law.lsu.edu/academics/files/2019/07/Tuition-Fees-2019-2020.pdf (law student pricing).

26.    I use data from Louisiana State University 2019-2020 submission to The Common Data Set (a collaboration data product in higher education supported by the College Board, Peterson's, and U.S. News & World Report, *see Common Dataset Initiative, available at* https://commondataset.org/), *See LSU Common Data Set 2019-2020, available at* https://www.lsu.edu/bgtplan/cds/2019.php [hereafter CDS]. I select the 2019-2020 CDS data as it covers the semester (Spring 2020) at issue in this case.

27.    Qualtrics is unable to target respondents under 18 years of age. 96 percent of LSU undergraduates are 25 or under. *See* CDS question F1. Five years after 25 equals 30. I therefore use an age range of 18 to 30.

28.    99 percent of all enrolled, degree-seeking, first-time, first-year (freshman) students at LSU had a 2.5 or higher high school GPA. *See* CDS question C11.

29.    LSU accepted students who submitted either the SAT or ACT. 97 percent of students who submitted SAT scores scored 1000 or higher. CDS question C9. LSU required students to take either the SAT or the ACT to apply. CDS question C8.

30.    99 percent of LSU students who submitted ACT scores scored 18 or higher. CDS question C9.

Privileged & Confidential

-13-

including that the upcoming portion of the survey will ask them to "select the semester offerings that you would actually select in real life," or to select the option to purchase none of the offerings. Respondents will be taken through the attributes of the semester offerings available to them, beginning with the characteristics that, consistent with LSU's own marketing materials, LSU offers its students. Respondents will be introduced to the three key attributes that will appear in the Conjoint module: (1) Class Modality, (2) Campus Access, and (3) Price per Semester. In that same portion of the survey, the respondents will also be introduced to some number of decoy attributes to divert attention from the key attributes of interest, thus avoiding "focalism bias" surrounding the key attributes.[31] Because respondents are limited in their cognitive ability to choose among a large number of options, CBC researchers generally limit surveys to six or fewer attributes—which will be done for the CBC survey for this matter.[32]

29.    A brief note on technical terminology: In a CBC survey, a "feature" is a category, which is composed of "levels," or values, that each feature can take. For example, the feature color may have three levels: red, blue, and green. In a survey design context, the term "attribute" is used to refer to a feature and all of its levels, collectively.[33] In the Attributes module, I will describe each attribute to the respondent, meaning that they will be informed of a feature (such as Class Modality) as well as all potential levels (such as On-Campus or Online) before they take the Conjoint Module. This will allow respondents to understand the entire array of potential options

---

31.    *See, e.g.,* Gerald Häubl, Benedict Dellaert and Bas Donkers, *Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search*, 29(3) MKTG. SCI. 438-455 (2010). Such attributes may include, *e.g.*, tutoring or advising services.

32.    To avoid cognitive fatigue among respondents, conjoint researchers typically limit surveys to no more than six attributes (as noted above), as well as four to five products or services, and no more than 20-30 choice tasks. Even so, "other researchers argue that many more attributes and products can be included, as long as the subjects understand how the attributes affect them[.]" *See* McFadden et al (2019) at 21. *See also* McFadden et al (2013) at 2.

33.    In practice, the terms "feature" and "attribute" may be used synonymously with little loss of clarity. *Step 1: Defining Conjoint Features & Levels*, QUALTRICS (accessed October 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/step-1-defining-conjoint-features-levels/.

Privileged & Confidential

-14-

they may see in the survey. If a respondent does not confirm that they understand the attributes described to them, they will be disqualified from the survey. The various attributes are described in further detail below.

30.    *Class Modality*: Respondents will be told that the semester offerings come in one of two class modalities: On-campus or Online.[34] The description of the On-Campus (in-person) learning modality will be based on LSU's contemporaneous marketing materials.[35] The description of the Online (remote-only) learning modality will likewise be based on LSU's marketing materials, especially LSU's ODL marketing materials,[36] which I understand to be the closest equivalent to the class modality actually deployed in Spring 2020.[37] These descriptions are provided in order to best reflect the choice students have been presented in the real world.

31.    *Campus Access*: Respondents will be told that the semester offerings come in one of two campus access options—Access or No Access. The description of Access will be a direct reflection of how LSU has marketed its campus, including its facilities, to prospective students.[38] The description of No Access will be a negation of the Access option. Respondents will be

---

34.    I understand LSU also offers a few partially-online courses, including *e.g.* 75 percent online. It would be a ministerial adjustment to include levels reflecting increments along the continuum from 0 percent online to 100 percent online. However, I have not included such levels in this initial proposal.

35.    *See, e.g., About Us*, LSU (Feb. 2020), *available at* https://web.archive.org/web/20200206024930/https://lsu.edu/about/index.php (reflecting LSU marketing as of Spring 2020).

36.    *See, e.g., Continuing Education*, LSU (Jan. 2020), *available at* https://web.archive.org/web/20200114133931/https://online.lsu.edu/continuing-education/ (reflecting LSU marketing as of Spring 2020).

37.    *See* Deposition of Kaprice Mumphrey (March 29, 2022), at 386:7-16 (Q.· ·Do you know whether the -- whether that the same thing that was done for purposes of launching an in-person course to an online course for LSU Online, whether that was done for the in-person courses that were transitioned to online courses in the wake of COVID-19? A.· ·No.· Because they weren't transitioned to online courses.· Remember, that's an eight-week window, seven-week window.· *They were just transitioned to remote or distance learning*." (emphasis added); Galligan Depo. at 69: 5-13 (Q:… [M]y understanding from Ms. Mumfre[y]'s testimony was that LSU's traditional campus-based, in-person classes were not transitioned to the LSU Online format following Covid 19, but instead were transitioned to the remote or distance learning format. Is that accurate from your perspective? A Yeah. That is accurate from my perspective.").

38.    LSU's marketing materials from the Spring 2020 semester will be relied upon in formulating this description of Access; *see, e.g., Live on Campus*, LSU (Feb. 2020), *available at* https://web.archive.org/web/20200206024452/https://lsu.edu/life/liveoncampus.php.

Privileged & Confidential

-15-

reminded that certain services are available to both students with Access and students with No Access.[39] This reminder will also account for the fact that Tuition and Fees may have covered some services other than those that specifically relate to being on campus.

32.    *Price per Semester*: Respondents will be told that the semester offerings will be priced inclusive of Tuition and Fees for the semester, but *not* inclusive of room and board or parking.[40] Respondents will be instructed to assume that the prices shown are for a full-time, 15-credit semester[41] and are based on LSU's 2019-2020 undergraduate, in-state tuition rates.[42] The prices shown to respondents will be randomized and centered upon LSU's actual Tuition and Fees for in-state students pursuing 15 credit hours. On that basis (based on current discovery), the Price per Semester figure is equal to $4,024.55 (Tuition) plus $1,955.45 (Mandatory Fees), for a total of $5,980.00.[43] The range shown will vary from 50 percent of this figure, $2,990.00, to 150 percent of this figure, $8,970.00, in steps of 25 percent (*i.e.* 50, 75, 100, 125, and 150 percent of the base price).

33.    The Conjoint module will ask respondents to select between Semester Packages with randomized combinations of the levels available within each attribute. CBC survey

---

39.   For example, I understand that after LSU announced the closure of campus in Spring 2020, students may have had access to limited campus library services. *See, e.g.,* Section 1442 Deposition, Exhibit 14.  Therefore, relevant exceptions to No Access will be reflected in the description of the Campus Access attribute.

40.   I am aware that students also paid fees for room (housing), board (meal plans) and parking.  I have not been provided comprehensive information about those fees, including amounts refunded to students.

41.   LSU states that students must take more than 12 credits per term to be considered full-time. CDS question G2. Undergraduate students must take 120 credits in total to graduate. *See, e.g., College of Science, Graduation,* LSU (accessed Nov. 7, 2022), *available at* https://www.lsu.edu/science/student_services/CurrentStudents_LandingPage/CoSGraduation.php. 120 divided by 8 semesters equals 15; therefore, I have presented Tuition and Fees corresponding to 15 credit hours/semester.

42.   One can modify the CBC survey methodology to focus on out-of-state students. In order to do so, one would modify the Tuition and Fee rates shown in the conjoint survey in order to reflect the pricing structure borne by these students.  LSU similarly groups and has specific pricing for this specific student population, as it does for in-state students. *See, e.g. Undergraduate Tuition and Required Fees,* LSU (accessed Nov. 7, 2022), *available at* https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/undergrad.pdf (in-state student pricing and nonresident student pricing).

43.   *See* Section 1442 Deposition, Exhibit 4.

Privileged & Confidential

-16-

respondents generally perform at most 30 "choice tasks" within the Conjoint module.[44] For each choice task, a respondent will be asked to select her preferred alternative from among a "choice set" of alternative Semester Offerings, with each choice defined by its features. In each choice set, the respondent will be asked to select the Semester Package offering that she would purchase if those were the only options available. Each choice task will present the respondent with three different Semester Package offerings from which to choose. Importantly, in every choice set, respondents will be given the option not to purchase any of the three Semester Package offerings. Including such a "no buy" option allows a researcher to identify the willingness-to-pay of the "marginal consumer"—that is, the price at which the marginal consumer is indifferent between purchasing the Semester Package offering and not purchasing it. In standard economic theory, the marginal consumer is the last person willing to enter the market and consume the good or service at that price, so the willingness-to-pay of the marginal consumer for a theoretical product or service represents the market price for that product or service. In other words, the marginal consumer sits at the intersection of the supply and demand curves.

**B.    Administration of CBC Survey**

34.    I will engage Qualtrics to provide the sample for the survey.[45] I intend to draw a sample of approximately 500 individuals for the respondent group.[46] Before fielding the test to all 500 respondents in a group, I will "soft-launch" the survey to a small group of respondents. Doing

---

44.    *See* Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto, *The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments*, 26 POLITICAL ANALYSIS 112-119 (2018).

45.    The conjoint survey will be administered by Qualtrics, which regularly conducts such surveys on behalf of business schools and large corporations. *See Conjoint Analysis Software Tool*, QUALTRICS, *available at* https://www.qualtrics.com/core-xm/conjoint-analysis/.

46.    Qualtrics provides their own estimate of the number of respondents needed given the number of levels across all features, the number of choice tasks, and a multiplier. Sawtooth software recommends a 500-user minimum. In practice, the 500 responded threshold often far exceeds traditional minimum sample size calculations. *See Conjoint Analysis White Paper*, QUALTRICS (accessed October 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/#SurveyandSampleSize.

Privileged & Confidential

-17-

so will, *inter alia*, allow me to evaluate if respondents are confused by any of the question language and identify if respondents are being disqualified from the survey at particular validation questions.

**C.    Calculation of Consumer Demand Sensitivity**

35.    Qualtrics uses standard statistical methods to obtain estimates of consumer-utility parameters for each respondent.[47] These estimates will allow me to estimate consumer disutility resulting from the shift from the traditional in-person, on-campus LSU program to online, remote-only.

36.    Specifically, the utility parameters will allow me to calculate, for each consumer, the "Net Disutility" associated with the shift experienced in Spring 2020. To calculate this Net Disutility, I will calculate the difference in total utility associated with (1) the On-Campus Class Modality and (2) Campus Access compared to the total utility associated with the (1) Online Class Modality and (2) No Campus Access. In other words,

$$Net\ Disutility$$
$$= \left( Utility_{On-Campus} + Utility_{Campus\ Access} \right)$$
$$- \left( Utility_{Online} + Utility_{No\ Campus\ Access} \right)$$

37.    Further, I will also calculate the "Net Utility" associated with a decline in price from the base Price per Semester, defined as the difference between (1) the utility that the respondent derives from a semester offering when the Tuition and Fees are discounted by a given amount, *x*; and (2) the utility she derives from an otherwise identical offering with a discount of $0. To illustrate,

---

47.    Qualtrics software uses standard Hierarchical Bayesian Methods to converge on the coefficients that represent the value of each attribute for each individual. Hierarchical Bayesian Methods represent the current standard in CBC analysis. *See Conjoint Analysis White Paper*, QUALTRICS (accessed November 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/.

Privileged & Confidential

-18-

$$Net\ Utility = Utility_{Discount\ x} - Utility_{No\ Discount}$$

Given each piece of information, I will solve algebraically for the discount from the base Price per Semester that the respondent would require to compensate her for the disutility experienced from the shift from the traditional in-person, on-campus LSU program to online, remote-only. I illustrate this solution process in the example below.

38.    Consider the following example, incorporating hypothetical utility values. Assume there is some respondent who derives a Net Disutility of -2.85, a Net Utility of 2.18 from a 25 percent discount, and a Net Utility of 3.41 from a 50 percent discount. In this example, a 25 percent discount is not sufficient to compensate the respondent for the disutility she experiences (-2.85 + 2.18 < 0). However, a 50 percent discount is more than sufficient to compensate the respondent for the disutility she experiences (-2.85 + 3.41 > 0). Accordingly, we can infer that this respondent would require a discount of between 25 percent and 50 percent to compensate her for the disutility resulting from the shift from the traditional, in-person, on-campus LSU program to online, remote-only. A more precise discount can be estimated as the utility-weighted average of 25 percent and 50 percent, calculated using the linear relationship between the two discount levels:

$$y = mx + b$$

where $m$ is the slope and $b$ is the utility at the lower discount level. Here, $m = \frac{0.56 - (-0.67)}{50\% - 25\%}$ and $b = -0.67$. To find the distance from the lower discount level, $x$, at the point at which the respondent is indifferent, the relevant equation sets her utility $y = 0$, such that:

$$0 = \frac{0.56 - (-0.67)}{50\% - 25\%} x - 0.67$$

Solving algebraically for $x$ yields approximately 13.6 percent. Therefore, the required discount for this respondent to accept the shift is 38.6 percent (= 25 percent + 13.6 percent).

39.    The average discount required per this methodology can be calculated using a

Privileged & Confidential

-19-

simple average, with two straightforward substitutions for specific respondent subsets, should they occur. *First*, there may be respondents for whom the Net Utility at the lowest discount level exceeds the Net Disutility (in absolute terms) of the shift from the traditional in-person, on-campus LSU program to online, remote-only. These respondents can be assigned the lowest discount level in the calculation of the simple average. *Second*, there may be respondents for whom the Net Utility at the highest discount level is less than the Net Disutility (in absolute terms) of the shift from the traditional in-person, on-campus LSU program to online, remote-only. These respondents will be assigned the highest discount level in the calculation of the simple average.

**D.    Demonstrating Impact and Estimating Aggregate Damages Using the CBC Framework**

40.    Certain respondents will likely demonstrate a preference or taste for the disamenity—for example, their preferences will suggest a greater willingness to pay for online learning or for not having access to on-campus services. But it bears noting that, even though my damages methodology is based on responses to surveys, the CBC is measuring the *price discount in the market* that LSU would have to give in order to maintain the same demand for its educational services. This same price discount would apply equally to all students, as *LSU does not offer individualized Tuition and Fees*, even for those students with a taste for the disamenity.[48] This means that all students pay the same Tuition and Fees, which is determined by the aggregate demand curve. Even if an *individual* has a taste for the disamenity, the collective downward shift in the aggregate demand curve from the collective Net Disutility of the disamenity would lower their but-for Tuition and Fees. Accordingly, the CBC methodology can be used to establish common impact to all Class Members.

---

48.    *See, e.g. Undergraduate Tuition and Required Fees,* LSU (accessed Nov. 7, 2022), *available at* https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/undergrad.pdf (undergraduate student pricing).

-20-

41.     With regard to estimating damages, aggregate damages depend on the estimated decline in the willingness-to-pay of the marginal consumer given the shift from the traditional in-person, on-campus LSU program to online, remote-only. Specifically, aggregate damages will be expressed as the product of: (1) student expenditures for On-Campus Class Modality with Campus Access in the Spring 2020 semester at LSU; (2) the proportion of the semester during which students received only Online Class Modality with No Campus Access; and (3) the percentage discount implied by the disutility estimates described above. This calculation of aggregate damages is also an entirely a classwide measure, in the sense that it does not turn on any individualized inputs.

### III. Incorporating More Complex Supply-Side Considerations

42.     The CBC method described above, without further analysis, is an approach that has been widely accepted as appropriate to estimate damages in several types of litigation matters.[49] This traditional approach to CBC does not ignore the supply side;[50] rather, it assumes that the supply curve for enrollment slots would have remained fixed (vertical) in the but-for world. LSU did in fact supply a set quantity for enrollment, which Class Members actually purchased. Thus, as a matter of historical fact, the supply was fixed, Class Members were subject to harm on each unit of that fixed supply, and the relevant question is by how much Class Members were subject to such harm (or benefit) for those specific purchases. The traditional CBC approach is, therefore, consistent with the proposed, consumer-driven theory of harm.

**A.     Evaluating Supply-Side Considerations in the Context of Higher Education**

43.     In this section I contemplate the possibility of an additional supply-side analysis.

---

49.   *See, infra,* fn. 5.
50.   The supply side of the market is implicitly incorporated through the attributes and pricing levels shown to respondents, which are based upon actual market prices. Actual market prices reflect the behavior of rivals to LSU and the competitive landscape within which LSU's pricing models were developed.

Privileged & Confidential

-21-

As a matter of theory, such analyses are relevant in understanding the behavior of the profit-maximizing firm; that is, a firm with some level of pricing power that could reduce its supply in response to a decline in demand. However, as a threshold matter, such theoretical principles are unlikely to apply fully in the context of not-for-profit higher education, especially a public school like LSU, for three reasons: (1) colleges and universities are not generally profit-maximizing in the traditional sense; (2) colleges and universities operate primarily under a fixed-cost or quasi-fixed-cost pricing model; (3) supply decisions were made and implemented on a broader basis than the single semester under consideration in this matter. Below, I discuss each of these in detail.

44.    Economic literature analyzing enrollment and pricing optimization strategies for institutions of higher education acknowledges that a nonprofit college or university faces a different maximization problem than a traditional profit-maximizing firm. Specifically, colleges and universities must incorporate additional factors, including, for example, considerations for a strong athletics program, diversity initiatives, and future earning potential of admittees. In mathematical terms, the relevant "objective function" incorporates elements beyond profits.[51]

45.    Moreover, the academic literature on higher education acknowledges that "universities do not typically cover all their costs through tuition and other fees, and *it is difficult to state what universities are maximizing or even who is doing the maximizing*."[52] The reasoning behind this ambiguity is related to the long-term incentives borne by institutions of higher education, as they relate to the quality-optimization problem introduced above. The marginal net revenue generated by an individual student during her enrollment is not necessarily the expected

---

51.    JAMES C. SPALL, INTRODUCTION TO STOCHASTIC SEARCH AND OPTIMIZATION: ESTIMATION, SIMULATION, AND CONTROL 2 (John Wiley & Sons 2003) ("the [objective] function [is] a scalar measure that summarizes the performance of the system for a give value of the adjustables.").

52.    Michael Rothschild and Lawrence J. White, *The Analytics of the Pricing of Higher Education and Other Services in Which the Customers Are Inputs*, 103(3) JOURNAL OF POLITICAL ECONOMY 573-586, 583 (1995) (emphasis added).

Privileged & Confidential

-22-

total revenue generated by that student; colleges and universities also factor in considerations of, for example, future donative contributions based on the earning potential of each admitted student and her experience at the college or university.[53] By extension, colleges and universities face incentives to maximize not only their per-semester revenues, but also to "maximize 'prestige' by maximizing alumnus success in the long run"[54] In other words, "[i]f the institution maximizes the human capital acquired by each student enrolled in the short run, then enrolling the highest quality student body consistent with the institution's quality reputation and its financial resources can maximize alumni success. Hence, in the short run the institution maximizes the *quality* of each class enrolled."[55]

46.    Given this incentive structure, while profit-maximization may represent a component of the relevant objective function faced by an institute of higher education, it is likely not the exclusive or even primary consideration. In fact, if the goal is to maximize long-term revenues, then the optimal enrollment strategy is to set tuition and fee levels to maximize the number of high-quality students enrolled, subject to capacity and quality constraints, where capacity and quality constraints represent the maximum number of students that can be enrolled without losing educational quality (for example, admitting underqualified students) or without abutting physical capacity constraints (for example, physical plant capacity, instructional capacity, and subsidy capacity).[56]

47.    This incentive structure—maximizing enrollment with respect to capacity

_____

53.   Glenn A. Bryan and Thomas W. Whipple, *Tuition Elasticity of the Demand for Higher Education among Current Students*, 66(5) JOURNAL OF HIGHER EDUCATION 560-574, 569 (1995) ("However, the output of the [optimization] model is only one factor in the tuition decision process. Net earnings maximization may not be the major objective of the institution, as nonprofit goals may have higher priority.").
54.   Donald I. Bosshardt, Larry Lichtenstein, and Mark P. Zaporowsky, *A Model Of College Tuition Maximization*, 2(1) CONTEMPORARY ISSUES IN EDUCATION RESEARCH 53-70, 54 (2009).
55.   Robert E. Martin, *Tuition Discounting Without Tears*, 23(2) ECONOMICS OF EDUCATION REVIEW 177-189 (2004).
56.   Bosshardt *et al* (2009) at 59.

Privileged & Confidential

-23-

constraints—also follows from the cost structure associated with institutions of higher education. Broadly, economists recognize three distinct cost types faced by all firms, including college and universities. These three cost types are fixed costs, variable costs, and quasi-fixed or stepwise costs. Fixed costs are independent of enrollment and include, for example, maintaining a building, making payments on debt, etc. Variable costs are an increasing function of enrollment and include, for example, software licenses and supplies for food services provided to students. Quasi-fixed or stepwise costs are costs that are fixed for certain enrollment levels and increase in a stepwise manner as enrollment levels reach certain thresholds, for example, an additional instructor must be hired for every 100 additional students enrolled. According to the economic literature on higher education pricing, "colleges are more likely to vary their net tuition price in order to attain a relatively *fixed* target enrollment… enrollment targets are likely to be set based on a college's residential hall capacity, instructional staff size, or available classroom and lab facilities."[57] That is, enrollment decisions are made with respect to targeting a specific capacity, rather than targeting a specific tuition (and fees) level.

48.     Finally, enrollment decisions are made on a long-term basis in at least two dimensions. *First*, students are admitted based on the expectation of an enrollment extending over multiple semesters. *Second*, to a lesser extent, hiring decisions—both instructional and in an academic support capacity—are similarly made on at least an academic year basis, with the possible exception of part-time lecturers.

49.     Taken together, these three factors—(1) colleges and universities face incentive structures not necessarily compatible with traditional profit maximization; (2) fixed costs are relatively higher than variable costs in the context of higher education and therefore colleges and

---

57.   Ann M. Gansemer-Topf, Peter F. Orazem, and Darin R. Wohlgemuth, *Do Liberal Arts Colleges Maximize Profits?*, 88(1) SOUTHERN ECONOMIC JOURNAL 274-294 (2021) (emphasis added).

Privileged & Confidential

-24-

universities are incentivized to enroll at their capacity constraint; and, (3) enrollment decisions are rarely limited to a single-semester outlook—imply that supply in the Spring 2020 semester at LSU in terms of enrollment slots was likely fixed. Therefore, it is my economic opinion that the relevant supply under consideration is the fixed supply actually offered to students during that time frame.

**B.     Standard Economics Shows How Profit-Maximizing Firms Decrease Their Prices in Response to Decreased Demand**

50.     Despite economic reasoning in support of fixed supply, as described in detail above, there is an alternate supply-side analysis that I will describe in this section that allows for the possibility that LSU could have, in theory, reduced supply in the but-for world, allowing it to charge a higher price than it otherwise could have. A supply reduction in the but-for world could have manifested as, for example, a reduction in the number of enrollment slots available to students following the transition from providing traditional in-person, on-campus educational services to online, remote-only. Such a reduction might have allowed LSU to incur lower costs in the but-for world, but only by reducing the total variable costs attributable to students.[58] Again, as a practical economic matter, this is unlikely; it would not be in LSU's long-term economic interests to remove students for a single semester in the presence of a demanded discount, such as that reflected in a CBC analysis. Nevertheless, this alternate supply-side modeling can be added into the traditional CBC framework described above.

51.     Elementary economic models show how a decrease in demand in a competitive market leads to a decrease in price, via a movement along the market supply curve.[59] As explained below, standard economics also shows that firms respond to a decrease in demand by lowering

---

58.    Supply-side analysis, however, holds costs fixed between the but-for and actual worlds. And while I understand that LSU likely did incur costs associated with the transition to online, remote-only, such costs generally would have been the same whether or not LSU had reduced supply.

59.    *See, e.g.*, N. Gregory Mankiw, PRINCIPLES OF MICROECONOMICS 80 (8th ed. 2018) ("How an Increase [or Decrease] in Demand Affects the Equilibrium[:] An event that raises [lowers] quantity demanded at any given price shifts the demand curve to the right [left]. The equilibrium price and the equilibrium quantity both rise [fall].").

Privileged & Confidential

-25-

their prices. Because the supply-side analysis depends on LSU's own-price elasticity of demand, which, in turn, depends on outside options for buyers, a supply-side analysis takes into account the behavior of rival suppliers.[60]

52.    To maximize profits, firms increase the price of their output until the markup of price over marginal cost is equal to the inverse of the own-price elasticity, a tenet of pricing theory sometimes referred to as the Lerner Index.[61] A profit-maximizing firm with pricing power chooses the price of its output—and thus the amount of output to supply—using this inverse elasticity rule, which can be written:

$$\frac{P - C}{P} = \frac{1}{E_D}$$

where $P$ is the price, $C$ is the marginal cost, and $E_D$ is the own-price elasticity of demand, defined as the percentage decrease in quantity demanded generated by a one percent increase in price. When $E_D$ is low, demand is said to be inelastic. The more inelastic the demand, the greater the markup of price over cost because consumer demand is less affected by price. The inverse-elasticity formula allows one to estimate how a profit-maximizing firm with pricing power would adjust its prices in response to a decrease in demand.[62]

---

60.    *See* William Landes & Richard Posner, *Market Power in Antitrust Cases,* 94 HARVARD LAW REVIEW 937, 937-996 (1981) (showing mathematically that a firm's own-price elasticity of demand is a function of the supply elasticity of competing firms).

61.    *Id.* 62. If the factfinder determines that LSU could have, in theory, reduced supply in the but-for world (manifesting as a reduction in the number of enrollment slots available to students in the Spring 2020 semester), it is straightforward to calculate that supply reduction using either *linear* or *nonlinear* demand approximation, depending on the structure of the margin and cost data made available to me by LSU.

62.    If the factfinder determines that LSU could have, in theory, reduced supply in the but-for world (manifesting as a reduction in the number of enrollment slots available to students in the Spring 2020 semester), it is straightforward to calculate that supply reduction using either *linear* or *nonlinear* demand approximation, depending on the structure of the margin and cost data made available to me by LSU.

Privileged & Confidential

-26-

### IV. COMPETITIVE BENCHMARK METHODOLOGIES

53.    Counsel for Plaintiffs has also asked me to provide initial estimates for two benchmark methodologies that are based on LSU's own market pricing for its educational services (the "competitive benchmarks"). The two competitive benchmarks are: (1) LSU's discount structure applied to Tuition and Fees in the Spring Intercession 2020, Summer 2020, and Summer Intersession 2020 academic sessions; and (2) the difference in tuition and fee structure between LSU's traditional in-person, on-campus program and its ODL course offerings. The competitive benchmarks can corroborate and help contextualize the damages calculated using the CBC methodology.

54.    *First*, record evidence indicates that LSU offered full- and part-time undergraduate and graduate students a 15 percent "tuition and fee exemption for Spring Intersession 2020, Summer 2020, and Summer Intersession 2020."[63] As a benchmark, this is conservative to the extent that Spring Intersession 2020, Summer 2020, and Summer Intersession 2020 enrollment contracts were entered into with the full knowledge and informed consent of impacted students.[64]

55.    This same discount could be applied in a straightforward arithmetic manner for the impacted portion of the Spring 2020 semester. For example, assuming that LSU had offered an identical discount during the impacted portion of the Spring 2020 semester, the same discount applied to tuition and fees charged to undergraduate students on the Baton Rouge campus would (based on current discovery) be approximately $11.5 million, as shown in Table 1 below.

---

63.    LSU's Answers To First Set of Interrogatories On Behalf Of Plaintiff (January 7, 2022), at 8.
64.    I am aware that one LSU witness has asserted this discount was not meant as compensation for the diminution in value of services rendered, but instead was meant to "increase that enrollment." *See, e.g.,* Deposition of Elahe Russell (March 28, 2022), at 180:7-14. This is not a distinct motivation from compensation, as it seeks to shift out the demand curve for the LSU product. Thus, it is reasonable for an economist to use this market-based response as a competitive benchmark.

-27-

TABLE 1: BENCHMARK ESTIMATE (UNDERGRADUATE), LSU'S 15% DISCOUNT

| (1) | (2) | (3) =<br>[1 - (2)] * (1)<br>+[(2) * (1) * [1 -<br>0.15]] | (4) = (1) - (3) |
|---|---|---|---|
| **Spring 2020 Semester, Tuition & Fees** | **Portion of Spring 2020 Semester Subject to Online, Remote-Only** | **Spring 2020 Semester, Tuition & Fees with 15% Discount** | **Estimate** |
| $157,407,594 | 48.7% | $145,904,732 | $11,502,863 |

*Source*: Section 1442 Deposition, Exhibit 4; LSU's Answers To First Set of Interrogatories On Behalf Of Plaintiff (January 7, 2022), at 8.

*Notes*: The portion of the Spring 2020 Semester impacted is based on a start date of 1/13/2020, an end date of 5/9/2020, and a COVID-related closure beginning 3/13/2020.

56.     *Second*, alternatively, I understand that LSU had a different market pricing structure for students enrolled in its traditional in-person, on-campus program, as compared to that for students enrolled in LSU's ODL program. Specifically, LSU's pricing for its ODL program had a lower per-credit-hour tuition rate as well as a different fee structure—in particular, ODL students were not charged "Required Activity Fees" charged to students enrolled in LSU's traditional in-person, on-campus program.[65] LSU's witnesses testified that the actual (emergency online, remote) offerings delivered in the Spring of 2020 were considered by LSU to be tantamount to its ODL offering.[66] In what follows, I use LSU's own pricing conventions for ODL as a competitive

---

65. *See, e.g., Tuition and Fees,* LSU (accessed Nov. 2022), *available at* https://online.lsu.edu/continuing-education/online-distance-learning/tuition-and-fees/ (Spring 2020 Tuition and Mandatory Fee charges for LSU's Online Distance Learning (ODL) program, including $920 in tuition for 5 credit hours); *Undergraduate Tuition and Required Fees,* LSU (accessed Nov. 7, 2022), *available at* https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/undergrad.pdf (Spring 2020 Tuition and Mandatory Fee charges for LSU's traditional in-person, on-campus programs, including $1545 in Tuition for 5 credit hours); *see also* Section 1442 Deposition, Exhibit 4 (identifying "Dedicated Fees" amounts as "Required Fees").

66. *See* Mumphrey Depo. at 386:7-16 (Q. Do you know whether the -- whether the same thing that was done for purposes of launching an in-person course to an online course for LSU Online, whether that was done for the in-person courses that were transitioned to online courses in the wake of COVID-19? A. No. Because they weren't transitioned to online courses.· Remember, that's an eight-week window, seven-week window.· *They were just  transitioned to remote or distance learning.*" (emphasis added); Galligan Depo. at 69: 5-13 (Q:… [M]y understanding from Ms. Mumfre[y]'s testimony was that LSU's traditional campus-based, in-person classes were not transitioned to the LSU Online format following Covid 19, but instead were transitioned to the remote or distance learning format. Is that accurate from your perspective? A Yeah. That is accurate from my perspective."). Although ODL may have been targeted to continuing education students, these statements suggest that LSU perceived the ODL offering as a reasonable approximation to the services rendered to full-time students in the Spring of 2020.

Privileged & Confidential

-28-

benchmark and apply this structure on a pro-rated basis to the portion of the Spring 2020 Semester restricted to online, remote-only. That measure is set forth below for undergraduate students on the Baton Rouge campus, separately for tuition and fees.

TABLE 2A: BENCHMARK ESTIMATE, TUITION (UNDERGRADUATE), LSU'S PRICING FOR ODL

| (1) | (2) | (3) | (4) | (5) = [1 - (4)] * (2) + (4) * (3) | (6) = (2) - (5) |
|---|---|---|---|---|---|
| Spring 2020 Semester, Total Credit Hours | Spring 2020 Semester, Tuition | Spring 2020 Semester, Tuition, based on ODL | Portion of Semester Subject to Online, Remote-Only | Spring 2020 Semester, Tuition with Pro-Rata ODL Discount | Estimate |
| 313,396 | $116,135,718 | $57,664,864 | 48.7% | $87,649,917 | $28,485,801 |

*Source*: Section 1442 Deposition, Exhibit 4; https://online.lsu.edu/continuing-education/online-distance-learning/tuition-and-fees/; https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/undergrad.pdf.
*Notes*: The portion of the Spring 2020 Semester impacted is based on a start date of 1/13/2020, an end date of 5/9/2020, and a COVID-related closure beginning 3/13/2020.

TABLE 2B: BENCHMARK ESTIMATE, FEES (UNDERGRADUATE), LSU'S PRICING FOR ODL

| (1) | (2) | (3) | (4) | (5) = [1 - (4)] * (2) + (4) * (3) | (6) = (2) - (5) |
|---|---|---|---|---|---|
| Spring 2020 Semester, Total Credit Hours | Spring 2020 Semester, Fees | Spring 2020 Semester, Fees, based on ODL | Portion of Semester Subject to Online, Remote-Only | Spring 2020 Semester, Fees with Pro-Rata ODL Discount | Estimate |
| 313,396 | $41,271,876 | $27,757,592 | 48.7% | $34,687,994 | $6,583,882 |

*Source*: Section 1442 Deposition, Exhibit 4; https://online.lsu.edu/continuing-education/online-distance-learning/tuition-and-fees/; https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/undergrad.pdf.
*Notes*: The portion of the Spring 2020 Semester impacted is based on a start date of 1/13/2020, an end date of 5/9/2020, and a COVID-related closure beginning 3/13/2020.

-29-

## CONCLUSION

57.    For the foregoing reasons, I conclude that economic injury and aggregate damages can be reliably demonstrated using methods and data common the Class.

\*    \*    \*

Hal J. Singer, Ph.D.:

_____

Executed on November 9, 2022

Privileged & Confidential

-30-

APPENDIX 1 : CURRICULUM VITAE OF HAL J. SINGER

**Hal J. Singer**

Econ One Research
Suite 510 805 15th St., N.W.
Washington, D.C. 20005
Phone: 202.312.3065
hsinger@econone.com

**Education**

Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics

B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor
Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Positions**

ECON ONE, Washington, D.C.: Managing Director 2018-present.

UNIVERSITY OF UTAH, Salt Lake City, UT: Adjunct Professor August 2022 -
present.

**Employment History**

GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS,
Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018, 2019, 2020, 2021,
2022

ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-2018.

NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.

EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-
2010.

CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008.
Senior Vice President, 1999-2004.

LECG, INC., Washington, D.C.: Senior Economist, 1998-1999.

U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF
ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-1998.

Privileged & Confidential

-31-

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT,
Baltimore: Teaching Assistant, 1996-1998.

**Honors**

Honoree, Outstanding Antitrust Litigation Achievement in Economics, American
Antitrust Institute, *In re Lidoderm Antitrust Litigation,* Oct. 9, 2018.

Finalist, Outstanding Antitrust Litigation Achievement in Economics, American
Antitrust Institute, *Tennis Channel v. Comcast*, Dec. 4, 2013.

**Authored Books and Book Chapters**

*Do Municipal Broadband Networks Stimulate or Crowd Out Private Investment?
An Empirical Analysis of Employment Effects*, in THE IMPACT OF THE
INTERNET ON JOBS (Lorenzo Pupillo, ed. Palgrave 2017).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR
TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored
with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in
THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE
REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia
University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in
LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed.,
John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-
Mexico Arbitration on Telecommunications Services*, co- authored with J.
Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip
Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE
INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden
and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should
We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING:
THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf
Dewenter eds., Elsevier Press 2005).

Privileged & Confidential

-32-

**Journal Articles**

*The Abuse of Offsets as Procompetitive Justifications: Restoring the Proper Role of Efficiencies After Ohio v. American Express and NCAA v. Alston*, GEORGIA STATE LAW REVIEW (2022), co-authored with Ted Tatos.

*Antitrust Anachronism: The Interracial Wealth Transfer in Collegiate Athletics Under the Consumer Welfare Standard,* ANTITRUST BULLETIN (2021), co-authored with Ted Tatos.

*Competing Approaches to Antitrust: An Application in the Payment Card Industry,* 27(3) GEORGE MASON LAW REVIEW (2020), co-authored with Kevin Caves.

*Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2020), co-authored with Ted Tatos.

*Antitrust Out of Focus: The FTC's Myopic Pursuit of 1-800 Contacts' Trademark Settlements,* ANTITRUST SOURCE (2019), co-authored with Geoff Manne and Josh Wright.

*Countervailing Coordination Rights in the News Sector Are Good for the Public (A Response to Professor Yun),* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2019), co-authored with Sanjukta Paul.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard,* 26 GEORGE MASON LAW REVIEW (2019), co-authored with Kevin Caves.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?,* ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2015), co-authored with Kevin Caves.

-33-

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

Privileged & Confidential

-34-

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

Privileged & Confidential

-35-

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co- authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

-36-

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co- authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

**Expert Testimony Since 2012**

In Re: Broiler Chicken Growing Antitrust Litigation (No. II), Case No. 6:20-MD-02977-RJS-CMR (E.D. Ok).

Fusion Elite All Stars et al v. Varsity Brands, LLC et al, Case No. 2:20-CV-03390 (SHL-tmp) (W.D. Tenn.)

In Re: Pork Antitrust Litigation, Case No. 0:18-cv-01776 (JRT-HB) (D. Minn.)

(Im)Balance of Power: How Market Concentration Affects Worker Compensation and Consumer Prices (U.S. House Committee on Economic Disparity and Fairness in Growth)

In re Google Play Consumer Antitrust Litigation, Case No. 3:20-cv-05761-JD (N.D. Cal)

Reviving Competition, Part 1: Proposals to Address Gatekeeper Power and Lower

Privileged & Confidential

-37-

Barriers to Entry Online (U.S. House of Representatives Subcommittee on Antitrust)

Breaking the News – Journalism, Competition, and the Effects of Market Power on a Free Press (U.S. Senate Subcommittee on Competition Policy)

In Re: London Silver Fixing, Ltd. Antitrust Litigation, Case No. 1:14-md-02573-VEC (S.D. N.Y.)

In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, Case No. 19-md-02913-WHO (N.D. Ca.)

Paul Weidman et. al v. Ford Motor Company, Case No. 18-cv-12719 (E.D. Mich.)

Leinani Deslandes et al v. McDonald's USA, LLC, Case No. 17-cv-04857 (N.D. IL)

In Re: Macbook Keyboard Litigation, Case No.: 5:18-cv-02813-EJD (N.D. Ca.)

Estate of Beverly Berland v. Lavastone Capital LLC, Case No. 1:18-cv-02002-CFC (D. Del.)

Donald Conrad et al. v. Jimmy John's Franchise LLC, et al., No. 3:18-cv-00133-NJR (S.D. Ill.)

Zydus Pharmaceuticals Inc. and Cadila Healthcare Limited v. Takeda Pharmaceutical Company Limited et al., No. 18-01994 (FLW)(TJB) (D. N.J.)

In Re GSE Bonds Antitrust Litigation, No. 1:19-cv-01704-JSR (S.D. N.Y.)

beIN Sports, LLC v. Comcast Cable Communications, LLC, File No. CSR-8972-P (FCC)

Chelsea Jensen, et al. v. Samsung Electronics et al., Court File No. T-809-18 (Federal Court in Canada)

Estate of Phyllis Malkin v. Wells Fargo Bank, N.A., No. 17-cv-23136 (S.D. Fl.)

In Re Capacitors Antitrust Litigation, Master File No. 3:14-cv-03264-JD (N.D. Ca.)

In re Foreign Exchange Benchmark Rates Antitrust Litigation, Case No. 1:13-cv-07789-LGS (S.D. N.Y.)

Massachusetts Technology Park Corporation v. Axia Netmedia Corporation,

Privileged & Confidential

-38-

KCST USA, Inc., No. 01-17-0004-3049 (American Arbitration Association)

Cung Le et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,
Case No.: 2:15-cv-01045-RFB-(PAL) (D. Nev.)

The Ohio State University v. New Par D/B/A Verizon Wireless, Case No. 2:15-
cv-2866 (S.D. Oh.)

Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds
Company, Case No. 17-cv-318 (W.D. Wis.)

Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al. Case No. 14CECG03039
MBS (Cal. Fresno)

In re Lidoderm Antitrust Litigation, MDL Dkt. No. 14-md-02521-WHO (N.D.
Cal.)

Maxon Hyundai Mazda et al. v. Carfax Inc., Case No. CV 2680 (AJN) (RLE)
(S.D. N.Y.)

Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice, et al., Case
No. 2014-cv-254012 (Ga. Super.)

In re MyFord Touch Consumer Litigation, Case No. 13-cv-3072-EMC (N.D.
Cal.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association, Case
No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association and
Larry Bryan, Case No. 14-CIV-62610-BLOOM/VALLE (S.D. Fla.)

In the Matter of Flat Wireless, LLC, for and on behalf of its Operating
Subsidiaries, v. Cellco Partnership d/b/a Verizon Wireless, and its Operating
Subsidiaries, File No. EB-15-MD-005 (Federal Communications Commission)

Omni Healthcare et al. v. Health First Inc. et al, Case No. 6:13-CV-01509-RBD-
DAB (M.D. Fla.)

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor
Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.)

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-
0001-6315 (Am. Arbitration Ass'n)

-39-

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.)

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board)

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission)

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Cal.)

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fla.)

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Cal.)

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission)

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission)

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation)

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association)

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. N.Y.)

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada)

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fla.)

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce)

Privileged & Confidential

-40-

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.)

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.)

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fla.)

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee)

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.)

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission)

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc., Case No. 2:06-cv-02768-MSG (E.D. Pa.)

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.)

## Memberships

American Economics Association

American Bar Association Section of Antitrust Law

## Reviewer

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy

Privileged & Confidential

-41-

## Appendix 2: Materials Considered

### Depositions

Section 1442 Deposition, Exhibit 4

Section 1442 Deposition, Exhibit 14

### Legal Documents

*Apple Electronics Co. Ltd. v. Samsung Electronics Co. Ltd.*, No. 11-CV-1846 (N.D. Cal. Dec. 2, 2011)

*Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018)

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018)

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 665 (N.D. Ga. 2016)

*In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal. Jun. 28, 2022)

*In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)

*In re MacBook Keyboard Litigation,* Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021)

*Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009)

*Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012)

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008)

*Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008)

### Literature

Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan*, 110 (4) Journal of Political Economy (2002)

Privileged & Confidential

-42-

Ann M. Gansemer-Topf, Peter F. Orazem, and Darin R. Wohlgemuth, *Do Liberal Arts Colleges Maximize Profits?*, 88(1) Southern Economic Journal, *available at* https://onlinelibrary.wiley.com/doi/full/10.1002/soej.12521

Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 Rand Journal of Economics (2000)

Bryan K. Orme, Getting Started with Conjoint Analysis: Strategies for Pricing Research (2nd ed. Research Publishers 2005)

Daniel McFadden, *The Choice Theory Approach to Market Research*, 5(4) Marketing science 275-297 (1986)

Dick Wittnick & Phillippe Cattin, *Commercial Use of Conjoint Analysis: An Update*, 53 Journal of Marketing 91-96 (1989)

Donald I. Bosshardt, Larry Lichtenstein, and Mark P. Zaporowsky, *A Model Of College Tuition Maximization*, 2(1) Contemporary Issues In Education Research (2009), *available at* https://files.eric.ed.gov/fulltext/EJ1056883.pdf

Gerald Häubl, Benedict Dellaert & Bas Donkers, *Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search*, 29(3) Mktg. Sci. 438-455 (2010)

Glenn A. Bryan and Thomas W. Whipple, *Tuition Elasticity of the Demand for Higher Education among Current Students,* 66(5) Journal of Higher Education (1995)

James C. Spall, *Introduction to Stochastic Search and Optimization: Estimation, Simulation, and Control* (John Wiley & Sons 2003)

John T. Mann and Shida R. Henneberry, *Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes*, 2012 AAEA Annual Meeting (2012)

Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) Journal of Education Finance 232-252 (2019)

Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19*, 35(3) Journal of Higher Education Management 35-43 (2020)

Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto, *The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments*, 26 Political Analysis (2018)

Lisa Cameron, Michael Cragg, and Daniel McFadden, *The Role of Conjoint Surveys in Reasonable Royalty Cases*, Law360 (2013)

Privileged & Confidential

-43-

Michael Rothschild and Lawrence J. White, *The Analytics of the Pricing of Higher Education and Other Services in Which the Customers Are Inputs*, 103(3) Journal of Political Economy (1995)

Mikolaj Czajkowski, Tomasz Gajderowicz, Marek Giergiczny, Gabriela Grotkowska, and Urszula Sztandar-Sztanderska, *Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method*, 61 Research in Higher Education 510-539 (2020)

Moshe Ben-Akiva, Daniel McFadden & Kenneth Train, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis.* 10(1-2) Foundations And Trends In Econometrics 1–144 (2019)

N. Gregory Mankiw, Principles of Microeconomics (8th ed. 2018)

Paul Green & V. Srinivasan *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice*, 54 Journal of Marketing 3-19 (1990)

Robert E. Martin, *Tuition Discounting Without Tears*, 23(2) Economics of Education Review (April 2004)

Vithala Rao, Applied Conjoint Analysis 133-36 (Springer-Verlag 2014).

William G. Zikmund et al., Business Research Methods (with Qualtrics Printed Access Card) (Cengage Learning 9th ed. 2012)

William Landes & Richard Posner, *Market Power in Antitrust Cases,* 94 Harvard Law Review (1981)


PUBLICLY AVAILABLE MATERIALS

*About Us,* LSU (Feb. 2020), available at
https://web.archive.org/web/20200206024930/https:/lsu.edu/about/index.php

*College of Science, Graduation,* LSU (accessed Nov. 7, 2022), *available at*
https://www.lsu.edu/science/student_services/CurrentStudents_LandingPage/CoSGraduation.php

*Common Dataset Initiative, available at* https://commondataset.org/

*Conjoint Analysis Software Tool,* Qualtrics, *available at* https://www.qualtrics.com/core-xm/conjoint-analysis/

Privileged & Confidential

-44-

*Conjoint Analysis White Paper,* Qualtrics (accessed November 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/

*Continuing Education,* LSU (Jan. 2020), available at https://web.archive.org/web/20200114133931/https://online.lsu.edu/continuing-education/

*Fall 2019 Semester Fees- Graduate Students*, Louisiana State University, *available at* https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/grad.pdf

*Fall 2019 Semester Fees- Undergraduate Students*, Louisiana State University, *available at* https://www.lsu.edu/bgtplan/Tuition-Fees/2019-2020/undergrad.pdf

*Live on Campus,* LSU (Feb. 2020), *available at* https://web.archive.org/web/20200206024452/https://lsu.edu/life/liveoncampus.php

*LSU Common Data Set 2019-2020*, Louisiana State University, *available at* https://www.lsu.edu/bgtplan/cds/2019.php

*Step 1: Defining Conjoint Features & Levels,* Qualtrics (accessed October 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/step-1-defining-conjoint-features-levels/

*Tuition and Fee Schedule,* Paul M. Hebert Law Center, *available at* https://www.law.lsu.edu/academics/files/2019/07/Tuition-Fees-2019-2020.pdf

*Tuition and Fees,* LSU (accessed Nov. 2022), *available at* https://online.lsu.edu/continuing-education/online-distance-learning/tuition-and-fees/

*Utah Project on Antitrust and Consumer Protection,* The University of Utah*, available at* https://utahproject.utah.edu/


**CASE MATERIALS**

Consolidated Petition for Damages, Michael Miazza, individually and on behalf of all others similarly situated, *Plaintiffs* v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, *Defendant*, Docket No.: C-696918 (19th D., E. Baton Rouge Parish, La.), filed March 25, 2021

LSU's Answers To First Set of Interrogatories On Behalf Of Plaintiff (January 7, 2022)

*Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008)

Privileged & Confidential

# EXHIBIT 12

# Cal Civ Code § 1514

Deering's California Codes are current through the 2023 Extra Session Ch 1, 2023 Regular Session Ch. 890.

*Deering's California Codes Annotated > CIVIL CODE (§§ 1 — 7021) > Division 3 Obligations (Pts. 1 — 4) > Part 1 Obligations in General (Titles 1 — 4) > Title 4 Extinction of Obligations (Chs. 1 — 6) > Chapter 3 Prevention of Performance or Offer (§§ 1511 — 1515)*

## § 1514. Same; Debtor entitled to ratable proportion of consideration, when

If performance of an obligation is prevented by any cause excusing performance, other than the act of the creditor, the debtor is entitled to a ratable proportion of the consideration to which he would have been entitled upon full performance, according to the benefits which the creditor receives from the actual performance.

## History

Enacted Stats 1872.

Deering's California Codes Annotated
Copyright © 2024 All rights reserved.

---

**End of Document**