COOLEY LLP
MICHELLE C. DOOLIN (179445)
(mdoolin@cooley.com)
LEO P. NORTON (216282)
(lnorton@cooley.com)
10265 Science Center Drive
San Diego, CA 92121
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

ALEXANDRA R. MAYHUGH (300446)
(amayhugh@cooley.com)
1333 2nd Street
Suite 400
Santa Monica, CA 90401
Telephone: (310) 883-6400
Facsimile: (310) 883-6500

MICHAEL N. SHEETZ *(Pro hac vice)*
(msheetz@cooley.com)
500 Boylston Street
Boston, MA 02116-3736
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

Attorneys for Defendants
UNIVERSITY OF SOUTHERN CALIFORNIA and THE
BOARD OF TRUSTEES OF THE UNIVERSITY OF
SOUTHERN CALIFORNIA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

*In re University of Southern California Tuition and Fees COVID-19 Refund Litigation*

Case No. 2:20-cv-4066-DMG-PVC

**EXHIBIT A TO THE DECLARATION OF JOHN L. HANSEN [ECF 239-5] IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**REDACTED PURSUANT TO ORDER OF COURT DATED FEBRUARY 13, 2024 [ECF 242]**

Date: March 1, 2024
Time: 2:00 p.m.
Courtroom: 8C
Action filed: May 7, 2020
Consolidated: July 17, 2020
Trial Date: May 21, 2024

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

EXHIBIT A TO HANSEN DECL. ISO
OPP. TO PLS' MSJ – REDACTED
CASE NO. 2:20-CV-04066-DMG-PVC

## In re University of Southern California
## Tuition and Fees COVID-19 Refund Litigation

## Case No. 2:20-CV-04066-DMG

## Expert Rebuttal Report of John L. Hansen

## TM Financial Forensics, LLC, an HKA Company

## January 18, 2023

John L. Hansen

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

I.    INTRODUCTION..................................................................................................... 3

A.    Scope Of Report................................................................................................. 3

B.    Information Considered ...................................................................................... 4

II.   BACKGROUND .................................................................................................... 4

III.  SUMMARY OF OPINIONS ................................................................................. 4

A.    Summary of the Opinions of Dr. Singer ........................................................... 4

B.    Summary of Rebuttal Opinions ......................................................................... 6

IV.   REBUTTALS TO DR. SINGER'S ANALYSIS AND OPINIONS ............................. 7

A.    Dr. Singer's CBC Analysis Is Inappropriate In This Circumstance And Yields Unreliable Results ......................................................................................................... 7

1.    Dr. Singer's Features of the "Semester Package" Do Not Reflect the Transition to Remote Education at USC ......................................................................................... 8

2.    Dr. Singer's CBC Analysis Ignores Factors That May Influence Students' Valuation of Remote Education ...................................................................................... 13

i.    Survey Respondents Were Not Accepted/Enrolled USC Students................................... 13

ii.   The CBC Analysis Ignores Students' Desire To Continue Progress Towards Degree Completion ......................................................................................................... 14

iii.  The CBC Analysis Ignores How USC Sets Tuition Prices ................................................. 15

iv.   The CBC Analysis Ignores The Impact of The Pandemic On Students' Demand For On-Campus Education......................................................................................................... 16

B.    USC's Fall 2020 Semester Demonstrates The Flaws In Dr. Singer's CBC Analysis ....... 16

C.    The Fair Market Value of Remote Education Cannot Be Measured Using a CBC Analysis In This Circumstance ......................................................................................... 20

1.    Dr. Singer's Assessment of Fair Market Value Ignores the Economic Realities Facing "Buyers".......................................................................................................... 21

2.    Dr. Singer's Assessment of Fair Market Value Ignores Supply Side Considerations....... 23

3.    Dr. Singer's Market Price in His "But-For" World Is Contradicted by Real World Tuition Data ......................................................................................................... 24

D.    Student Non-Loan Financial Aid Impacts Potential Alleged Harm to Putative Class Members ......................................................................................................... 26

1.    Non-Loan Financial Aid (i.e., Scholarships or Grants) Impacts Potential Alleged Harm. 27

2.   Robert Lee Calvert's Financial Aid Package Illustrates the Need for Individualized Analysis ............................................................................................................... 29

3.   Use of An Overall Percentage Discount Does Not Reliably Measure Damages to Putative Class Members .................................................................................................... 30

E.   Dr. Singer Failed To Consider The Impact Of The Supply Side Issues He Identified On USC's Ability And Willingness To Lower Tuition ................................................. 31

F.   Dr. Singer's CBC Analysis Fails to Address Individualized Issues Facing USC Students That Impact Putative Class Members Alleged Damages ......................................... 33

# I.  INTRODUCTION

## A. Scope Of Report

1.  TM Financial Forensics, LLC, and HKA Company ("TMF-HKA") was retained by USC, the USC Board of Trustees (collectively "Defendants"), and USC's counsel of record in this action to address issues related to class certification and potential damages or restitution alleged by Plaintiffs.[1]  I understand that Plaintiffs seek to recover damages relating to, or restitution of, tuition and fees because USC transitioned its provision of education from in-person to remote and closed certain campus facilities in response to the COVID-19 pandemic in compliance with state and local health orders for part of the Spring 2020 semester.[2]  TMF-HKA has also been retained to respond to any damage claim set forth by Plaintiffs.  In particular, I have been asked to respond to the Report of Hal J. Singer, Ph.D. (the "Singer Report").[3]  This Rebuttal Report responds to the analyses and opinions presented in the Singer Report.

2.  I previously submitted the Opening Expert Report of John L. Hansen dated December 9, 2022, in this matter ("Opening Expert Report").  I incorporate herein my opinions, analysis and support relied on in my Opening Expert Report, and this Rebuttal Report should be read in conjunction with my Opening Expert Report and its accompanying Attachments.

3.  My curriculum vitae, including publications during the last ten years, is **Attachment 1** to this Rebuttal Report.  A listing of cases in which I have testified as an expert witness at trial, arbitration, and/or deposition during the last four years is **Attachment 2** to this Rebuttal Report.  My hourly billing rate on this matter is $625.  TMF-HKA's compensation is not dependent on the outcome of this matter.

4.  I understand that Plaintiffs may potentially be entitled to pre-judgment interest in the event Plaintiffs prevail and obtain a damages award.  Accordingly, I may be asked to

---

[1] In this Rebuttal Report, defined terms have the same meaning as in my Opening Expert Report.
[2] First Amended Consolidated Class Action Complaint, *In re University of Southern California Tuition and Fees COVID-19 Refund Litigation*, dated May 5, 2022 ("First Amended Consolidated Complaint"): p. 1.
[3] Report of Hal J. Singer, Ph.D., dated December 9, 2022 ("Singer Report").

provide opinions related to pre-judgment interest as directed by the Court. For example, I may provide opinions as to the appropriate interest rate and methodology used to calculate pre-judgment interest. I reserve the right to provide such opinions before or at trial as necessary.

### B. Information Considered

5.  **Attachment 3** to my Opening Expert Report contains a listing of various documents, data and other information considered in forming my opinions in this matter. **Attachment 3.U** to this Rebuttal Report contains a listing of additional documents and information received and considered in forming my opinions after submitting my Opening Expert Report on December 9, 2022. Selected pages of the documents and information listed on **Attachment 3** and **Attachment 3.U** may be used as exhibits to summarize or support my opinions. I have also had discussions with Megan Chan, USC Associate Dean of Financial Aid, Compliance and Training.

6.  The opinions in this Rebuttal Report are based on currently available information. If representatives of the Plaintiffs, USC and/or experts retained on behalf of the Plaintiffs present additional information, then my opinions and conclusions may be supplemented, amended or revised. Additionally, I may prepare graphical or illustrative exhibits to use at trial based on the documents and information relied upon and my analysis of those documents and information.

## II.  <u>BACKGROUND</u>

7.  My Opening Expert Report includes background information relevant for this Rebuttal Report, including background on USC, Plaintiffs, USC's Spring 2020 calendar, and the USC Course Catalogue. I incorporate that background herein by reference.

## III.  <u>SUMMARY OF OPINIONS</u>

### A. Summary of the Opinions of Dr. Singer

8.  Dr. Hal J. Singer submitted a Report dated December 9, 2022, addressing alleged harm to Plaintiffs and putative class members at USC resulting from the transition to remote

education during the Spring 2020 semester.[4]  Dr. Singer stated he was asked to "assess whether economic injury and aggregate damages to Class Members flowing from USC's conduct challenged in the *Complaint* … can reliably be determined using data and methods common to the Class."[5]

9.    Dr. Singer concludes that "economic injury and aggregate damages to the class can be demonstrated under the theory of harm in this matter using Choice-Based Conjoint ("CBC") analysis."[6]  Using such a method, Dr. Singer calculates that the "Online Experience has a fair market value that is 30.4 and 24.1 percent *less* than the On-Campus Experience for undergraduates and graduate students, respectively."[7]  After determining the alleged reduced fair market value, Dr. Singer calculated "aggregate damages to the Class based on Spring 2020 tuition and the proportion of the Spring 2020 semester that was affected by the switch to Online."[8]  Dr. Singer claims the "[d]amages to the Class (the difference between what Class Members paid and the value of what they received) sum to $76.31 million, composed of $49.24 million in damages to undergraduate Class Members and $27.08 million in damages to graduate Class Members."[9]  **Table 1** below summarizes the results of Dr. Singer's CBC analysis and claimed damages to putative class members.

**Table 1: Summary of Dr. Singer's Findings**[10]

| Type of Putative Class Member | Alleged Reduced Fair Market Value | Alleged Damages |
|---|---|---|
| Undergraduate Students | 30.4% | $49.24 million |
| Graduate Students | 24.1% | $27.08 million |
| **Total** | | **$76.31 million** |

10.    Dr. Singer claims to have calculated aggregate damages under two methods.[11]  First, under the "'traditional CBC framework', which assumes that supply of the purported

---

[4] Singer Report: ¶¶ 1-4.
[5] Singer Report: ¶ 5.
[6] Singer Report: ¶ 7.
[7] Singer Report: ¶ 7.
[8] Singer Report: ¶ 7.
[9] Singer Report: ¶ 7.
[10] Singer Report: ¶ 7.
[11] Singer Report: ¶ 10.

product at issue (asserted to be enrollment spots at USC) would have remained the same in the but-for world" and second, under a method that accommodates "a supply response using a linear demand assumption."[12]  However, Dr. Singer does not believe the second methodology is necessary or appropriate in this case as "all available evidence-including USC's direct testimony-shows that the supply of enrollment slots for Spring 2020 would have remain[ed] fixed."[13]  Dr. Singer also identifies various reasons to support his view that USC's enrollment would have remained fixed, such as: (1) "USC would not avoid significant expenses by reducing enrollment;" (2) "USC's costs are largely fixed;" (3) USC is a non-profit and its educational mission "does not permit it to engage in short-term profit-maximization;" and (4) USC representatives testified that the school cannot arbitrarily reduce enrollment.[14]

### B.  Summary of Rebuttal Opinions

11.   Dr. Singer's use of a CBC analysis in this circumstance is inappropriate and results in an unreliable determination of alleged aggregate class damages.  Dr. Singer failed to test the potential impact of a transition to remote education mid-way through the Spring 2020 semester, and ignores numerous real-world considerations that are inconsistent with his analysis.  Moreover, as demonstrated by USC's actual experience for the Fall 2020 semester, Dr. Singer's CBC analysis yields unreliable results that are contradicted by USC's actual experience.

12.   Dr. Singer's use of CBC analysis to determine the "fair market value" of on-campus education is not appropriate in the context of higher education generally, much less USC in particular.  Specifically, it cannot be used to assess the value of remote education compared to on-campus education at USC, as USC's price for tuition is not set based on the consumers' willingness to pay or the supply and demand for USC's educational services at issue in this matter.

---

[12] Singer Report: ¶¶ 10-11.
[13] Singer Report: ¶ 11.
[14] Singer Report: ¶ 10.

13.  Dr. Singer also did not address the multitude of factors addressed in my Opening Expert Report that would require an individualized analysis to determine if putative class members were actually damaged.

14.  In **Section IV** below, I address the various flaws in Dr. Singer's "fair market value" assessment from an economic and accounting perspective, as well as various real-world issues that are not addressed in Dr. Singer's CBC analysis.  Additionally, I understand that Dr. Ronald Wilcox will be addressing some of these issues and others specific to the implementation of Dr. Singer's CBC analysis.

## IV.   REBUTTALS TO DR. SINGER'S ANALYSIS AND OPINIONS

### A. Dr. Singer's CBC Analysis Is Inappropriate In This Circumstance And Yields Unreliable Results

15.  As discussed above, Dr. Singer designed and administered a CBC survey in a purported effort to determine alleged economic injury and damages to the putative class.  Dr. Singer's CBC analysis contains three "modules:" the "Screener module; the Attributes module; and the Conjoint module."[15]  The "Screener" module was designed to assertedly ensure survey respondents were in the population Dr. Singer sought to survey.[16]  The "Attributes" module describes to the eligible respondents the purported "product," a description of the "Semester Package," and the features that compose it.[17]  The "Conjoint" module presents to the eligible respondents random combinations of attributes in an effort to determine each respondent's "individual valuation of the attributes."[18]

16.  I understand that, among other things, Dr. Wilcox will be addressing certain flaws in the design and implementation of Dr. Singer's CBC analysis.  However, from an economic

---

[15] Singer Report: ¶ 29.

[16] Singer Report: ¶ 29.

[17] Singer Report: ¶ 21, 29.  Dr. Singer alleges that the "CBC can be used to objectively quantify consumer 'fair market valuations' of product features that are not priced separately."  However, as addressed in **Section II.E** of my Opening Expert Report, the USC Catalogue states that it is the "document of authority for all students. The program requirements listed in the *USC Catalogue* supersede any information that may be contained in any bulletin of any school or department" and that USC "reserves the right to change its policies, rules, regulations, requirements for graduation, course offerings and any other contents of this catalogue at any time."  Dr. Singer's CBC analysis does not account for the USC Catalogue or the reservation of rights, including the ability to make changes, contained within the USC Catalogue.

[18] Singer Report: ¶ 29.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

and valuation perspective, Dr. Singer's CBC analysis is inconsistent with this circumstance, and Dr. Singer fails to consider certain issues that impact the results of his analysis. In the sections below, I address various shortcomings of Dr. Singer's analysis. Additionally, as described in **Section IV.B** below, USC's Fall 2020 semester contradicts Dr. Singer's conclusion and demonstrates the flaws in his analysis.

### 1. Dr. Singer's Features of the "Semester Package" Do Not Reflect the Transition to Remote Education at USC

17.    The "Attribute" module of Dr. Singer's survey asked respondents to consider "Class Modality."[19]    **Figure A** below is an image containing Dr. Singer's Class Modality descriptions.

**Figure A: Dr. Singer's Class Modality Descriptions[20]**

> You will be given the choice of two learning modalities for your classes for the next semester: **On-campus** or **Online**.
>
> **On-campus** classes will take place primarily in classrooms, laboratories, art and dance studios, and performing arts spaces on the 229-acre University Park campus in Los Angeles, CA. In an **On-campus** class, you will attend a live lecture and have the opportunity to meet with your professors and classmates in person.
>
> **Online** classes will be available via an internet-based learning platform and will consist of both asynchronous and synchronous components. For example, you will have access to pre-recorded lectures at any time and you will be required to participate in group discussions or other online activities at specified times over an online video conferencing tool. All communications with faculty, staff, and students would be done through email or video conferencing.

18.    Dr. Singer states that "[t]hese descriptions were provided to best reflect the choice between the two distinct options that USC students were presented in the real world prior to the Spring 2020 semester."[21]    Dr. Singer also clarified that the language describing each modality did not vary between undergraduate and graduate respondents.[22]

19.    However, Dr. Singer's description of "Online" classes did not accurately reflect the remote education provided to USC students. After the transition to remote education, I

---

[19] Singer Report: ¶ 41.
[20] Singer Report: ¶ 41.
[21] Singer Report: ¶ 41.
[22] Singer Report: ¶ 41.

understand that course lectures were presented to students live, and the live sessions were recorded to increase flexibility for students and assist those students in other time zones/internationally, as well as to provide students with flexibility in viewing the sessions.[23]  Therefore, the description of Dr. Singer's "Online" modality is misleading, as it omits the significant feature that USC's classes would continue in both a synchronous (i.e., live via video conferencing software such as Zoom) and asynchronous format.

20.    Dr. Singer's CBC survey also provided "Campus Facilities Access" descriptions.  **Figure B** below is an image containing Dr. Singer's Campus Facilities Access descriptions.

**Figure B: Dr. Singer's Campus Facilities Access Descriptions**[24]

Your semester package may allow you access to **Campus Facilities.**

If you select a semester package with access to **Campus Facilities**, for the next semester you will have full access to USC's state of the art campus facilities, including dining halls, galleries, libraries, athletics facilities, gyms, and more. You will have the opportunity to socialize in various campus buildings, quads, parks, and study areas, as well as the opportunity to be a part of various sports teams and clubs. In addition, you will have access to USC-sponsored events, such as football games, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events.

If you select a semester package with without access to **Campus Facilities**, you will not have access to any of the campus facilities, groups, opportunities, or events described above. If you are taking **On**-campus classes, your access to USC's campus and facilities will be limited to the only the classrooms relevant to your classes

21.    Dr. Singer's description of the Campus Facilities also did not accurately reflect the services provided to USC students.  As addressed below and in my Opening Expert Report, after the transition to remote education, putative class members continued to have access to campus services and activities that had been transitioned to the remote modality.[25]  Dr. Singer simply states that if one selects "a semester package [] without

---

[23] See, as examples: Memorandum from Charles Zukoski to USC Faculty Re: Online Teaching and Asynchronous Education During COVID-19, dated March 22, 2020: USC000127076-077; Deposition of Injune David Choi, dated October 23, 2022: p. 165; Deposition of Jenna Julia Greenberg, dated October 10, 2022: pp. 69-70, 76-77, 133-134; Deposition of Chile Mark Aguiniga Gomez, dated October 11, 2022: pp. 57, 64, 135-136; Deposition of Latisha Watson, dated October 14, 2022: pp. 116, 125-126; Deposition of Justin Kerendian, dated October 12, 2022: pp. 86-90. See also, Deciding Between Synchronous & Asynchronous Modes of Teaching: USC000130360-369; Letter from Andrew T. Guzman (USC) to The Honorable Jenny Rivera, Re: Synchronous Learning: USC000039141.
[24] Singer Report: ¶ 42.
[25] Opening Expert Report: ¶¶ 84-88.

access to Campus Facilities, you will not have any access to any of the campus facilities, groups, opportunities, or events" described in his definition of access to Campus Facilities.[26]   Putative class members had access to these campus facilities for approximately half of the Spring 2020 semester and continued to have access to various services via the remote modality after the transition to remote education.[27]

22.   After receiving descriptions of the various modalities to be considered in the CBC survey, Dr. Singer presented respondents variations of educational offerings at different price points.[28]  **Figure C** below is Table 1 from Dr. Singer's report, the "Undergraduate Survey CBC Attributes."[29]

**Figure C: "Table 1: Undergraduate Survey CBC Attributes" from Dr. Singer's Expert Report**[30]

| TABLE 1: UNDERGRADUATE SURVEY CBC ATTRIBUTES | | |
|---|---|---|
| **Feature** | **Description** | **Levels** |
| (1) Class Modality | If classes take place in classrooms on-campus or online via an internet-based learning platform. | On-campus |
| | | Online |
| (2) Campus Facilities Access | If students have access to USC's campus, campus facilities, and in-person events. | Access |
| | | No Access |
| (3) Tutoring Services | If students have access to tutoring through USC's Academic Support Network. | Available |
| | | Not Available |
| (4) Career Services and Events | If students have access to career services and events. | Available |
| | | Not Available |
| (5) Semester Cost (Price for a "Semester Package") | 150% of Base Price | $43,646 |
| | 125% of Base Price | $36,372 |
| | Base Price | $29,098 |
| | 75% of Base Price | $21,823 |
| | 50% of Base Price | $14,549 |

23.   As addressed above, Dr. Singer claimed that "[t]hese descriptions were provided to best reflect the choice between the two distinct options that USC students were presented in

---

[26] Singer Report: ¶ 42.
[27] Opening Expert Report: ¶¶ 18, 84-88.
[28] Singer Report: ¶ 39.
[29] Singer Report: ¶ 39, Table 1.
[30] Singer Report: ¶ 39, Table 1.

the real world prior to the Spring 2020 semester."[31]  This statement is inaccurate, as USC undergraduate students were not presented with an online option in the real world prior to the Spring 2020 semester.[32]  Even assuming these "two distinct options" could have been presented during the Fall 2019 semester when USC students were enrolling in Spring 2020 classes, the descriptions do not reflect the real-world situation USC students faced as the COVID-19 pandemic unfolded and classes were transitioned to an online modality mid-semester.

24. Putative class members received their education via the on-campus modality from January 13, 2020 through March 10, 2020.[33]  After the transition to remote education, putative class members received their education via the remote modality from March 22, 2020 through the end of exams on May 13, 2020.[34]

25. Dr. Singer claims that his model "assesses what Class Members *would have* paid in Tuition and Fees in a 'but-for' world ***where Class Members were fully informed of the mid-semester switch*** from an On-campus Experience to an Online Experience."[35]  However, this claim is not accurate, as neither of Dr. Singer's "Class Modality" options reflect a transition to remote education during the semester.  Instead, respondents are asked to value a full semester with either the on-campus or online modalities.

26. To remedy his failure to assess what putative class members would have paid in tuition and fees if "fully informed of the mid-semester switch," Dr. Singer prorates the tuition and fees paid by putative class members for the portion of the semester that was remote.[36]  Dr. Singer claims aggregate damages is the product of various factors, including "the

---

[31] Singer Report: ¶ 41.
[32] As addressed in my Opening Expert Report, certain graduate programs were offered in the Virtual Academic Center (i.e., online classes via the internet).  Regardless of the modality, USC charged the same tuition on a per unit basis.  See for example <https://catalogue.usc.edu/preview_program.php?catoid=16&poid=24919&returnto=6360>; Opening Expert Report: ¶¶ 30-32.
[33] Opening Expert Report: ¶ 18; USC Academic Calendar 2019-2020: USC000128974; See also Memorandum from Charles Zukoski to USC Community, Re: Test of Online Class System, dated March 6, 2020: USC000127140-141.
[34] Opening Expert Report: ¶ 18.  USC "Spring Recess" took place from March 15 through March 22, 2020, therefore, there were no scheduled classes from March 15 through March 22, 2020.  *See:* USC Academic Calendar 2019-2020: USC000128974.
[35] Singer Report: ¶ 63 (emphasis added).
[36] Singer Report: ¶ 70.

proportion of the semester during which students received only Online learning with No Campus Access."[37]

27.    There is no basis for Dr. Singer to claim that prorating tuition and fees for the portion of the semester that was remote results in a reliable measure of how students would value an educational experience that transitions to remote education mid-semester.    As discussed in **Section III.A.2** of my Opening Expert Report, putative class members had access to campus and services provided by USC on-campus for approximately half of the semester.[38]    After the transition to remote education, putative class members continued to have access to their professors and curriculum, as well as campus services and activities that had been transitioned to the remote modality.[39]    There is no basis to assume that simply prorating the tuition and fees paid by putative class members reliably measures how students would value a semester during which they received on-campus education and access to campus facilities for the first half of the semester.    As summarized in my Opening Expert Report, course evaluations for the Spring 2020 semester reflect the students' perspective that the education they received in Spring 2020 was generally equivalent, if not better, than previous in-person education.[40]

28.    Additionally, Dr. Singer's CBC survey does not address or mention the health and safety risks that existed during the Spring 2020 semester, nor does it mention legal requirements limiting access to locations outside one's home put in place by the State of California and the City of Los Angeles.[41]    At the time of the transition to remote education, there was significant uncertainty and fear surrounding contracting COVID-19.    At the time of Dr. Singer's survey, the understanding of COVID-19 had evolved, including the availability of vaccines.    Excluding these factors from the parameters of the CBC survey does not accurately reflect the situation faced by putative class members nor the value survey participants would have placed on on-campus education if "fully informed" of the

---

[37] Singer Report: ¶ 70.  To calculate the reduction in tuition and fees students allegedly would have paid for remote education, Dr. Singer multiplies Spring 2020 tuition and fees for undergraduates and graduates by 46.79% to reflect the portion of the semester that putative class members received remote education. Singer Report: ¶ 70, Tables 9-10.
[38] Opening Expert Report: ¶¶ 33-40.
[39] Opening Expert Report: ¶¶ 84-88.
[40] Opening Expert Report: ¶ 56.
[41] Opening Expert Report: ¶ 19.

circumstances surrounding the mid-semester switch to remote education.  As a result, the eligible survey respondents were not valuing a situation comparable to the situation putative class members experienced during the Spring 2020 semester.

### 2. Dr. Singer's CBC Analysis Ignores Factors That May Influence Students' Valuation of Remote Education

29.   In addition to the fundamental flaw that Dr. Singer's survey fails to reflect the actual situation facing students during the Spring 2020 semester, Dr. Singer's CBC analysis fails to account for numerous other factors that could impact students' relative valuation of an on-campus USC education.[42]  In the paragraphs below, I address several such factors that could impact students' valuation of a transition to remote education.

### i. Survey Respondents Were Not Accepted/Enrolled USC Students

30.   Dr. Singer's eligible survey respondents are not USC students.  Dr. Singer claims that he targeted "eligible individuals who could plausibly attend or have attended USC's in-person, on campus" program.[43]  Requirements for eligible respondents included having taken within the past five years or planning to take within two years undergraduate or graduate in-person, on-campus courses and having a grade point average and standardized test scores consistent with those that meet USC's undergraduate and graduate admission criteria.[44]

31.   Notably, putative class members were USC students during the Spring 2020 semester who had applied to, been accepted by, and enrolled at USC.  Putative class members' valuation of a transition to remote education at USC may be different than a survey respondent who was allegedly qualified to attend an institution like USC.

---

[42] Under valuation theory, market data may not be instructive if the underlying transactions are not comparable to the subject of the valuation.  Differences between the allegedly comparable transactions (the variables impacting the value of remote education included in the survey) and the subject of the valuation (the value of remote education at USC during the Spring 2020 semester) that could impact the valuation must be addressed for the comparable transaction data to be instructive.  In general, survey results cannot account for the potential impact of variables that could influence the valuation if those variables were not included in the survey.

[43] Singer Report: ¶¶ 32-33.

[44] Singer Report: ¶¶ 32-33.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## ii. The CBC Analysis Ignores Students' Desire To Continue Progress Towards Degree Completion

32. I understand that eligible respondents to Dr. Singer's CBC survey were told the "topic of the survey was semester offerings at USC."[45]  Additionally, eligible respondents were "asked to assume that they were taking courses related their major (or in the case of graduate students, their program)."[46]  The CBC survey did not explicitly address the influence of the importance of academic career progression or graduating on time. Students who apply to USC, are accepted by USC, and enroll in an educational program at USC are not making short-term valuation decisions about a particular semester offering.  Rather, real-life USC students weigh the considerations associated with making a multi-semester, multi-year decision about obtaining a degree from USC.

33. As addressed in **Section III.A.4.** of my Opening Expert Report, students place an emphasis on graduating on time.[47]  Specifically, Plaintiffs in this matter testified to the importance of continuing progress towards their degree.[48]  Typical undergraduate programs span four years for students entering as freshmen, and the majority of USC freshmen successfully graduate within six years.  **Table 2** below lists available data for USC's six-year graduation rates since 2017.

**Table 2: USC Six-Year Graduation Rates[49]**

| Graduating Year | Graduation Rates |
|---|---|
| 2022 (Fall 2016 freshman class) | 92% |
| 2021 (Fall 2015 freshman class) | 92% |
| 2020 (Fall 2014 freshman class) | 92% |
| 2019 (Fall 2013 freshman class) | 91% |
| 2018 (Fall 2012 freshman class) | 92% |
| 2017 (Fall 2011 freshman class) | 92% |

34. Enrolled USC students are not making decisions for their educational careers based on comparing two educational modalities for an individual semester, and Dr. Singer provides

---

[45] Singer Report: ¶ 35.
[46] Singer Report: ¶ 35.
[47] Opening Expert Report: ¶¶ 44-48.
[48] Opening Expert Report: ¶ 47.
[49] <https://about.usc.edu/facts/>.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

no basis to assume otherwise. Dr. Singer's CBC analysis focuses on the "next semester" and does not reflect the real-life considerations impacting a student's pursuit of a multi-semester, multi-year education or the influence of an enrolled student's preference to graduate on time. Although students have the opportunity to transfer or withdraw from USC, as addressed in my Opening Expert Report, putative class members demonstrated a preference to continue their USC education.[50] This preference to continue making progress towards degree completion at USC, which is not reflected in Dr. Singer's CBC analysis, could impact a student's willingness to pay tuition and fees.

35.    Additionally, putative class members were at different points in their academic careers when USC was forced to transition to remote education. For example, Plaintiff Watson was in her fourth semester at USC, Plaintiff Choi was in his tenth semester, and Plaintiff Greenberg was in her second semester.[51] Each of the Plaintiffs would have been impacted by the transition to remote education differently based on their individual academic program and career progression, which Dr. Singer failed to consider. For example, a student that has already participated in on-campus education for multiple semesters may place less value in the on-campus aspect of their education for the Spring 2020 semester. The CBC survey does not consider a respondent's stage in their education.

### iii.    The CBC Analysis Ignores How USC Sets Tuition Prices

36.     Dr. Singer states that in the "Conjoint module" he provided respondents the "option not to purchase any of the three semester offerings."[54] Dr. Singer claims including "a 'no buy' option allows a researcher to identify the willingness-to-pay of the marginal consumer—that is, the price at which the marginal consumer is indifferent between purchasing the

---

[50] Opening Expert Report: ¶¶ 47-48, 53.
[51] Opening Expert Report: **Attachment 6**.
[52] Deposition of Gregory Condell (VP of Finance, USC), dated October 28, 2022: pp. 59-60.
[53] Opening Expert Report: ¶ 63.
[54] Singer Report: ¶ 47.

semester offering and not purchasing it."[55]  Dr. Singer states "the marginal consumer sits at the intersection of the supply and demand curves."[56]  However, as addressed above and in my Opening Expert Report, USC did not set tuition price based on the intersection of the supply and demand curves.

37.    Dr. Singer focuses on the price "a reasonable consumer would have paid at the time of purchase," however, students would not have had the option to pay the price resulting from Dr. Singer's CBC analysis.[57]  Overall, Dr. Singer's analysis ignores the price USC would be willing to charge students based on its own economics and policies and practices.

### iv.  The CBC Analysis Ignores The Impact of The Pandemic On Students' Demand For On-Campus Education

38.    Each individual USC student has their own medical history, health and safety preferences, and risk tolerance.  Therefore, each USC student's demand for on-campus education would be impacted differently by the COVID-19 pandemic.  Dr. Singer's survey does not address the COVID-19 pandemic or reference health and safety concerns associated with on-campus education and access to USC's campus facilities.  Because this information is excluded, the survey ignores any potential impact on a survey respondent's valuation of on-campus education related to health and safety concerns, and the increased demand for remote educational services.

### B.  USC's Fall 2020 Semester Demonstrates The Flaws In Dr. Singer's CBC Analysis

39.    USC's actual Fall 2020 tuition and enrollment information indicates that the results from Dr. Singer's CBC analysis are unreliable.  As addressed above, Dr. Singer's CBC analysis does not account for the potential impact of numerous factors that could influence students' valuation of on-campus education.  However, USC's Fall 2020 semester, which USC announced in advance would be delivered via the remote modality and was in fact

---

[55] Singer Report: ¶ 47.
[56] Singer Report: ¶ 47.
[57] Singer Report: ¶ 3, footnote 10.

conducted remotely, reflects real world data that accounts for many of the flaws identified in Dr. Singer's analysis.  In particular, data from USC's Fall 2020 semester reflects: (1) students that actually applied to, were accepted, and enrolled at USC; (2) the potential influence of enrolled students' preference to continue progress towards degree completion; (3) the potential influence of the stage of a student's academic career (i.e., year in school or program); (4) the potential impact of the pandemic and associated health and safety risks on students' demand for (and valuation of) remote education; and (5) USC's setting of tuition for a semester that would be conducted remotely.

40.     As addressed in my Opening Expert Report in **Section III.A.6.**, after the conclusion of the Spring 2020 semester, a banner was put on the USC website for the course catalogue that stated, "The Fall 2020 semester will begin with fully remote instructions, with limited exceptions for clinical education."[58]  In other words, for the Fall 2020 semester, USC students were aware that education would be delivered remotely, possibly for the entire semester.  Moreover, when faced with providing remote education during the Fall 2020 semester, and with continuing and new students "fully informed" of the modality, USC increased its tuition by 3.5% from the 2019-2020 academic year to the 2020-2021 academic year,[59] instead of reducing the tuition by the 30.4% and 24.1% indicated by the results of Dr. Singer's CBC analysis.

41.     As addressed above, USC's new and continuing students were fully informed of the remote modality for the Fall 2020 semester.  Despite an increased tuition price, USC enrolled a similar number of undergraduate freshmen for the Fall 2020 semester as it had in prior years.  **Table 3** below summarizes USC's freshman enrollments from Fall 2016 through Fall 2020.

---

[58] Deposition of Andrew Stott (Vice Provost for Academic Programs, USC), dated October 13, 2022: pp. 150-152.
[59] Spring 2020 undergraduate tuition was $28,628, see Deposition of Andrew Stott (Vice Provost for Academic Programs, USC), dated October 13, 2022: Exhibit 45: USC Catalogue 2019-2020: USC000130695-723 (at 699-700). Fall 2020 undergraduate tuition was $29,630, see <https://web-app.usc.edu/ws/soc_archive/soc/term-20203/tuition-and-fees/index.html>; See also **Attachment 11**.

**Table 3: USC Undergraduate Freshmen Enrollment**[60]

| Semester | Number of Full Time Enrollments |
|----------|--------------------------------|
| Fall 2016 | 3,066 |
| Fall 2017 | 3,358 |
| Fall 2018 | 3,401 |
| Fall 2019 | 3,167 |
| Fall 2020 | 3,437 |

42.    As shown in **Table 3**, USC's undergraduate enrollments for freshmen have remained consistent since the 2016-2017 academic year, including for the Fall 2020 semester after USC increased tuition and informed its students that courses would be delivered via the remote modality.

43.    USC student retention and enrollment information for Fall 2020 indicates that actual USC students place a premium on continuing their academic progression.  In my Opening Expert Report, I previously addressed the freshmen class retention rates.[61]  **Table 4** below summarizes USC's first year retention rates for 2017 through 2021.

**Table 4: USC Retention Rates**[62]

| Current Semester | % Enrolled in Following Fall Semester |
|------------------|---------------------------------------|
| Fall 2021 | 97% |
| Fall 2020 | 96% |
| Fall 2019 | 91% |
| Fall 2018 | 96% |
| Fall 2017 | 97% |

44.    For this Rebuttal Report, USC provided the student retention rate for all non-graduating undergraduate students at USC from the Spring semester to the Fall semester (i.e., the first semester of the next academic year) for 2017 through 2021.  **Table 5** below summarizes USC's undergraduate student retention rates for non-graduating students from 2017 through 2021.

---

[60] Opening Expert Report: **Attachment 10**.
[61] Opening Expert Report: ¶ 53.
[62] Opening Expert Report: ¶ 53.

**Table 5: USC Non-Graduating Undergraduate Student Retention Rates[63]**

| Calendar Year | Spring Enrollment | Fall Enrollment | Retention Rate |
|---|---|---|---|
| 2017 | 14,472 | 13,750 | 95.0% |
| 2018 | 14,867 | 14,282 | 96.1% |
| 2019 | 15,639 | 15,069 | 96.4% |
| 2020 | 15,547 | 14,274 | 91.8% |
| 2021 | 15,298 | 14,681 | 96.0% |

45.  As shown in **Table 5**, USC's retention rate for non-graduating undergraduate students was consistently over 90% from 2017 to 2021.  Students could pause their education by not registering for classes.  The 5% drop in retention from Spring 2020 to Fall 2020 does not necessarily mean that a student did not believe that remote education was worth the tuition.  Any number of reasons unrelated to the transition to remote learning could have contributed to the drop, such as illness of the student or a family member, pandemic-related hardships, changes in life circumstances, or other personal hardships.  Contrary to Dr. Singer's opinion that all students would value remote education at a significant discount, only a limited portion of USC's undergraduate students did not continue in the Fall 2020 semester.  The over 90% of actual USC students that elected to continue in the Fall 2020 semester indicates that they valued remote education at the tuition USC charged, which was 3.5% higher than the Spring 2020 semester.

46.  Similarly, USC provided the student retention rate for all non-graduating graduate students at USC from the Spring semester to the Fall semester for 2017 through 2021.  **Table 6** below summarizes USC's graduate student retention rates for non-graduating student from 2017 through 2021.

---

[63] **Attachment 12**.

**Table 6: USC Non-Graduating Graduate Student Retention Rates**[64]

| Calendar Year | Spring Enrollment | Fall Enrollment | Retention Rate |
|---|---|---|---|
| 2017 | 15,904 | 14,726 | 92.6% |
| 2018 | 16,694 | 15,605 | 93.5% |
| 2019 | 17,335 | 16,268 | 93.8% |
| 2020 | 16,927 | 15,910 | 94.0% |
| 2021 | 17,024 | 15,940 | 93.6% |

47.    As indicated by the above student retention rate data, the vast majority of putative class members continued their education at USC, despite a remote modality and a higher tuition price.  Indeed, USC's Spring-to-Fall 2020 retention rate for graduate students was higher than other years, as well as higher than for undergraduates.

48.    USC's Fall 2020 semester experience contradicts Dr. Singer's assertion of a reduced fair market value (which cannot be measured by a CBC analysis in this circumstance as explained below) for USC remote education and indicates that the multitude of factors that Dr. Singer's CBC analysis failed to consider have a material impact on the results of his analysis.

### C. The Fair Market Value of Remote Education Cannot Be Measured Using a CBC Analysis In This Circumstance

49.    Dr. Singer claims that a CBC analysis is a "common statistical research tool that can be used to objectively measure the fair market value of a service."[65]  Dr. Singer defines fair market value as "the amount that a willing buyer and a willing seller would both accept."[66]  As discussed in **Section III.A.** above, Dr. Singer concluded that the fair market value of an "Online Experience" is 30.4% less than the "On-Campus Experience" for undergraduate students and 24.1% less for graduate students.[67]

---

[64] **Attachment 12**.
[65] Singer Report: ¶ 7.
[66] Singer Report: ¶ 7.
[67] Singer Report: ¶ 7.

50.   Dr. Singer's use of a survey to determine the fair market value of on-campus education is not economically appropriate in the context of higher education.[68]  Specifically, it cannot be used to assess the value of remote education compared to on-campus education at USC, as USC's price for tuition is not set based on students' willingness to pay or the supply and demand for the educational services at issue in this matter.  In the sections below, I address various flaws in Dr. Singer's fair market value assessment from a valuation and economic perspective.

### 1.   Dr. Singer's Assessment of Fair Market Value Ignores the Economic Realities Facing "Buyers"

51.   Dr. Singer's assessment of the fair market value of remote education ignores the economic reality facing his asserted buyers.  USC transitioned to remote education in mid-March 2020, as California, and the United States, were responding to the COVID-19 pandemic.  As addressed in my Opening Expert Report, USC students were not legally permitted to access campus facilities, as ordered by the governor of California and mayor of Los Angeles.[69]  Similar "safer at home" orders were in place nationwide, with states enforcing mandatory stay at home orders.[70]

52.   Because the transition to remote education and the restrictions on access to public areas was happening throughout the country, putative class members did not have a readily available alternative "product" to purchase.  During the COVID-19 pandemic, other major universities also transitioned to remote education (see **Attachment 13**).[71]  As addressed in my Opening Expert Report, USC students in the Spring 2020 semester had the ability to defer their education or withdraw.[72]  As discussed above, the vast majority of USC students elected not to do so.

---

[68] I understand that Dr. Wilcox may address why the use of a CBC analysis in the context of higher education is not technically appropriate.
[69] Opening Expert Report: ¶ 19.
[70] "Timing of State and Territorial COVID-19 Stay-at-Home Orders and Changes in Population Movement," CDC, September 4, 2020: <https://www.cdc.gov/mmwr/volumes/69/wr/mm6935a2.htm>.
[71] For example, in evaluating tuition, USC identified 32 "Peer Universities."  Each of these Peer Universities transitioned to remote education in March 2020. See **Attachment 13**.
[72] Opening Expert Report: ¶¶ 45-47.

53.    Furthermore, higher education is a non-fungible service.  Each institution of higher education has its own criteria for admission, reputation, history and traditions, alumni network, tuition and fees, and process for setting tuition and fees.  Students interested in transferring would have to meet the target institution's admission criteria.  Overall, the higher education market, and enrolled students at USC in particular, do not reflect a traditional market characterized by buyers with readily available, equivalent alternative products and services available for purchase.

54.    Additionally, not all students seeking to attend college are eligible buyers of USC's educational services.  To attend USC, a prospective student must have an interest in attending, apply to USC, and be accepted by the university.  In other words, the potential buyers are limited to a predetermined set of consumers chosen by USC through the application and admission process.

55.    Furthermore, a USC education is highly desired and admission to USC is selective.[73] From 2016 to 2020, USC accepted approximately 15% of its over 300,000 undergraduate applicants.[74]  In the 2019-2020 academic year, for every 1 undergraduate student enrolled at USC, approximately 21 applied for admission.[75]  As such, not all students seeking to attend college are eligible buyers of USC's educational services.  And once accepted to a highly selective university like USC, a student may place increased value on coming to and/or remaining at USC to earn a degree.  Given the overwhelming demand for admission to it, USC would not have to lower its tuition if offering remote education for a semester, and applicants not accepted by USC would have likely been willing to pay the full cost of USC's tuition.  This is illustrated by the Fall 2020 semester, when USC enrolled the highest number of incoming freshmen over the prior 5-year period, despite an increase in tuition and remote education.[76]

---

[73] Opening Expert Report: ¶ 63.
[74] Opening Expert Report: ¶ 63.
[75] Opening Expert Report: **Attachment 10**.  Calculated as 66,198 ÷ 3,167 = 20.9.
[76] Opening Expert Report: **Attachment 10**.

### 2. Dr. Singer's Assessment of Fair Market Value Ignores Supply Side Considerations

56.   Dr. Singer's assessment of the fair market value of remote education ignores how USC sets its tuition. As acknowledged by Dr. Singer, to reflect a "fair market value," the tuition has to reflect an amount that the buyer (the student) and the seller (USC) would both accept. Dr. Singer claims that "[u]sing this model, I show that in the 'but-for' world, all Class Members would have been charged lower Tuition and Fees, and thus are commonly impacted."[77]   For the claimed tuition to reflect fair market value, and for Dr. Singer's statement on the level of but-for tuition to be true, USC would have to accept the 30.4% and 24.1% price declines that Dr. Singer's analysis indicates buyers would be willing to pay. There is no basis to assume that USC would be willing or able to accept tuition prices 30.4% and 24.1% lower than were actually charged during the Spring 2020 semester to provide remote education.   In this circumstance, there is a significant difference between Dr. Singer's alleged "value of what class members received" and the tuition that USC would have been willing to accept.[78]

57.   As addressed in my Opening Expert Report, ███████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████[79] █████████████
████████████████████████████████████████████████████
████████████████.[80]   Therefore, the very foundation of Dr. Singer's analysis of the alleged fair market value of tuition for online education – what buyers and sellers would willingly accept – does not apply in this circumstance. Dr. Singer focuses on the price "a reasonable consumer would have paid at the time of purchase," however, students would not have had the option to pay the price resulting from Dr. Singer's CBC analysis.

---

[77] Singer Report: ¶ 9.
[78] Singer Report: ¶ 18.
[79] Deposition of Gregory Condell (VP of Finance, USC), dated October 28, 2022: pp. 59-60.
[80] Opening Expert Report: ¶ 63.

58.    Moreover, as previously addressed, USC already subsidizes the cost of instruction for its students[81] and operates at a loss as tuition and fees do not cover the cost of education.[82] Any tuition reduction by USC would increase that loss.  Because of the resulting increased losses, USC would not reasonably be willing to accept the 30.4% and 24.1% price declines that Dr. Singer's analysis allegedly indicates buyers would be willing to pay.  Dr. Singer's analysis ignores if USC would be willing to provide remote education at his claimed tuition rate.

### 3.    Dr. Singer's Market Price in His "But-For" World Is Contradicted by Real World Tuition Data

59.    Dr. Singer's alleged fair market value for remote education at USC in his "but-for" world is contradicted by real world tuition prices for USC tuition.  This data includes USC's historical practice of charging the same tuition for remote and on-campus education, USC's Fall 2020 semester tuition increase while offering remote education, and USC history of increasing tuition in response to the increased cost to provide educational services.

60.    As detailed in my Opening Expert Report in **Section III.A.1.**, USC charges tuition based on the number of units a student enrolls in and charges one flat tuition price for undergraduate and graduate students taking between 12 and 18 units and 15 and 18 units per semester, respectively.[83]  The USC Catalogue for 2019-2020 defined tuition and identifies the amount of tuition payable for the number of units taken during each semester.[84]  The USC Catalogue states the "number of units for which tuition is charged is indicated by the number in parentheses after the title of each course listed under Courses of Instruction."[85]  During the Spring 2020 semester, students continued to earn units towards degree completion.  Andrew Stott, Vice Provost for Academic Programs at USC,

---

[81] Deposition of Gregory Condell (VP of Finance, USC), dated October 28, 2022: pp. 59-60.
[82] Opening Expert Report: ¶ 62.
[83] Deposition of Andrew Stott (Vice Provost for Academic Programs, USC), dated October 13, 2022: Exhibit 45: USC Catalogue 2019-2020: USC000130695-723 (at 700).
[84] Deposition of Andrew Stott (Vice Provost for Academic Programs, USC), dated October 13, 2022: Exhibit 45: USC Catalogue 2019-2020: USC000130695-723 (at 699-700).
[85] Deposition of Andrew Stott (Vice Provost for Academic Programs, USC), dated October 13, 2022: Exhibit 45: USC Catalogue 2019-2020: USC000130695-723 (at 699-700).

testified that "tuition pays for the units you earn towards your degree. And we continued to make progress with students in their educational programs toward their degrees."[86]

61.    Prior to the Spring 2020 semester, USC did not offer undergraduate degree programs in the online modality.[87]   However, USC did offer certain graduate programs via the Virtual Academic Center (i.e., online classes via the internet).[88]   Regardless of the modality, USC charged the same tuition on a per unit basis.[89]   Overall, USC's contemporaneous data demonstrates that USC charges, and USC students have been willing to pay, the same level of tuition per unit for remote education as in-person education.   There is no evidence to support Dr. Singer's assertion that USC would have been willing to charge less per unit for remote education during the Spring 2020 semester, or that courses delivered remotely are less valuable to USC's students (and therefore USC students would have been unwilling to pay full tuition for remote education for a semester).

62.    ████████████████████████████████████████████████████ ██████████████████, USC's Fall 2020 semester indicates that there is high demand for a USC education, regardless of the modality, at current or higher tuition prices.   When faced with offering remote education due to the pandemic in the Fall 2020 semester, USC raised its tuition, and the vast majority of students (who were willing buyers) agreed to pay the increased tuition.

63.    Reducing tuition for remote education is also inconsistent with USC's history of annual tuition increases, driven by the increased costs that impact USC's tuition setting decisions. **Table 7** below summarizes USC's tuition increases for the 5 years prior to the 2020-2021 academic year.

---

[86] Deposition of Andrew Stott (Vice Provost for Academic Programs, USC), dated October 13, 2022: p. 232. Plaintiffs also recognized that tuition was charged based on the number of units for which students register.  See for example, Deposition of Christina Diaz, dated October 16, 2022: p. 176; Deposition of Chile Mark Aguiniga Gomez, dated October 11, 2022: p. 101; Deposition of Justin Kerendian, dated October 12, 2022: p. 150.
[87] First Amended Consolidated Complaint: p. 2; <https://online.usc.edu/programs/>;
<https://web.archive.org/web/20191108020154/https://online.usc.edu/programs/>.
[88] See for example, <https://catalogue.usc.edu/preview_program.php?catoid=16&poid=24919&returnto=6360>.
[89] Opening Expert Report: ¶¶ 30-32.

**Table 7: USC Tuition Change Over Time**[90]

| Academic Year | Graduate / Undergraduate Tuition per Semester | % Change |
|---|---|---|
| 2016-2017 | $25,721 | N/A |
| 2017-2018 | $26,724 | 3.9% |
| 2018-2019 | $27,660 | 3.5% |
| 2019-2020 | $28,628 | 3.5% |
| 2020-2021 | $29,630 | 3.5% |

64.  Overall, Dr. Singer's survey results are contradicted by USC's practice of charging the same tuition for remote and on-campus education, USC's actual experience during the Fall 2020 semester, and USC history of tuition increases based on the factors that drive increases in USC's tuition.

### D.  Student Non-Loan Financial Aid Impacts Potential Alleged Harm to Putative Class Members

65.  When describing his survey design, Dr. Singer states that "respondents were asked to assume that they had the same access to financial aid or scholarships they actually received in real life (or anticipated to receive in the case of a prospective student)."[91]  Dr. Singer claims this was "done to ensure that respondents would view the Tuition and Fees as *charges* in the same way that students did in real life.  In that way, a student would internally factor in any financial aid when making their choice."[92]

66.  When describing the results of his CBC analysis, Dr. Singer states "[b]ecause I calculated the required discount in percentage terms, the percentage reduction in value can be applied regardless of whether the student received financial aid."[93]  Dr. Singer claims to base damages on "*net* Tuition and Fees" which reflects any financial aid received by students.[94]  Dr. Singer states that "[a]ny financial aid received by Class Members

---

[90] **Attachment 11**.
[91] Singer Report: ¶ 38.
[92] Singer Report: ¶ 38.
[93] Singer Report: ¶ 67.
[94] Singer Report: ¶ 67.

(including full-ride students) is not included in my analysis of Class Member damages."[95] Dr. Singer further states that "to the extent USC claims that its Tuition and Fees are in any way subsidized, my use of a percentage reduction in the fair market value means that the post-subsidy price can be adjusted by the same amount."[96]

67.    In the sections below, I address the impact of the various source of funds on whether or not a putative class member was potentially damaged, as well as why the use of an overall percentage discount does not reliably measure damage to individual putative class members.

## 1. Non-Loan Financial Aid (i.e., Scholarships or Grants) Impacts Potential Alleged Harm

68.    Simply asking respondents to assume the same access to financial aid received does not mean that all putative class members were allegedly damaged by the same percentage. As discussed in **Section III.C.3.** of my Opening Expert Report, approximately 65% of USC students during the Spring 2020 semester received aid through grants and/or scholarships.[97]    Students receiving non-loan financial aid received, on average, approximately $40,000 per year or $20,000 per semester.[98]  Students who received non-loan financial aid (i.e., aid that does not need to be paid back) may not have been harmed based on the amount of aid received and tuition paid out-of-pocket.  Given the levels of non-loan aid provided by USC and other sources, even if survey respondents assumed "the same access to financial aid or scholarships," the amount of tuition some putative class members would have been required to pay would not have changed even with a reduction in tuition of 30.4% or 24.1%.

69.    It is necessary to understand each individual student's financial aid package to understand whether that student would potentially be harmed.  Eligibility for need-based financial aid is based on two factors: the Cost of Attendance ("COA") and a student's Expected

---

[95] Singer Report: ¶ 67.
[96] Singer Report: ¶ 67, footnote 94.
[97] Opening Expert Report: ¶ 100.
[98] Opening Expert Report: ¶ 100.

Family Contribution ("EFC"), calculated by USC.[99]  As discussed in my Opening Expert Report, USC calculates Cost of Attendance and Expected Family Contribution on a student-by-student basis.[100]  A student's EFC is determined individually for every student by analyzing several financial factors for every family including: 1) family taxable and untaxed income; 2) family assets (money in bank accounts, stock funds, real estate, and others); 3) any special financial circumstances (such as a job loss or higher-than-average medical expenses); 4) the total number of children; 5) the total number of children currently enrolled as full-time undergraduates in college; and 6) years until retirement age of each parent.[101]  All USC students seeking financial aid must apply for financial aid every year, and the EFC may be adjusted to reflect any changes in a family's financial strength.[102]

70.    Based on discussions with Megan Chan, Associate Dean of Financial Aid, Compliance, and Training, each student's individual financial aid package differs based on his or her specific circumstances.  While COA and EFC are determined prior to the start of an academic year, the financial aid package to bridge the gap between COA and EFC can be modified throughout the academic year.[103]  The financial aid package can be made up of federal loans, federal grants, work-study programs, third-party scholarships, and university grants, amongst other forms of aid.[104]  I understand that to determine any alleged harm to a putative class member based on a reduction in tuition and fees, one must first understand how any financial need was met, and what portion of that aid needs to be repaid (e.g., loans) versus not repaid (e.g., grants or scholarships).[105]  I further understand that an individualized analysis would be required to determine if the amount that a particular student was required to pay would change based on the specific components included in that student's financial aid package.[106]

---

[99] Opening Expert Report: ¶ 99.
[100] Opening Expert Report: ¶ 99.
[101] Opening Expert Report: ¶ 99.
[102] Opening Expert Report: ¶ 99.
[103] Discussion with Megan Chan, Associate Dean of Financial Aid, Compliance, and Training. While COA and EFC are calculated prior to an academic year, I understand that students are able to appeal the Cost of Attendance and Expected Family Contribution levels based on individual circumstances, and that such appeals are common.
[104] Discussion with Megan Chan, Associate Dean of Financial Aid, Compliance, and Training.
[105] Discussion with Megan Chan, Associate Dean of Financial Aid, Compliance, and Training.
[106] Discussion with Megan Chan, Associate Dean of Financial Aid, Compliance, and Training.

71.   Dr. Singer's approach ignores if putative class members would have been required to pay the same amount of tuition even accepting his asserted reduced fair market value of remote education.

### 2. Robert Lee Calvert's Financial Aid Package Illustrates the Need for Individualized Analysis

72.   Former plaintiff Robert Lee Calvert's financial aid situation illustrates the need for individualized analysis to determine if putative class members actually suffered harm, particularly in situations where the student paid out-of-pocket based on their EFC and received non-loan financial aid.

73.   ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████[108]██████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████ Assuming Dr. Singer's analysis is correct, and undergraduate tuition and fees should be reduced by 30.4%, such a reduction would not impact Mr. Calvert's family's ability to pay.  EFC is calculated based on the family's income and assets, amongst other factors, and not based on USC's topline tuition amount. █████████████████████████████████████
████████████████████████████.  In this illustration, Mr. Calvert would have been required to pay the same amount of tuition out-of-pocket, via the EFC, despite the reduced COA associated with the reduced tuition level Dr. Singer claims should have been charged. █████████████████████████████
███████████████████████████████████████████████████
████████████████████████.  Therefore, even accepting that remote education was worth less, Mr. Calvert would not be financially harmed by the transition to remote education.

---

[107] **Attachment 14**.
[108] **Attachment 14**.

**Table 8: Illustrative Impact of Dr. Singer's Reduced Value
on Robert Lee Calvert's Spring 2020 Tuition**

| | Actual Tuition, Fees, and Payments [109] | Dr. Singer's Alleged Undergraduate Reduced Value | Adjusted Tuition, Fees, and Payments (considering Alleged Reduced Value) |
|---|---|---|---|
| Tuition and Fees | $29,185 | <30.4%> | $20,313 |
| ███████ | ███████ | | ███████ |
| **Spring 2020 Balance** | **$ -** | | **$ -** |

74.   The situation illustrated in **Table 8** above is not limited to Mr. Calvert. Assuming Dr. Singer's 30.4% or 24.1% reduced value, putative class members may or may not have been financially harmed, depending upon the calculated EFC and the amount and source of financial aid received to bridge the gap between the COA and EFC.[110]   Therefore, understanding the harm to putative class members requires an individualized analysis.

### 3.   Use of An Overall Percentage Discount Does Not Reliably Measure Damages to Putative Class Members

75.   As addressed above, Dr. Singer alleges that the use of a discount in percentage terms allows the percentage reduction to be applied regardless of financial aid.[111]   Dr. Singer claims the use of a "percentage reduction in the fair market value" means that any subsidized price can be adjusted by the same amount.[112]   However, Dr. Singer's analysis of the damages allegedly suffered by putative class members incorrectly assumes that any reduction in tuition would be applied equally to the amounts paid from all sources. This

---

[109] **Attachment 14**.

[110] In addition to Mr. Calvert, undergraduate students with an EFC per semester at or below the level of Dr. Singer's asserted reduced tuition who were able to bridge the gap between COA and EFC with grants from the University would not be harmed under Dr. Singer's methodology. However, understanding such a student's financial package would require an individualized analysis. For example, a student with an EFC as high as approximately $19,000 (calculated as USC undergraduate full-time semester tuition of $28,628 x (1 - 30.4%) = $19,925) who was able to obtain University Grants to bridge the gap between COA and EFC would not be harmed.

[111] Singer Report: ¶ 67.

[112] Singer Report: ¶ 67, footnote 94.

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

assumption is unsupported and fails to account for manner in which USC determines the portion of the tuition that students' families will be required to pay.

76. Dr. Singer assumes that any reduction in tuition would be shared equally (on a percentage basis) amongst all sources used to fund the tuition payment. In other words, Dr. Singer asserts that the alleged discount can be applied to whatever portion each student actually paid (i.e., tuition net of financial aid received). This assumption means that an alleged reduction in the value of the education received would result in each student paying less in tuition, even if the amount the student actually paid was less still less than the claimed reduced value of remote education. Even assuming that remote education is worth less (which has not been demonstrated), many students would not pay for the alleged reduced value of the education they received.

77. Dr. Singer's analysis takes the average of "the required discount across all respondents" to aggregate the "*net* required discount and change in valuation" necessary to make each student "whole."[113] However, Dr. Singer's analysis does not consider what amount of payment is required to make any individual putative class member "whole." Understanding individual impacts requires an individualized analysis, and Dr. Singer's CBC analysis highlights the individualized nature of valuing remote education. Dr. Singer calculates the alleged aggregate damages for the class by adding up the individual required discounts "to be made whole."[114] Such a process indicates that each individual survey respondent placed unique and differing values on remote education.

### E. Dr. Singer Failed To Consider The Impact Of The Supply Side Issues He Identified On USC's Ability And Willingness To Lower Tuition

78. Dr. Singer's analysis of supply side issues (i.e., "reducing supply in response to lower prices") ignores the impact of the factors he studied on USC's ability and willingness to lower tuition for remote education.[115] Dr. Singer concludes that three factors, "(1) universities face incentive structures not necessarily compatible with traditional short-term profit maximization; (2) fixed costs are relatively higher than variable costs in the

---

[113] Singer Report: ¶ 61, Table 7.
[114] Singer Report: ¶ 61.
[115] Singer Report: ¶¶ 74, 80.

context of higher education and therefore universities are incentivized to enroll at their capacity constraint; and, (3) enrollment decisions are rarely limited to a single-semester outlook" imply that USC's enrollment in the Spring 2020 semester was likely fixed, and it could not reduce enrollment to create price pressure.[116]

79.   The same reasons Dr. Singer opines would limit the ability of USC to reduce enrollment would similarly limit USC's ability to reduce tuition.  Dr. Singer asserts that USC's incentives are "not necessarily compatible with traditional short-term profit maximization."  These incentives would impact tuition setting as well as enrollment decisions, as revenue is the product of both enrollment and tuition.  Dr. Singer asserts that institution of higher education like USC have "long-term incentives" to maximize "prestige" of the university by maximizing alumni success in the long-term.[117]  Dr. Singer did not explain how lowering tuition would be consistent with USC's long-term incentives to maximize the prestige of USC or enhance the long-term success of alumni. Furthermore, Dr. Singer is admitting that the higher educational market, and USC in particular, does not function like a traditional market, rendering his use of CBC analysis to determine the fair market value of remote education unreliable.

80.   

81.   Dr. Singer also asserts that enrollment decisions are not limited to a "single-semester outlook."  As USC's academic programs are multi-semester, multi-year programs, USC's

[116] Singer Report: ¶ 80.
[117] Singer Report: ¶ 76.
[118] Singer Report: ¶ 80.
[119] Opening Expert Report: ¶ 69.
[120] Opening Expert Report: ¶ 60.
[121] Opening Expert Report: ¶¶ 59-64.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

pricing decisions would similarly not be based on a "single-semester outlook."  University representatives emphasize that the university's focus for its students is to allow them to continue to progress through their academic careers, without any delay.[122]  There is no basis for Dr. Singer to assume that USC's tuition pricing decisions would be based on a "single-semester outlook."

### F.  Dr. Singer's CBC Analysis Fails to Address Individualized Issues Facing USC Students That Impact Putative Class Members Alleged Damages

82.   As addressed in **Section III.A.** above, Dr. Singer conducted a CBC analysis to understand how eligible survey respondents would value access to on-campus education and facilities compared to remote education and no access to facilities.  Dr. Singer's CBC analysis ignores individual USC students' circumstances that would impact putative class members' valuation of on-campus education.  Numerous individualized issues identified in my Opening Expert Report are not accounted for in Dr. Singer's CBC analysis, such as: (1) putative class members pursue a variety of different educational programs for a variety of different reasons, and would therefore place a different value on the in-person experience; (2) putative class members would value student organizations differently at different points throughout their academic progression, and participate in student organizations at different levels, both on campus and via the remote modality; and (3) putative class members would value and utilize campus resources, such as the health center or the fitness center, differently.[123]  Dr. Singer's approach does not address how it can account for these issues that would impact the amount of damages allegedly suffered by any individual class member.

---

[122] Deposition of Gregory Condell (VP of Finance, USC), dated October 28, 2022: pp. 52-53; Deposition of Andrew Stott (Vice Provost for Academic Programs, USC), dated October 13, 2022: p. 232.
[123] Opening Expert Report: ¶¶ 73-93.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Attachment 1**

# John L. Hansen, CPA, CFF, CLP, CGMA

**TM Financial Forensics, LLC**
An HKA Company
3595 Mt. Diablo Blvd, Suite 250
Lafayette, CA 94549

Direct: 415.692.6373
Mobile: 415.465.2325
JHansen@TMFin.com

**Professional History**
- **HKA** (2022 – present) - Partner
- **TM Financial Forensics, LLC** (2010 – 2022) – Vice President
- **Navigant Consulting** (2004 – 2010) – Director
- **Tucker Alan Inc.** (1994 – 2004) – Vice President
- **Peterson Consulting** (1989 - 1994) – Executive Consultant

**Education**
- Santa Clara University, Bachelor of Science in Commerce, Degree in Finance and a minor in Economics 1989 – Cum Laude
- Beta Gamma Sigma
- Financial Executives Institute's Top Finance Student Scholarship

**Professional Associations and Certifications**
- Advisory Board, Leavey School of Business, Santa Clara University (2016 – present)
- Certified Public Accountant, State of California, License No. 94883
- Certified in Financial Forensics
- Certified Licensing Professional
- Chartered Global Management Accountant

Mr. Hansen is a Partner with over 30 years of experience providing business, financial and damages consulting to individuals, business entities and counsel.  Mr. Hansen is a Certified Public Accountant licensed in the State of California, Certified in Financial Forensics, a Certified Licensing Professional and a Chartered Global Management Accountant.  Mr. Hansen focuses on commercial damages, intellectual property, class action, forensic accounting, and valuation matters.  Mr. Hansen has analyzed and addressed claims for lost profits, price erosion, reasonable royalties, unjust enrichment, increased costs and diminution of asset and business value in a variety of circumstances and industries.  He has also assisted clients with the valuation and licensing of intellectual property.  Mr. Hansen has testified as an expert on damages and economic issues in deposition, trial and arbitration in State Courts, Federal Courts and in the International Trade Commission.

## PROFESSIONAL EXPERIENCE

### Intellectual Property

Analyzed the financial and economic impacts due to alleged intellectual property infringement and misappropriation including patents, trademarks, copyrights, trade secrets, trade dress and rights of publicity.  Evaluated the appropriate measure of damages including lost profits, price erosion, reasonable royalties, and disgorgement of defendants' gains.

Evaluated and prepared claims for lost profits related to lost sales, price erosion and convoyed sales, as well as unjust enrichment.  Evaluated and analyzed market size and potential, market share, head-start periods, competition, product features and functionality, available alternatives, customer demand, historical and projected sales, ability to achieve projected sales, company and product profitability, nature of costs, cost allocations and product pricing issues.  Analyzed manufacturing capacity, sales and distribution channels and capacity, customer relationships and capital expenditures required to bring products to market.

Determined and evaluated reasonable royalties and the hypothetical negotiation of license agreements.  Analyzed cost saving and enhanced earnings related to licensing technology, licensing history, comparable license agreements, design-around considerations, apportionment of profits, appropriate royalty base and avoided product development costs.  Analyzed industry standards, patent pools and establishing royalty rates for standard essential patents.  Investigated licensing and royalty disputes, including the level of reported sales and underpayment of royalties, guaranteed minimums, deductions from revenue and efforts to commercialize patent portfolios.

**John L. Hansen, CPA, CFF, CLP, CGMA**

Patent analyses have related to a variety of industries and products, including:

- 3D Graphic Accelerators
- Agricultural Equipment
- Athletic Shoe Cushioning
- Automotive Diagnostic Equipment
- Business Intelligence Software
- Bus Ramps
- Casino Gaming
- Chemical Vapor Deposition
- Composite Materials
- Computer Audio Chips and Cards
- CPU Utilization Management
- Dental Equipment
- Digital Film
- Digital Rights Management Technology
- Disk Drives and Storage Products
- DRAM
- E-Commerce
- Educational Toys
- Electronics
- FEP Cable Insulation
- Flash Memory
- Game Consoles
- Garage Door Openers
- GPS Chip Sets
- Hard Drive Partitioning
- In-Line Skates
- Light-Emitting Diodes
- Liquid Crystal Displays
- Medical Devices
- MLC Flash Memory
- MOSFETs
- Notebook Computer Security
- Optical Networking
- Perfect Silicon
- PET Oxygen Barrier Bottles
- Pharmaceutical Products
- Photonic Integrated Circuits
- Plug-N-Play Functionality
- Polyisoprene Condoms
- Power Management ICs
- Printers
- Radiotherapy Equipment
- Sales Configuration Software
- Semiconductors
- Set Top Boxes
- Smartphones
- Software
- Sub-Surface Laser Marking
- Tablets
- Telecommunications Equipment
- Tire Sealants
- Trampoline Enclosures
- Ultrasound Equipment
- VCRs
- Video Games
- Video Teleconferencing
- Voice Recognition Software
- Wafer Marking Systems
- Water Purification
- Web Conferencing
- Wi-Fi Functionality
- Wi-Fi Hotspots

Copyright and trade secret analyses have related to a variety of industries and products, including:

- Architectural Designs
- Antennas
- Athletic Shoe Cushioning
- ATVs
- Deodorant
- Dolls
- Educational Programs
- Electronics
- Graphical Flight Simulators
- Insurance Brokerages
- Lab Chip Technology
- Music Royalties
- Oncology Test Equipment
- Operating Systems
- Personal Digital Assistants
- Portable Media Players
- Software Installations
- SRAM
- Treatment Planning Software
- Videos
- Web Conferencing
- Web Portals

**John L. Hansen, CPA, CFF, CLP, CGMA**

Analyzed lost profits, disgorgement of defendants' gains, royalties and corrective advertising related to alleged trademark infringement, false designation of origin, trademark dilution, false advertising and unfair competition claims. Determined revenue related to the alleged use of trademarks. Analyzed deductible expenses, cost allocations and the apportionment of profit attributable to factors other than the challenged conduct. Analyzed trademark license agreements and franchise agreements, as well as determined royalties for trademarks.

Trademark and false advertising analyses have related to a variety of industries and products, including:

- Athletic Shoes
- Banking/Remittance Services
- Bottled Juice and Water
- Cellular Communications
- Cookie Sticks
- Cookware
- Custom Printing
- Department Stores
- Diesel Engines
- E-Commerce
- Electronics/Power Supplies
- Employee Staffing
- Frozen Foods
- Furniture Retailers
- Hair Care
- Health and Beauty Products
- Kombucha
- Leadership Training
- Legal Services
- Licensed Merchandise
- Nutrition Bars
- Off-Road Vehicles
- Online Shopping Apps
- Professional Sports Franchises
- Semiconductors
- Software
- Solar Panels
- Sports Memorabilia
- Virtual Reality
- Watercraft

Analyzed the value of intellectual property related to its transfer, licensing, and disposition. Consulted with clients regarding factors influencing licensing opportunities and potential royalty rates, licensing strategy and licensing positions. Assisted with settlement and licensing negotiations.

Assisted clients with Section 337 investigations in the United States International Trade Commission. Analyzed domestic industry issues, including the investment in plant and equipment, employment of labor and capital, and efforts to commercialize and exploit the articles covered by the subject patents. Evaluated the commercial success of articles covered by the subject patents and analyzed the impact of an exclusion order extending to downstream products. Addressed remedy issues, such as bonding and inventory levels.

Analyzed the commercial success of products covered by patents in matters pending before the Patent Trial and Appeal Board.

**John L. Hansen, CPA, CFF, CLP, CGMA**

**Commercial Damages, Valuation and Forensic Accounting**

Analyzed the operations, financial condition and profitability of businesses under a variety of circumstances, including breach of contract, bankruptcy and insolvency, business interruption, lender liability, defective product, merger and acquisition, business and asset valuation and fraud investigations.

Prepared and analyzed numerous damage studies including analyses of lost profits, lost value and increased costs. Analyzed actual and projected revenues, market share, competition, industry and market conditions, cost of goods sold, the nature of costs and cost allocations, as examples. Analyses have related to a variety of industries and products, including:

- Aloe Vera
- Apparel
- ATVs
- Biotechnology
- Commercial and Retail Developments
- Computer Assembly
- Computer Resellers
- Concessions and Souvenirs
- Dental Anesthetic
- Deodorant
- Flash Memory
- Footwear
- GPS Chipset Development
- Hospitality
- Internet of Things Software
- IT Outsourcing

- Luxury Branded Products
- MoCA Technology
- OLED Panels
- Online Advertising
- Power Generation
- Printers
- Printing Equipment
- Real Estate
- Restaurants
- Retail Merchandising
- Satellite Television
- Semiconductor Manufacturing
- Software Installations
- Sports Agents
- Telecommunication Equipment
- Video Teleconferencing

Prepared and analyzed numerous valuations of businesses and business interests, solvency, financial condition, the viability of continuing operations, company capital structure, trend and ratio analysis, cost of capital and discount rates. Analyzed comparable companies and transactions, discounted cash flows and valuation multiples. Valuation analyses have related to a variety of industries and businesses, including:

- Ambulance Services
- Aquaculture
- Chemical Manufacturing
- Database Software
- Diamond Coated Capsules
- Diesel Engine Technology
- Flash Memory
- Food Processing
- Furniture Retailer
- Health and Beauty Products
- High Capacity Disk Drives
- Independent Power Producers
- Mineral Water and Juice Bottling

- Pharmaceutical Products
- Professional Sports Promotion
- Public Utilities
- Refrigerated Bars
- Semiconductor Manufacturing
- Sporting Goods Retail Outlets
- Surgical and Diagnostic Centers
- Television Programming
- Tire and Retread Operations
- Transpacific Shipping
- Tug Boat Operations
- VOIP Equipment
- Web Conferencing

Investigated the comingling of personal and business funds and assets, the personal use of business funds and the business purpose of expenditures. Analyzed alleged fraudulent conveyances and preferences and investigated and documented indicia of fraud. Analyzed the flow of funds and assets between entities and performed detailed tracing of transactions and documentation of their accounting treatment.

**John L. Hansen, CPA, CFF, CLP, CGMA**

**Class Action, Unfair Competition and Antitrust**

Created and analyzed databases to identify potential class members, dissimilarities among potential class members and evaluation of class representatives. Analyzed if damages may be calculated on a class-wide basis and evaluated potential class damages. Analyzed product pricing, cost of goods sold and cost allocations, valuation, and the financial impact of alleged wrongful conduct on consumers. Consulted on projects involving a variety of industries and circumstances, including:

- Automobile Replacement Parts
- CD and DVD Distribution
- Dental Supplies
- Sporting Event Promotion
- LCD Panels
- Extended Warranty Coverage
- Student Tuition and Fees

- Privacy/Online Advertising
- Professional Athletes
- Professional Sports Leagues
- State Employee Compensation
- Theater Gift Certificates
- Kombucha

**Insurance and Environmental**

Accumulated, analyzed and allocated costs related to environmental investigation and remediation efforts. Analyzed the nature and classification of expenditures, documented expenses and associated proof of payment, and evaluated continuing operational costs. Analyzed damages related to loss of use and business interruption related to environmental contamination. Consulted on environmental projects involving various industries, including:

- Cement Manufacturing
- Electronics
- Gun Ranges
- Lead Shields

- Lock and Keyset Manufacturing
- Port Facilities
- Refineries
- Semiconductor Manufacturing

**Construction and Utility**

Analyzed the impact of delays, disruption and acceleration and the associated costs on construction projects. Investigation, identification and documentation of factors contributing to project schedule impacts and associated costs. Analyzed project accounting and cost documents including contractor bids, budgets, production and productivity, general and administrative and jobsite overhead cost pools and allocations, equipment utilization and rates, materials, labor and changed work. Assessed the financial condition and capitalization of construction contractors. Analyzed working capital, cash flow, operations of related companies, customers and industry conditions. Consulted on construction and utility projects, including:

- Airports
- Apartment Buildings
- Coal-Fired Cogeneration Plant
- Electric Transmission Facilities
- High-Rise Condominiums
- Highways and Roads
- Hotels

- Manufacturing Facilities
- Pipelines
- Port Facilities and Container Cranes
- Pumped Storage Hydroelectric Plant
- Telecommunication Facilities
- Waste Water Treatment Plant
- Wind Farms

Analyzed utility ratemaking and cost of providing service. Analyzed regulatory policies and the resulting contracts with qualifying facilities in California. Reviewed the development of California's standard offer power purchase contracts. Evaluated ratepayer impact of long term fixed price contracts and the impact of transmission constraints on a utility's ability to accept qualifying facility power. Analyzed project viability for alternative energy projects related to the specifics of each project.

**John L. Hansen, CPA, CFF, CLP, CGMA**

**Labor and Employment**

Analysis and assessment of class certification and/or damages related to:

- Company Uniform Policy
- Employee Misclassification
- Expense Reimbursement
- Minimum Wage Violations
- Off-the-Clock Work
- Sales Commission Chargebacks
- Standby Pay
- Unpaid Meal and Rest Breaks

Assisted with analysis of class certification issues and identifying potential class members. Developed models to determine risk exposure and potential damages based on numerous factors, such as employee location, job title and activities performed. Evaluated employee activity based on available company data including computer, phone, card swipe, punch card, payroll and employee schedule data. Analyzed economic offsets to potential damages, including incentive compensation plan payments.

Analyzed and prepared numerous claims related to breach of contract, labor termination, discrimination, personal injury and wrongful death. These engagements have included economic studies of compensation, fringe benefits, retirement and pension plans, stock options, personal consumption, appropriate period of loss, wage escalation and discount rates. Analyzed replacement compensation, including independent consulting ventures and the value of small businesses.

Analyses have related to a variety of industries, including:

- Accounting
- Apparel Retail Sales
- Call Centers
- Commercial Fishing
- Computer Hardware
- Construction
- Consumer Goods
- Healthcare
- Investment Management
- Manufactured Homes
- Oil Refining
- Package Delivery
- Paper Products
- Parking Facilities
- Pharmaceuticals
- Produce Packing
- Real Estate Development
- Semiconductors
- Software
- Telecommunications
- Timeshare Sales
- Television Programming
- Transportation
- Video Game Development
- Wine and Spirits
- Wireless Communications

Performed numerous analyses of labor and related costs and employee cost allocations on commercial damage, construction, business interruption, valuation and increased cost claims, including analysis of labor burdens, benefit costs, salary and compensation plans.

**John L. Hansen, CPA, CFF, CLP, CGMA**

**TESTIMONY**

Testimony in deposition or trial in United States District Court:

- Central District of California
- Eastern District of California
- Northern District of California
- Southern District of California
- District of Delaware
- Northern District of Illinois
- District of Massachusetts
- Eastern District of Michigan
- Western District of Missouri
- District of Nevada
- District of New Jersey
- Southern District of New York
- Middle District of North Carolina
- Western District of Pennsylvania
- Eastern District of Texas
- Western District of Texas
- Western District of Washington

Testimony in United States International Trade Commission

Testimony in deposition or trial in Superior Court of the State of California:

- County of Alameda
- County of Marin
- County of Orange
- County of San Francisco
- County of San Mateo
- County of Santa Clara

Testimony in deposition or trial in State Court:

- Circuit Court of Cook County, Illinois
- Court of Chancery of the State of Delaware
- Superior Court of the State of Arizona in and for the County of Maricopa
- District Court of Collin County, Texas

Declarations and deposition testimony in matters before the Patent Trial and Appeal Board

Testimony in Arbitrations, participation in Mediations and assisted with settlement negotiations


**SELECTED SPEAKING ENGAGEMENTS**

- Continuing Legal Education: Damages (1996)
- Continuing Legal Education: Understanding And Using Financial Information (1997)
- Stanford University: Financial And Ratio Analysis (1997)
- Stanford University: Financial Statement Analysis Case Study (1998)
- Maritime Industry Personal Injury Damages (1998)
- Intellectual Property Section of the Sacramento County Bar: Intellectual Property Damages Update (1999)

**John L. Hansen, CPA, CFF, CLP, CGMA**

- Intellectual Property Section of the Bar Association of San Francisco: Intellectual Property Damages (1999)
- Continuing Legal Education: Accounting And Financial Issues For Lawyers (2001)
- University of California, Hastings College of the Law: Patent Damages (2002)
- Licensing Executives Society Annual Meeting – Chicago: An Update On Patent Damages (2002)
- Stanford University: Financial Statement And Ratio Analysis (2002)
- Santa Clara University School of Law: Patent Damages (2005)
- Licensing Executives Society – Dallas: Recent Developments In Patent Damages (2005)
- Continuing Legal Education, Morgan, Lewis & Bockius LLP: Recent Developments In Patent Damages (2005)
- Santa Clara University School of Law: Intellectual Property Litigation – Damages (2006)
- Continuing Legal Education, McDermott Will & Emery: Presenting Patent Damages / Trial Case Study (2006)
- Santa Clara University School of Law: Patent Infringement Damages (2007)
- Santa Clara University School of Law: Intellectual Property Litigation – Patent Damages Case Study (2007)
- 5th Annual Rocky Mountain Intellectual Property & Technology Institute – Denver: Emerging Patent Valuation and Damages Issues (2007)
- Santa Clara University School of Law: Patent Infringement Damages (2008)
- Continuing Legal Education, McDermott Will & Emery: Section 337 Investigations in the ITC – Role of the Financial/Economic Expert (2008)
- Santa Clara University School of Law: Patent Infringement Damages (2009)
- 7th Annual Rocky Mountain Intellectual Property & Technology Institute – Denver: Damages (2009)
- Stanford University: Fundamentals and Analysis of Construction Accounting and Finance (2010)
- San Mateo County Bar Association: Accounting Principles and Tips for Business Lawyers and Litigators (2010)
- Stanford University: Valuing Intellectual Property and Intangible Assets (2011)
- The Federal Bar Association – San Diego: Patent Damages Law: Life After Lucent, ResQNet and UNILOC (2012)
- Continuing Legal Education, Morgan, Lewis & Bockius LLP: Selecting, Retaining and Working with Experts (2013)
- CalCPA Forensic Services Section: Innovatio IP Ventures Patent Litigation and the Potential Relevance to Non-FRAND Damages Calculations (2014)
- The McCarthy Institute and Hanson Bridgett: New Paradigms in Patent Monetization and Damages (2015)
- Golden Gate University School of Law: Patent Damages (2015)
- Stanford Law School: IP litigation, Patent Damages (2015)
- SFIPLA: Recent Developments in Patent Damages (2015)
- The Bar Association of San Francisco: IP BYTES: Hot Topics in Trademark, Disgorgement of Defendants' Profits (2015)
- Golden Gate University School of Law: Patent Damages (April 2016)
- Golden Gate University School of Law: Patent Damages (September 2016)

**John L. Hansen, CPA, CFF, CLP, CGMA**

- Stanford University: CEE 244 Accounting, Finance & Valuation for Engineers and Constructors / Revenue Recognition, Equipment Costs and Fixed Asset Accounting (November 2018)
- University of California, Hastings College of the Law: Patent Damages (November 2018)
- Stanford University, Saudi Industrial Development Fund Business Management Program: Valuation of Companies and Assets (August 2019)
- University of California, Hastings College of the Law: Patent Law (Law 505), Patent Damages (November 2019)
- University of California, Hastings College of the Law: Patent Damages (November 2020)
- Golden Gate University School of Law: Patent Damages (April 2021)
- Santa Clara University, Business Law: Intellectual Property Damages (November 2021)
- University of California, Hastings College of the Law: Patent Damages (November 2021)

**PUBLICATIONS**

Hansen, John L., "Appendix A, Damages," <u>Maritime Personal Injury Defense</u>, March 1999, pp. 127-137 (by James R. Walsh and Robert A. Bleicher)

**John L. Hansen, CPA, CFF, CLP, CGMA**
**Testimony – Last 4 Years**                                    **Attachment 2**

| | |
|---|---|
| Ahern Rentals, Inc. v. *EquipmentShare.com Inc, et al.*  United States District Court for the Western District of Missouri (Federal MDL); District Court of Collin County, Texas (Texas MDL) | Deposition: November 2022 |
| ImmerVision, Inc. v. *LG Electronics U.S.A., Inc. and LG Electronics, Inc.*  United States District Court for the District of Delaware | Deposition: June 2022 |
| Ahern Rentals, Inc. *v. EquipmentShare.com Inc. and Deral Bonner, et al.*  Superior Court of the State of Arizona in and for the County of Maricopa | Deposition: June 2022 |
| Tortilla Factory, LLC v. *GT's Living Foods, LLC*  United States District Court for the Central District of California | Trial: June 2022<br>Deposition: September 2019<br>Deposition: May 2019 |
| Palantir Technologies Inc. v. *Marc L. Abramowitz*  United States District Court for the Northern District of California | Deposition: May 2022 |
| Pegasystems Inc., Plaintiff/Counterclaim Defendant v. *Appian Corporation, Defendant/Counterclaim Plaintiff* and Business Process Management, Inc., Defendant  United States District Court for the District of Massachusetts | Deposition: April 2022 |
| Uptown Newport Jamboree, LLC, Plaintiff and Cross-Defendant v. *Newport Fab, LLC d/b/a Jazz Semiconductor, Defendant and Cross-Complainant*  Superior Court of the State of California, for the County of Orange | Deposition: February 2022 |
| *Chemours Company FC, LLC* v. Daikin Industries, Ltd. and Daikin America, Inc.  United States District Court for the District of Delaware | Deposition: January 2022 |
| Branch Banking and Trust Company v. *Hitachi Vantara Corporation*  United States District Court for the Middle District of North Carolina | Deposition: January 2022 |
| Asetek Danmark A/S, Plaintiff and Counter-Defendant v. *CoolIT Systems, Inc., Defendant and Counter-Claimant*  United States District Court for the Northern District of California | Deposition: January 2022 |

**John L. Hansen, CPA, CFF, CLP, CGMA**
**Testimony – Last 4 Years**                                    **Attachment 2**

| | |
|---|---|
| Thomas A. Shields, et al. v. *Fédération Internationale de Natation (FINA)*  United States District Court for the Northern District of California | Deposition: September 2021 |
| Total Recall Technologies *v. Palmer Luckey and Facebook Technologies, LLC (f/n/a Oculus VR, LLC)*  United States District Court for the Central District of California | Deposition: August 2021<br>Deposition: November 2020 |
| Delaney Sharpe, et al., on Behalf of Themselves and all Others Similarly Situated v. *GTs Living Foods, LLC*  United States District Court for the Central District of California | Deposition: July 2021 |
| AdTrader, Inc., et al. v. *Google LLC*  United States District Court for the Northern District of California | Deposition: July 2021 |
| Ahern Rentals, Inc. *v. EquipmentShare.com Inc. and Christina Gutierrez, et al.*  Superior Court of the State of Arizona in and for the County of Maricopa | Deposition: February 2021 |
| *Freedom Debt Relief, LLC* v. Accredited Debt Relief, LLC and Accredited Debt Relief, LLC v. *Freedom Debt Relief, LLC*<br>Superior Court of the State of California, County of San Mateo | Deposition: August 2020 |
| Realtime Adaptive Streaming LLC v. *Google LLC and YouTube, LLC*  United States District Court for the Central District of California | Deposition: October 2019 |
| Harold H. Robinson v. *Jennifer M. Johnson, SilverBelt Investments, LLC and SilverBelt Holdings, LLC*  Superior Court of the State of California, County of San Francisco | Deposition: September 2019 |
| GearSource Holdings, LLC v. *Google LLC*  United States District Court for the Northern District of California | Deposition: June 2019 |
| *Ezaki Glico Kabushiki Kaisha and Ezaki Glico USA Corporation* v. Lotte International America Corp. and Lotte Confectionary Co. Ltd. United States District Court for the District of New Jersey | Deposition: May 2019 |
| SIMO Holdings Inc. v. *Hong Kong uCloudlink Network Technology Limited and uCloudlink (America), Ltd.*  United States District Court for the Southern District of New York | Trial: May 2019<br>Deposition: February 2019 |

# John L. Hansen, CPA, CFF, CLP, CGMA
# Testimony – Last 4 Years

**Attachment 2**

| | |
|---|---|
| Daikin Industries Ltd. and Daikin America, Inc. v. *The Chemours Company FC, LLC*  United States Patent and Trademark Office, before the Patent Trial and Appeal Board, Cases: IPR2018-00992 and IPR2018-00993 | Deposition: April 2019 |
| DealDash Oyj and DealDash Inc. v. *ContextLogic Inc. d/b/a Wish* United States District Court for the Northern District of California | Deposition: April 2019 |
| Blue Spike LLC, Blue Spike International Ltd., and Wistaria Trading Ltd. v. *VIZIO, Inc.*  United States District Court for the Southern District of California | Deposition: April 2019 |
| Mondis Technology Ltd. v. *LG Electronics, Inc. and LG Electronics U.S.A., Inc.*  United States District Court for the District of New Jersey | Trial: April 2019<br>Hearing: March 2019<br>Deposition: April 2018 |
| *The Renco Group, Inc.* v. MacAndrews AMG Holdings LLC, MacAndrews & Forbes Holdings Inc., Ronald Perelman, and AM General Holdings LLC  Court of Chancery of the State of Delaware | Deposition: December 2018 |

\* *Italics* denote client.
\*\* Mr. Hansen is a licensed CPA in California only.  Neither Mr. Hansen nor TM Financial Forensics, LLC, an HKA Company, provide audit or attest services, in this or any other state.

**Documents Considered**                                          **Attachment 3.U**

**Documents Received After Opening Expert Report (December 9, 2022)**

| Beginning Bates | | Ending Bates |
| --- | --- | --- |
| USC000017397 | - | USC000017446 |
| USC000026374 | - | USC000026397 |
| USC000039141 | - | USC000039141 |
| USC000127089 | - | USC000127091 |
| USC000130360 | - | USC000130369 |
| USC000133302 | - | USC000133302 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Documents Considered**                                                    Attachment 3.U

**Documents Received After Opening Expert Report (December 9, 2022)**

| Depositions | Date |
|---|---|
| ● Errata to the 30(b)(6) Deposition of Andrew Stott (Vice Provost for Academic Programs at USC) | 10/13/2022 |

| Expert Reports | Date |
|---|---|
| ● Report of Hal J. Singer, Ph.D. and Appendices and Workpapers | 12/9/2022 |
| ● Materials Relied Upon in the Report of Hal J. Singer, Ph.D. and Appendices and Workpapers | 12/9/2022 |

| Legal Filings | Date |
|---|---|
| ● Plaintiffs' Notice of Initial Expert Disclosure and Report | 12/9/2022 |
| ● Defendants' Initial Expert Disclosure | 12/9/2022 |

**Websites**

- https://catalogue.usc.edu/content.php?catoid=11&navoid=3681
- https://www.cdc.gov/mmwr/volumes/69/wr/mm6935a2.htm
- https://catalogue.usc.edu/content.php?catoid=6&navoid=1488
- https://catalogue.usc.edu/content.php?catoid=7&navoid=1762
- https://catalogue.usc.edu/content.php?catoid=8&navoid=2383
- https://catalogue.usc.edu/content.php?catoid=12&navoid=4239
- https://www.tc.columbia.edu/articles/2020/march/update-on-covid-19---extending-online-courses-and-remote-work-pilot/
- https://humanities.uchicago.edu/articles/2020/03/university-chicago-transitioning-remote-learning-spring-quarter
- https://president.tufts.edu/news/2020/03/10/covid-19-update-significant-and-immediate-changes-to-tufts-operations/
- https://www.bc.edu/bc-web/schools/ssw/about/bcssw-news/2020/what-you-need-to-know-about-covid-19.html
- https://coronavirus.duke.edu/2020/03/community-update-changes-to-spring-break-and-classes-new-travel-restrictions/
- https://penntoday.upenn.edu/announcements/coronavirus-and-important-changes-our-operations-remainder-semester
- https://gwtoday.gwu.edu/important-covid-19-message-president-leblanc
- https://healthy.brown.edu/updates/brown-campus-brown-transition-remote-learning-and-limited-campus-housing
- https://www.brandeis.edu/president/letters/2020-03-13-covid-19-important-community-update.html
- https://www.cmu.edu/leadership/president/campus-comms/2020/2020-03-11.html
- https://tulane.edu/tulane-university-moves-online-instruction-cancels-large-events
- https://statements.cornell.edu/2020/20200313-5MTe7Z-update-on-classes.cfm
- https://www.northwestern.edu/coronavirus-covid-19-updates/history/developments/stay-at-home-order.html
- https://www.georgetown.edu/news/covid-19-update-flexibilities-to-assist-undergraduate-students-during-spring-2020-remote-learning/
- https://www.bu.edu/articles/2020/bu-all-classes-online-coronavirus/
- https://www.rochester.edu/coronavirus-update/leadership-message-to-university-of-rochester-community/
- https://www.timesunion.com/news/article/RPI-suspends-in-person-instruction-moves-classes-15120447.php
- https://hub.jhu.edu/2020/03/10/hopkins-coronavirus-online-instruction-spring-break/
- https://yalecollege.yale.edu/moving-classes-online-and-other-important-information-related-covid-19-response-march-10-2020
- https://source.wustl.edu/2020/03/coronavirus-alters-washington-university-history/
- https://covid.nd.edu/news/father-jenkins-in-person-classes-suspended-moved-online/
- https://together.caltech.edu/updates/general/3132020
- https://news.syr.edu/blog/2020/03/10/residential-instruction-suspended-effective-end-of-day-friday-march-13-university-to-transition-to-online-learn
- https://covid-19.mit.edu/update-from-president-l-rafael-reif-to-the-mit-community
- https://www.nyu.edu/about/news-publications/news/2020/march/important-new-coronavirus-related-measures-and-restrictions--and.html
- https://healthalerts.stanford.edu/covid-19/2020/03/10/spring-quarter-update/
- https://news.emory.edu/stories/2020/03/coronavirus_remote_learning/campus.html
- https://news.harvard.edu/gazette/story/2020/03/harvard-offers-coronavirus-resources-and-help-guides/
- https://www.princeton.edu/news/2020/03/22/princeton-resume-classes-teaching-remotely-and-continues-support-community-wherever
- https://www.vanderbilt.edu/healthwellness/2020/03/11/community-alternative-education/
- https://case.edu/covid19/university-communications/moving-remote-delivery-courses-information-students-living-campus
- https://coronavirus.rice.edu/news/message-faculty-classes-moving-remote-delivery-march-23

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

**Summary of USC Undergraduate and Graduate Tuition by Academic Year**    **Attachment 11**

| | Undergraduate | | Graduate | |
| --- | --- | --- | --- | --- |
| **Academic Year** | **Semester Tuition (12-18 Units)** | **Percentage Growth** | **Semester Tuition (15-18 Units)** | **Percentage Growth** |
| 2016-2017[1] | $ 25,721 | N/A | $ 25,721 | N/A |
| 2017-2018[2] | 26,724 | 3.9% | 26,724 | 3.9% |
| 2018-2019[3] | 27,660 | 3.5% | 27,660 | 3.5% |
| 2019-2020[4] | 28,628 | 3.5% | 28,628 | 3.5% |
| 2020-2021[5] | 29,630 | 3.5% | 29,630 | 3.5% |

**Notes**:

[1]  University of Southern California 2016-2017 Archived Catalogue, Tuition and Fees: <https://catalogue.usc.edu/content.php?catoid=6&navoid=1488>.

[2]  University of Southern California 2017-2018 Archived Catalogue, Tuition and Fees: <https://catalogue.usc.edu/content.php?catoid=7&navoid=1762>.

[3]  University of Southern California 2018-2019 Archived Catalogue, Tuition and Fees: <https://catalogue.usc.edu/content.php?catoid=8&navoid=2383>.

[4]  University of Southern California 2019-2020 Archived Catalogue, Tuition and Fees: <https://catalogue.usc.edu/content.php?catoid=11&navoid=3681>.

[5]  University of Southern California 2020-2021 Archived Catalogue, Tuition and Fees: <https://catalogue.usc.edu/content.php?catoid=12&navoid=4239>.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Summary of University of Southern California Undergraduate and Graduate Retention Rates by Calendar Year**[1],[2]    **Attachment 12**

| | Undergraduate | | | Graduate | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | *A* | *B* | *C = B / A* | *D* | *E* | *F = E / D* | *G = A + D* | *H = B + E* | *I = H / G* |
| **Calendar Year** | **Spring Enrollment** | **Fall Enrollment** | **Retention Rate** | **Spring Enrollment** | **Fall Enrollment** | **Retention Rate** | **Spring Enrollment** | **Fall Enrollment** | **Retention Rate** |
| 2017 | 14,472 | 13,750 | 95.0% | 15,904 | 14,726 | 92.6% | 30,376 | 28,476 | 93.7% |
| 2018 | 14,867 | 14,282 | 96.1% | 16,694 | 15,605 | 93.5% | 31,561 | 29,887 | 94.7% |
| 2019 | 15,639 | 15,069 | 96.4% | 17,335 | 16,268 | 93.8% | 32,974 | 31,337 | 95.0% |
| 2020 | 15,547 | 14,274 | 91.8% | 16,927 | 15,910 | 94.0% | 32,474 | 30,184 | 92.9% |
| 2021 | 15,298 | 14,681 | 96.0% | 17,024 | 15,940 | 93.6% | 32,322 | 30,621 | 94.7% |

**Notes**:

[1]    Continuation Data from Spring to Fall, Calendar Years 2017-2021: USC000133302.

[2]    Semester enrollment counts represent enrolled degree-seeking students who did not graduate and continued their education at USC the following semester. For example, in Spring 2017, there were 14,472 enrolled degree-seeking undergraduate students (who did not graduate in Spring 2017 or Summer 2017), of which 13,750 (95.0%) continued their enrollment in the Fall 2017 semester.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Summary of USC Identified Peer Universities**
**Transition to Remote Education During Spring 2020**

| | Institution[1] | Transitioned to Remote Education | Source |
|---|---|---|---|
| 1. | Columbia University | Yes | https://www.tc.columbia.edu/articles/2020/march/update-on-covid-19---extending-online-courses-and-remote-work-pilot/ |
| 2. | University of Chicago | Yes | https://humanities.uchicago.edu/articles/2020/03/university-chicago-transitioning-remote-learning-spring-quarter |
| 3. | Tufts University | Yes | https://president.tufts.edu/news/2020/03/10/covid-19-update-significant-and-immediate-changes-to-tufts-operations/ |
| 4. | Boston College | Yes | https://www.bc.edu/bc-web/schools/ssw/about/bcssw-news/2020/what-you-need-to-know-about-covid-19.html |
| 5. | Duke University | Yes | https://coronavirus.duke.edu/2020/03/community-update-changes-to-spring-break-and-classes-new-travel-restrictions/ |
| 6. | University of Pennsylvania | Yes | https://penntoday.upenn.edu/announcements/coronavirus-and-important-changes-our-operations-remainder-semester |
| 7. | George Washington University | Yes | https://gwtoday.gwu.edu/important-covid-19-message-president-leblanc |
| 8. | Brown University | Yes | https://healthy.brown.edu/updates/brown-campus-brown-transition-remote-learning-and-limited-campus-housing |
| 9. | Brandeis University | Yes | https://brandeis.edu/president/letters/2020-03-13-covid-19-important-community-update.html |
| 10. | Carnegie Mellon University | Yes | https://www.cmu.edu/leadership/president/campus-comms/2020/2020-03-11.html |
| 11. | Tulane University | Yes | https://tulane.edu/tulane-university-moves-online-instruction-cancels-large-events |
| 12. | Cornell University | Yes | https://statements.cornell.edu/2020/20200313-5MTe7Z-update-on-classes.cfm |
| 13. | Northwestern University | Yes | https://www.northwestern.edu/coronavirus-covid-19-updates/history/developments/stay-at-home-order.html |
| 14. | Georgetown University | Yes | https://www.georgetown.edu/news/covid-19-update-flexibilities-to-assist-undergraduate-students-during-spring-2020-remote-learning/ |
| 15. | Boston University | Yes | https://www.bu.edu/articles/2020/bu-all-classes-online-coronavirus/ |
| 16. | University of Rochester | Yes | https://www.rochester.edu/coronavirus-update/leadership-message-to-university-of-rochester-community/ |
| 17. | Rensselaer Polytechnic Institute | Yes | https://www.timesunion.com/news/article/RPI-suspends-in-person-instruction-moves-classes-15120447.php |
| 18. | Johns Hopkins University | Yes | https://hub.jhu.edu/2020/03/10/hopkins-coronavirus-online-instruction-spring-break/ |
| 19. | Yale University | Yes | https://yalecollege.yale.edu/moving-classes-online-and-other-important-information-related-covid-19-response-march-10-2020 |
| 20. | Washington University | Yes | https://source.wustl.edu/2020/03/coronavirus-alters-washington-university-history/ |
| 21. | University of Notre Dame | Yes | https://covid.nd.edu/news/father-jenkins-in-person-classes-suspended-moved-online/ |
| 22. | California Institute of Technology | Yes | https://together.caltech.edu/updates/general/3132020 |
| 23. | Syracuse University | Yes | https://news.syr.edu/blog/2020/03/10/residential-instruction-suspended-effective-end-of-day-friday-march-13-university-to-transition-to-online-learning/ |
| 24. | Massachusetts Institute of Technology | Yes | https://covid-19.mit.edu/update-from-president-l-rafael-reif-to-the-mit-community |
| 25. | New York University | Yes | https://www.nyu.edu/about/news-publications/news/2020/march/important-new-coronavirus-related-measures-and-restrictions--and.html |
| 26. | Stanford University | Yes | https://healthalerts.stanford.edu/covid-19/2020/03/10/spring-quarter-update/ |
| 27. | Emory University | Yes | https://news.emory.edu/stories/2020/03/coronavirus_remote_learning/campus.html |
| 28. | Harvard University | Yes | https://news.harvard.edu/gazette/story/2020/03/harvard-offers-coronavirus-resources-and-help-guides/ |
| 29. | Princeton University | Yes | https://www.princeton.edu/news/2020/03/22/princeton-resume-classes-teaching-remotely-and-continues-support-community-wherever |
| 30. | Vanderbilt University | Yes | https://www.vanderbilt.edu/healthwellness/2020/03/11/community-alternative-education/ |
| 31. | Case Western Reserve University | Yes | https://case.edu/covid19/university-communications/moving-remote-delivery-courses-information-students-living-campus |
| 32. | Rice University | Yes | https://coronavirus.rice.edu/news/message-faculty-classes-moving-remote-delivery-march-23 |

**Note**:

[1]    Each institution is identified by the University of Southern California as a "Peer University." *See:*  Undergraduate Tuition and Mandatory Fees for Selected Peer Universities, 2017-18 and 2018-19: USC000027946-28107 (at 959).

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

**Robert Lee Calvert**                                                        **Attachment 14**
**Summary of Spring 2020 USC Account Itemization**

| Transaction Date | Description | Charge Amount[1] | Payment/Refund Amount[2] | Cumulative Balance |
|---|---|---|---|---|
| 11/25/2019 | Undergraduate Tuition Sp2020 | $ 28,628.00 | $ - | $ 28,628.00 |
| 11/25/2019 | N. Topping Student Aid Fund Sp2020 | 8.00 | - | 28,636.00 |
| 11/25/2019 | Student Health Fee Sp2020 | 366.00 | - | 29,002.00 |
| 11/25/2019 | Student Programming Fee - Sp2020 | 64.00 | - | 29,066.00 |
| 11/25/2019 | Tuition Refund Insurance Sp2020 | 119.17 | - | 29,185.17 |
| ▮▮▮ | ▮▮▮▮ | | | ▮▮▮ |
| ▮▮ | ▮▮▮▮ | | ▮▮▮▮ | |
| **Spring 2020 Total** | | **$ 29,185.17** | **$ (29,185.17)** | |

**Notes**:

[1]   University of Southern California Payment Summary dated 12/07/2019 for Calvert, Robert, Lee: USC000017405-406 (at 405).

[2]   University of Southern California Payment Summary dated 01/11/2020 for Calvert, Robert, Lee: USC000017407-408 (at 407). A Bank Card Payment in the amount of $25 dated 12/10/2019 has not been included in this summary as it relates to a Health Center Invoice charge dated 10/8/2019. *See:* University of Southern California Payment Summary dated 11/02/2019 for Calvert, Robert, Lee: USC000017403-404 (at 403).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY